## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| *versus* | § | **CRIMINAL NO. H-10-459** |
| | § | |
| **WILMAR RENE DURAN-GOMEZ** | § | |

## MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY; REQUEST FOR A HEARING, AND FOR OTHER MISCELLANEOUS RELIEF – BASED UPON GEOGRAPHIC, RACIAL AND FUNDING DISPARITIES IN THE SOUTHERN DISTRICT OF TEXAS AND HARRIS COUNTY (HOUSTON, TEXAS)

**TO THE HONORABLE JUDGE HOYT:**

**COMES NOW WILMAR RENE DURAN-GOMEZ,** by and through his attorneys of record, Wendell A. Odom, Jr. and Neal Davis, III, and respectfully requests, pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, an evidentiary hearing on his below claims, and thereafter, an order striking the Notice of Intent to Seek the Death Penalty, and declaring that the Federal Death Penalty as unconstitutionally arbitrary in the Southern District of Texas, and/or Harris County (Houston, Texas), based upon the demonstrated and highly significant geographical, racial and funding disparities.

The following is set forth in support:

## I.    <u>INTRODUCTION</u>

Mr. Duran Gomez is a Hispanic defendant indicted in the Southern District of Texas, Houston Division, for charges that carry a possible death sentence. The Attorney General of the United States has authorized a capital prosecution, and a *Notice of Intent to Seek the Death Penalty* was filed on October 4, 2012 (Doc. 137). His trial will be in the Houston Division. This motion sets forth very compelling and disturbing geographical, racial and funding disparities between the Southern District of Texas and Houston compared to the rest of the Nation. Mr. Duran Gomez seeks an evidentiary hearing to more fully develop these claims, in order to demonstrate that the death penalty is unconstitutionally arbitrary, in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution. .

## II.    <u>GEOGRAPHICAL DISPARITIES</u>

> "Clearly, the death penalty is not evenly distributed across the country. Texas, for example, has the well-deserved reputation as the capital of capital punishment".
>
> *The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases At Enormous Costs to All*; Death Penalty Information Center (2013)[1]

The State of Texas has executed 542 people since *Furman* was decided, almost four (4) times as many as its closest competitor(s), and more than the next **six** States **combined**: Oklahoma, (112), Virginia (112), Florida (92), Missouri (88), Georgia (70) and Alabama (59). *See*, https://deathpenaltyinfo.org/number-executions-state-and-region-1976.

### 1. **HARRIS COUNTY (Houston, Texas)**

In his dissenting opinion in *Glossip v. Gross*, Justice Breyer noted that "[g]eography also plays an important role in determining who is sentenced to death. And that is not simply because some States permit the death penalty while others do not. Rather *within* a death penalty state, **the**

---

[1]    www.deathpenaltyinfo.org

imposition of the death penalty heavily depends on the county in which a defendant is tried". *Glossip v. Gross*, 135 S. Ct. 2726, 2761, 192 L. Ed. 2d 761, 800 (2015) (Justice Breyer, dissenting, joined by Ginsburg)(emphasis added). Even more clearly than Texas' dubious distinction of being the "capital of capital punishment", *supra*, Harris County is unequivocally the single most prolific death-county in the nation.

### 1. Harris County leads the nation in executions since 1976

Since the death penalty was resurrected in 1976, more defendants from Harris County have been executed **than any other county in the nation,** more than doubling the second place finisher, Dallas County (56). The following chart is current as of January 1, 2013:



Source: Death Penalty Information Center (data current as of 1/1/13),

https://deathpenaltyinfo.org.

Since the above chart was created, updated data shows that Harris County's total has risen to 127, Dallas County's to 56, Tarrant County's to 40, Bexar County's to 43, Nueces County's to 16, Jefferson County's to 16, and Montgomery County has a corrected total of 15[2]. The updated data also suggests that Smith County, with 12, may well also now be in the top 15 counties nationwide[3].

"The combination of aggressive use of the death penalty and systemic abuses in Harris County has been well documented. Racial disparities, flawed forensic science, and other injustices in the death penalty paralleled **its reputation as the county that exceeded not only every other county in the country but also every state (except Texas itself)** in executions". *See*, *The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases At Enormous Costs to All*, A Report from the Death Penalty Information Center by Richard C. Dieter, Executive Director (October 2013)(emphasis added).

### 2.   Harris County is second in the Nation in its current death row

Further, Harris County is second only to Los Angeles County in its current death row population:

---

[2]   http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html.

[3]   As of January 1, 2013, Maricopa and Pima Counties, in Arizona, were tied with 3 Texas Counties for 11th, with 11 executions each. Arizona has only executed 3 people since that date, so Smith County, now with 12, may be within the top 15 at this time.



Source: Death Penalty Information Center (data current as of 1/1/13),

https://deathpenaltyinfo.org

### 3.  Harris County leads the Nation in <u>female</u> executions

Harris County's bloodlust is also clearly evident from its distinction of being the **only county in the United States to have executed more than two females**. In fact, only Oklahoma County, Oklahoma - with two - has executed more than one. A clear majority of jurisdictions with the death penalty have **never** in modern times executed a female. **Of 31 states that permit capital punishment[4], 23 have never executed a female**. The Federal government has not, nor has the military. Of those jurisdictions that have, Georgia (1), Arkansas (1), Alabama (1), Virginia (1), North Carolina (1) have only executed one female in modern times. Florida (2) has

---

[4]  According to the most recent data from the Death Penalty Information Center, those States are: Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. The United States Government and the Military also permit the death penalty.

executed two, and Oklahoma (3) has executed three. Harris County alone has three females who have been executed, meaning that **Harris County has secured the execution of more females not just than any county in the nation, but also, any state, save Oklahoma, which it tied**. Texas leads the nation amongst all states with six (6) female executions. The following chart illustrates all modern female executions in the United States:

| Date ▲ | Name | Age | Sex | Race | Number, Race, and Sex of Victims | State | County | Region | Method | Juvenile | Federal | Volunteer | Foreign National |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/02/84 | Velma Barfield | 52 | f | White | 1 White Male(s) | NC | Robeson | S | Lethal Injection | No | No | No | No |
| 02/03/98 | Karla Tucker | 38 | f | White | 1 White Male(s)<br>1 White Female(s) | TX | Harris | S | Lethal Injection | No | No | No | No |
| 03/30/98 | Judy Buenono | 54 | f | White | 1 White Male(s) | FL | Orange | S | Electrocution | No | No | No | No |
| 02/24/00 | Betty Beets | 62 | f | White | 1 White Male(s) | TX | Henderson | S | Lethal Injection | No | No | No | No |
| 05/02/00 | Christina Riggs | 28 | f | White | 1 White Male(s)<br>1 White Female(s) | AR | Pulaski | S | Lethal Injection | No | No | Yes | No |
| 01/11/01 | Wanda Allen | 41 | f | Black | 1 Black Male(s) | OK | Oklahoma | S | Lethal Injection | No | No | No | No |
| 05/01/01 | Marilyn Plantz | 40 | f | White | 1 White Male(s) | OK | Oklahoma | S | Lethal Injection | No | No | No | No |
| 12/04/01 | Lois Smith | 61 | f | White | 1 White Female(s) | OK | Sequoyah | S | Lethal Injection | No | No | No | No |
| 05/10/02 | Lynda Block | 54 | f | White | 1 White Male(s) | AL | Lee | S | Electrocution | No | No | Yes | No |
| 10/09/02 | Aileen Wuornos | 46 | f | White | 1 White Male(s) | FL | Volusia | S | Lethal Injection | No | No | Yes | No |
| 09/14/05 | Frances Newton | 40 | f | Black | 2 Black Male(s)<br>1 Black Female(s) | TX | Harris | S | Lethal Injection | No | No | No | No |
| 09/23/10 | Teresa Lewis | 41 | f | White | 2 White Male(s) | VA | Pittsylvania | S | Lethal Injection | No | No | No | No |
| 06/26/13 | Kimberly McCarthy | 52 | f | Black | 1 White Female(s) | TX | Dallas | S | Lethal Injection | No | No | No | No |
| 02/05/14 | Suzanne Basso | 59 | f | White | 1 White Male(s) | TX | Harris | S | Lethal Injection | No | No | No | No |
| 09/17/14 | Lisa Coleman | 38 | f | Black | 1 Black Male(s) | TX | Tarrant | S | Lethal Injection | No | No | No | No |
| 09/30/15 | Kelly Gissendaner | 47 | f | White | 1 White Male(s) | GA | Gwinnett | S | Lethal Injection | No | No | No | No |

Source: Death Penalty Information Center, https://deathpenaltyinfo.org

### 4.  Harris County is second in the Nation in <u>juvenile offender</u> executions

Another highly significant and disturbing disparity concerns Harris County (and Texas') treatment of **juvenile** offenders. Of twenty-two (22) executions of juvenile offenders in modern times, Texas overwhelmingly leads the nation with thirteen (13), or 59%[5], **and Harris County is one of the only two counties in the nation to have executed more than one juvenile offender**.

---

[5]      The execution of Texas juvenile offenders by Counties is as follows: Potter (3), Harris (2), Brazos (1), Behar (1), Hays (1), Montgomery (1), Orange (1), Smith (1), Gregg (1) and Dallas (1). The remaining executions throughout the Nation are: Richland, South Carolina (1), Lafayette, Louisiana (1), St. Louis, Missouri (1), Liberty, Georgia (1), Fairfax (1), Middlesex (1) and Greene (1), Virginia, and Creek (1) and Oklahoma (1), Oklahoma.

A clear majority of jurisdictions with the death penalty have **never** in modern times executed a juvenile offender. **Of the 31 states that permit capital punishment, 24 have never done so**. The Federal government has not. Nor has the military. Only seven states have in modern times executed a juvenile offender. Of those jurisdictions which have, Harris County alone has two juvenile offenders who have been executed, meaning that **Harris County has secured the execution of more juveniles than any other <u>state</u> in the nation, trailing only Potter County, Texas, which has three.** Juvenile offender executions in the modern era are set forth in the following chart:

| Date ▲ | Name | Age | Sex | Race | Number, Race, and Sex of Victims | State | County | Region | Method | Juvenile | Federal | Volunteer | Foreign National |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/11/85 | Charles Rumbaugh | 28 | m | White | 1 White Male(s) | TX | Potter | S | Lethal Injection | Yes | No | Yes | No |
| 01/10/86 | James Roach | 25 | m | White | 1 White Male(s) 1 White Female(s) | SC | Richland | S | Electrocution | Yes | No | No | No |
| 05/15/86 | Jay Pinkerton | 24 | m | White | 2 White Female(s) | TX | Potter | S | Lethal Injection | Yes | No | No | No |
| 05/18/90 | Dalton Prejean | 30 | m | Black | 1 White Male(s) | LA | Lafayette Parish | S | Electrocution | Yes | No | No | No |
| 02/11/92 | Johnny Garrett | 28 | m | White | 1 White Female(s) | TX | Potter | S | Lethal Injection | Yes | No | No | No |
| 07/01/93 | Curtis Harris | 31 | m | Black | 1 White Male(s) | TX | Brazos | S | Lethal Injection | Yes | No | No | No |
| 07/28/93 | Frederick Lashley | 29 | m | Black | 1 Black Female(s) | MO | St. Louis City | M | Lethal Injection | Yes | No | No | No |
| 08/24/93 | Ruben Cantu | 26 | m | Latino | 1 Latino Male(s) | TX | Bexar | S | Lethal Injection | Yes | No | No | No |
| 12/07/93 | Christopher Burger | 33 | m | White | 1 White Male(s) | GA | Liberty | S | Electrocution | Yes | No | No | No |
| 04/22/98 | Joseph Cannon | 38 | m | White | 1 White Female(s) | TX | Hays | S | Lethal Injection | Yes | No | No | No |
| 05/18/98 | Robert Carter | 34 | m | Black | 1 Latino Female(s) | TX | Harris | S | Lethal Injection | Yes | No | No | No |
| 10/14/98 | Dwayne Wright | 24 | m | Black | 1 Black Female(s) | VA | Fairfax City | S | Lethal Injection | Yes | No | No | No |
| 02/04/99 | Sean Sellers | 29 | m | White | 2 White Male(s) 1 White Female of | OK | Oklahoma | S | Lethal Injection | Yes | No | No | No |
| 01/10/00 | Douglas Thomas | 26 | m | White | 2 White Male(s) | VA | Middlesex | S | Lethal Injection | Yes | No | No | No |
| 01/13/00 | Steven Roach | 23 | m | White | 1 White Female(s) | VA | Greene | S | Lethal Injection | Yes | No | No | No |
| 01/25/00 | Glenn McGinnis | 27 | m | Black | 1 White Female(s) | TX | Montgomery | S | Lethal Injection | Yes | No | No | No |
| 06/22/00 | Shaka Sankofa (Gary Graham) | 36 | m | Black | 1 White Male(s) | TX | Orange | S | Lethal Injection | Yes | No | No | No |
| 10/22/01 | Gerald Mitchell | 33 | m | Black | 1 White Male(s) | TX | Harris | S | Lethal Injection | Yes | No | No | No |
| 05/28/02 | Napoleon Beazley | 25 | m | Black | 1 White Male(s) | TX | Smith | S | Lethal Injection | Yes | No | No | No |
| 08/08/02 | T.J. Jones | 25 | m | Black | 1 White Male(s) | TX | Gregg | S | Lethal Injection | Yes | No | No | No |
| 08/28/02 | Toronto Patterson | 27 | m | Black | 3 Black Female(s) | TX | Dallas | S | Lethal Injection | Yes | No | No | No |
| 04/03/03 | Scott Hain | 32 | m | White | 1 White Male(s) 1 White Female(s) | OK | Creek | S | Lethal Injection | Yes | No | No | No |

## 2.   THE SOUTHERN DISTRICT OF TEXAS

As discussed above, four of the top 15 counties in the country who have executed people are within the Southern District of Texas, led by Harris County, *to wit*: Harris (127),

Montgomery (15), Nueces (16), and Brazos (12)[6].

Of the 1454 total state executions post-*Furman*[7], these four counties have accounted for 170, or almost 12% of all executions. Additionally, Cameron, Galveston and Brazoria Counties, also within the Southern District, are within the top 2% of counties nationwide, having executed six, six, and four individuals respectively[8]. *See, The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases At Enormous Costs to All*, A Report from the Death Penalty Information Center by Richard C. Dieter, Executive Director (October 2013). Further, since the Death Penalty Information Center Report only tracked the top 2% of counties nationwide, it was necessary to research other sources of information concerning counties that were not part of the top 2%. That analysis revealed that other Counties within the Southern District executed at least twenty one (21) people[9], bringing the grand total to at least 206, or 14% of all executions.

Given the fact that there are ninety four (94) Federal Districts, **it is truly astonishing that a full one in seven (1 in 7) modern executions have come from the counties within a single Federal district** - the Southern District of Texas.

---

[6]     http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html

[7]     https://deathpenaltyinfo.org/number-executions-state-and-region-1976

[8]     The FDIC report only tracked the top 2% of Counties nationwide.

[9]     See, http://www.tdcj.state.tx.us/death_row/dr_county_conviction_executed.html

### 3.  NATIONAL DISPARITIES GENERALLY

On September 12, 2000, the Department of Justice released a comprehensive study that detailed how the modern federal death penalty had been administered for the twelve-year period from its inception in 1988 to the summer of 2000.[10] Consistent with the historical roots of the death penalty, twelve of the nineteen defendants on federal death row at the time of the DOJ Study had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece.   No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[11]

**The study found a regional bias in the enforcement of the federal death penalty**. The DOJ Study revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had **ever** submitted a case recommending capital prosecution.  (DOJ Study at 14.)[12]

- Twenty-two federal districts had **never** submitted a case for review at all.[13]  (DOJ

---

[10]    The Department filed a supplemental report on June 6, 2001 after the change in administration. Additionally, on June 7, 2007, the Justice Department transmitted statistics and more recent findings on the administration of the federal death penalty to Senator Feingold in preparation for oversight hearings.

[11]    In terms of percentages across the board, the race and region figures have not changed appreciably in the 17 years since the 2000 DOJ Study's release.

[12]    As of the present time, there are still 23 of the 94 federal districts that have never had an authorized capital case. This includes entire districts in California, Alabama, Minnesota, Delaware, the Eastern and Western Districts of Washington, Nebraska, Oklahoma, and the Eastern and Western Districts of Wisconsin, South Dakota, Utah, Wyoming and Montana.

[13]    The potential universe of federal capital prosecutions is vast. Virtually any murder committed in the course of a federal firearms violation is a potential federal death penalty case. 18 U.S.C. § 924(j). In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant, an unfortunately garden variety type of criminal behavior.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering. Any murder committed while engaged in a narcotics conspiracy involving more than 50 grams of crack cocaine or 5 kilograms of heroin remains a potential federal capital case.  21 U.S.C. § 848(e).

Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had **never sought permission to seek the death penalty** in any case.[14]

As to the regional bias of federal capital prosecutions, the FDPA remains a largely Southern phenomenon. Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states. Additionally, these states sentence federal defendants to death at a significantly higher rate than elsewhere in the country.

TABLE I: 1988-2015
STATES WITH MORE THAN ONE FEDERAL DEATH VERDICT

| STATE | AUTHORIZED CASES | DEFENDANTS TRIED | DEATH SENTENCES | RATE |
|---|---|---|---|---|
| Texas | 31 | 21 | 14 | 66% |
| Missouri | 29 | 21 | 10 | 50% |
| Virginia | 57 | 35 | 8 | 23% |
| Louisiana | 11 | 6 | 5 | 83% |
| North Carolina | 10 | 5 | 4 | 80% |
| Georgia | 9 | 6 | 3 | 50% |
| Oklahoma | 6 | 5 | 3 | 60% |
| Maryland | 26 | 10 | 2 | 20% |
| Pennsylvania | 23 | 9 | 2 | 22% |

---

[14]     The recommendation that accompanies a submission is of great importance. In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General. (DOJ Study at 43.) In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General. *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000. In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization. The approval rate for those cases was 90%.  (DOJ Study at 10.)

| | | | |
|---|---|---|---|
| Arkansas | 7 | 5 | 2 | 40% |
| California | 44 | 10 | 2 | 20% |
| Florida | 15 | 7 | 2 | 29% |
| Illinois | 12 | 5 | 2 | 40% |
| Iowa | 4 | 2 | 2 | 100% |
| Massachusetts | 5 | 3 | 2 | 66% |
| New York | 45 | 24 | 2 | 8% |
| South Carolina | 3 | 2 | 2 | 100% |
| West Virginia | 8 | 3 | 2 | 66% |

(Source: McNally Declaration)

In *Santiago*, noting the regional caprice of the death penalty on a nation-wide basis, the Connecticut Supreme Court examined the death penalty sentencing rates of the 13 states that made up the Confederacy and concluded that those states were responsible for 75% of the executions carried out in the United States since 1976. *State v. Santiago*, 2015 Conn. Lexis at*228.[15] In terms of federal death verdicts and the confederacy (the number of federal executions – three – are not enough to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas), 49 of 81 federal death verdicts have come out of the states that formed the confederacy, more than 62% of all federal capital verdicts. Just three of those former confederate states – Texas, Missouri and Virginia – account for 32 federal death verdicts, 40 per cent of the total.[16]

---

[15]    The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

[16]    A recent study conducted by the Death Penalty Information Center concluded that more than half of this nation's *post-Furman* executions came as a result of cases prosecuted in two per cent of the nation's counties. *See*, "The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous costs to All" (Death Penalty Information center 2013).

When one examines the numbers on a circuit basis, the results reflect the same regional bias. To put it bluntly, if we have a national death penalty it should not matter where you are tried in terms of the likelihood of receiving a death sentence but that very much is the reality.

TABLE II: 1988-2015

DEATH SENTENCING RATES BY CIRCUIT

| CIRCUIT | AUTHORIZED DEFENDANTS TRIED | SENTENCED T0 DEATH | PER CENT |
|---|---|---|---|
| First | 12 | 2 | 17% |
| Second | 31 | 3 | 10% |
| Third | 17 | 2 | 12% |
| Fourth | 70 | 14 | 20% |
| Fifth | 29 | 19 | 66% |
| Sixth | 19 | 3 | 16% |
| Seventh | 9 | 3 | 33% |
| Eighth | 31 | 15 | 48% |
| Ninth | 22 | 4 | 18% |
| Tenth | 18 | 5 | 28% |
| Eleventh | 20 | 6 | 30% |
| DC | 4 | 0 | 0% |

(Source: McNally Declaration)

Historically, the death penalty has been a largely Southern phenomenon; that remains the case today. As of September 2, 2015, there had been 1,414 post- *Gregg* executions carried out in the United States. Of these, 1,148 – or 81% – have been carried out by Southern states. Three states alone – Texas, Oklahoma and Virginia – have accounted for 750 executions, more than

half (53%) of all post-*Gregg* executions. With this historical perspective in mind, it is no surprise that those federal jurisdictions in states with  an established "culture of death" reflect that culture, consciously or not, in decisions to pursue the death penalty. Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same. Regional bias, however, is inimical to a national penalty that is, theoretically at least, that death is sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in a given case. As the next table shows, the Department has failed miserably at this. (Chart appears on following page.)

CHART I: STATES WHERE FEDERAL
DEATH VERDICTS HAVE BEEN RETURNED (MAY 2015)



The "ideal" of a national standard aside, the federal death penalty into 2015 continues to be a Southern phenomenon and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts. Thus, "[o]f the 81 federal death sentences imposed by juries since 1988, 51 [64 %] have come from the traditional 'death belt' states, the states that

have historically executed the most people." (McNally Declaration) In a study of this issue

published in 2010, the authors note:

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, "The Racial Geography of the Federal Death Penalty"*, 85 WASHINGTON LAW REV. 425, 429-430 (2010)*. As of 2015 25% of the 94 federal districts have *never* had an authorized federal capital case. The reality is there has been no appreciable change since the 2000 DOJ Study, and the federal death penalty remains a disproportionately Southern phenomenon. It thus appears – whether one takes a micro or macro view – that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed. This is the essence of arbitrariness and caprice. To quote former President Clinton, "[W]hat your prosecution is may turn solely on where you committed the crime."[17]

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See*, *Bush v. Gore*, 531 U.S. 98, 106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)

---

[17]   It also appears that trying to "fix" one part of the geography problem may give rise to others. *See*, B. Weiser and W. Glaberson, "Ashcroft Pushed Executions in More Cases in New York," *N.Y. Times,* 2/6/03 (Reporting on efforts by the Attorney General to require federal prosecutors in New York and Connecticut to seek death more often; (A82); B. Weiser and W. Glaberson, "Decisions on Death Cases Raise Questions of Race," *N.Y. Times*, 2/14/03 (Pointing out that the 12 defendants as to whom Attorney General Ashcroft overruled a New York area federal prosecutor's decision not to seek the death penalty were all African-American or Hispanic).

(equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment.")

**"Slave State" geographical disparities**

The geographical disparities of capital punishment in this Nation are also very closely tied to our shameful history of slavery, and constitute a "badge and incident of slavery". The below chart sets illustrates the current status of death penalty jurisdictions:



The term "Slave States" is commonly understood as encompassing "any of the 15 states of the Union in which slavery was legal before the Civil War, including Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Missouri, North

Carolina, South Carolina, Tennessee, Texas, and Virginia". See, http://www.thefreedictionary.com/slave+state. Additionally, as the below chart makes clear, the territory which **later** became Oklahoma also experienced significant slavery prior to the Civil War.



According to the Oklahoma Historical Society[18]:

In the 1830s African American slavery was established in the Indian Territory, the region that would become Oklahoma. … While some Indian communities incorporated blacks as free people, American Indians in each of the nations, except the Seminole, began to purchase African Americans as slaves. … By the 1830s more than three thousand African Americans, mostly slaves, lived among the tribes. … When the Civil War erupted in 1861, more than eight thousand blacks were enslaved in Indian Territory. They comprised 14 percent of the population. Slavery continued in the territory through the Civil War, after which the five nations legally abolished the practice.

Of the fifteen States in the Union (and what is now Oklahoma) where slavery existed

---

[18]    See, http://www.okhistory.org/publications/enc/entry.php?entry=SL003

before the Civil War, all but Delaware and Maryland have retained the death penalty[19]. **No juvenile offender has been executed in a State that did not permit slavery. Likewise, no female offender has been executed in a State that did not permit slavery**. Executions in the "Slave States" (including Oklahoma) comprise 1281[20] of the total 1454, or almost 9 out of 10 (88%). Texas and neighboring Oklahoma **alone** have accounted for 654, or 45% of those executions.

### III.   FUNDING DISPARITIES

In 2010, the Spencer Report Update recognized a "significant geographic variation in the distribution of defense resources", in "the period encompassed by th[e] study, 1998 through 2004".

p. 50-51. The data showed a very close correlation between inadequate defense funding and death verdicts. More specifically, "individuals whose defense cost less than $320,000 in combined attorney and expert assistance – the lowest one-third of federal capital trials – had a 44 percent chance of being sentenced to death at trial. Individuals whose total representation costs were above that amount – the remaining two-thirds of defendants – had a 19 percent chance of being sentenced to death. **Defendants in the low-cost group thus were more than twice as likely to be sentenced to death**. Spencer Update, p. 44

---

[19]    And although Delaware and Maryland are not currently death penalty States, they both have employed it and executed individuals. See next footnote.

[20]    Alabama (59), Arkansas (31), Delaware (16), Florida (92), Georgia (70), Kentucky (3), Louisiana (28), Maryland (5), Mississippi (21), Missouri (88), North Carolina (53), South Carolina (43), Tennessee (6), Texas (542), Virginia (112), Oklahoma (112). See, Death Penalty Information Center, https://deathpenaltyinfo.org/number-executions-state-and-region-1976.

**Table 13**
**Relationship Between Defense Cost and Death Sentence**

| Total Trial Cost | Sentenced to Death | Other Verdicts | Total Cases |
|---|---|---|---|
| Lowest Cost Cases (under $320,000) | 44 percent | 56 percent | 18 |
| Remaining Two-Thirds of Cases | 19 percent | 81 percent | 43 |
| Total Cases | 16 | 45 | 61 |

Note: All relationships significant at the .05 level.

Tabel 13 from Spencer Update, p. 45

According to the Spencer Update, "the relationship between case cost and sentencing outcome was too significant to disregard". Id, at 45.

**a.   Texas is <u>second lowest</u> in the Nation in terms of adequate defense funding**

As set forth above, according to the Spencer Update, the lowest one-third expenditures would span from under $320,000. The median cost would be $797,000. *Id.* at 45. In Texas, the median defense cost at trial was $197,324 with 71% of those trials resulting in a death sentence. *Id.* at 54.

**Table 15**
**Regional Variation in Capital Trials by State, 1998-2004**

| State | Circuit | Median Defense Cost at Trial | Number of Capital Trials |
|---|---|---|---|
| Georgia | 11 | $132,334 | 2 |
| Texas | 5 | $197,324 | 7 |
| North Carolina | 4 | $208,802 | 2 |
| Florida | 11 | $313,243 | 2 |
| Indiana | 7 | $419,950 | 2 |
| Maryland | 4 | $435,657 | 4 |
| New York | 2 | $496,927 | 7 |
| Virginia | 4 | $519,108 | 8 |
| Missouri | 8 | $525,279 | 5 |
| Michigan | 6 | $567,549 | 2 |
| Pennsylvania | 3 | $672,204 | 2 |
| California | 9 | $1,039,655 | 2 |
| Connecticut | 2 | $1,213,063 | 3 |
| Massachusetts | 1 | $1,220,267 | 2 |
| District of Columbia | DC | $1,762,893 | 3 |
| National | ---- | $465,602 | 55 |

Id. at 51.

The Spencer Update also connected the funding disparities to **geographical** factors:

Perhaps more significantly, geography also helps to explain the relationship between low cost cases and death sentences at trial, to the point that the influence of low cost is significantly affected by a state's capital culture. Put another way, it is not just that defendants in low cost cases are disproportionately sentenced to death, but that **federal cases brought in states with a historically strong attachment to the death penalty are more likely to be low cost *and* disproportionately end in a death sentence**. The findings suggest that the link between low cost cases and death sentence at trial is concentrated in particular states. (emphasis added)
p. 53

Similarly, the Report stated that "[a]lthough there were some exceptions, in

general defense resources spent on federal capital trials were lowest in those states that

had the highest per capita execution rates". *Id*, at 53.

### b. Texas leads the Nation in percentage of Federal capital trials resulting in a death sentence

**Table 16**
**Outcomes of Federal Death Penalty Trials by Cost, 1998-2004**
**(Excluding federal districts with a single trial)[62]**

| State | State Per Capita Execution Rate | Median Defense Cost at Trial | % of Trials Resulting in a Death Sentence[63] |
|---|---|---|---|
| Georgia | 4.8 | $132,334 | 50 percent |
| Texas | 19 | $197,324 | 71 percent |
| North Carolina | 5.3 | $208,802 | 50 percent |
| Florida | 4 | $313,243 | 0 percent |
| -------$320,000------ | ----------------- | Threshold | ---------------- |
| Indiana | 3.1 | $419,950 | 50 percent |
| Maryland | 0.94 | $435,657 | 25 percent |
| New York | 0 | $496,927 | 0 percent |
| Virginia | 13.8 | $519,108 | 0 percent |
| Missouri | 11.7 | $525,279 | 60 percent |
| Michigan | 0 | $567,549 | 50 percent |
| Pennsylvania | 0.24 | $672,204 | 0 percent |
| California | 0.38 | $1,039,655 | 0 percent |
| Connecticut | 0.29 | $1,213,063 | 0 percent |
| Massachusetts | 0 | $1,220,267 | 50 percent |
| District of Columbia | 0 | $1,762,893 | 0 percent |
| National | ------ | $465,602 | 27 percent |

*Id.* at 54.

The Spencer Report was deeply troubled by this data, noting that "… 61 percent (8 of 13) of the federal defendants tried in states with low cost trial defense received a death sentence, whereas only 19 percent (8 of 42) of the federal defendants tried in other states were sentenced to death". *Id*, at 55. Nowhere is this clearer than in Texas.

## IV.     RACIAL DISPARITIES

The Southern District of Texas' record of racial disparity in Federal death penalty cases is **unprecedented anywhere in the Nation**. In the modern history of the Federal death penalty, there have been sixty-five (65) individuals indicted in the Southern District of Texas for death-eligible offenses, whose cases are now completed through the trial level. **With the exception of two very clear "outlier" cases, every single one has been Hispanic (52) or black (2)**. The outlier cases were 1) a complex, Aryan Brotherhood multiple murder Indictment involving ten defendants, and 2) a wealthy businessman who was first tried in State Court for killing his wife, and acquitted, thus requiring a Federal prosecution.

**The Government has never sought the death penalty for a white defendant in the Southern District of Texas**. In contrast, the Government sought death for both of the black defendants. The Government also sought death for Hispanic Juan Raul Garza, who became one of only three individuals executed by the Federal Government in modern times. The Government is now seeking death for Defendant and his co-defendant, Rodriguez Mendoza.

On a Statewide level, in 2013, the American Bar Association (ABA) issued an Assessment Report, entitled *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report, An analysis of Texas' Death Penalty Laws, procedures and Practices*. The Assessment Report noted that "Texas-specific data on the race and ethnicity of executed offenders and the current death row population also suggest patterns of discrimination". ABA Assessment Report, p. 363. Further, "[a]s the State of Texas has not investigated - fully or otherwise - or evaluated the impact of racial discrimination in its criminal justice system, Texas is not in compliance with Recommendation #1. ABA Assessment Report, P, 358

The Assessment Report also recognized "[a] culture of discriminatory use of peremptory challenges … in Texas's most active capital-case jurisdiction, Harris County". Id, at 365-66. Furthermore, at an evidentiary hearing, testimony "revealed that prosecutors were 'wary' and 'cautious' of minority jurors and that 'everybody' in the Harris County District Attorney's Office talked about 'the undesirability of minorities on juries.'" The testimony of judges and counsel who had served and practiced in the district courts of Harris County likewise bolstered the federal court's finding that "racism played a part in jury selection" in *State v. Rosales*. *Id*.

As a further example, the Houston Chronicle noted in November, 2011 that "[t]he last white man to join death row from Harris County was a convicted serial killer in 2004," and that, "[s]ince then, 12 of the last 13 men newly condemned to die have been black."[21].

### a. National race factors

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, almost exclusively federal prosecutors in the South utilized the federal death penalty and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African- Americans and Hispanics.

By 1994 – barely six years after the return of a "modern" federal death penalty – obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

---

[21]     Lise Olsen, *Harris County Death Penalties Show Racial Pattern*, HOUS. CHRON., Nov. 14, 2011.

> Race continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.  On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87 per cent) were black or Hispanic.  *Id.*  Presently the figure is 74 percent (A83), hardly an "improvement" to boast of.

Earlier evidence of the potential race-effect of the death penalty had also been provided by the agency formerly known as the General Accounting Office (now the Government Accountability Office).  At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty.  21 U.S.C. § 848(o)(2) (Repealed).  The GAO in fact undertook that study in 1990 and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
>
> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks. This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and low quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-57, Feb. 1990) at p. 5.  In a 1999 law review article, Professor Rory Little, writing with the

perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that the administrative process within the Justice Department had not ameliorated serious questions about regional and racial disparities. R.K. Little, 26 FORDHAM URBAN L.J. 347 (1999) at 450-90. Thus, from the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematical.

### b. The 2000 DOJ Study

In a press conference that took place on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." In response, the President said the following about the application of the federal death penalty, acknowledging concerns about race and regional practices:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of both those issues at this time.

(Transcript of the President's 6/28/2000 press conference: available on line at http://www.presidency.ucsb.edu/ws/index.php?pid=1666 (Last visited September 22, 2015).

On September 12, 2000, the Department of Justice released the comprehensive study alluded to by President Clinton in his remarks. The study detailed how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[22] The essence of the

---

[22]     The Department filed a supplemental report on June 6, 2001 after the change in administration.

2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. the Study reported that federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time of the DOJ Study had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece.   No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[23]

In terms of which defendants actually faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%). *See,* Table 1A at p. T-2 of DOJ Study. Thus, as of the summer of 2000, more than 70% of the federal defendants targeted for the death penalty had been non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (DOJ Study at 14.)[24]

Additionally, on June 7, 2007, the Justice Department transmitted statistics and more recent findings on the administration of the federal death penalty to Senator Feingold in preparation for oversight hearings.

[23]    In terms of percentages across the board, the race and region figures have not changed appreciably in the 15 years since the 2000 DOJ Study's release.

[24]    As of the present time, there are still 23 of the 94 federal districts that have never had an authorized capital case. (A100.) This includes entire districts in California, Alabama, Minnesota, Delaware, the Eastern and Western Districts of Washington, Nebraska, Oklahoma, and the Eastern and Western Districts of Wisconsin, South Dakota, Utah, Wyoming and Montana.

- Twenty-two federal districts had never submitted a case for review at all.[25]  (DOJ Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[26]

The release of the report drew the following public comment from officials at the Justice Department and the White House:

> Saying she was "sorely troubled" by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, "Reno Troubled by Death Penalty Statistics," *N.Y. Times*, September 13, 2000. The *Times* also reported the reaction of then Deputy Attorney General Eric Holder, who was, at the time, the highest-ranking African American at the Justice Department:

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

---

[25]    The potential universe of federal capital prosecutions is vast. Virtually any murder committed in the course of a federal firearms violation is a potential federal death penalty case. 18 U.S.C. § 924(j). In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant, an unfortunately garden-variety type of criminal behavior.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering. Any murder committed while engaged in a narcotics conspiracy involving more than 50 grams of crack cocaine or 5 kilograms of heroin remains a potential federal capital case.  21 U.S.C. § 848(e).

[26]    The recommendation that accompanies a submission is of great importance. In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General. (DOJ Study at 43.) In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General. *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000. In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization. The approval rate for those cases was 90%.  (DOJ Study at 10.)

*Id*. CNN reported that Attorney General Reno wanted "a broader analysis."[27] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: "'At first glance, those numbers are troubling. We need to know what's behind the numbers.'"[28] During his confirmation hearings the year following the Study's release, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." Quoted in *United States v. Bass, supra*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations or remedy arbitrary and invidious practices. As this discussion continues, it will be seen that more than15 years later, nothing has changed. If anything, to quote the title of Mr. McNally's DePaul Law Review article, a "non-existent" problem has gotten worse. See, Kevin McNally, "Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse", 53 DEPAUL L. REV. 1615 (2004).

### c.   The law on race and the death penalty

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan, Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death and what would factor into that process. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense counsel would have to

---

[27]   In *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *reversed*, 532 U.S. 1035 (2002) (per curium), the Sixth Circuit quoted at length from the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. 266 F.3d at538.

[28]   Considering the impact of the study, Judge Sand in *United States v. bin Laden*, 126 F. Supp.2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

level with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[29] In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans. One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287.

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Id.* at 373-74.

The historical truth is that in the United States capital punishment and race have always been inextricably intertwined. That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, "What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh," 53

---

[29]     After his retirement from the bench, Justice Powell wrote that he regretted both voting with the majority, and authoring the Court's 5-4 opinion upholding the death-penalty in *McCleskey*. *See,* Jeffries, *Justice Lewis F. Powell, Jr.* (1994) at pp. 451-52.

DEPAUL L. REV. 1591 (2004); K. McNally, "Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse," 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, "Black Man's Burden: Race and the Death Penalty in America," 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, "Race, Region, and Death Sentencing in Illinois," 81 OREGON L.REV. 39 (2002); S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty," 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, "Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction," 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 RUTGERS L.REV. 27, 100-57 (1988).

In Connecticut's recent *Santiago* decision, the issue of race and the death penalty in that affluent northeastern state was examined with the following conclusion:

> [D]ata from three authoritative governmental sources ... all suggest that the death penalty in Connecticut continues to be imposed disproportionately based on the race and ethnicity of the offender and the victim. The alleged disparities are significant and hold across hundreds of cases. We are not aware of any study or report to have reached a contrary conclusion.

> *State v. Santiago*, 205 Conn. Lexis at *246.

In *Furman*, Justice Douglas had explored the correlation between race and the death penalty and concluded:

> In a Nation committed to equal protection of the laws there is no permissible "caste" aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position. In ancient Hindu law, a Brahman was

> exempt from capital punishment, and in those days, "[g]enerally, in the law books, punishment increased in severity as social status diminished." We have, I fear, taken in practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.) As recently as 1991, the execution of a white man for the murder of a black man was front- page news as an event that had not occurred in the nation for 50 years. *See*, D. Margolick, "Rarity for U.S. Executions: White Dies for Killing Black," *N.Y. Times*, September 7, 1991, p.1, col. 1. DPIC reports that since executions resumed in the wake of *Gregg,* there have been 31 executions of a white defendant for killing a black victim; but there have been 295 executions of black defendants who killed a white victim. (A16.)

Mr. Duran Gomez's showing in this motion is sufficient to establish a case of arbitrariness in the enforcement of the death penalty. It is difficult to imagine how, other than racism, one can explain the arbitrary manner in which the death penalty has been administered in Texas as a whole, in the Southern District, and in Harris County (Houston) in terms of the race of those who are targeted. *See, Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). This case, as a federal prosecution, is subject to the Due Process Clause of the Fifth Amendment which has long been held to embody a guarantee of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.")

In the area of criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . . of combating racial discrimination." *Id.* at 558. That the death penalty operates with an impermissible racist effect is powerful evidence that it operates fundamentally unfairly and with arbitrariness and caprice. Accordingly, Mr. Duran Gomez has standing pursuant to the Eighth Amendment and Fifth Amendment Due Process Clause not to be subjected to an arbitrary system of capital punishment.

There is strong and consistent evidence that minority defendants are many times more likely than white defendants to face the death penalty at the hands of the government. This is a problem that demands our government's "most rigid scrutiny" of the kind described in *Loving*.

The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments. *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Secondly, it is obvious that racial discrimination is a species of the arbitrariness condemned in *Furman*. This is apparent from the opinions of the Justices in the majority and of

those in dissent alike. For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and thus ran directly counter to "the desire for equality . . . reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-366 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J. dissenting); *id.* at 449-50 (Powell, J., dissenting).  Later Supreme Court cases have applied this interpretation. Thus, for example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman*  would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant." 462 U.S. at 885.

Taken together, then, these two points can be summarized as follows:  The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the (implicit) equal protection clause of the Fifth Amendment. In *Graham v. Collins*, 506 U.S. 461 (1993), Justice Thomas' concurring opinion summed this point up succinctly when he noted that racial prejudice or bias in the context of capital punishment "is the paradigmatic capricious and irrational sentencing factor." *Id*. at 484. Where a death penalty appears to operate so as to institutionalize racism,  it offends the same constitutional values that yielded *Furman* and this nation's abandonment of capital punishment.

As the chart on the following page demonstrates, the disproportionate targeting of minorities for the federal death penalty has had what would be the expected effect on the population of death row. Thus, as of the spring of 2015, 60 percent of those presently on federal

death row are non-white. This is an unacceptable state of affairs and, bluntly, one that should be a source of intense concern to the Justice Department.

CHART III: RACIAL COMPOSITION OF
FEDERAL DEATH ROW (MAY 2015)



## CONCLUSION

For the reasons set forth above, the motion should be granted in all respects together with any and all such other relief as the court deems just and proper. A hearing is requested on all disputed facts and as further requested in this motion.

**Respectfully submitted,**

**/s/Wendell A. Odom, Jr.**
**Wendell A. Odom, Jr.**
**Texas Bar # 15208500**
**Federal Bar # 0947**
**440 Louisiana Ste. 200**
**Houston, Texas 77002**
**(713) 223-5575**
**(713) 224-2815 (FAX)**

**/s/ Neal Davis, III**
**NEAL DAVIS, III**
**Texas State Bar # 24038541**
**Federal Bar # 706329**
**440 Louisiana, Suite 200**
**Houston,, TX 77002**
**(713) 223-5575**
**(713) 224-2815 (FAX)**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was delivered via ECF and email on June 20, 2017 to the attorneys representing the United States of America.

**/s/ Wendell A. Odom, Jr.**
**WENDELL A. ODOM, JR.**

**/s/ Neal Davis, III**
**NEAL DAVIS, III**