IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § | CRIMINAL NO. H-10-459 |
| WILMAR RENE DURAN GOMEZ | § § § § | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MOTION TO SEVER TRIAL

Defendant Wilmar Rene Duran Gomez, through his undersigned counsel, moves this Court to sever his trial from that of co-defendant Efrain Rodriguez-Mendoza.  This motion is brought under Federal Rule of Criminal Procedure 14(a) and the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

I.    Background

A.    Indictments

On July 1, 2010, a grand jury returned an indictment charging: (1) Mr. Duran Gomez, Mr. Rodriguez-Mendoza, Jose Alberto Bolanos-Garza, Jose Fuentes, Patricia Holguin, and Mauricio Mercado with one count of conspiracy to transport and harbor illegal aliens, under 8 U.S.C. § 1324(a)(1)(A)(v)(I); (2) Mr. Duran Gomez, Mr. Bolanos-Garza, and Mr. Rodriguez-Mendoza with two counts of harboring an illegal alien, resulting in death, under 8 U.S.C. § 1324(a)(1)(A)(iii), (B)(i), (A)(v)(II), (B)(iv); and (3) Mr. Duran Gomez with one count of conspiracy to launder money derived from harboring aliens, under 18 U.S.C. § 1956(h).  ECF No. 1, 28.

On October 4, 2012, the government notified Mr. Duran Gomez that if he were convicted on either of the harboring counts, it would seek the death penalty. ECF No. 137. A superseding indictment, unveiled that same day, contained special findings as to the gateway and aggravating factors that rendered Mr. Duran Gomez eligible for the death penalty. ECF No. 147 at 10-12. The superseding indictment was otherwise materially identical to the original indictment. *See* ECF No. 147 at 1-10.

Between January and December 2016, Mr. Fuentes, Mr. Bolanos-Garza, Ms. Holguin, and Mr. Mercado pleaded guilty pursuant to plea agreements. *See* ECF Nos. 269, 273, 290, 304. On January 10, 2017, the grand jury handed up a second superseding indictment (SSI) against Mr. Duran Gomez and Mr. Rodriguez-Mendoza. ECF No. 314. The SSI repeated the conspiracy-to-harbor and harboring counts and charged both defendants with two counts of kidnapping resulting in death, under 18 U.S.C. § 1201(a)(1), and two counts of hostage taking resulting in death, under 18 U.S.C. § 1203. ECF No. 314 at 1-12. It also included separate special findings as to gateway and aggravating factors as to Mr. Rodriguez-Mendoza, in addition to repeating the special findings for Mr. Duran Gomez that were in the first superseding indictment. ECF No. 314 at 12-16.

## B.   Allegations

The SSI alleges that, beginning in January 2005, Mr. Duran Gomez organized a scheme to smuggle aliens from Mexico into the United States for money. ECF No.

2

314 at 3.  Smugglers would guide aliens across the U.S.-Mexico border and take them to various "locations north of the Border Patrol check point," from which they would be transported to Houston, Texas.  ECF No. 314 at 2.  There, Mr. Duran Gomez would allegedly hold them in a warehouse at 7315 Ashcroft Drive until the aliens' relatives or friends paid a smuggling fee, at which point he would arrange the aliens' transportation to their final locations.  ECF No. 314 at 2-3.  The indictment alleges Mr. Duran Gomez formed two transportation companies, Transportes Junior's and Transporte Sabrina, to facilitate the smuggling conspiracy.  ECF No. 314 at 3.

The SSI further alleges that on November 6, 2006, unknown co-conspirators delivered to the warehouse a "load of smuggled aliens" that included Abelardo Sagastume and Hector LNU (last name unknown) ("Hector").  ECF No. 314 at 4.  On November 7, 2006, Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza, who were allegedly working for Mr. Duran Gomez as guards, informed the aliens there was a fire in the warehouse and ordered them to evacuate.  ECF No. 314 at 5.[1]  Upon returning to the warehouse, Mr. Bolanos-Garza allegedly called Mr. Duran Gomez, who came to the warehouse to determine what had occurred.  ECF No. 314 at 5.  Mr. Bolanos-Garza told him several of the aliens had set the fire in an attempt to escape.  ECF No. 314 at 5.

---

[1] The SSI actually alleges that "a co-conspirator and EFRAIN RODRIGUEZ-MENDOZA" told the aliens to evacuate.  ECF No. 314 at 5.  The first superseding indictment makes clear, however, that the "co-conspirator" was Mr. Bolanos-Garza.  ECF No. 147 at 5.

According to the SSI, Mr. Duran Gomez—and, at his direction, Mr. Rodriguez-Mendoza—began beating the aliens in an effort to elicit information about who had set the fire.  ECF No. 314 at 5-6.   The SSI alleges the two men learned that Hector and Mr. Sagastume were responsible for the fire.  ECF No. 314 at 6.  Mr. Duran Gomez and Mr. Rodriguez-Mendoza then allegedly beat Mr. Sagastume and Hector as punishment; the two aliens ultimately died from their injuries.  ECF No. 314 at 6. The SSI alleges Mr. Duran Gomez "caused the [victims'] bodies . . . to be moved" to a vacant lot in Fort Bend County, where police discovered them on November 15, 2006. ECF No. 314 at 6.

Additional facts about the allegations and the government's evidence are discussed below.

### C.    Mr. Rodriguez-Mendoza's motion to sever

On September 4, 2018, Mr. Rodriguez-Mendoza filed a motion to sever his trial from that of Mr. Duran Gomez.  ECF No. 394.  That motion indicates that "[a]t trial, Mr. Rodriguez-Mendoza will argue that co-defendant Duran Gomez had control over the warehouse and direct supervisory control over Mr. Rodriguez-Mendoza.  He was the driving force behind the beatings and deaths of the decedents.  Mr. Duran-Gomez directed the actions of Mr. Rodriguez-Mendoza and others."  ECF No. 394 at 9.  In addition, the motion explains that Mr. Rodriguez-Mendoza will introduce evidence tending to show that "Mr. Duran Gomez was (a) a dangerous and unstable person (b) with a history of violence, and (c) the capacity and inclination to respond violently to

4

anyone who disobeyed his instructions." ECF No. 394 at 9.  Mr. Rodriguez-Mendoza intends to inform the jury, for example, that Mr. Duran Gomez allegedly "admitted to committing an almost identical assault in September 2006." ECF No. 394 at 9.

Mr. Rodriguez-Mendoza's motion makes clear that his strategy at sentencing, as during the guilt-innocent phase, will be to blame Mr. Duran Gomez.  ECF No. 394 at 10.  Specifically, he will "argue that his relative blameworthiness in the crime is below Mr. Bolanos-Garza's, and even further below Mr. Duran-Gomez's," which is relevant to several of the mitigating factors enumerated in 18 U.S.C. § 3592(a).  ECF No. 394 at 10.

## II. Argument

Trying both co-defendants together would compromise Mr. Duran Gomez's right to confront the witnesses against him, his right to avoid prejudice in the guilt-innocence phase through introduction of any criminal history, his right to a trial untainted by prejudicial propensity evidence, his right to notice of the evidence upon which a jury might sentence him to death, and his right to an individualized sentencing proceeding.  Given Mr. Duran Gomez's and Mr. Rodriguez-Mendoza's antagonistic defenses at both the guilt and sentencing phases, a joint trial would also prevent the jury from making a reliable judgment about guilt or the appropriate sentence.  This Court should therefore sever the co-defendants' trials from one another.

## A.   Law of severance

Courts recognize "[t]here is no question that joint trials, involving defendants with different degrees of culpability, can raise a substantial risk of prejudice, that evidence of a codefendant's wrongdoing might erroneously lead the jury to convict the defendant, that exculpatory evidence that would be available to a defendant tried alone may well be unavailable in a joint trial." *United States v. Green*, 324 F. Supp. 2d 311, 319 (D. Mass. 2004).   Indeed, joint trials are always a fertile ground for potential prejudice.   *See King v. United States*, 355 F.2d 700, 703 (1st Cir. 1966) ("A joinder . . . of defendants, involves a presumptive possibility of prejudice to the defendant."); *United States v. DeLeon*, 187 F.3d 60, 64 (1st Cir. 1999) (discussing "ever-present risk of prejudice in such joint trials"); *United States v. Maggard*, 865 F.3d 960, 971 (7th Cir. 2017) (noting joint trials "can . . . prejudice the defendants who are tried together").

To avoid this prejudice, Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."   District courts should grant severance under Rule 14 "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Reed*, 908 F.3d 102, 114 (5th Cir. 2018).

6

Although, in general, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012), federal courts do not apply this presumption in capital cases, as the need to protect defendants' right to a fair trial is entitled to special deference when a death sentence is at stake.

The Fifth Circuit has observed that although "efficiency factors support joint trials even in capital cases," there is an "inherent tension between joinder and each defendant's constitutional entitlement to an individualized capital sentencing decision." *United States v. Bernard*, 299 F.3d 467 475 (5th Cir. 2002). As a result, "[a] trial court must be especially sensitive to the existence of such tension in capital cases, which demand a heightened degree of reliability." *Id.*; *see also Coble v. Davis*, 728 F. App'x 297, 301 (5th Cir. 2018) (unpublished) ("The Supreme Court has recognized that the Eighth Amendment requires heightened reliability in death penalty cases." (citing *Spaziano v. Florida*, 468 U.S. 447, 456 (1984)); *United States v. Tipton*, 90 F.3d 861, 892 (4th Cir. 1996) ("More important of course than any consideration of inconvenience or possible unfairness to the Government from sequential separate trials are the possibilities of unfairness to the accused persons from a joint penalty-phase trial—specifically the threat posed to individualized consideration of their situations, and in particular the quite different mitigating factors relevant to each."); *Perez*, 299 F. Supp. 2d at 44 (ordering severance in light of "the heightened need for reliability in a death penalty trial"); *United States v.*

7

*Roland*, No. 12-cr-298 (D.N.J. June 15, 2015), attached as Exhibit A, at 5 (finding "that the threshold for showing prejudice is lower in a capital case than in a non-capital case"); *Green*, 324 F. Supp. 2d at 320 ("[T]he standards for severance are necessarily leavened by the fact this is a death penalty case.").

For this reason, "[d]efendants are severed much more frequently in capital than in non-capital cases." *Roland*, Ex. A at 4. Indeed, one judge has "described severance in a capital case as 'virtually mandatory' not in a legal sense but in a practical sense." *Roland*, Ex. A at 5 (ordering severance of capital defendant from non-capital defendant); *see also* Jon B. Gould & Lisa Greenman, Report to the Committee on Defender Services, Judicial Conference of the United States: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases 81 (2010) ("In multi-defendant cases involving more than one authorized defendant, many judges have followed the practice of trying each capital defendant separately.").

Federal district courts have granted severance in "a clear majority" of multi-defendant capital trials. Declaration of Kevin McNally, attached hereto as Exhibit B, at 2. The Federal Death Penalty Resource Counsel Project, which is funded and overseen by the Administrative Office of the United States Courts, reports that of 80 such cases that have gone to trial, courts have granted some form of severance in 64 percent and denied it in only 18 percent. Ex. B at 3-6. In virtually all the remaining cases, the district court never ruled on the severance issue because, e.g., defendants

8

did not move for severance before trial or a guilty plea by one defendant mooted the issue.  Ex. B at 5-6.

Moreover, concerns about judicial economy, though relevant to the severance analysis, are entitled to less weight when only two defendants intend to go to trial. *See, e.g.*, *United States v. Romanello*, 726 F.2d 173, 181 (5th Cir. 1984) ("Because the evidence was uncomplicated and only two defense camps were involved, the inconvenience and expense of separate trials would not have been great."); *United States v. Crawford*, 581 F.2d 489, 492 (5th Cir. 1978) (same); *United States v. Perez*, 299 F. Supp. 2d 38, 44 (D. Conn. 2004) ("[H]aving two trials instead of one is an incremental burden on the Court and Government, but is not an inordinate burden."). Thus "Rule 14 directs the court to ask, in effect—at what price judicial economy?— particularly with respect to individual defendants." *Green*, 324 F. Supp. 2d at 319.

## B.    A joint trial would compromise several of Mr. Duran Gomez's "specific trial rights."

A court should order severance if there is a "serious risk" that a joint trial would "compromise a specific trial right of one of the defendants." *Reed*, 908 F.3d at 114.  Trying Mr. Duran Gomez alongside Mr. Rodriguez-Mendoza would compromise a number of Mr. Duran Gomez's trial rights: his right to confront the witnesses against him, his right to avoid prejudice in the guilt-innocence phase through introduction of any criminal history, his right to a trial untainted by prejudicial propensity evidence, and his right to notice of the evidence upon which a jury might sentence him to death.

9

### 1.   Right to confrontation: *Bruton v. United States*

"The Sixth Amendment's Confrontation Clause provides a criminal defendant 'the right . . . to be confronted with the witnesses against him,' and to cross-examine these witnesses." *United States v. Dickerson*, 909 F.3d 118, 126 (5th Cir. 2018).  In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that "a defendant's Confrontation Clause rights were violated by the admission of a non-testifying co-defendant's confession that directly implicated the defendant in the criminal act, even though the trial court issued a limiting instruction to the jury." *United States v. Powell*, 732 F.3d 361, 376 (5th Cir. 2013).  "<u>*Bruton*</u> violations pose a substantial risk that juries, despite any instructions to the contrary, will improperly use a non-testifying co-defendant's inculpatory statements against the defendant— so powerful is this form of evidence." *Dickerson*, 909 F.3d at 126.

The Supreme Court subsequently held in *Richardson v. Marsh*, 481 U.S. 200 (1987), that "admission of a confession did *not* violate the Sixth Amendment where the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *United States v. Nanda*, 867 F.3d 522, 527 (5th Cir. 2017) (emphasis in original).  But, the Court explained in *Gray v. Maryland*, 523 U.S. 185 (1998), a non-testifying co-defendant's statement is "facially incriminating" and therefore does offend *Bruton* "if it include[s] statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession

the very first item introduced at trial." *United States v. Gibson*, 875 F.3d 179, 194 (5th Cir. 2017).

Mr. Rodriguez-Mendoza's severance motion catalogues numerous statements made by Mr. Duran Gomez, admission of which would violate Mr. Rodriguez-Mendoza's *Bruton* rights.   ECF No. 394 at 16-18.   The discovery also contains statements made by Mr. Rodriguez-Mendoza that would violate Mr. Duran Gomez's confrontation rights if admitted at a joint trial.

For instance, Mr. Bolanos-Garza's wife, Elvira Madrigal-Salinas, told investigators that "one day, while she, BOLANOS-Garza, and their children were at the flea market, Chente called BOLANOS-Garza to tell him that he (Chente) and the fat man had killed the two (2) aliens."   Bates 029525-26.   "Chente" is one of Mr. Rodriguez-Mendoza's aliases, and "the fat man" refers to Mr. Duran Gomez.   ECF No. 314 at 1; Bates 070389.   Thus this statement amounts to a confession by Mr. Rodriguez-Mendoza that he and Mr. Duran Gomez "killed the two aliens."   Ms. Madrigal-Salinas also says she heard Mr. Rodriguez-Mendoza say he and Mr. Duran Gomez "had beaten the aliens."   Bates 029544.[2]   These statements directly inculpate both defendants.

---

[2] In a subsequent report of investigation, Ms. Madrigal-Salinas claimed that she did not hear this statement directly, but that Mr. Bolanos-Garza told her the other two men had beaten the aliens.   Bates 029551.

In addition, Mr. Bolanos-Garza told investigators that while he was in the warehouse, he "heard Vicente inform Oscar that he believed one of the men had died." Bates 029513. "Vicente" and "Oscar" are aliases for Mr. Rodriguez-Mendoza and Mr. Duran Gomez, respectively. ECF No. 314 at 1. Mr. Bolanos-Garza's statement therefore implicates both defendants because, if believed by the jury, could be construed as Mr. Rodriguez-Mendoza reporting to Mr. Duran Gomez in the way an agent reports to a principal. Mr. Bolanos-Garza also proffered that on the day the aliens died, he heard Mr. Duran Gomez ask Mr. Rodriguez-Mendoza what he was doing, to which Mr. Rodriguez-Mendoza replied that he was "taking care of them." Bates 029621. By this statement, Mr. Rodriguez-Mendoza meant he "was beating the two illegal aliens that set the warehouse on fire." Bates 029621.

Finally, Mr. Rodriguez-Mendoza's proffer statement, made to the government in March 2015, contains numerous statements that implicate both co-defendants. Mr. Rodriguez-Mendoza told the government that "he and BOLANOS' boss, named 'El Gordito,' maintained a boss and employee relationship." Bates 029652. He then alleged that Mr. Duran Gomez (one of whose aliases is Gordito): (1) arrived drunk at the warehouse one night and began to beat the aliens; (2) locked the aliens in a room because he was angry they had tried to burn down the warehouse; and (3) beat the aliens because he was mad they had not paid their smuggling fees. Bates 029652; *see* ECF No. 314 at 1. In its response to Mr. Rodriguez-Mendoza's severance motion, the government indicated that it believes he has violated the terms of his proffer

12

agreement and that it "reserves the right to pursue all available remedies for this breach."  ECF No. 409 at 14 n.2.  Introduction of Mr. Rodriguez-Mendoza's proffer statements at trial is presumably among the remedies the government expects it may pursue, as reflected in the government's standard proffer letter in this district.

Because the above statements by Mr. Rodriguez-Mendoza "directly implicate" Mr. Duran Gomez, their admission would run afoul of *Bruton*, notwithstanding any limiting instruction.  *Powell*, 732 F.3d at 376.  Moreover, the statements "refer directly to someone" who is "obviously [Mr. Duran Gomez]," with the result that admitting the statements would violate the Confrontation Clause even if they were redacted.  *Gibson*, 875 F.3d at 194.  To avoid this constitutional violation, the Court should sever Mr. Duran Gomez's and Mr. Rodriguez-Mendoza's trials.

### 2.    Right to keep evidence of prior convictions from the jury

Federal Rule of Evidence 609 permits an opposing party to "attack[] a witness's character for truthfulness" by introducing evidence of the witness' prior felony convictions.  This rule applies only when the witness actually testifies.  Thus Mr. Duran Gomez would ordinarily be able to keep the jury from learning of any prior criminal record by exercising his constitutional right not to testify.  (In its Notice of Intent to Seek the Death Penalty, the government alleges as one of its non-statutory aggravators that Mr. Duran Gomez has two prior convictions.  ECF No. 137 at 7.  Mr. Duran Gomez does not concede the existence or validity of these alleged prior

13

convictions, but recognizes that a joint trial greatly increases the chances that any such evidence would be introduced in the guilt-innocence phase of trial.)

But Federal Rule of Evidence 806 provides that "[w]hen a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Under this rule, Mr. Rodriguez-Mendoza would be permitted to present evidence of Mr. Duran Gomez's alleged prior convictions if the government introduces hearsay statements by Mr. Duran Gomez that inculpate Mr. Rodriguez-Mendoza. Assuming he chooses not to testify, Mr. Duran Gomez would have no opportunity to address—and attempt to take the sting out of—these convictions, as he would be able to if he testified.

This situation creates two "impossible dilemma[s]." *Perez*, 299 F. Supp. 2d at 42. First, it creates a clash between two of Mr. Duran Gomez's evidentiary rights. Mr. Duran Gomez must either sacrifice his right not to testify in order to protect his right to keep any evidence of past convictions from the jury, or vice versa. Either way, one of his "specific trial right[s]" would be "compromise[d]." *Reed*, 908 F.3d at 114.

Second, it creates a clash between Mr. Duran Gomez's trial rights and Mr. Rodriguez-Mendoza's. "[E]ither Mr. [Duran Gomez's] right to a fair trial is prejudiced because the jury hears otherwise impermissible and unfairly prejudicial evidence against him, or Mr. [Rodriguez-Mendoza's] rights are compromised because of his

14

inability to fully challenge the credibility of the declarant of those alleged statements." *Perez*, 299 F. Supp. 2d at 42. Faced with this "impossible dilemma," the court in *Perez* severed the defendants' trials in order to ensure each received a fair process. *Id.* at 44; *see also United States v. Hall*, 854 F.2d 1036, 1043 (7th Cir. 1988) ("Where one defendant attempts to attack the credibility of another by introducing evidence of the co-defendant's prior convictions, there is a danger that the co-defendant's defense will be prejudiced since the presumption of innocence accorded the co-defendant may become tainted.").

A joint trial in this case would be even more prejudicial than in *Perez*. The defendants there were charged with murder and conspiracy to commit murder-for-hire, among other crimes. *Id.* at 40. The statements at issue "d[id] not implicate" the non-declarant co-defendant and "ha[d] little or no probative value in establishing [his] participation in the murder." *Id.* at 42-43. He therefore had little "need" to impeach the declarant co-defendant. *Id.* at 42. Nevertheless, the *Perez* court ordered severance because the declarant's statements were relevant to "establishing the existence of a conspiracy," which was an "essential element[] of the offense charged against [the non-declarant] that the Government must prove at trial." *Id.* at 43. Here, by contrast, the government is likely to introduce hearsay statements by Mr. Duran Gomez that directly inculpate Mr. Rodriguez-Mendoza. Mr. Rodriguez-Mendoza therefore has an even stronger need to impeach the declarant (Mr. Duran

Gomez) than did the *Perez* non-declarant.  If severance was appropriate in *Perez*, it is appropriate here.

### 3.   Right to a trial untainted by propensity evidence

Under Federal Rule of Evidence 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   The prohibition on such propensity evidence "is based on the fear that the jury will use evidence that the defendant has, at other times, committed bad acts to convict him of the charged offense."  *United States v. Krezdorn*, 639 F.3d 1327, 1332-33 (5th Cir. 1981).  Barring this type of evidence forces the jury to decide a defendant's guilt based only on the facts of a particular case:

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.  The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*United States v. Carrillo*, 660 F.3d 914, 929 n.7 (5th Cir. 2011) (quoting *Old Chief v. United States*, 519 U.S. 172, 181 (1997)).

Mr. Rodriguez-Mendoza, however, indicated in his severance motion that he will argue during the guilt phase of trial that Mr. Duran Gomez is "(a) a dangerous and unstable person (b) with a history of violence, and (c) the capacity and inclination to respond violently to anyone who disobeyed his instructions."  ECF No. 394 at 9.

16

Specifically, Mr. Rodriguez-Mendoza intends to introduce evidence that Mr. Duran Gomez assaulted other smuggled aliens in September 2006 as punishment for trying to escape the warehouse.  ECF No. 394 at 9; *see* Bates 011791-92.  The clear purpose of airing these allegations is to invite the jury to conclude that if Mr. Duran Gomez beat aliens in his warehouse once, he must have done it a second time.[3]  In addition, Mr. Rodriguez-Mendoza's motion notes Mr. Duran Gomez allegedly has an extended history of violence toward multiple ex-girlfriends.  ECF No. 394 at 6.  Such evidence would lead the jury to speculate that Mr. Duran Gomez has a violent character and is therefore more likely to have committed the instant offenses.  This is pure propensity evidence—exactly the kind of prejudicial information juries are not supposed to consider.

Ordinarily, this Court could protect Mr. Duran Gomez's right to a trial free from propensity inferences by simply excluding the evidence Mr. Rodriguez-Mendoza hopes to introduce.  But doing so here threatens to violate Mr. Rodriguez-Mendoza's constitutional rights.  "Whether rooted directly in the Due Process Clause of the [Fifth] Amendment or in the Compulsory Process or Confrontation clauses of the

---

[3] Federal Rule of Evidence 404(b)(2) permits admission of other-acts evidence for a purpose other than proving propensity—for example, to establish motive, intent, or identity.  But Mr. Rodriguez-Mendoza does not attempt to show that evidence of Mr. Duran Gomez's alleged September 2006 assault would be admissible under Rule 404(b)(2).  *See* ECF No. 394 at 9.  Indeed, his motion makes clear that he believes that evidence is relevant precisely because it suggests Mr. Duran Gomez is more likely than Mr. Rodriguez-Mendoza to have committed the instant offense.

17

Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005).  An essential part of this right is "the right to present witnesses to establish a defense." *United States v. Piper*, 912 F.3d 847, 854 (5th Cir. 2019); *see also Kittelson*, 426 F.3d at 320 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").  Thus keeping out Mr. Rodriguez-Mendoza's evidence of the September 2006 assault could violate his constitutional right to put on the witnesses he needs to present a robust offense.  *See Boyer v. Vannoy*, 863 F.3d 428 451 (5th Cir. 2017) ("The right[] to . . . call witnesses in one's own behalf ha[s] long been recognized as essential to due process.").

Of course, "[a] defendant does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible." *Kittelson*, 426 F.3d at 320.  "In exercising the right to present witnesses, a defendant must comply with established rules of . . . evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Piper*, 912 F.3d at 854.  This rule, however, would not preclude Mr. Rodriguez-Mendoza from offering evidence of the alleged September 2006 assault if he were tried alone.

The Fifth Circuit has observed that when a "crime, wrong, or other act" is "not committed by the defendant, the evidence will not tend to show that the defendant has a criminal disposition and that he can be expected to act in conformity therewith." *Krezdorn*, 639 F.2d at 1333.  As a result, evidence of a non-defendant's other acts does

18

"not impugn the defendant's character, [and] the policies underlying Rule 404(b) are inapplicable." *Id.* The Fifth Circuit has therefore held Rule 404(b) "deals with acts committed by the defendant himself," not with acts committed by other people. *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir. 1983); *see also United States v. Johnson*, 872 F.2d 612, 623 & n.11 (5th Cir. 1989) (declining to exclude, under Rule 404(b), statements that bore on actions of someone other than defendant); *Wynne v. Renico*, 606 F.3d 867, 873 n.3 (6th Cir. 2010) ("The First, Second, Third, Fifth, and Eleventh Circuits have determined that Federal Rule of Evidence 404(b) is not applicable to evidence regarding acts of someone other than the defendant.").

In sum, admitting evidence of a purported September 2006 assault would violate Mr. Duran Gomez's right to a trial untainted by propensity inferences. But excluding that evidence would violate Mr. Rodriguez-Mendoza's right to present a full defense.

Mr. Duran Gomez is mindful that "juries are presumed to follow the instructions given to them by the district court" and that such instructions can sometimes obviate the need for severance. *Owens*, 683 F.3d at 100. The Fifth Circuit has recognized, however, that this presumption is just that—a presumption, not an absolute rule. There are situations in which, the Fifth Circuit has held, the prejudice from joinder is so great that jury instructions are insufficient to ensure a fair trial. *United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998) (vacating convictions and ordering severance on remand where "[l]imiting instructions given by the trial judge

19

were inadequate to mitigate the prejudicial effect of the overwhelming testimony regarding the violent, criminal activities of [a group to which some co-defendants did not belong]"); *United States v. Fisher*, 106 F.3d 622, 632 (5th Cir. 1997) ("The instructions the jury received to consider each defendant and offense separately before returning a verdict were insufficient to protect Fisher."), *abrogated on other grounds by Ohler v. United States*, 529 U.S. 753 (2000); *United States v. Tarango*, 396 F.3d 666, 673-74 & n.9 (5th Cir. 2005) (ordering new trial where (1) "district court observed that as the trial progressed it became clear the cautionary instructions that had been given to the jury . . . inadequately shielded [defendant] from being prejudiced," and (2) Fifth Circuit explained it was "troubled, just as the district court was, by the fact that the jury was permitted to hear a great deal of evidence that was inadmissible against [defendant]"); *United States v. McRae*, 702 F.3d 806, 827-28 (5th Cir. 2012) (holding severance required where court was "unconvinced that limiting instructions did, or could have cured the prejudice of the spillover effect from the government's case against [a co-defendant] for the alleged cover-up or the voluminous testimony, and evidence the government presented in connection with [certain charged conduct]"); *see also, e.g., Tootick*, 952 F.2d at 1085-86 (ordering severance where jury instructions, though "lengthy and accurate," were "received by a jury that ha[d] already been numbed by the conflicting defenses and [wa]s ready to believe nobody").

20

In this case, the presumption that juries can follow instructions must yield. Mr. Rodriguez-Mendoza intends to introduce evidence that, two months before the charged offense, Mr. Duran Gomez committed almost exactly the same acts charged in the indictment. It would require "mental gymnastics" of the highest order to receive this kind of other-acts evidence and yet give it no weight in the guilt-innocence determination. *United States v. Crowder*, 141 F.3d 1202, 1215 (D.C. Cir. 1998). Jury instructions cannot resolve the clash between Mr. Duran Gomez's and Mr. Rodriguez-Mendoza's trial rights. The only way out of this bind is to sever the two defendants' trials. *See United States v. Cook*, 2018 WL 2303016, at *8 (D. Conn. May 21, 2018) (ordering severance because court "fear[ed] there [wa]s a serious risk that the introduction of substantial amounts of Rule 404(b) evidence against the other defendants might prevent the jury from making a reliable judgment about [the moving defendant's] guilt or innocence").

### 4. Right to notice of the evidence upon which a death sentence is based

Forcing Mr. Duran Gomez to go to trial with Mr. Rodriguez-Mendoza would also compromise both defendants' due process rights at the eligibility and sentence-selection phases of the sentencing proceeding.

Unlike the government, co-defendants are not obligated to provide discovery to each other before a capital sentencing proceeding. Mr. Duran Gomez therefore has no way of knowing ahead of time what witnesses Mr. Rodriguez-Mendoza will call at sentencing—and no way of preparing to cross-examine them or call rebuttal

witnesses.   Mr. Rodriguez-Mendoza's severance motion indicates, however, that whoever those witnesses are, they will offer testimony tending to show that Mr. Rodriguez-Mendoza is less culpable than Mr. Duran Gomez.   ECF No. 394 at 10. Because co-defendants' relative culpability is among the statutory mitigating factors at a capital sentencing, *see* 18 U.S.C. §3592(a)(3), (4), Mr. Duran Gomez will be left without the ability to meaningfully contest information relevant to the jury's determination of life or death.

This situation counsels in favor of severance.   The Supreme Court has "recognized that death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357 (1977); *see also United States v. Farrar*, 876 F.3d 702, 717 (5th Cir. 2017) ("[P]enalty of death is different in kind.").   It is therefore "of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner*, 430 U.S. at 358.   Citing these principles, a plurality of the Court held in *Gardner* that a defendant is "denied due process of law when [a] death sentence [i]s imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 362.   The American criminal legal system, after all, is rooted in the "belief that debate between adversaries is often essential to the truth-seeking function of trials," which makes it essential that counsel have "an opportunity to comment on facts which may influence the sentencing decision in capital cases." *Id.* at 360.

22

The trial judge in *Gardner* imposed a death sentence based on factual information in a presentence investigation report that was not made available to counsel. *Id.* at 353. Those facts are not present here. But *Gardner* is relevant to this case nonetheless: courts applying *Gardner*—including the Fifth Circuit—have found due process violations where a capital sentencing jury considered information a defendant knew of, but had no realistic opportunity to contest.

The defendant in *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979), was charged with capital murder following an armed robbery in which a victim was killed. 602 F.2d at 695. Before trial, the state court directed the prosecutor to have Smith examined by a psychiatrist, Dr. James Grigson, to determine whether he was competent to stand trial. *Id.* at 696. Defense counsel were never informed that Dr. Grigson had examined their client, and Dr. Grigson did not tell Smith that the examination would concern any matters other than competence. *Id.* Dr. Grigson found Smith was competent and relayed this information to the court in a letter, without filing a formal report. *Id.* At some point before trial, defense counsel found that letter while looking through "the court's file of the case." *Id.* The prosecution did not include Dr. Grigson's name on a list of witnesses it intended to call during its case in chief. *Id.* at 696-97.

The jury voted to convict. *Id.* at 695. After Smith made his sentencing presentation, the prosecution called Dr. Grigson in rebuttal, and the court denied Smith's motion to exclude this previously undisclosed witness. *Id.* at 696-97. Dr.

23

Grigson offered "extremely damaging" testimony, opining that, based on his examination, he believed Smith was "a sociopathic personality . . . a very severe sociopath" whose behavior "would only get worse" if he were "released into society." *Id.* at 697. This opinion was relevant to one of the three questions the jury was tasked with deciding: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 696. The jury sentenced Smith to death. *Id.* at 698.

On federal habeas review, the Fifth Circuit held "*Gardner* requires [setting] aside Smith's death sentence." *Id.* at 699. Surprise, the court noted, "can be as effective as secrecy in preventing effective cross-examination, in denying the opportunity for (defense) counsel to challenge the accuracy or materiality of evidence, and in foreclosing that debate between adversaries (which) is often essential to the truth-seeking function of trials." *Id.* at 700 (parentheses in original). Although, unlike in *Gardner*, Smith was aware of all information presented to the jury, the prosecution's failure to disclose Dr. Grigson's name before trial gave defense counsel "no chance to prepare an effective response to Dr. Grigson's testimony or to impeach it in any significant way." *Id.* at 701. Because defense counsel could not "effectively cross-examine[]" Dr. Grigson, his testimony "carrie[d] no assurance of reliability whatever." *Id.* If defense counsel "had had some reasonable time to prepare," they might "have had some success in impeaching Dr. Grigson's testimony or offering an opposing view." *Id.* at 700 n.7. But defense counsel did not get that

24

opportunity, and the result was that Smith's "sentencing hearing was at least as unreliable as the proceedings in *Gardner*." *Id.* at 699. The testimony from Dr. Grigson, a previously unnoticed witness, did not comport with the "extraordinarily fair and reliable procedures" required in capital cases. *Id.* at 703.

The Fifth Circuit reaffirmed *Smith* three years later in *Gholson v. Estelle*, 675 F.2d 734 (5th Cir. 1982). There, after defendant Ross raised an insanity defense before trial, the state court granted the prosecution's motion for a psychiatric examination by Dr. Grigson, limited to issues of sanity and competency to stand trial. 675 F.2d at 736. Although Ross withdrew his insanity plea, he and co-defendant Gholson were examined by both Dr. Grigson and another doctor hired by the prosecution, John Holbrook. *Id.* The prosecution did not inform either defense counsel or the court that Dr. Holbrook had examined the defendants. *Id.* At the sentencing phase, the state called Dr. Holbrook, who testified both defendants were sociopaths who would constitute a future threat if released. *Id.* at 737. Gholson called his own psychiatrist expert to testify he was not a sociopath, and the prosecution responded by eliciting testimony from Dr. Grigson that Gholson "was a sociopath 'at the very end of the scale in terms of severity.'" *Id.* The jury sentenced both defendants to death. *Id.*

Citing *Gardner* and *Smith*, the Fifth Circuit set aside the death sentences because the sentencing proceeding did not afford the defendants "the full force of the protections and safeguards guaranteed by the Constitution" in capital cases. *Id.*

25

Specifically, the "defendants—at the punishment phase of their trials—were confronted and surprised by the doctors' testimony," which "inhibited, if not denied," their "ability to question or challenge the veracity of the very testimony that served as the groundwork for their being condemned to die." *Id.* at 738. As a result of this lack of notice, "defense counsel were thwarted in their effort to conduct a meaningful cross-examination of the doctors." *Id.* Such surprise "strikes at the heart of the adversary system of justice." *Id.* If the state is going to execute someone, the court wrote, "it should be as a result of a decision based on reason and reliable evidence—not as a result of ambush." *Id.*

The Federal Death Penalty Act provides that at least three days before trial, a capital defendant "shall . . . be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness." 18 U.S.C. § 3432. The "purpose" of this provision "is 'to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence.' In other words, § 3432 is designed to prevent trial by ambush where a defendant's life is at stake." *United States v. Fulks*, 454 F.3d 410, 422 (4th Cir. 2006) (quoting *Logan v. United States*, 144 U.S. 263, 304 (1892)).

*Smith* and *Gholson* make clear that impermissible "ambush" occurs not only when a defendant lacks any access at all to information on which a life-death determination is made, as in *Gardner*, but also when he learns of that information

26

for the first time during the sentencing proceeding.  A defendant must be able not only to cross-examine adverse witnesses, but to do so "effectively," *Smith*, 602 F.2d at 701—to conduct a "*meaningful* cross-examination," *Gholson*, 675 F.2d at 738 (emphasis added).  And, *Smith* and *Gholson* teach, a defendant cannot do so when he does not learn the identity of sentencing-phase witnesses before they are called to the stand.  *See Smith*, 602 F.2d at 701 (holding due process requires defendant be able to prepare "an *effective* response" that may impeach witnesses "in a[] *significant* way" (emphasis added)).

Here, the witnesses of whom Mr. Duran Gomez will not have advance notice are a co-defendant's witnesses, not the government's.  But this fact is irrelevant to the question in this case: whether, as a matter of discretion, the Court should order a separate trial at which Mr. Duran Gomez will not be "ambush[ed]" by witnesses he has no meaningful opportunity to cross-examine before the jury potentially sentences him to death.  *Gholson*, 675 F.2d at 738; *see United States v. Hager*, 879 F.3d 550, 557 (5th Cir. 2018) ("Severance . . . remains in the sound discretion of the trial court.").  The fundamental unfairness inherent in such an ambush will exist whether the previously unnoticed witnesses are called by the government or by his co-defendant.  This Court should therefore sever Mr. Duran Gomez's and Mr. Rodriguez-Mendoza's trials.  *See Green*, 324 F. Supp. 2d at 326 (ordering severance and noting that "[w]hile the government has to give notice of aggravating factors, a codefendant does not"—a dynamic that could result in "a classic trial by ambush").

27

### C.     A joint trial will prevent the jury from making a reliable judgment about guilt or innocence.

As explained above, a court should order severance "if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Reed*, 908 F.3d at 114.  Such a risk exists when two defendants present "antagonistic defenses." *United States v. Clay*, 408 F.3d 214, 219 (5th Cir. 2005).  To warrant severance, antagonistic defenses "must concern the core or essence of a defense, not merely minor or peripheral matters." *United States v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002).

The Fifth Circuit has recognized that antagonism of defenses causes "specific prejudice" because "defendants become weapons against each other, clawing into each other" like "the wretches in Dante's hell." *Romanello*, 726 F.2d at 174.  This prejudice manifests "in a number of ways":

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant.  In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant.  The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor.  Opening statements . . . can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant. . . . Counsel can make and oppose motions that are favorable to their defendant, without objection by the government.

> Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached.  Cross-examination of the defendant's witnesses provides further opportunities for impeachment and the ability to undermine the defendant's case.  The presentation of the codefendant's case becomes a separate forum in

28

which the defendant is accused and tried.  Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime.

Joinder can provide the individual defendants with perverse incentives.  Defendants do not simply want to demonstrate their own innocence, they want to do everything possible to convict their codefendants.  These incentives may influence the decision whether or not to take the stand, as well as the truth and content of the testimony.

The joint trial of defendants advocating mutually exclusive defenses produces fringe benefits for the prosecution.  Joinder in these cases can make a complex case seem simple to the jury: convict them both.

The government's case becomes the only unified and consistent presentation.  It presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions.  While the defendants' claims contradict each other, each claim individually acts to reinforce the government's case.  The government is further benefited by the additive and profound effects of repetition. Each important point the government makes about a given defendant is echoed and reinforced by the codefendant's counsel.

Joinder of defendants who assert mutually exclusive defenses has a final subtle effect.  All evidence having the effect of exonerating one defendant implicitly indicts the other.  The defendant must not only contend with the effects of the government's case against him, but he must also confront the negative effects of the codefendant's case.

*United States v. Tootick*, 952 F.2d 1078, 1082-83 (9th Cir. 1991); *see also United States v. Lee*, 744 F.2d 1124, 1126 (5th Cir. 1984) ("Perhaps the primary danger against which the rule [regarding antagonistic defenses] is designed to guard is that of a defendant having to face what amounts to two prosecutors—the state and his co-defendant."); *Zafiro v. United States*, 506 U.S. 534, 543-44 (1993) (Stevens, J., concurring in the judgment) (noting "[j]oinder is problematic in cases involving mutually antagonistic defenses" and "may operate to reduce the burden on the

prosecutor" because it "may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary"); *Catalan-Roman*, 376 F. Supp. 2d at 105-06 ("When there is a real risk that one co-defendant will become the other's prosecutor, the Court should favorably consider proceeding separately. . . . In such a scenario, the government, who has the burden of proving the existence of aggravating factors, could sit back and let each defendant prosecute each other.").

These dangers will be present at both the guilt and sentencing phases of a joint trial in this case.

### 1.    The guilt phase

As to the guilt phase, Mr. Rodriguez-Mendoza's severance motion indicates he will argue he is not guilty because Mr. Duran Gomez "had control over the warehouse and direct supervisory control over Mr. Rodriguez-Mendoza"; was "the driving force behind the beatings and deaths of the decedents"; and "directed the actions of Mr. Rodriguez-Mendoza and others."   ECF No. 394 at 9.   Mr. Rodriguez-Mendoza's trial strategy, in other words, will be to contend he is not legally responsible because he was merely a subordinate who had no control over—and played only a minimal role in—the kidnapping, beating, and deaths of the two victims.

But evidence provided in discovery supports Mr. Duran Gomez's ability to raise an antagonistic defense: that it was Mr. Rodriguez-Mendoza, not Mr. Duran Gomez, who had control over the individuals in the warehouse.   Ms. Madrigal-Salinas told

30

investigators that her husband, Mr. Bolanos-Garza, first got involved in alien smuggling while working as a mechanic at a car shop in Edinburg, Texas. Bates 029520. A man referred to as El Michoacano, who was known to be an alien smuggler, would frequently have work done at the shop and would tip Mr. Bolanos-Garza generously. Bates 029520. At some point, El Michoacano invited Mr. Bolanos-Garza to join him in his work, which eventually led Mr. Bolanos-Garza to the warehouse in Houston and his involvement in the instant case. *See* Bates 029520, 070382.

El Michoacano, whose real name is Miguel Garduno, appears to have been the most senior member of the smuggling operation: it was Mr. Garduno who bought "work cell phones" for Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza, Bates 029598; who directed his alleged co-conspirators in Houston to call smuggled aliens' family members to demand payment, *see* Bates 029542, 029610, 029613; who assessed his co-conspirators' job performance, Bates 029617; who made decisions about when aliens who had not paid their smuggling fees could be released, *see* Bates 029525; who ordered those in Houston, including Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza, not to feed the aliens, *see* Bates 029555; who was entitled to the money that aliens owed for their smuggling fees, *see* Bates 029551; and who arranged to find a driver to dispose of the decedents' bodies, Bates 029623-24. When the fire started in the warehouse, Mr. Bolanos-Garza called Mr. Garduno to report it to him. Bates 070393.

31

In her deposition, Ms. Madrigal-Salinas testified that Mr. Duran Gomez was not always at the warehouse; that Mr. Rodriguez-Mendoza and Mr. Bolanos-Garza were there at all times, including when the fire started; and that the latter two men were "working for" Mr. Garduno.  Bates 070384-86.  Mr. Bolanos-Garza said in his proffer that Mr. Duran Gomez also "worked for Miguel GARDUNO."  Bates 029589. Ms. Madrigal-Salinas also said that Mr. Duran Gomez never gave her orders but that Mr. Garduno, who was "in charge of the alien smuggling ring," ordered her to call some of the aliens' families.  Bates 070387-88, 070394.

Mr. Rodriguez-Mendoza, whose real name is Vicente Garduno, is Miguel Garduno's cousin.  Bates 029522.  Thus Mr. Duran Gomez will be able to argue persuasively at trial that Mr. Rodriguez-Mendoza, as a constant presence at the warehouse and a relative of the alleged conspiracy's overall leader, was most directly responsible for controlling the events that led to the decedents' deaths.  Indeed, Mr. Bolanos-Garza proffered that Mr. Garduno "did not trust anyone, so Vicente GARDUNO"—i.e., Mr. Rodriguez-Mendoza—"kept tabs, reported payments that were made, and illegal aliens that left the warehouse to Miguel GARDUNO."  Bates 029594.  Mr. Garduno also told Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza "to watch out for DURAN and make sure DURAN did not take 'their' illegal aliens." Bates 029595.  And Mr. Bolanos-Garza proffered that on one occasion, when Mr. Duran Gomez showed up to the warehouse, Mr. Rodriguez-Mendoza was already

beating the two victims while speaking on the phone with Mr. Garduno.   Bates 029617.

Events following the aliens' deaths further suggest that Mr. Rodriguez-Mendoza played a more substantial role in the events at the warehouse.   Unlike Mr. Duran Gomez, Mr. Rodriguez-Mendoza and Mr. Bolanos-Garza fled the United States and returned to Mexico, suggesting a greater consciousness of guilt.   Bates 029523, 029627.   Authorities did not capture Mr. Rodriguez-Mendoza until April 4, 2013, when he was arrested along with 23 other aliens.   Bates 029569.   The circumstances of the arrest suggest Mr. Rodriguez-Mendoza may still have been operating as an alien smuggler at this time, possibly in conjunction with Mr. Garduno.[4]

In addition to asserting that Mr. Rodriguez-Mendoza directed events at the warehouse, Mr. Duran Gomez will argue, contrary to his co-defendant, that it was Mr. Rodriguez-Mendoza who inflicted the most severe, and ultimately fatal, blows to the victims.   Witnesses at the warehouse saw Mr. Rodriguez-Mendoza whip the victims with an extension cord, leaving marks on their thighs and backs, Bates 011774; beat the victims with a broomstick until it broke, Bates 011774; sodomize Hector with a bottle, Bates 011776; pour lotion onto the aliens, then set it on fire, Bates 011547; and beat Hector in the head with a gun until he bled, Bates 011544.

---

[4] On February 24, 2014, an indictment charging Mr. Garduno with various counts relating to smuggling and harboring aliens was filed, and an arrest warrant issued the same day. *See United States v. Miguel Garduno*, 14-cr-0087 (S.D. Tex.). As of this filing, Mr. Garduno remains a fugitive.

One witness reported that Mr. Rodriguez-Mendoza "kicked [the victims] the most" and "kicked the persons hard." Bates 011795. Another said Mr. Rodriguez-Mendoza "conducted most of the beatings." Bates 011450.

According to multiple witnesses, Mr. Rodriguez-Mendoza was drunk and may have been high on marijuana when he beat the aliens. Bates 011544, 011781, 029604. Such intoxication may have contributed to the viciousness of Mr. Rodriguez-Mendoza's beatings. Mr. Rodriguez-Mendoza even told Mr. Bolanos-Garza that "he [Mr. Rodriguez-Mendoza] had overdone it" during his beatings of the victims. Bates 011779. Given events at the warehouse, it makes sense that Mr. Rodriguez-Mendoza was primarily responsible for beating the victims: one of the alleged co-conspirators overheard several of the aliens discussing a plan to lure Mr. Rodriguez-Mendoza to the bathroom and kill him—a plan that was known to Mr. Rodriguez-Mendoza. Bates 011441; *see also* Bates 029617-19.

By contrast, one witness said Mr. Rodriguez-Mendoza and Mr. Bolanos-Garza, but not Mr. Duran Gomez, conducted the beatings, and another told investigators that Mr. Duran Gomez "did not hurt, beat or abuse anyone" (although he later tried to walk that statement back). Bates 011774, 011783. Indeed, witnesses reported hearing Mr. Rodriguez-Mendoza say he would figure out who started the fire—"by beating the aliens if necessary"—without any indication that he was receiving orders from Mr. Duran Gomez. Bates 011444. Mr. Bolanos-Garza, too, said Mr. Rodriguez-

34

Mendoza "beat the illegal aliens on his own free will and without DURAN's orders." Bates 029611.

Because Mr. Duran Gomez and Mr. Rodriguez-Mendoza will offer dueling narratives about who was responsible for the victims' deaths, each will assume the role of a "second prosecutor" in his co-defendant's case. *Tootick*, 952 F.2d at 1082; *Lee*, 744 F.2d at 1126. They may "portray the other defendant as the sole perpetrator of the crime," "emphasize the exclusive guilt of the other defendant" during cross-examination, "help rehabilitate a witness that has been impeached" by the government, and "echo[] and reinforce[]" the points the government makes against the co-defendant. *Id.* As the Fifth Circuit has recognized, these conditions—in which each defendant is "the government's best witness against the other"—are "inherently prejudicial." *Crawford*, 581 F.2d at 492.

## 2.    The sentencing phase

If the defendants are convicted, the prejudice of a joint trial will persist into the sentencing phase. This prejudice will manifest in two ways. First, Mr. Duran Gomez and Mr. Rodriguez-Mendoza will offer antagonistic defenses centering on their relative culpability. Second, a joint sentencing proceeding would deny Mr. Duran Gomez his Eighth Amendment right to an individualized penalty determination.

### a.    Antagonistic defenses

The Federal Death Penalty Act, under which the defendants would be sentenced, "sets up a weighing scheme in which the jury is asked to weigh any aggravating factors found to exist beyond a reasonable doubt against any mitigating factors found to exist by a preponderance of the evidence." *United States v. Jones*, 132 F.3d 232, 251 (5th Cir. 1998).   Among the mitigating factors the jury must consider are (1) whether "[t]he defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge"; and (2) whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death."  18 U.S.C. § 3592(a)(3), (4).

Mr. Rodriguez-Mendoza intends to seize on these mitigating factors to argue against a death sentence, asserting he was nothing more than a minor participant whose "relative blameworthiness in the crime is below Mr. Bolanos-Garza's, and even further below Mr. Duran-Gomez's."  ECF No. 394 at 10.   Although he does not mention this fact in his severance motion, Mr. Rodriguez-Mendoza may also introduce evidence that he agreed to plead guilty in return for a non-death sentence and proceeded to trial only because the Attorney General refused to approve the deal. This evidence, which would be inadmissible against Mr. Duran Gomez at a severed sentencing proceeding, would penalize Mr. Duran Gomez for exercising his right to

trial.  If the jury is allowed to hear that the local prosecutors recommended approval of the plea, it would insert the prosecutors' opinions into the jury's decision-making.

Mr. Duran Gomez, too, will argue his relatively low culpability counsels against capital punishment.  As explained above, substantial evidence in discovery suggests it was Mr. Rodriguez-Mendoza who inflicted the most, and the most severe, beatings and who, as Mr. Garduno's cousin and a constant on-the-ground presence, had more direct responsibility for the smuggled aliens pursuant to Mr. Garduno's orders.  Mr. Duran Gomez will therefore ask the jury to find that, to the extent he was involved in the charged offenses at all, his "participation was relatively minor" compared to Mr. Rodriguez-Mendoza's.  § 3592(a)(3).  And, insofar as the jury is inclined to spare Mr. Rodriguez-Mendoza's life, Mr. Duran Gomez will argue a death sentence is inappropriate because Mr. Rodriguez-Mendoza, who is at least "equally culpable in the crime, will not be punished by death."  *Id.* § 3592(a)(4).

The co-defendants' defenses will therefore be antagonistic, rendering any joint sentencing proceeding prejudicial.[5]  As one district court has explained in ordering severance:

---

[5] Mr. Rodriguez-Mendoza has indicated he intends to argue he is ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is intellectually disabled.  *See* ECF No. 419.  If the Court denies his motion, he is likely to argue at sentencing that his intellectual impairments make it unlikely he could have been the leader in the beating deaths of the two victims.  In a joint sentencing proceeding, the Court would presumably afford Mr. Rodriguez-Mendoza greater leeway to present evidence of his intellectual disability than it would afford the government in a sentencing at which the jury was determining only the sentence for

In a joint trial, capital accuseds with diametrically opposed defenses, as here, may not only attempt to minimize their own role under section 3592(a)(3), but also present their mitigation case implicitly, or by design, to redound to their codefendant's detriment.  In such a scenario, a co-defendant, in effect, locks arms with the prosecutor, stressing the aggravators applicable against the adversary co-defendant, and may even advocate other aggravators unencumbered by the notice procedures found in 18 U.S.C. § 3593(a) that are applicable to the prosecutor alone. . . .

In assuring that only those most deserving of a capital sentence actually receive it, society benefits from allowing a defendant to make the best case in mitigation possible to a fact finder who has under consideration that defendant alone.  This one-on-one adversarial approach more faithfully implements the apparent intention of the FDPA, and the jurisprudence of the Supreme Court, that a capital defendant receive from the jury an individualized decision concerning the propriety of the ultimate sanction.

*United States v. Lecco*, No. 2:05-cr-107, ECF No. 1115 at 8-10 (S.D. W. Va. Sept. 3, 2009).

Here, if the jury believes Mr. Rodriguez-Mendoza's culpability is lower than Mr. Duran Gomez's, it must necessarily conclude the "relatively minor" mitigating factor does not apply to Mr. Duran Gomez, and vice versa.  The jury cannot believe both co-defendants simultaneously.  Thus "an aggravating fact for one defendant is a mitigating fact for another," and "virtually every argument for mitigation made by one defendant will be in effect an argument against mitigation as to the other

---

Mr. Duran Gomez.  A joint trial would therefore prejudice Mr. Duran Gomez for an additional reason: it would permit the jury to hear additional evidence about Mr. Rodriguez-Mendoza's full-scale IQ and, if established, poor adaptive functioning—evidence that would be inadmissible at a severed trial.

defendant if that defendant cannot claim the same attribute." *Green*, 324 F. Supp.
2d at 325-26.   Anticipating that the defendants would "argue for mitigation by
shifting blame to the other, or by arguing that they are not as worthy of death as their
codefendant," the court in *Green* determined the only way to ensure both defendants
a fair trial was to grant severance.   *Id.* at 326.   The same dynamic exists in this case,
and severance is appropriate for the same reasons.[6]

### b.   Individualized sentencing determination

The Eighth Amendment "require[s] that a capital sentencer must have
individualized sentencing capability."  *Nelson v. Quarterman*, 472 F.3d 287, 319 (5th
Cir. 2006).  That is, "punishment should be directly related to the personal culpability
of   the   criminal   defendant,"   and   the   sentencer   must   "make   an
individualized assessment of the appropriateness of the death penalty."   *Id.*

---

[6] The First Circuit reversed the district court in *Green*, but for reasons unrelated to the
likelihood that the defendants would offer antagonistic defenses at sentencing.  Specifically, the
district court severed the case into two trials, each of which would feature both a capital and a
non-capital defendant.  *United States v. Green*, 407 F.3d 434, 436 (1st Cir. 2005).  Then, to avoid
the prejudice to the non-capital defendants of being tried by death-qualified jurors, the district
court ordered that each trial should feature two separate juries, different in composition: one
(non-death-qualified) to decide guilt or innocence, and a second (death-qualified) to determine
the sentence of the capital defendant.  *Id.* at 436-37.  The government appealed, arguing the
Federal Death Penalty Act does not permit district courts to empanel separate juries for the guilt
and sentencing phases in capital cases.  *Id.* at 436; *see* 18 U.S.C. § 3593(b)(1) (providing capital
sentencing hearing shall be held "before the jury that determined the defendant's guilt," subject
to five narrow exceptions).  The First Circuit agreed that the district court exceeded its authority
in bifurcating the juries within each trial, and remanded for further proceedings.  *Green*, 407
F.3d at 444.  Because neither Mr. Duran Gomez nor Mr. Rodriguez-Mendoza is asking for
separate juries at the guilt and sentencing phases, the First Circuit's ruling in *Green* is irrelevant
to this case.

(emphasis omitted).  This requirement ensures "that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence."  *Id.* (emphasis omitted); *see also United States v. Fields*, 483 F.3d 313, 325-26 (5th Cir. 2007) (noting "the particular importance of individualized sentencing in capital cases").

Indeed, even when reviewing one of the minority of federal capital cases where severance was not granted, the Fifth Circuit "share[d] [the defendant's] concern over the inherent tension between joinder and each defendant's constitutional entitlement to an individualized capital sentencing decision." *Bernard*, 299 F.3d at 475.  And the court cautioned that "[a] trial court must be especially sensitive to the existence of such tension in capital cases, which demand a heightened degree of reliability." *Id.* Thus the possible "scandal and inequity of inconsistent verdicts," *Zafiro*, 506 U.S. at 537—which the Supreme Court has said counsels against severance in a mine-run case—may well be the very lifeblood of Eighth Amendment minimum requirements, i.e., "individualized sentencing" and "heightened reliability."

Data suggest Mr. Duran Gomez may not receive the requisite individualized consideration if he is sentenced alongside Mr. Rodriguez-Mendoza.  A careful analysis of the sentencing practices of federal capital juries in the modern era reveals that almost every single federal jury that has decided the fate of multiple defendants has rendered the exact same punishment verdict as to each co-defendant:

> In those trials involving more than one capital defendant, juries have reached the same verdict on punishment—either life or death—for all

40

defendants in nearly every case (89%).  In 32 trials the penalty verdict was the same.  In only four trials was the penalty verdict different for the defendants.  In four other cases, the jury acquitted all defendants.

Ex. B at 6-8.

To protect Mr. Duran Gomez's Eighth Amendment right to an individualized sentencing proceeding, this Court should sever his trial from Mr. Rodriguez-Mendoza's.

## III.  Conclusion

Because death is different, the Constitution requires "heightened reliability" and "individualized sentencing" in capital cases.  Consistent with these requirements, the federal system's normal preference for joint trials does not apply in capital cases.  Rather, federal courts routinely order severance of capital co-defendants' trials.

Severance is appropriate here.  A joint trial would compromise numerous of Mr. Duran Gomez's specific trial rights—his right to confront the witnesses against him, his right to avoid prejudice in the guilt-innocence phase through introduction of any criminal history, his right to a trial untainted by prejudicial propensity evidence, his right to notice of the evidence upon which a jury might sentence him to death, and his right to an individualized sentencing proceeding.  And, because the defendants intend to pursue antagonistic defenses, trying them together presents a serious risk that the jury would be unable to make a reliable judgment about guilt or innocence.

41

Mr. Duran Gomez therefore respectfully requests this Court sever his trial from that of Mr. Rodriguez-Mendoza.

Respectfully submitted,

/s/ Wendell A. Odom, Jr
WENDELL A. ODOM, JR.
Texas State Bar # 15208500
Federal Bar # 0947
440 Louisiana, Suite 200
Houston, TX 77002
(713) 223-5575
(713) 224-2815 (FAX)

/s/ Neal Davis, III
NEAL DAVIS, III
Texas State Bar #24038541
Federal Bar # 706329
440 Louisiana, Suite 200
Houston, TX 77002
(713) 223-5575
(713) 224-2815 (FAX)

/s/ James Wyda
JAMES WYDA (#25298)
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
(410) 962-3962
(410) 962-0872 (FAX)

/s/ Julie L.B. Stelzig
JULIE L.B. STELZIG (#27746)
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
(301) 344-0600
(301) 344-0019 (FAX)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Defendant's Motion to Sever Trial** was delivered via electronic filing to the Assistant United States Attorney in this cause on February 8, 2019.

*/s/ Neal Davis, III*
NEAL DAVIS, III

## CERTIFICATE OF CONFERENCE

Counsel has spoken with the Assistant United States Attorney in this cause, Jill Stotts, who stated that she is opposed.

*/s/ Neal Davis, III*
NEAL DAVIS, III

43