**United States District Court
for the Southern District of Texas
Houston Division**

| | | |
|---|---|---|
| United States of America | § | |
| | § | |
| v. | § | **Criminal No. H-10-459** |
| | § | |
| Wilmar Rene Duran Gomez | § | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**Motion to Dismiss the Indictment or, in the Alternative, to
Strike the Government's Notice of Intent to Seek the Death Penalty**

Defendant Wilmar Rene Duran Gomez moves this Court, pursuant to the Fifth

Amendment Due Process Clause, the Sixth Amendment Speedy Trial Clause, and the Eighth

Amendment, to dismiss the second superseding indictment or, in the alternative, strike the

government's notice of intent to seek the death penalty.

## I.   Factual and procedural history

### A.   Obstruction charge

On December 27, 2006, a grand jury indicted Mr. Duran Gomez on one count of

obstructing justice, under 18 U.S.C. § 1505.  *United States v. Duran Gomez*, No. 4:06-cr-459

(S.D. Tex.) ("*Duran Gomez I*"), ECF No. 19.  The indictment alleged that Mr. Duran Gomez and

his sister (Judith Lopez) and mother (Florencia Lopez) obstructed and impeded an Immigrations

and Customs Enforcement (ICE) investigation "into the harboring of illegal aliens resulting in

the death of any person."  *Duran Gomez I*, ECF No. 19.

Mr. Duran Gomez entered a plea agreement with the government on May 25, 2007.

*Duran Gomez I*, ECF No. 75.  At sentencing on January 13, 2011, the court sentenced Mr. Duran

Gomez to 60 months in prison (the statutory maximum), to be followed by three years of

supervised release.  *Duran-Gomez I*, ECF No. 200 at 13-14.

1

**B.      Smuggling and related charges**

On July 1, 2010, a grand jury returned an indictment charging Mr. Duran Gomez and

Efrain Rodriguez Mendoza with one count of conspiracy to transport and harbor aliens, under 8

U.S.C. § 1324(a)(1)(A)(v)(I), and two counts of harboring an illegal alien resulting in death,

under 8 U.S.C. § 1324(a)(1)(A)(iii), (B)(i), (A)(v)(II), (B)(iv).  *United States v. Duran Gomez*,

No. 4:10-cr-00459 (S.D. Tex.) ("*Duran Gomez II*"), ECF No. 142 at 1-8.  The harboring counts

are "punish[able] by death or imprison[ment] for any term of years or for life."  18 U.S.C.

§ 1324(a)(1)(B)(iv).

The indictment alleged that Mr. Duran Gomez, along with Mr. Rodriguez Mendoza,

smuggled aliens from Mexico to a warehouse in Houston, where he housed them pending

transportation to their final destinations in the United States.  *Duran Gomez II*, ECF No. 142 at 2.

When some of the aliens lit a fire in the warehouse in an attempt to escape, the defendants

allegedly beat the aliens repeatedly over the course of several days.  *Id.* at 5-6.  The indictment

alleged that two of the aliens, Abelardo Sagastume and Hector LNU (last name unknown), died

as a result.  *Id.* at 6.

On October 4, 2012, the government (1) filed a notice of intent to seek the death penalty

(NOI) against Mr. Duran Gomez, and (2) unveiled a first superseding indictment.  *Duran Gomez*

*II*, ECF Nos. 137, 147.

The government arrested Mr. Rodriguez Mendoza, who had been a fugitive, on April 9,

2013.  *Duran Gomez II*, ECF No. 216 at 1.  Almost four years later, on January 10, 2017, the

government filed a second superseding indictment (SSI) that retained the conspiracy-to-harbor

and harboring counts and added two counts of kidnapping resulting in death, under 18 U.S.C.

§1201(a)(1), and two counts of hostage taking resulting in death, under 18 U.S.C. § 1203.  *Duran*

*Gomez II*, ECF No. 314 at 1-12.  The government filed a notice of its intent to seek the death penalty against Mr. Rodriguez Mendoza on February 10, 2017.  *Duran Gomez II*, ECF No. 326.

## II.   Argument

### A.   The pretrial delay in this case violates Mr. Duran Gomez's Sixth Amendment right to a speedy trial.

By the time of trial in March 2021, almost eleven years will have elapsed since the government indicted Mr. Duran Gomez on capital charges, and more than fourteen years will have elapsed since the alleged crimes.  Such a lengthy delay violates his right to a speedy trial under the Sixth Amendment.  This Court should therefore dismiss the SSI.

#### 1.   Legal background

"The Sixth Amendment states that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'"  *United States v. Molina-Solorio*, 577 F.3d 300, 304 (5th Cir. 2009).  "In analyzing whether this right has been violated, the Supreme Court in *Barker v. Wingo* adopted 'a balancing test, in which the conduct of both the prosecution and the defendant are weighed.'"  *Boyer v. Vannoy*, 863 F.3d 428, 441-42 (5th Cir. 2017) (quoting 407 U.S. 514, 530 (1972)).  This test requires consideration of four factors: "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant diligently asserted his right; and (4) whether the defendant suffered prejudice."  *United States v. Rojas*, 812 F.3d 382, 410 (5th Cir. 2016).

The *Barker* test "eschews rigid rules and mechanical factor-counting in favor of a difficult and sensitive balancing process."  *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011) (per curiam).  "[N]one of the four *Barker* factors is either necessary or sufficient to find a speedy trial violation."  *United States v. Frye*, 489 F.3d 201, 213 (5th Cir. 2007).  Rather, "they are related factors and must be considered together with such other circumstances as may be relevant."  *Goodrum v. Quarterman*, 547 F.3d 249, 257 (5th Cir. 2008).

The first factor, length of delay, "performs a dual function." *Amos*, 646 F.3d at 205. At the "threshold," it "operates as a screening device," separating "ordinary delay from presumptively prejudicial delay." *Id.* at 205-06. "The delay between [1] arrest or indictment and [2] trial crosses the line from 'ordinary' to 'presumptively prejudicial' somewhere around the one-year mark." *Id.* at 206. If a defendant makes this threshold one-year showing, the court "undertakes a full *Barker* analysis." *United States v. Harris*, 566 F.3d 422, 432 (5th Cir. 2009). If not, his claim does not "trigger a speedy trial analysis," and he is unentitled to relief. *Amos*, 646 F.3d at 206.

The length of delay's second function is to serve as "one factor among several" in the full *Barker* analysis, i.e., in examination of "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* This question entails balancing the first three *Barker* factors (length of delay, reason for the delay, assertion of the right) against the fourth (prejudice). *United States v. Bergfeld*, 280 F.3d 486, 488 (5th Cir. 2002). "Ordinarily the burden is on the defendant to demonstrate actual prejudice." *Amos*, 646 F.3d at 208. He will prevail if he can show that "such prejudice is sufficient to outweigh the other three factors." *Frye*, 489 F.3d at 209.

"But where the first three factors together weigh heavily in the defendant's favor, [courts] may conclude that they warrant a presumption of prejudice, relieving the defendant of his burden." *Amos*, 646 F.3d at 208. "If prejudice is presumed, the Government can overcome that by 'showing that the presumption is extenuated . . . or rebutting the presumption with

evidence.'"[1] *Frye*, 489 F.3d at 209 (ellipsis in original) (citation omitted).  "'Actual prejudice' is assessed in light of the three following interests of the defendant: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired."  *Harris*, 566 F.3d at 433.

"The only remedy for a violation of the [speedy trial] right is dismissal of the indictment."  *Molina-Solorio*, 577 F.3d at 304.

### 2.      Analysis

The grand jury returned the original indictment in this case on July 1, 2010—almost eleven years before the current trial date (March 2021).  *Duran Gomez II*, ECF No. 1.  This case therefore easily crosses the one-year threshold between "ordinary delay" and "presumptively prejudicial delay."  *Amos*, 646 F.3d at 206.  Accordingly, this Court must undertake a "full *Barker* analysis" that considers all four speedy-trial factors.  *Harris*, 566 F.3d at 432.

### a.      Length of delay

The first *Barker* factor, the length of delay, militates strongly in favor of presuming prejudice.  Because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or . . . identify," the "presumption that pretrial delay has prejudiced the accused intensifies over time."  *Boyer*, 863 F.3d at 443 n.59 (ellipsis in original) (citations

---

[1] Thus the speedy-trial analysis involves two separate steps at which a court may either presume prejudice or not: (1) at the threshold, to decide whether a "full *Barker* analysis" is appropriate, and (2) as part of that "full *Barker* analysis," to decide who bears the burden of establishing prejudice or lack of prejudice.

omitted); *see also Goodrum*, 547 F.3d at 260 ("[T]he likelihood of evidentiary prejudice, though difficult to prove, increases in tandem with the length of the delay.").[2]

Trial in this case is currently scheduled to begin in March 2021, eleven years after the government first indicted Mr. Duran Gomez on capital charges and more than fourteen years after the alleged crimes. When a delay is "extraordinary"—i.e., over five years—the first factor "weighs heavily in [a defendant's] favor," *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002), and can, on its own, give rise to a presumption of prejudice, *see, e.g.*, *Boyer*, 863 F.3d at 443 ("[T]he state appellate court found that the length of delay was presumptively prejudicial, which is reasonable given the seven year time period between arrest and trial."); *Goodrum*, 547 F.3d at 260 (noting a six-year delay is sufficient to warrant presumption of prejudice); *United States v. Parker*, 505 F.3d 323, 328-29 (5th Cir. 2007) ("We have held that delays of less than five years are not enough, by duration alone, to presume prejudice."); *Doggett v. United States*, 505 U.S. 647, 652 (1992) (describing delay of eight-and-a-half years as "extraordinary").

As a result, this Court should presume prejudice exists, regardless of its weighing of the second and third *Barker* factors. *See, e.g.*, *United States v. Reagan*, 725 F.3d 471, 487 (5th Cir. 2013) ("Because [neither the second nor third *Barker* factor] supports a presumption of prejudice, and because the delay was not long enough to require a presumption of prejudice *by itself*, we do not presume prejudice." (emphasis added)). But even if this Court considers the second and third factors, a presumption of prejudice is still appropriate.

---

[2] As explained in greater depth below, *see infra* Part II.B.2.a, the Supreme Court has held that the Eighth Amendment's prohibition on cruel and unusual punishment "requires increased reliability of the process by which capital punishment may be imposed." *Herrera v. Collins*, 506 U.S. 390, 405 (1993). Thus the need to ensure that delay does not undermine the reliability of trial, thereby prejudicing the defendant, is particularly important in capital cases. *See also, e.g.*, *Caldwell v. Johnson*, 226 F.3d 367, 373 (5th Cir. 2000) (describing Supreme Court "decisions imposing heightened procedural requirements on capital trials and sentencing proceedings").

### b.      Reason for the delay

When applying *Barker*, courts ask "whether the government or the criminal defendant is more to blame for the delay." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009). "The burden is on the Government to assign reasons to justify the delay," and "[d]ifferent reasons are entitled to different weight." *Amos*, 646 F.3d at 207.

> At one extreme, a deliberate delay to disadvantage the defense is weighted heavily against the [government]. At the other end of the spectrum, delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the [government]. Between these extremes fall unexplained or negligent delays, which weigh against the [government], but not heavily.

*Id.* In cases that occupy this negligent "middle ground," the "weight assigned to the [second] factor increases as the length of the delay increases." *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003). "A court's toleration of such negligence varies inversely with its protractedness." *Id.* "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Molina-Solorio*, 577 F.3d at 305; *see also Brillon*, 556 U.S. at 90 ("More neutral reasons such as negligence or overcrowded courts weigh less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.").

Mr. Duran Gomez is not currently aware of any evidence that the government engaged in deliberate, bad faith delay. He does assert, however, that the government will be unable to articulate any "valid reasons" for a delay of almost eleven years. *Amos*, 646 F.3d at 207. And because the delay in this case has been so lengthy, the second factor weighs more heavily in Mr. Duran Gomez's favor than it might otherwise. *Serna-Villarreal*, 352 F.3d at 232.

7

Mr. Duran Gomez acknowledges that he has asked for several continuances in this case, which might cut in the government's favor.  *See, e.g.*, *Reagan*, 725 F.3d at 487 (holding second factor "militate[s] against a presumption of prejudice" because "the delay was partially attributable to Reagan's requests for two continuances").  But the Court should not place undue weight on this fact.

The Fifth Circuit has recognized that where a case is "complex," a defendant's requests for continuances are "understandable" because trial and sentencing require substantial preparation.  *United States v. Bishop*, 629 F.3d 462, 468 (5th Cir. 2010); *cf.* 18 U.S.C. § 3161(h)(7)(B)(iii) (providing that under Speedy Trial Act, court may continue case to serve "ends of justice" if "the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section").  As a result, the second *Barker* factor favors the government only weakly in such cases.  *Bishop*, 629 F.3d at 468.

The Court has designated this case complex because of "the nature of the prosecution, the existence of novel questions of fact and law, and the large volume of discoverable materials." *Duran Gomez II*, ECF No. 94.  The discovery produced to date includes over 70,000 pages of documents and dozens of hours of recordings and videos, as well as substantial physical evidence.  Moreover, the large majority of this discovery—roughly 62,000 pages—was not produced until 2016, and much of the discovery provided before then related to Mr. Duran Gomez's obstruction case, rather than his capital charges.  Given the immense volume of materials to review, categorize, and investigate, and given the government's tardiness in making

those materials available, Mr. Duran Gomez's continuance requests hardly establish that he is to blame for the inordinate delay.

In addition, this case has stalled because Mr. Duran Gomez has not received the funds necessary to present an effective defense at trial and a compelling mitigation case at sentencing. Mr. Duran Gomez's counsel applied for expert funding shortly after he was indicted, seeking funding for a mitigation specialist and fact investigator for "pre-authorization" work essential to preparing for meeting with the Department of Justice. Mr. Duran Gomez applied for additional funds after the government issued its NOI. *Duran Gomez II*, ECF No. 198. As with the first request, this Court approved only a portion of the requested funds, finding certain expenses were unnecessary or duplicative. *Duran Gomez II*, ECF No. 205. When Mr. Duran Gomez sought approval for additional funds on July 6, 2015, the Court once again denied funding for whole categories of necessary experts and approved only a fraction of the requested amounts for others. *Duran Gomez II*, ECF No. 247. The sum the Court authorized for post-NOI fact investigation was completely expended by the end of 2016, and the amount for post-NOI mitigation work was exhausted by early 2018.

Mr. Duran Gomez's inability to secure the necessary funding—which cannot be imputed to him—has prolonged the pretrial proceedings. Capital cases are expensive. To put on the robust defense to which he is constitutionally entitled in a capital case, Mr. Duran Gomez has had to hire fact investigators, mitigation experts, future-dangerousness experts, forensic experts, paralegals, and others. *See* American Bar Association, Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, Guideline 10.11(B) (2008) ("The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors,

which may provide a basis for a sentence less than death.").  In particular, counsel in capital

cases are ethically obligated to conduct a mitigation investigation into a client's "medical history,

complete prenatal, pediatric and adult health information; exposure to harmful substances in

utero and in the environment; substance abuse history; mental health history; history of

maltreatment and neglect; trauma history; educational history; employment and training history;

military experience; multi-generational family history, genetic disorders and vulnerabilities, as

well as multi-generational patterns of behavior; prior adult and juvenile correctional experience;

religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-

economic, historical, and political factors." *Id.*  Gathering such information frequently requires

"in-person, face-to-face, one-on-one interviews with the client, the client's family, and other

witnesses who are familiar with the client's life." *Id.* Guideline 10.11(C).

Investigators in Mr. Duran Gomez's case have had to research events that took place

many years ago, both in the United States and abroad, and talk to witnesses who are scattered

across the United States and at least three other countries.  Preparation for sentencing will require

Mr. Duran Gomez's mitigation experts to travel extensively, hunt down witnesses in remote

locations, and navigate other countries' legal bureaucracies.  All this work requires substantial

time and money—the latter of which Mr. Duran Gomez, through no fault of his own, was unable

to access for many years.

Finally, several of Mr. Duran Gomez's continuance requests were based on events

exclusively within the government's control.  In an October 31, 2013 continuance motion, for

example, Mr. Duran Gomez wrote that he needed additional time, in part, because the

government was still in the "pre-authorization phase" for determining whether to seek the death

penalty against co-defendant Efrain Rodriguez Mendoza, whom the government had arrested

seven months previously.  *Duran Gomez II*, ECF No. 216 at 1-2.  Because Mr. Rodriguez Mendoza was accused of being extensively involved in the charged crimes, Mr. Duran Gomez could not proceed to trial without knowing the status of his co-defendant's case—information that would potentially be material to numerous pretrial motions, trial strategy, and sentencing arguments.  Mr. Duran Gomez made this same point in three subsequent continuance motions, filed February 20, 2015; January 19, 2016; and September 7, 2016.  *Duran Gomez II*, ECF Nos. 237, 264, 285.

It was not until February 10, 2017—six and a half years after indicting him on death-eligible charges, and almost four years after arresting him—that the government announced its intent to seek the death penalty against Mr. Rodriguez Mendoza.  *Duran Gomez II*, ECF Nos. 142; 237 at 1; 326.  Mr. Duran Gomez's requests for continuances during this period should, if anything, weigh against the government, which had sole authority to make the "seek" decision and is therefore responsible for the inordinate delay.  *See United States v. Black*, 918 F.3d 243, 260-61 (2d Cir. 2019) (holding "the government's delayed decision on whether to seek the death penalty" should be "charge[d] to the government" because court did not expect defendant to proceed with filing motions that might end up being "substantively useless if the prosecution sought the death penalty").

In sum, little, if any, of the delay so far can be attributed to Mr. Duran Gomez.  The second *Barker* factor therefore weighs in Mr. Duran Gomez's favor.

### c.    Assertion of the right

Mr. Duran Gomez has not previously filed a motion formally objecting to the inordinate delay in this case.  He did, however, raise the issue of delay-related prejudice in previous court proceedings.  *See, e.g.*, Transcript of October 11, 2012 Status Conference, attached as Exhibit A, at 14 (defense counsel indicating Mr. Duran Gomez planned to file motion "dealing with the

11

question of whether or not [he] can get a fair trial based upon the length of time"). And he pointed out the delay while meeting with the Attorney General's Review Committee on Capital Cases (AGRCCC) in 2012, arguing that the delay provided a compelling reason to reverse the decision to seek death.

Regardless, even if Mr. Duran Gomez had never expressed his desire to expedite the proceedings, this fact would be entitled to little weight. The Supreme Court in *Barker* "refused to . . . hinge the right on a defendant's explicit request for a speedy trial." *Brillon*, 556 U.S. at 89-90. And the Fifth Circuit has emphasized repeatedly that "none of the four *Barker* factors is either necessary or sufficient" to find a delay unconstitutional. *Frye*, 489 F.3d at 21; *see also, e.g.*, *Goodrum*, 547 F.3d at 257 (same). It is therefore immaterial that Mr. Duran Gomez has not previously filed a formal objection to the delay in this case.

The first three *Barker* factors support presuming prejudice in this case.

### d.    Prejudice

If this Court presumes prejudice, the government will be unable to rebut that presumption. And even if the Court does not apply the presumption, the final *Barker* factor weighs strongly in Mr. Duran Gomez's favor. The extraordinary delay in this case will produce a trial and a sentencing proceeding that are fundamentally, and irreparably, unfair.

Mr. Duran Gomez addresses each of the three types of prejudice identified in *Barker*.

### i.    Impairment of Mr. Duran Gomez's defense

Events over the eleven years preceding trial—and the more than fourteen years since the alleged crimes—make it more likely that the jury will convict Mr. Duran Gomez of capital offenses and sentence him to death.

12

### (a)    Fact witnesses

Numerous fact witnesses, who might have provided exculpatory testimony at trial, have died or been deported:

- Gilberto Esteban Peralta-Navarette was at the warehouse when police executed a search warrant there on November 22, 2006.  During a May 2, 2007 deposition, he testified that, during the week or so he was at the warehouse, he did not see anyone being beaten.  He also said he did not remember Mr. Duran Gomez being present.  It appears the government deported Mr. Peralta-Navarette in May 2007.  Bates 12418-20.  Mr. Duran Gomez does not know where Mr. Peralta-Navarette is now or how he can locate him to secure his testimony at trial.

- Manuel Jesus Gonzalez-Sanchez was also at the warehouse on November 22, 2006.  When interviewed by ICE agents a week later, he said he had been at the warehouse for about four days, during which time he did not see anyone get hurt or physically abused.  Mr. Gonzalez-Sanchez was also deported in May 2007.  Bates 12418-20.  Mr. Duran Gomez does not know Mr. Gonzalez-Sanchez's whereabouts or how to track him down for purposes of investigation.

- Diana Soledad Caldas-Guevara, Mr. Duran Gomez's then-girlfriend, was arrested at the same time he was.  After pleading guilty to making a false statement to an ICE agent, she was sentenced to time served in May 2007 and deported.  She told ICE agents in a January 2008 interview in Peru that Judith Lopez—Mr. Duran Gomez's sister, who implicated him in the deaths of Mr. Sagastume and Hector LNU—wanted to testify against Mr. Duran Gomez as payback for getting her and their mother in legal trouble.  Ms. Caldas-Guevara also said that Ms. Lopez asked her to "ally" against Mr. Duran Gomez and that a key detail in Ms. Lopez's story

to authorities—that Ms. Caldas-Guevera drove the victims' bodies to Fort Bend County—is false.  Mr. Duran Gomez does not know Ms. Caldas-Guevera's current whereabouts or how to contact her in spite of repeated requests to the government.

- Jessie Morin was a driver and business associate of Mr. Duran Gomez who held the lease on the warehouse.  Mr. Morin stated in earlier interviews that he had not heard complaints of physical abuse from individuals he had transported.  Mr. Morin died on September 28, 2017.

In addition, as the defense investigation continues, it is certain that there will be other witnesses who cannot be interviewed because they have been deported by the government or are deceased.  Even when witnesses can be located, the extended passage of time since the events in question will likely diminish their utility.  Mr. Duran Gomez's inability to call these witnesses will make it harder for him to defend against the charges in the SSI.  *See Frye*, 489 F.3d at 213 (explaining that government action that "impair[s] the defendant's ability to present his defense by essentially making an exculpatory witness unavailable" presents "exactly the type of prejudice the Supreme Court was most concerned with in *Barker*").

### (b)    Documentary and physical evidence

In addition to the fact witnesses described above, documentary evidence that could exculpate Mr. Duran Gomez at the guilt phase has gone missing or been destroyed.

On December 7, 2006, a Hispanic male identifying himself as "Luis" called Yurina Rico, a reporter with the California newspaper La Opinion, and told her that he had recently been held hostage in Texas by alien smugglers.  He reported that he and four other Hispanic males had been beaten at a stash house.  Luis said he saw Abelardo Sagastume die from his injuries. Although Ms. Rico informed ICE of this conversation the next day, on December 8, 2006, ICE

14

investigators did not contact her to follow up until December 5, 2007—almost a year later.  By

that time, Ms. Rico could not locate her notes on Luis, whom ICE agents considered a "surviving

victim."  As a result of this delay, a key fact witness will remain unknown to Mr. Duran Gomez,

who cannot use his testimony at trial.  *See id.* ("If witnesses die or disappear during a delay,

the prejudice is obvious.").

Mr. Duran Gomez will also be unable to access a number of school and court records

necessary to building an effective mitigation case.  Those records have been destroyed under

document-retention plans that call for the routine purging of documents after a set period of

time, ranging from six months to seven years.  For example, some school, medical,

immigration, court, employment, and detention center records are no longer available as they

have been destroyed.  In addition, the integrity of physical evidence collected in this case in

2006, some of which may require re-testing, is currently unknown.

### (c) Mitigation witnesses

Perhaps most important, numerous members of Mr. Duran Gomez's family have passed

away since the alleged conduct in this case.  His maternal great-grandmother, father, and

stepfather are now deceased, as are the woman who raised him and the pastor of the church he

attended through childhood.  These witnesses could have testified at a potential sentencing

hearing about Mr. Duran Gomez's upbringing in El Salvador, including how he regularly

attended church services and school, how he was raised apart from the rest of his family, and the

impact of the civil war on his small village.  But because sentencing will occur so long after the

alleged crimes, these witnesses—and their uniquely powerful mitigation testimony—are no

longer available.

The Supreme Court has recognized that "'evidence about [a] defendant's background and

character is relevant [at a capital sentencing proceeding] because of the belief, long held by this

society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (ellipsis in original) (citation omitted).  In particular, a "troubled history," including a "brain abnormality, difficulty reading and writing, and limited schooling," is "relevant to assessing a defendant's moral culpability." *Id.*  If Mr. Duran Gomez cannot call some of the witnesses best-equipped to testify to his background, he will be unable to provide the jury with all the evidence it needs to make an informed decision between life and death.  *See Nelson v. Quarterman*, 472 F.3d 287, 300 (5th Cir. 2006) ("[I]t is only when the jury is given a vehicle for expressing its reasoned moral response to [mitigating] evidence in rendering its sentencing decision that we can be sure that the jury has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence.").

This Court should therefore hold that the loss of mitigation witnesses has prejudiced Mr. Duran Gomez.  *See, e.g.*, *United States v. Young*, 657 F.3d 408, 420 (6th Cir. 2011) (recognizing that, in capital prosecution, loss of "important mitigation witnesses and records" can constitute prejudice under *Barker*, but holding defendant did not make sufficient factual showing of loss in that case); *cf. United States v. Williams*, 558 F.2d 224, 227 (5th Cir. 1977) (noting in probation-revocation context that defendant "may be prejudiced if delay has impaired his ability to present evidence of mitigating circumstances that might affect the decision to incarcerate him").

### (d)    Capital Assistance Project

Until 2011, the El Salvadorian government ran a program called the El Salvador Capital Assistance Project (ESCAP) that assisted El Salvadorian nationals charged with capital crimes in foreign countries.  ESCAP would collect social history (e.g., school and medical) records, interview witnesses in El Salvador, conduct investigations, and make additional resources available.  It would provide these services free of charge.  But El Salvador "temporarily

suspended" ESCAP in November 2011 and has not revived it since.  Thus Mr. Duran Gomez,

who did not receive notice of the government's intent to seek death until October 2012, has been

unable to take advantage of a resource that would have substantially strengthened his mitigation

case.  By depriving him of the ability to put on compelling mitigation evidence, the delay in this

case has prejudiced Mr. Duran Gomez in a way that can never be remedied.[3]

### ii.    Oppressive pretrial incarceration

The fourteen years Mr. Duran Gomez will have spent awaiting trial constitute

"oppressive pretrial incarceration."  *Harris*, 566 F.3d at 433.  The Second Circuit has held that

with respect to this component of prejudice, a defendant was "severely prejudiced" by "[h]is

nearly seven years of pretrial incarceration."  *United States v. Tigano*, 880 F.3d 602, 618 (2d Cir.

2018).  Such a delay, the court held, is "egregiously oppressive":

> The *Barker* Court noted that "most jails offer little or no recreational or
> rehabilitative programs.  The time spent in jail is simply dead time."  *Barker*, 407
> U.S. at 532–33.  Nearly seven years of pretrial detention in local jails—before the
> defendant has been convicted of any crime—is precisely the type of prejudice
> contemplated by the right to a speedy trial.

*Id.*  Here, the period of pretrial detention will likely be at least four years longer than in *Tigano*,

where the Second Circuit said the defendant "amply demonstrate[d]" that he was subject to

oppressive pretrial incarceration.

### iii.    Anxiety and concern

Mr. Duran Gomez's prolonged detention has caused him substantial "anxiety and

concern."  *Harris*, 566 F.3d at 433.  The Supreme Court said in *Barker* that the third prejudice

---

[3] The government bears an extra burden of responsibility with regard to Mr. Duran
Gomez's inability to receive assistance from ESCAP, because it failed to contact the consulate in
El Salvador to advise it of Mr. Duran Gomez's arrest, notwithstanding a request for consular
notification that Mr. Duran Gomez made on November 22, 2006, one day after his arrest.  In
spite of this documented request, the government failed to notify the consulate in El Salvador
until August 2011, just months before ESCAP ceased operations.

factor—limiting the possibility that the defense will be impaired—is "the most serious."  407 U.S. at 532.  Nevertheless, the Court has also recognized that "[t]he Sixth Amendment right to a speedy trial is . . . not primarily intended to prevent prejudice to the defense caused by passage of time." *United States v. MacDonald*, 456 U.S. 1, 8 (1982).  Rather, the principal purpose of the speedy trial right is "to minimize the possibility of lengthy incarceration prior to trial":

> [T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense.  To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime.  Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

*Id.*; *see also Goodrum*, 547 F.3d at 262-63 (explaining *Barker* "recogni[zes] anxiety and concern of the accused as a type of cognizable harm that may result from a delayed trial, and other cases stress its independence from whatever impact the delay may or may not have on the defense"). This form of prejudice is not to "be treated lightly."  *United States v. Macino*, 486 F.2d 750, 753 (7th Cir. 1973).

Mr. Duran Gomez has suffered all the "evils" described in *MacDonald*.  456 U.S. at 8. But his incarceration has also caused particular stress and anxiety unlike that in the typical case. Because the government in this case is seeking capital punishment, Mr. Duran Gomez must endure not merely the psychological strain attendant to any period of incarceration, but also the fear that he may face an imminent death.  *Cf. Black*, 918 F.3d at 265 ("In addition to the psychological effects of pre-trial custody, [the defendants] were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees."); *United States v. Green*, 2018 WL 786185, at *11 (W.D.N.Y. Feb. 8, 2018) ("[I]n

addition to the prejudice that arises from the sheer length and oppressive nature of Defendants' pretrial detention, Defendants suffered the unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases.").

\* \* \* \*

Whether the Court considers the first *Barker* factor by itself, or the first three factors taken together, the record in this case establishes a presumption of prejudice. The government will be unable to overcome that presumption. Alternatively, even if no presumption arises here, the actual prejudice to Mr. Duran Gomez from an eleven-year delay is substantial. This Court should dismiss the SSI.

**B.      The excessive delay in this case violates Mr. Duran Gomez's right, under the Fifth and Eighth Amendments, to a speedy sentencing.**

Even if the Court concludes dismissal of the SSI is not required, the inordinate passage of time before Mr. Duran Gomez's capital sentencing violates his due process right to fundamental fairness. To remedy that violation, this Court should strike the NOI and bar the government from seeking the death penalty against Mr. Duran Gomez.

**1.      Legal background**

In a string of cases dating back to at least the 1970s, the Fifth Circuit held that the speedy-trial right applied not only to the period between indictment and trial, but also to the period between verdict and sentencing. *See Juarez-Casares v. United States*, 496 F.2d 190, 192 (5th Cir. 1974) (explaining "the imposition of sentence is part of the trial for the purposes of the Sixth Amendment speedy trial guarantee" and "[i]f there has been an unreasonable delay, and if that delay results in prejudice to the defendant, then a violation [of the Sixth Amendment] has occurred"); *United States v. Campbell*, 531 F.2d 1333, 1335 (5th Cir. 1976) ("[U]nreasonable

delay in sentencing may constitute a violation of a defendant's Sixth Amendment right to a speedy trial."); *United States v. Howard*, 577 F.2d 269, 270 (5th Cir. 1978) (per curiam) ("The constitutionally guaranteed right to speedy trial applies to sentencing."); *United States v. Abou-Kassem*, 78 F.3d 161, 167 (5th Cir. 1996) (same); *United States v. Washington*, 626 F. App'x 485, 487 (5th Cir. 2015) (unpublished) ("Although many cases implicating the Sixth Amendment's Speedy Trial Clause arise in the context of a delay before trial, we have held that the constitutionally guaranteed right to a speedy trial also applies to sentencing."). These opinions applied the *Barker* factors to determine whether pre-sentencing delay violated the Sixth Amendment. *E.g.*, *Campbell*, 531 F.2d at 1335; *Washington*, 626 F. App'x at 487.

The Supreme Court abrogated this line of case law in 2016 when it decided *Betterman v. Montana*, 136 S. Ct. 1609 (2016). In that case, the defendant contended the trial court violated his Sixth Amendment rights by waiting 14 months to sentence him following acceptance of his guilty plea. *Betterman*, 136 S. Ct. at 1612. The Supreme Court rejected that argument, holding the Sixth Amendment speedy trial right "attach[es]" upon arrest or indictment and "detaches upon conviction." *Id.* at 1613. As a result, the "[a]dverse consequences of postconviction delay" fall "outside the purview of the Speedy Trial Clause." *Id.* at 1615.

But, the Court cautioned, "[t]hat does not mean . . . that defendants lack any protection against undue delay" preceding sentencing. *Id.* at 1617. Specifically, "due process serves as a backstop against exorbitant delay": "[a]fter conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair." *Id.* Considerations relevant to impermissible pre-sentencing delay under the Due Process Clause, the Court wrote, "may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice"—i.e., the *Barker*

20

factors. *Id.* at 1618 n.12. Because the defendant in *Betterman* had not preserved a due process

claim, the Court did not address how the *Barker* test might apply to his case. *Id.* at 1617-18. It

made clear, however, that "although the Speedy Trial Clause does not govern" sentencing

proceedings, "a defendant may have other recourse, including, in appropriate circumstances,

tailored relief under the Due Process Clauses." *Id.* at 1612.

Concurring, Justice Sotomayor observed that "it seem[ed] to [her] that the *Barker*

factors capture many of the concerns posed in the sentencing delay context and that because the

*Barker* test is flexible, it will allow courts to take account of any differences between trial and

sentencing delays." *Id.* at 1619 (Sotomayor, J., concurring).

The Fifth Circuit has not yet determined whether the fundamental fairness secured by the

Due Process Clause prohibits excessive pre-sentencing delay. *See United States v. Piper*, 912

F.3d 847, 854 (5th Cir. 2019) ("The Due Process Clause guarantees that a criminal defendant

will be treated with that fundamental fairness essential to the very concept of justice."). But the

Supreme Court in *Betterman* strongly suggested that it does, and multiple courts have recognized

post-*Betterman* that due process imposes limits on permissible pre-sentencing delay. *E.g.*,

*United States v. James*, 712 F. App'x 154, 161 (3d Cir. 2017) (unpublished) (citing old case law

that applied *Barker* factors to sentencing delay under Due Process Clause and observing,

"Because the Supreme Court put forward no holding on the availability of a speedy sentencing

claim under the Due Process Clause, our prior precedent under the Due Process Clause survives

*Betterman*"); *United States v. Brown*, 709 F. App'x 103, 103 (2d Cir. 2018) (unpublished)

("[I]nordinate sentencing delay can violate the Due Process Clause." (citing *Betterman*, 136 S.

Ct. at 1612)); *Deck v. Steele*, 249 F. Supp. 3d 991, 1079-80 (E.D. Mo. 2017); *see also, e.g.*,

*United States v. Danner*, 429 F. App'x 915, 917 (11th Cir. 2011) (unpublished) (in pre-

*Betterman* case, treating Fifth Amendment and Sixth Amendment speedy-sentencing rights as coextensive and analyzing both under *Barker*).

And the Fifth Circuit has recognized that certain types of delay not governed by the Sixth Amendment can violate due process if they endure long enough. *See Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir. 1980) ("We are convinced that due process can be denied by any substantial retardation of the appellate process, including an excessive delay in the furnishing of a transcription of testimony necessary for completion of an appellate record.").  There is no reason to believe the Fifth Circuit would not extend due process protections to the sentencing context now that *Betterman* has removed such claims from the ambit of the Sixth Amendment.  Such protections are especially important in capital proceedings, given "that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).  In light of this "qualitative difference between death and all other penalties," *Miller v. Alabama*, 567 U.S. 460, 481 (2012), the Supreme Court "has demanded that factfinding procedures aspire to a heightened standard of reliability" in capital cases, *Ford*, 477 U.S. at 411.

This Court should therefore apply the *Barker* due process test to Mr. Duran Gomez's claim that the sentencing delay in this case will violate his right to fundamental fairness. Consideration of the *Barker* factors demonstrates that, in light of the excessive delay in this case, permitting the government to seek death would violate due process.  Given the heightened reliability the Supreme Court has long required for fact-finding in capital cases, the eleven-year pre-sentencing delay will prevent Mr. Duran Gomez from receiving a capital sentencing that comports with due process.  Fundamental fairness therefore requires that the government be

prohibited from seeking the death penalty.  Accordingly, Mr. Duran Gomez respectfully requests

that this court strike the NOI.[4]

   2. **Analysis**

     a. **The *Barker* factors weigh in Mr. Duran Gomez's favor.**

       i. **Length of delay**

   In the sentencing context, courts typically determine the length of delay by measuring the

time between (1) a guilty plea or conviction, and (2) sentencing.  *See, e.g.*, *Abou-Kassem*, 78

F.3d at 167; *Washington*, 626 F. App'x at 487; *James*, 712 F. App'x at 162; *United States v. Ray*,

578 F.3d 184, 200 (2d Cir. 2009).  Courts use this yardstick because it is usually relevant to

assessing the kinds of prejudice caused by pre-sentencing delay: "the possible prejudice of

anxiety" about the impending sentence, *Howard*, 577 F.2d at 270; "disserv[ice of the] basic

notion that, once convicted, an offender should be able to serve his sentence and be done with

it," *id.*; "the detrimental effect on rehabilitation," *Danner*, 429 F. App'x at 918—if, for instance,

a defendant is held in a jail, rather than a prison, pending sentencing; delaying "a defendant's

ability to reintegrate into society," *id.*; and losing "the opportunity to receive a concurrent

sentence or to appeal as of right," *United States v. Nieves*, 648 F. App'x 152, 155 (2d Cir. 2016)

(unpublished).

   But *Barker* instructs that prejudice "should be assessed in the light of the interests of

defendants which the speedy trial right was designed to protect."  407 U.S. at 532.  Where a

---

[4] In *Betterman*, the Supreme Court expressly "reserve[d] the question whether the [Sixth Amendment] Speedy Trial Clause applies to bifurcated proceedings in which, at the sentencing stage, facts that could increase the prescribed sentencing range are determined (*e.g.*, capital cases in which eligibility for the death penalty hinges on aggravating factor findings)."  136 S. Ct. at 1613 n.2.  To preserve such a claim, Mr. Duran Gomez hereby repeats and incorporates his due process arguments, which follow, and asserts that they also support finding that the delay in this case violates his Sixth Amendment right to a speedy sentencing.

defendant claims an interest and a type of prejudice different from those above, therefore, courts "will consider [the *Barker* analysis'] application and perhaps adapt its insights to the situation presented" in a given case. *Howard*, 577 F.2d at 271; *see also Amos*, 646 F.3d at 205 ("[The *Barker*] balancing test eschews rigid rules and mechanical factor-counting in favor of a difficult and sensitive balancing process."). Here, Mr. Duran Gomez asserts that excessive pre-sentencing delay may cause a type of prejudice—i.e., imposition of "a harsher sentence than he otherwise would have [received]"—that affects an interest different from those described above. *Howard*, 577 F.2d at 271. Specifically, he claims that the unavailability of witnesses, evidence, and El Salvador's Capital Assistance Project makes it more likely that (1) he will be convicted of the capital offenses in the SSI, and (2) the jury will sentence him to death.

The severity of this type of prejudice does not turn on the narrow question of how much time passes between a conviction and sentencing. Instead, it turns on the question of how much time has passed since the case began, i.e., since the alleged crimes occurred—or, at the very least, since the government arrested Mr. Duran Gomez. "If witnesses die or disappear during a delay, the prejudice is obvious," as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Frye*, 489 F.3d at 213. This "obvious" prejudice exists at sentencing regardless of whether witnesses die or disappear (1) between arrest or indictment and trial, or (2) between verdict and sentencing. *See Washington*, 626 F. App'x at 488 n.3 (noting that "in the context of re-sentencing[,] . . . after a long delay, a defendant may be unable to locate evidence of, or witnesses to testify about, mitigating circumstances like childhood abuse"). The prejudice of losing a mitigation witness is no less severe simply because she died before, rather than after, verdict.

In assessing the prejudice caused by a delayed sentencing, this Court should therefore treat the relevant period of delay as beginning when the government first arrested Mr. Duran Gomez for potential capital charges.[5]  The delay from that date (in November 2006) until sentencing (likely sometime in the summer or fall of 2021) will be in the neighborhood of fifteen years.  *See* Bates No. 011230-011231.  This lengthy delay crosses the one-year threshold between "ordinary delay" and "presumptively prejudicial delay," *Amos*, 646 F.3d at 206, requiring this Court to undertake a "full *Barker* analysis" that considers all four speedy-trial factors, *Harris*, 566 F.3d at 432.

As explained above, an "extraordinary" delay of five years or more "weighs heavily in [a defendant's] favor." *Cardona*, 302 F.3d at 497.  Given the fifteen-year sentencing delay in Mr. Duran Gomez's case, this Court should therefore presume prejudice exists based on the first *Barker* factor alone.  *See Boyer*, 863 F.3d at 443; *Goodrum*, 547 F.3d at 260; *Parker*, 505 F.3d at 328-29.  Or, in the alternative, it should find prejudice results from the first three factors taken together.  *See Reagan*, 725 F.3d at 487 (noting prejudice can result from first factor, either on its own or in combination with factors two and three).

### ii.        Reason for the delay

For the reasons explained above, the government, rather than Mr. Duran Gomez, "is more to blame for the delay" in this case.  *Brillon*, 556 U.S. at 90.  The discovery is voluminous and the government has been tardy in producing much of it; Mr. Duran Gomez has not received the funds he needs to investigate and prepare a defense; and Mr. Duran Gomez was for many

---

[5] Law enforcement officials first arrested Mr. Duran Gomez on November 21, 2006, ostensibly on unspecified "immigration charges," although it is apparent that the government was really holding Mr. Duran Gomez in connection with its murder investigation.  The circumstances surrounding Mr. Duran Gomez's arrest will be the subject of a separate motion.

years forced to ask for continuances because the government dragged its feet in deciding whether

to seek the death penalty against Mr. Rodriguez Mendoza. *See supra*, Part II.A.2.b. Thus little,

if any, of the 15-year pre-sentencing delay can properly be imputed to Mr. Duran Gomez.

### iii.   Assertion of the right

Mr. Duran Gomez previously expressed to this Court his concern about proceeding to

trial after the passage of so much time, and he raised this issue with the government as part of the

AGRCCC review process. *See, e.g.*, Ex. A at 14. But even if he had not, his failure to assert a

right to a speedy sentencing is not determinative. *See Brillon*, 556 U.S. at 89-90 (noting *Barker*

"refused to . . . hinge the right on a defendant's explicit request for a speedy trial"); *Frye*, 489

F.3d at 21 (explaining that "none of the four *Barker* factors is either necessary or sufficient" to

find a delay unconstitutional). In the sentencing context, courts have recognized that "'a

defendant does not bear the burden of seeking his own sentencing.'" *Brown*, 709 F. App'x at

103 (quoting *Ray*, 578 F.3d at 191). Indeed, the Second Circuit held in *Ray* that a defendant's

failure to object to sentencing delay was irrelevant:

> To the extent the defendant is seeking not to vacate her conviction by reason of
> the delay but seeking rather a modification of the terms of her sentence by reason
> of the prejudice to her from imposing a custodial sentence fifteen years after her
> conviction, notwithstanding her impressive rehabilitation, we see no reason to
> impose blame, fault, or responsibility on her for the delay, on the mere basis of
> the fact that she did not take earlier steps to be sentenced more rapidly.

578 F.3d at 200.

It is immaterial that Mr. Duran Gomez has not previously filed a formal objection to the

delay in this case. The first three *Barker* factors support a presumption of prejudice.

### iv.   Prejudice

The same facts that prejudice Mr. Duran Gomez's right to a fair trial also prejudice his

right to a fundamentally fair sentencing proceeding, which implicates the Eighth Amendment as

well.  Fact witnesses who have died or been deported and documentary evidence that has gone missing both make it more likely that Mr. Duran Gomez will be convicted of capital charges, requiring a capital sentencing hearing that has been unfairly delayed.  And the closure of ESCAP and the death of numerous family members will frustrate Mr. Duran Gomez's ability to put on a meaningful mitigation case at sentencing.  *See supra*, Part II.A.2.d.i.c.  Courts have recognized that the inability to present effective mitigation is the kind of prejudice that can render sentencing delay violative of due process if it results in imposition of a harsher sentence.  *See, e.g.*, *United States v. Cain*, 734 F. App'x 21, 25 (2d Cir. 2018) (unpublished) ("[F]orms of prejudice include prejudice related to the defendant's ability to present his or her case (i.e., in presenting a defense or sentencing submission)."); *Washington*, 626 F. App'x at 488 n.3 (recognizing prejudice may arise where, "after a long delay, a defendant may be unable to locate evidence of, or witnesses to testify about, mitigating circumstances like childhood abuse"); *cf. United States v. Yelverton*, 197 F.3d 531, 539 (D.C. Cir. 1999) (finding prejudice lacking where defendant "ma[de] no claim that the delay affected his ability to present his position on his sentence or adversely affected the sentence he received").

* * * *

The Supreme Court has held that the Eighth Amendment's prohibition on cruel and unusual punishment "requires increased reliability of the process by which capital punishment may be imposed."  *Herrera*, 506 U.S. at 405; *see also Lankford v. Idaho*, 500 U.S. 110, 125 (1991) ("emphasiz[ing] the special importance of fair procedure in the capital sentencing context" and stressing that "death is a different kind of punishment from any other which may be imposed in this country"); *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998) ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability

when the death sentence is imposed.").  In light of this need for heightened reliability, the delay in this case—and the resulting loss of evidence—would render any capital sentencing proceeding fundamentally unfair.

The recent (post-*Betterman*) opinion in *Deck v. Steele*, 249 F. Supp. 3d 991 (E.D. Mo. 2017), is instructive.  The petitioner in that case was found guilty of two counts of murder in 1998 and sentenced to death on both counts.  *Deck*, 249 F. Supp. 3d at 1014.  Following reversal, a second penalty phase, reimposition of the death penalty, a second reversal, and a third penalty phase, he was sentenced to death a third time in 2008.  *Id.* at 1014-15.  On federal habeas corpus review, the petitioner claimed "the inordinate delay between his conviction in February 1998 and his final sentencing trial in September 2008 caused his mitigation evidence to be unavailable on account of its loss or destruction and because of 'witness fatigue,' thereby depriving him of his constitutional right to adequately present mitigating evidence to the jury at his third penalty-phase trial."  *Id.* at 1076.  The sentencing proceeding, he argued, "violated his rights to due process and to be free from the infliction of cruel and unusual punishment."  *Id.*

The federal habeas court agreed.  Citing *Betterman*, the court held defendants have a due process right to be free from "inordinate delay in sentencing," which in capital cases is intertwined with the Eighth Amendment requirement that the death penalty "can only be imposed after adequate consideration of factors that might warrant mercy."  *Id.* at 1079.  Under the fourth prong of the *Barker* test, the court found the "prejudice resulting from the delay weigh[ed] heavily in favor of [the petitioner]" because "his inability to present substantial mitigation evidence at his third penalty-phase trial was directly attributable to the passage of many years' time."  *Id.* at 1082.  The court explained: "Witnesses who previously cooperated and provided favorable testimony were no longer available, either because of their unknown location,

changed and hostile attitudes, illness, or even death." *Id.* Therefore, the court held, "the inordinate passage of time between [the petitioner's] conviction and his final penalty-phase trial deprived [the petitioner] of his constitutional right to present mitigation evidence, thereby rendering his final trial fundamentally unfair." *Id.*

The district court in *Deck* resolved the petitioner's sentencing-delay claim pursuant to the Antiterrorism and Effective Death Penalty Act of 1996. *Id.* at 1019, 1079. Under that statute's "highly deferential standard," a federal habeas petitioner can obtain relief only if he shows "the state court's ruling on his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Miller v. Thaler*, 714 F.3d 897, 901 (5th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). If the *Deck* petitioner was entitled to relief under such a demanding standard, then Mr. Duran Gomez—whose case is not governed by AEDPA—is necessarily entitled to relief as well: a potential sentencing in this case would likely occur fifteen years after Mr. Duran Gomez was arrested, rendering crucial evidence unavailable. Such a lengthy delay would subject Mr. Duran Gomez to a capital sentencing proceeding that is fundamentally unfair.

### b.   The proper remedy is to strike the NOI and bar the government from seeking death.

The Supreme Court "ha[s] not read the Speedy Trial Clause . . . to call for a flexible or tailored remedy." *Betterman*, 136 S. Ct. at 1615 n.6. When the delay between arrest and trial becomes excessive, the "sole remedy" available is "dismissal of the charges." *Id.* at 1615. But the Due Process Clause establishes a "more pliable standard." *Id.* at 1618; *see also Zhang v. Gonzales*, 432 F.3d 339, 346 (5th Cir. 2005) ("[T]he requirements of due process are flexible and call for such procedural protections as the particular situation demands."). Courts considering

29

sentencing-delay claims rooted in due process therefore "evaluate [a] claim in order to fashion relief designed to rectify the prejudice of the violation." *Burkett v. Fulcomer*, 951 F.2d 1431, 1447 (3d Cir. 1991); *see also Ray*, 578 F.3d at 202 ("After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation.").

The Fifth Circuit has held that "in the context of unconstitutional delays before sentencing, 'the proper remedy . . . is to vacate the sentence.'" *Washington*, 626 F. App'x at 489 (quoting *Juarez-Casares*, 496 F.2d at 193) (ellipsis in *Washington*); *see also United States v. Sanders*, 452 F.3d 572, 580-81 (6th Cir. 2006) (describing "suspension of the remainder of the sentence" as appropriate remedy for sentencing delay that violates due process); *Ray*, 578 F.3d at 202-03 (finding sentencing-delay violation under Due Process Clause and ordering "vacatur of the remainder of the sentence"). Here, where the fundamental unfairness to Mr. Duran Gomez results from subjecting him to a capital sentencing proceeding, vacatur of the sentence means removing the possibility of a death sentence. This is the course the court took in *Deck*: after finding the ten-year delay violated the petitioner's due process rights, the court "order[ed] that [his] death sentences be vacated and that he be sentenced to life in prison without the possibility of parole." 249 F. Supp. 3d at 1086.

Numerous courts have recognized that an analogous remedy is appropriate if the government fails to file its death notice "a reasonable time before the trial," as required by 18 U.S.C. § 3593(a). *E.g.*, *United States v. Ponder*, 347 F. Supp. 2d 256, 263 (E.D. Va. 2004) ("A Death Notice filed an objectively unreasonable period of time prior to trial, such that it violates a defendant's right not to face trial for his life without adequate notice, must be stricken."); *United States v. Hatten*, 276 F. Supp. 2d 574, 579-80 (S.D. W. Va. 2003) (granting motion to strike death notice because "the Government should have acted more quickly in filing the Notice");

*United States v. McGriff*, 427 F. Supp. 2d 253, 268 (E.D.N.Y. 2006) (observing that, depending on circumstances of the case, proper remedy for untimely death notice may be "striking the notice").  Likewise, the appropriate remedy in this case—one that is "fashion[ed] [to] counteract[] the prejudice caused by the violation," *Ray*, 578 F.3d at 202—is to strike the NOI, thereby preventing the government from seeking a death sentence rendered fundamentally unfair by inordinate delay.

Such a remedy, while protecting Mr. Duran Gomez's right to a speedy and fundamentally fair sentencing, also preserves the government's ability to vindicate its interests.  Precluding a death sentence "is not so drastic, extraordinary, draconian, or extreme as the outright dismissal of serious criminal charges," as the "government may still seek a conviction and the serious penalty of life imprisonment."  *United States v. Lopez-Matias*, 522 F.3d 150, 154 n.9 (1st Cir. 2008).  Because striking the NOI "is not quite as serious as dismissing the indictment altogether, . . . perhaps still less prejudice is required."  *Id.* at 158; *see also Hernandez v. Thaler*, 398 F. App'x 81, 84 (5th Cir. 2010) (unpublished) ("Because of the severity and finality of the death sentence, any doubts should be resolved in favor of the petitioner."); *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004) (explaining that when a "case involves the death penalty, any doubts as to whether a [certificate of appealability] should issue must be resolved in [the capital defendant's] favor").

## III.   Conclusion

For the reasons described above, this Court should dismiss the SSI or, in the alternative, strike the NOI and prohibit the government from seeking the death penalty in the case of conviction.

Respectfully submitted,

/s/ Wendell A. Odom, Jr
WENDELL A. ODOM, JR.
Texas State Bar # 15208500
Federal Bar # 0947
440 Louisiana, Suite 200
Houston, TX 77002
(713) 223-5575
(713) 224-2815 (FAX)

/s/ Neal Davis, III
NEAL DAVIS, III
Texas State Bar #24038541
Federal Bar # 706329
440 Louisiana, Suite 200
Houston, TX 77002
(713) 223-5575
(713) 224-2815 (FAX)

/s/ James Wyda
JAMES WYDA (#25298)
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
(410) 962-3962
(410) 962-0872 (FAX)
Email: jim_wyda@fd.org

/s/ Julie L.B. Stelzig
JULIE L.B. STELZIG (#27746)
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
(301) 344-0600
(301) 344-0019 (FAX)
Email: julie_stelzig@fd.org