# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | **CRIMINAL NO. H-10-459-S** |
| **WILMAR RENE DURAN-GOMEZ** | § | |
| **aka "El Gordo," aka "Junior," aka** | § | |
| **"Oscar," aka "Carnalito"** | § | |

## UNITED STATES' RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Now comes the United States of America, by and through Ryan K. Patrick, United States Attorney for the Southern District of Texas, and Assistant United States Attorney Jill Jenkins Stotts and James B. Nelson, Department of Justice Trial Attorney, in response to Defendant's "Motion to Dismiss the Indictment or, in the Alternative, to Strike the Government's Notice of Intent to Seek the Death Penalty." Dkt. 454 ("Def. Motion.").

Defendant's motion, which is premised on the United States' supposed delay, does not satisfy the controlling legal standard and rests on an incomplete recitation of the case's procedural history. Indeed, it fails to acknowledge that on May 7, 2019, defense counsel sought consent to commence jury selection in December 2021, with a trial date in early 2022. Thus, the motion fails under the law and contradicts defense counsel's own representations. Accordingly, the Court should deny the motion without a hearing.[1]

---

[1] The Court should, if it finds necessary, conduct an *in camera* inquiry of defense counsel

1

## PROCEDURAL AND FACTUAL BACKGROUND

On July 1, 2010,[2] a federal grand jury sitting in Houston returned an Indictment charging Defendant and numerous other individuals with Conspiracy to Transport and Harbor Illegal Aliens, as well as two counts of Harboring an Illegal Alien resulting in Death, and one count of Conspiracy to Launder Funds. Dkt. 1. On July 23, 2010, Attorney Odom was appointed to represent Defendant. Dkt. 37. On July 26, 2010, Defendant and Attorney Odom both signed a Waiver of Detention Hearing and conceded that Defendant should be detained pending trial. Dkt. 39.

On July 29, 2010, codefendant Fuentes moved to certify the case as "complex" pursuant to the Speedy Trial Act, and to continue the trial date indefinitely. Dkt. 43. Defendant did not object to that motion. On August 12, 2010, the Court granted the motion, certified the case as complex, and continued the trial date to December 14, 2010. Dkt. 52.

On November 15, 2010, codefendant Fuentes moved to continue the trial date. Dkt. 56. Defendant did not object to this motion. On December 2, 2010, the Court granted the motion and continued the trial date until April 26, 2011. Dkt. 57.

---

to reconcile the numerous discrepancies between the factual allegations contained in the instant motion and those contained in the twelve motions to continue the trial date.

[2] Defendant begins his "timeline" on December 27, 2006. The fact that he was charged, convicted, and sentenced for crimes committed under a separate indictment has no bearing on his Speedy Trial rights here. *United States v. Bigler*, 810 F.2d 1317, 1320-21 (5th Cir. 1987) (excluding under the Speedy Trial Act defendant's pretrial detention on state charges); *see also United States v. Montoya*, 827 F.2d 143, 147-50 (7th Cir. 1987) (excluding under the Speedy Trial Act detention while defendant negotiated plea agreement of other charges).

On February 3, 2011, codefendant Bolanos-Garza was arrested and ordered detained pending trial. Dkt. 76. On February 10, 2011, Attorney Neal Davis, III, joined Attorney Odom in representing Defendant. On March 23, 2011, Attorney Davis moved for an extension of time to file pre-trial motions on Defendant's behalf.[3] Dkt. 86. On March 25, 2011, the Court granted the motion and continued the deadline indefinitely. Dkt. 87.

On March 29, 2011, codefendant Bolanos-Garza moved to continue his trial setting and motions deadline. Dkt. 89. Defendant did not object to this motion, or request severance from Bolanos-Garza to protect his trial date. On April 12, 2011, the Court granted the motion, recognizing that the complexity of the case. Dkt. 94.

On November 7, 2011, Attorney Davis filed another motion to extend the pretrial motions deadline.[4] Dkt. 106. On November 22, 2011, the defendants filed a sealed motion to continue the trial date (rendering Dkt. 106 moot). Dkt. 108. The Court granted the defendants' motion, and continued the trial to February 28, 2012. Dkt. 107. On January 17, 2012, the defendants filed another sealed motion to continue the trial. Dkt. 114. The Court granted the motion and set the trial for May 1, 2012. Dkt. 115. On February 21, 2012, the defendants filed another sealed motion to continue the trial. Dkt. 118. The Court granted the motion and continued the trial to November 13, 2012. Dkt. 119.

---

[3] This was Defendant's first request for a continuance.
[4] This was Defendant's second request for a continuance.

On October 4, 2012, the United States filed its Notice of Intent to Seek the Death Penalty against Defendant. Dkt. 137. That same day, the grand jury returned the First Superseding Indictment, charging Defendant and five codefendants, including a fugitive,[5] with conspiracy to transport and harbor illegal aliens, two counts of harboring an illegal alien resulting in death, and conspiracy to launder funds. Dkt. 147. On October 10, 2012, Attorney Davis filed another motion to continue the trial date.[6] Dkt. 139. The Court granted that motion, and set trial for April 23, 2013. Dkt. 163.

On March 18, 2013, Attorney Davis filed another motion to continue the trial.[7] Dkt. 184. The Court granted the motion and continued the trial date to February 10, 2014. Dkt. 185. On April 9, 2013, codefendant Rodriguez-Mendoza was arrested crossing the border from Mexico into the United States. On April 25, 2013, codefendant Rodriguez-Mendoza was ordered detained pending trial. Dkt. 197. The Court held a hearing on May 28, 2013, during which it encouraged the United States to "make an expeditious movement to separate the non-seek defendants" from the defendants against whom it would seek the death penalty. Dkt. 203.

On October 31, 2013, Attorney Davis filed another motion to continue the trial.[8] Dkt. 216. On November 21, 2013, the Court conferred with the parties to discuss the United

---

[5] Codefendant Rodriguez-Mendoza's location was then unknown.
[6] This was Defendant's third request for a continuance.
[7] This was Defendant's fourth request for a continuance.
[8] This was Defendant's fifth request for a continuance.

4

States' decision-making process regarding pursuit of the death penalty against codefendant Rodriguez-Mendoza. Following that conference and the filing of a sealed motion by the defendants, the Court terminated all dates and set a status conference for February 10, 2014. Dkt. 220, 221, 222, 224. On March 3, 2014, the Court granted Defendant's motion to continue (Dkt. 216) and continued the trial until September 14, 2015. Dkt. 232.

On February 20, 2015, Attorney Davis filed another motion to continue the trial.[9] Dkt. 237. Following a status conference on the motion (Dkt 238, 240), the Court granted the motion and continued the trial to January 25, 2016. Dkt. 241.

On January 19, 2016, Attorney Davis filed another motion to continue the trial.[10] Dkt. 264. The Court granted the motion and continued the trial until September 26, 2016. Dkt. 265.

On January 27, 2016, codefendant Fuentes pled guilty pursuant to an agreement that included his promise to cooperate against Defendant. Dkt. 266, 269. On February 25, 2016, codefendant Bolanos-Garza pled guilty pursuant to a plea agreement that included his promise to cooperate against Defendant. Dkt. 272, 273.

On September 7, 2016, Attorney Davis filed another motion to continue the trial.[11] Dkt. 285. The Court granted the motion and continued the trial to April 3, 2017. Dkt. 287.

---

[9] This was Defendant's sixth request for a continuance.
[10] This was Defendant's seventh request for a continuance.
[11] This was Defendant's eighth request for a continuance.

5

On September 15, 2016, codefendant Holguin pled guilty pursuant to an agreement that included her promise to cooperate against Defendant. Dkt. 289, 290. On December 20, 2016, codefendant Mercado pled guilty pursuant to a plea agreement that included his promise to cooperate against Defendant. Dkt. 303, 304.

On January 10, 2017, a federal grand jury sitting in Houston returned the Second Superseding Indictment, charging Defendant and codefendant Rodriguez-Mendoza with conspiracy to transport and harbor illegal aliens, two counts of harboring an illegal alien resulting in death, two counts of kidnapping resulting in death, and two counts of hostage-taking resulting in death. Dkt. 314.

On February 10, 2017, the United States filed its Notice of Intent to Seek the Death Penalty against codefendant Rodriguez-Mendoza. Dkt. 326. On March 20, 2017, the Court held a status conference and an *ex parte* conference with defense counsel regarding a prior, sealed motion. Dkt. 332, 333. That same day, the Court issued a written order on filing deadlines regarding Defendant's constitutional challenge to the death penalty and codefendant Rodriguez-Mendoza's alleged intellectual disability. (Dkt. 334).

On May 30, 2017, Attorney Davis moved to extend the filing deadline for Defendant's constitutional challenge to the death penalty.[12] Dkt. 340. The Court granted the motion and continued the deadline until June 13, 2017. Defendant did not file anything on June 13, 2017. The United States elected to omit a timeliness objection to Defendant's

---

[12] This was Defendant's ninth request for a continuance.

6

motion to continue the deadline, filed June 20, 2017,[13] as a professional courtesy. Dkt. 342. That same day, Defendant filed his constitutional challenge to the death penalty. Dkt. 343. The Court permitted Defendant's untimely filing and later granted the United States' requests for extensions of time to respond, filed September 15, 2017. Dkt. 344, 345, 347, 354.

Following a hearing on the constitutional challenge, counsel for Defendant and codefendant Rodriguez-Mendoza counsel approached the United States to negotiate a new scheduling order. Based on counsel's representations, the United States agreed to an extension. On October 4, 2017, the parties filed a Joint Scheduling Order, which included numerous pretrial motions deadlines. Dkt. 358.

On January 19, 2018, Defendant joined codefendant Rodriguez-Mendoza in requesting a re-setting of the agreed-to scheduling order. Dkt. 369. On February 27, 2018, the parties submitted a second joint-proposed scheduling order. Dkt. 372. In view of Defendant's representations, the Court issued an order that scheduled voir dire to begin October 7, 2019, with an anticipated trial date of January 13, 2020. Dkt. 374.

On September 4, 2018, codefendant Rodriguez-Mendoza moved for severance from Defendant. Dkt. 394. On November 20, 2018, Attorneys Wyda and Stelzig appeared on behalf of Defendant. Dkt. 411, 412, 413, 414. On February 4, 2019, Defendant moved to continue the pretrial filing deadlines, alleging the four learned counsel had not adequately

---

[13] This was Defendant's tenth request for a continuance.

7

investigated the mitigation case.[14] Dkt. 420. The Court granted a continuance. Dkt. 423. On February 8, 2019, Defendant moved for severance from codefendant Rodriguez-Mendoza. Dkt. 421. His motion was substantively identical to codefendant Rodriguez-Mendoza's request. Dkt. 394. Notably, Defendant's motion did not assert as a grounds for severance pretrial delay resulting from Rodriguez-Mendoza's arrest. Dkt. 421.

On May 8, 2019, the Court held a status conference. Prior to that conference, defense counsel represented to undersigned counsel that they could not be prepared to pick a jury in October 2019, and sought the United States' consent to begin jury selection in December 2021 with trial to follow in early 2022. Undersigned counsel stated that the United States could not consent to Defendant's requested 23-month continuance.[15] The parties agreed to begin jury selection on January 25, 2021, with a likely trial date of March 8, 2021. The Court adopted the proposed scheduling order. Dkt. 450.

On August 26, 2019, Attorney Stelzig filed this motion, asking the Court to dismiss the Second Superseding Indictment for delay, less than four months after requesting a trial date in 2022. This opposition follows.

## **ARGUMENT**

The use of delay is a standard tactic amongst the capital defense bar. As the Supreme Court recently observed, the capital defense bar frequently resorts to "pleading games" in

---

[14] This was Defendant's eleventh request for a continuance.

[15] This was Defendant's twelfth request for a continuance, not counting the codefendants' motions, none of which Defendant opposed.

an attempt to thwart prosecution of capital offenses by "increasing the delay and cost" of capital prosecutions. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019). Not unlike the tactics discussed in *Bucklew*, the delay that Defendant now complains of was borne of his own defense strategy.

No less than twelve times, Defendant has requested a continuance of the trial date, pleadings deadlines, or both. Dkt. 86, 106, 139, 184, 216, 237, 264, 285, 340, 342, 420, 439. The United States and this Court acquiesced to Defendant's requests to ensure due process. Dkt. 87, 108, 163, 185, 232, 241, 265, 287, 341, 344, 423, 450. Having repeatedly used due process as a shield to delay his trial, Defendant now wields it as a sword in seeking to dismiss the indictment. He contends the United States' acquiescence to his numerous continuances violated his Sixth Amendment right to a speedy trial. Def. Mot. As fully noted below, the law holds otherwise.

## 1. <u>Defendant's Motion Seeks an Illegal Remedy</u>

Defendant proposes, *in lieu* of dismissal, that the Court convert the case to a non-capital prosecution—an outcome he has sought since he was charged. <u>Def. Motion</u>, at 19-31. His proposal contravenes settled law. "The sole remedy for a violation of the speedy trial right" is "dismissal of the charges." *Betterman v. Montana*, 136 S. Ct. 1609, 1615 (2016) (citation omitted). "We have not read the Speedy Trial Clause . . . to call for a flexible or tailored remedy. . . violation of the right demands termination of the prosecution." *Id.*, n.6.; *see also United States v. Frye*, 489 F.3d 201, 211 (5th Cir. 2007)

9

(noting "dismissal is the only remedy to a speedy trial violation.") (citing *Strunk v. United States*, 412 U.S. 434, 440 (1973)). Quite simply, the Court lacks the legal authority to eliminate the death penalty based on the claim of error at hand. Thus, Defendant's proposed alternative remedy can be rejected out of hand.

### 2. <u>Defendant Cannot Establish a Speedy Trial Violation</u>

Defendant argues he is entitled to a dismissal of the Second Superseding Indictment due to pretrial delay. <u>Def. Motion</u>, at 3-19. This argument is meritless.

The Sixth Amendment's Speedy Trial Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial."   U.S. CONST. amend. VI. "Though apparently straightforward, the contours of this right have proven difficult to describe, largely because what may be considered 'speedy' is necessarily dependent on the nature of the trial and the parties' interests in the given case." *United States v. Ghailani*, 733 F.3d 29, 41 (2d Cir. 2013) (noting that "[m]uch of the difficulty derives from the fact that the right to a speedy trial protects not just the interests of the defendant, but also the 'societal interest in providing a speedy trial'") (citations omitted). Thus, the right has been described by the Supreme Court as "amorphous, slippery, and necessarily relative." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (internal quotation marks omitted).

The speedy trial right "neither prohibits all delays, nor establishes a strict time limit between the announcement of a charge and the commencement of trial." *United States v. Ray*, 578 F.3d 184, 191 (2d Cir. 2009). "Thus, the Supreme Court has recognized for more

10

than a century that the constitutional right to a speedy trial is not 'so unqualified and absolute' that it must prevail over 'the demands of public justice.'" *Ghailani*, 733 F.3d at 42. "To the contrary, '[i]t is consistent with delays[,] depends upon circumstances . . . [and] does not preclude the rights of public justice.'" *Id.* (quoting *Beavers v. Haubert*, 198 U.S. 77, 86 (1905)).

In *Barker v. Wingo*, the Supreme Court refused to "quantif[y]" the right "into a specified number of days or months" or to hinge the right on a defendant's explicit request for a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 522-25 (1972)). Rejecting such "inflexible approaches," *Barker* established a "balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 529, 530. "[S]ome of the factors" that courts should weigh include "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* "None of these factors is either necessary or sufficient to find a speedy trial violation; '[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant.'" *Goodrum v. Quarterman*, 547 F.3d 249, 257 (5th Cir. 2008) (quoting *Barker*, 407 U.S. at 533).

As the Fifth Circuit noted in *Frye*, an assertion of the speedy trial right "will generally be an objection to a continuance or a motion asking to go to trial. At the very least, a defendant's assertion of his speedy trial rights should manifest 'his desire to be tried promptly.'" 489 F.3d at 211-12 (quoting *United States v. Litton Sys., Inc.*, 722 F.2d 264,

271 (5th Cir.1984)). In short, a successful claim that the government has unconstitutionally delayed trial requires a consistent assertion of the speedy trial right:

> More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial . . . . Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried.

*Id.* (quoting *Barker*, 407 U.S. at 534-35).

In this case, Defendant has never communicated a desire for a prompt trial. Quite the contrary, for nine years he has repeatedly asserted that he needs more time to prepare for trial. His present request for dismissal, like that in *Frye*, seeks a remedy inappropriate in the absence of any prior assertion of the speedy trial right. *Id.* at 212. Defendant did not simply acquiesce to delay, he repeatedly asked for it. He could not have been any clearer about the fact that he did not want a timely trial. Apart from Defendant's twelve motions to continue, the docket reflects no objections to his codefendants' motions for a continuance and no prior assertions of his speedy trial rights.

Application of the *Barker* factors to the facts of this case shows that none of them – individually or cumulatively – warrants dismissal of the Second Superseding Indictment. Although nine years has elapsed since the original indictment, that delay did not happen in a vacuum. Defendant conveniently ignores the fact that both Bolanos-Garza and Rodriguez-Mendoza were fugitives at the time of the indictment, and their subsequent arrest and post-arrest cooperation transformed this case into a capital trial. The only delay

12

attributable to the United States resulted from the mandatory Capital Review process necessitated by those post-indictment arrests. All other delay can be traced directly to Defendant's efforts or acquiesce.

### A.  *First Barker Factor: Length of Delay*

Courts only consider the other *Barker* factors if the defendant can demonstrate, as a threshold matter, that "the interval between accusation and trial has crossed the threshold that separates ordinary delay from presumptively prejudicial delay." *Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011) (internal quotation and citation omitted). The United States concedes the first *Barker* factor is satisfied in this case.

### B.  *Second Barker Factor: Reason for Delay*

"The flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). *Barker* instructs that "different weights should be assigned to different reasons," *id*., at 531. In applying *Barker*, the Supreme Court has asked "whether the government or the criminal defendant is more to blame for th[e] delay." *Brillon*, 556 U.S. at 90 (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992)). The Fifth Circuit explained the difference as follows:

> At one extreme, a deliberate delay to disadvantage the defense is weighted heavily against the state. At the other end of the spectrum, delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the state. Between these extremes fall unexplained or negligent delays, which weigh against the state, "but not heavily."

13

*Goodrum v. Quarterman*, 547 F.3d 249, 258 (2008) (quoting *Cowart v. Hargett*, 16 F.3d 642, 647 (1994), and citing *Barker*, 407 U.S. at 531).

Courts have repeatedly held that *"[t]he Sixth Amendment is rarely violated by delay attributable entirely to the defendant, or by delay that serves some legitimate government purpose*." *United States v. Moreno*, 789 F.3d 72, 79 (2d Cir. 2015); (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009); *Doggett*, 505 U.S. at 656; *Barker*, 407 U.S. at 531) (emphasis added). "A defendant's claim that the government violated her right to a speedy trial is seriously undermined when the defendant . . . is the cause of the delay." *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988)). It has long been the law in the Fifth Circuit that "a defendant 'will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court.'" *Robinson v. Whitley*, 2 F.3d 562, 569 (5th Cir. 1993) (quoting *Nelson v. Hargett*, 989 F.2d 847, 852 (5th Cir. 1993)).

Delay is a particular fact of life in capital litigation: "The simple fact is the process takes so long because there is a concerted effort afoot to slow it down, and because our legal system requires scrupulous review before a death sentence can be carried out." Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run–On Sentence*, 46 CASE W. RES. L. REV. 1, 25 (1995); *see also United States v. Abad*, 514 F.3d 271, 274-75 (2d Cir. 2008) (discussing 31-month delay between arrest and capital trial; "there were a number of valid reasons for the delay, not least of which was the time needed for the Capital Case Unit to decide whether to seek the death penalty against defendants, including time for the

14

defendants to make mitigation submissions to the Department of Justice"). As detailed below, Defendant and his codefendants are overwhelmingly responsible for any delay in this case. The vast majority of the delay is attributable to Defendant's requests and, the post-indictment arrests of codefendants Bolanos-Garza and Rodriguez-Mendoza. [16] Consequently, this factor weighs heavily against Defendant and his motion must fail.

Defendant was indicted on July 1, 2010, and his trial is currently scheduled for March 8, 2021 – a delay of 128 months and 7 days. Defendant's twelve requests for continuance, and his acquiescence in his codefendant's continuances, caused 114 months and 30 days' worth of that delay. The Capital Case Review Process necessitated by the post-indictment arrests of codefendants Bolanos-Garza and Rodriguez-Mendoza caused a mere 13 months and 8 days of delay. That delay, to which Defendant never objected, falls well short of the postponement deemed acceptable in *Abad*, 514 F.3d at 274-75. Simple arithmetic shows that Defendant's requests account for 90% of the delay in this case, and the rest is attributable to a process about which he had no complaint. Defendant cannot justly secure a dismissal of the indictment based on delays he sought or agreed to.

*1. Delay Between Indictment and Bolanos-Garza's Arrest*

The original indictment in this case was returned July 1, 2010. Dkt. 1. On July 29, 2010, codefendant Fuentes moved to continue the trial date indefinitely. Dkt. 43. Defendant

---

[16] After committing the crime, Bolanos-Garza and Roldriguez-Mendoza fled to Mexico. The United States sought warrants for their arrest. Dkt. 71, 144. Both codefendants re-entered the United States illegally during Defendant's prosecution. (Docket 74, 188).

15

did not object, and the motion was granted. Dkt. 52. On November 15, 2010, codefendant Fuentes moved to continue the trial date again. Dkt. 56. Defendant did not object, and the Court granted the motion—setting jury selection for April 26, 2011. Dkt. 57. <u>The delay from July 1, 2010, to April 26, 2011, is attributable to Defendant</u>.

       2. *<u>Delay Between Bolanos-Garza's Arrest and Rodriguez-Mendoza's Arrest</u>*

On February 3, 2011, codefendant Bolanos-Garza was ordered detained pending trial. Dkt. 76. On March 29, 2011, codefendant Bolanos-Garza moved to continue trial. Dkt. 76, 88. Defendant did not object, and the Court set trial for August 23, 2011. Dkt. 94. <u>The delay from April 26, 2011, to August 23, 2011, is attributable to Defendant</u>.

On August 3, 2011, the defendants filed a sealed motion to continue the trial. Dkt. 97. The Court granted that motion, and continued trial to November 29, 2011. Dkt. 98. <u>The delay from August 23, 2011, to November 29, 2011, is attributable to Defendant</u>.

Following his arrest and detention, Bolanos-Garza began cooperating with law enforcement officers which, in turn, strengthened the United States' case against Defendant. Defendant was aware that Bolanos-Garza was cooperating. On November 7, 2011, Defendant moved to continue the filing deadlines in advance of trial. Dkt. 106. On November 7, 2011, one defendant submitted a "sealed event." Dkt. 108. The next day, the Court continued the trial to February 28, 2012. Dkt. 109. <u>The delay from November 29, 2011, to February 28, 2012, is attributable to Defendant</u>.

On November 18, 2011, during the continuance requested by Defendant,[17] the U.S. Attorney made a submission to the Attorney General for a decision whether to seek the death penalty, and Defendant received an opportunity to present mitigating information to the Attorney General's Review Committee on Capital Crimes (AGRCCC). On July 2, 2012, Attorneys Odom and Davis presented a 139-page mitigation submission to the Committee and appeared in person to urge the AGRCCC not to recommend seeking the death penalty. Attorney Odom submitted additional information on July 23, 2012. On September 18, 2012, the AGRCCC made its recommendation to the Attorney General, who authorized pursuit of capital punishment on October 4, 2012. The delay between February 28, 2012, and October 4, 2012, is attributable to the mandatory death penalty Protocol process. This delay was not the result of negligence and, far from prejudicing Defendant, this procedure allowed him to present mitigating evidence in hope that the death penalty might not be authorized. *See Abad*, 514 F.3d at 274-75.

On October 4, 2012, a federal grand jury returned a Superseding Indictment adding two counts of harboring an alien resulting in death – a capital offense. Dkt. 147. That day, the United States filed notice of its intent to seek the death penalty against Defendant. Dkt. 137. On October 10, 2012, Defendant successfully moved to continue the trial to April 23,

---

[17] Defendant was aware, in advance, that this process would be undertaken—indeed, Attorneys Odom and Davis submitted a request, in writing, urging the United States Attorney *not* to request authorization to seek the death penalty.

2013. Dkt. 139, 163. The delay from October 4, 2012, to April 23, 2013, is attributable to Defendant.

On March 18, 2013, Defendant again moved to continue trial, asserting the need to review discovery and investigate mitigation. Dkt. 184. The Court set trial for February 10, 2014. Dkt. 185. The delay from April 23, 2013, to February 10, 2014, is attributable to Defendant.

### 3.   *Delay Between Rodriguez-Mendoza's Arrest and Present*

On April 9, 2013, codefendant Rodriguez-Mendoza was arrested. Dkt. 188. On April 22, 2013, Attorneys Berg and Mallett were appointed to represent Rodriguez-Mendoza. Dkt. 193, 194, 197. Following the arrest, codefendant Rodriguez-Mendoza's counsel began investigating his case and preparing for review by the AGRCCC. Understanding the importance of that review, Defendant moved to continue on October 31, 2013. Dkt. 216. Given that his case had been pending for three years, Defendant could have moved for severance from Rodriguez-Mendoza and asked proceed to trial. Rather, he urged a continuance, stating "Mendoza is material to Duran's defense." *Id.* The Court subsequently held a status conference and terminated the trial date and all deadlines. Dkt. 220, 221, 224. After hearing from the parties, the Court granted Defendant's motion and set trial for September 14, 2015. Dkt. 232. The delay from February 10, 2014, to September 14, 2015, is attributable to Defendant.

18

On February 20, 2015, Defendant moved to continue the trial date, citing his desire to avoid trial until Rodriguez-Mendoza completed his mitigation investigation. Dkt. 237. Defendant further stated he required additional time to conduct his own mitigation investigation. *Id*. The Court held a status conference on the motion. Dkt. 238, 240. During that conference, Defendant could have, asserted his speedy trial rights. He did not. The Court granted the motion and set trial for January 25, 2016. Dkt. 241. The delay from September 14, 2015, to January 25, 2016, is attributable exclusively to Defendant.

On January 19, 2016, Defendant moved to continue trial. Dkt. 264. As previously, Defendant stated he did not wish to go to trial until Rodriguez-Mendoza completed his investigation. *Id*. He further stated he required additional time to conduct his own mitigation investigation. *Id*. The Court granted Defendant's motion and set trial for September 26, 2016. Dkt. 265. The delay from January 25, 2016, to September 26, 2016, is attributable to Defendant.

On September 7, 2016, Defendant filed another motion to continue, again asserting his desire to await the completion of his codefendant's mitigation investigation and claiming the need for more time to complete his own. Dkt. 285. The Court granted the motion and set trial for April 3, 2017. Dkt. 287. The delay from September 26, 2016, to April 3, 2017, is attributable exclusively to Defendant.

On February 6, 2017, Acting Attorney General Dana J. Boente authorized the United States to seek the death penalty against Rodriguez-Mendoza. Defendant's motion

makes much of the length of Rodriguez-Mendoza's AGRCCC review. Def. Motion, at 11. However as Defendant knows, and knew at the time, Rodriguez-Mendoza raised a specific defense before the AGRCC which required substantial investigation by both defense counsel and the United States before that review could take place. Defendant could have moved for severance had he been troubled by the delay involved in that investigation. He did not. Defendant's *post hoc* complaints about the delay caused by his codefendant's mitigation investigation are mendacious.

The United States filed its notice of intent to seek the death penalty against Rodriguez-Mendoza on February 10, 2017. Dkt. 326. The Court held a status conference on March 20, 2017, at which time the pending trial date was dismissed, without objection from Defendant or any assertion of his Speedy Trial right. Dkt. 332. On September 11, 2017, the parties appeared for a status conference and informed the Court they were crafting an agreed scheduling order for trial. Dkt. 353. As ordered, the United States filed the proposed order September 26, 2017. Dkt. 353-55. On October 4, 2017, the Court adopted the agreed joint scheduling order and set trial for October 15, 2018. Dkt. 357. Defendant concurred or acquiesced in every aspect of that delay. The delay from April 3, 2017, to October 15, 2018, is attributable to Defendant.

At a status conference on February 26, 2018, defense counsel informed the Court that they had spoken to undersigned counsel and indicated a need for time to prepare for trial, rather than any desire to proceed. With the Court's encouragement, the parties agreed

20

to a new proposed scheduling order, which was adopted by the Court and set trial for January 13, 2020. Dkt. 372. The delay from October 15, 2018, to January 13, 2020, is attributable to Defendant.

On February 4, 2019, Defendant successfully moved to continue pretrial filing deadlines in advance of the January 13, 2020 trial date. Dkt. 421, 423. On February 8, 2019, Defendant successfully moved to sever his case from Rodriguez-Mendoza's. Dkt. 421, 425. On March 27, 2019, the Court scheduled a status conference for May 8, 2019. Dkt. 427. Ahead of the hearing, undersigned counsel met with Attorneys Neal, Odom, and Stelzig to determine their position vis-à-vis Defendant's trial date. Defense counsel agreed that they could not be prepared to pick a jury before December 2021, with a resulting trial date in early 2022. The United States refused to consent to Defendant's requested 23-month continuance, and the parties later agreed on a jury selection date of January 25, 2021, with a likely trial date of March 8, 2021. The Court adopted that schedule. Dkt. 450. The delay between January 13, 2020, and March 8, 2021, is attributable to Defendant.

Despite ample opportunity to demand a speedy trial, Defendant has repeatedly requested additional time to prepare for one. Not until the United States objected to an unjustifiable 23-month continuance, did Defendant encounter any resistance to his persistent thirst for delay. Defendant unquestionably caused 90% of his own pretrial delay, and his counsel's litigating position on May 7, 2019 sought to enlarge that delay by more than a full year. The second *Barker* Factor weighs heavily against Defendant's motion.

21

**C.** **_Third Barker Factor: Defendant's Assertion of the Speedy Trial Right_**

The third *Barker* factor asks whether Defendant timely asserted his right to a speedy trial. To satisfy the factor, Defendant must demonstrate "diligence" which should "take the form of seeking a speedy trial." *Frye*, 489 F.3d at 211. A motion to dismiss is not a speedy trial assertion. *Id*. (citing *Barker*, 407 U.S. at 534-35).

Defendant has never asserted his speedy trial rights. Quite the contrary, his pleadings demonstrate an unwavering desire <u>not</u> to receive a speedy trial—merely four months ago he sought to delay jury selection until December 2021. Indeed, prior to filing this motion, Defendant only mentioned his speedy trial rights when he was waiving them. He did not complain of pretrial delay until it became clear that the Court would force him to trial. A criminal trial is not a game, however—it is a search for truth. *Williams v. Florida*, 399 U.S. 78, 82 (1970). Whatever "speedy trial assertions" Defendant has conjured up for the instant motion, he cannot outrun his own docket entries. Accordingly, the third *Barker* factor weighs heavily against Defendant's motion.

**D.** **_Fourth Barker Factor: Resulting in Prejudice to Defendant_**

The final *Barker* factor requires Defendant to show prejudice from any delay. Given that Defendant is responsible for 90% of his delay, he is not entitled to a presumption of prejudice: the possibility that pretrial delay might affect the fairness of his trial "was obviously a risk [he] was willing to take." *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993). Consequently, Defendant must "establish *actual* prejudice and demonstrate that the

22

prejudice sufficiently outweighs the other factors." *Frye*, 489 F.3d at 212 (emphasis original). "'Actual prejudice' is assessed in light of three interests: (1) 'to prevent oppressive pretrial incarceration'; (2) 'to minimize anxiety and concern of the accused'; and (3) 'to limit the possibility that the defense will be impaired.'" *United States v. Harris*, 566 F.3d 422, 433 (5th Cir. 2009) (quoting *Barker*, at 532). Conclusory assertions of prejudice without proof of actual harm are insufficient. *Frye*, 489 F.3d at 213. But Defendant relies exclusively on the conclusory assertions – none of which satisfies the fourth *Barker* element.

### 1. *Alleged Impairment of Defendant's Defense*

Defendant asserts the pretrial delay has impaired his defense by rendering witnesses and documents unavailable to him. Def. Motion, at 12-17. He first alleges his defense has been impaired by the deportation of certain "fact" witnesses. Def. Motion, at 12-14. Defendant concedes he has received records of each of these witnesses' interviews. He is, therefore, aware that none of those witnesses was present at the murder scene. *Id.* More importantly, however, the deportations occurred in 2007, and Defendant has known of them since *at least* 2012 – as evidenced by his AGRCCC mitigation submission. Defendant's motion fails to explain (a) why he waited until 2019 to seek a remedy or why he would seek twelve trial continuances before doing so. Clearly, Defendant did not view these witnesses as necessary to his defense and saw their unavailability as "a risk [he] was willing to take." *Robinson*, 2 F.3d at 570.

23

Defendant next contends certain documentary evidence might not be available to him at trial, thus prejudicing his defense. Def. Motion, at 14. Again, as noted in his AGRCCC mitigation submission, Defendant has known since *at least* 2012 that he would need to gather documentary evidence for his mitigation case. And, again, Defendant fails to explain why he waited until 2019 to seek a remedy or why he sought repeated continuances before doing so, if delay would render certain documents unavailable. And again, it appears this was "a risk [Defendant] was willing to take." *Robinson*, 2 F.3d at 570.

Finally, Defendant contends that he is prejudiced by the deaths of family members who could have testified in mitigation during the penalty phase. Def. Motion, at 15. This contention ignores the fact that hearsay testimony is admissible in the penalty phase (18 U.S.C. § 3593(c)); thus, Defendant can present the evidence through other witnesses.[18] Given his twelve requests for delay, Defendant clearly believed the unavailability of the witnesses was "a risk [he] was willing to take." *Robinson*, 2 F.3d at 570; *see also Harris*, 566 F.3d at 433 (defendant's blanket statement that loss of deceased mother's mitigation testimony prejudiced his defense was unconvincing given that defendant failed to explain "why he or his attorneys failed to take any steps to preserve this testimony for trial") (citing *United States v. Neal*, 27 F.3d 1035, 1043 (5th Cir. 2007)).

---

[18] Defendant provides a detailed account of forgone testimony from unavailable witnesses (Def. Mot., at 15), indicating he still has a capacity to present that evidence.

24

Though Defendant now claims prejudice, his requests for continuance demonstrate he cared more about delaying his trial than he did about the potential consequences of that delay. This element does not Defendant's claim of actual prejudice.

2. *Allegedly Oppressive Pretrial Incarceration*

Relying on *Harris*, Defendant next asserts his detention thus far "constitute[s] 'oppressive pretrial incarceration.'" Def. Motion, at 17 (quoting 566 F.3d at 433). Curiously, *Harris* does not discuss "oppressive pretrial incarceration," except to quote *Barker* and note it as an element of the fourth factor. Defendant also quotes *United States v. Tigano*, 880 F.3d 602, 618 (2d Cir. 2018), a case distinguishable on its face. *Tigano* involved charges of marijuana distribution and a trial that the prosecutor described as "simple." *Id.* at 619. Given the absence of cognizable analogy, Defendant's reliance on a bare quotation from of *Tigano* as proof of oppression is dubious.

Apart from demonstrating judicial recognition of the concept of oppressive incarceration, Defendant offers no analysis as to why his self-perpetuated detention satisfies the doctrine, especially given his express desire to continue trial to spring 2022. This element does not support Defendant's claim of actual prejudice.

3. *Alleged Anxiety and Concern*

Finally, Defendant asserts prejudice in the form of "substantial 'anxiety and concern.'" Def. Motion, at 17-18. As in his "oppressive pretrial incarceration" argument, Defendant relies on quotations and string-cites without analysis of his condition. Such bare

allegations will not satisfy *Barker*. *Frye*, 489 F.3d at 213 (noting "[a] lengthy pretrial incarceration does not inherently offend a defendant's liberty interests"). Like the defendant in *Frye*, Defendant's minimum sentence upon his conviction is life imprisonment without the possibility of release. (Docket 314); 18 U.S.C. §§ 1201(a)(1), 1203(a). Consequently, the duration of his self-perpetuated, pre-trial incarceration is not prejudicial, to the extent he has pursued delay in an effort to avoid the death penalty. *Id*. This element does not support Defendant's claim of actual prejudice.

## CONCLUSION

Defendant's motion ignores the obvious fact that he is the most responsible party for the pretrial delay. Although the mandatory capital review procedure for Bolanos-Garza and Rodriguez-Mendoza delayed the trial, that delay pales in comparison to the delay requested by, and granted to, the Defendant based on his repeated motions. Indeed, had Defendant gotten his way, trial in this matter would be delayed more than a full year longer than it is. Given that he caused the delay, it is beyond argument that the delay was not prejudicial to him. If it had been, he would have asserted his right to a speedy trial and demanded to go to trial – something he *still* has never done. Accordingly, Defendant cannot, and has not, satisfied *Barker* factors and he is undeserving of any remedy.

WHEREFORE, the Government respectfully requests that Defendant's "Motion to Dismiss the Indictment or, in the Alternative, to Strike the Government's Notice of Intent to Seek the Death Penalty" be DENIED without a hearing.

26

Respectfully submitted,

RYAN K. PATRICK
United States Attorney

By:    */s/ Jill Jenkins Stotts*
        JILL JENKINS STOTTS
        Assistant United States Attorney

        */s/ James B. Nelson*
        JAMES B. NELSON
        Trial Attorney
        United States Department of Justice

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

> */s/ James B. Nelson*
> James B. Nelson
> Trial Attorney
> Capital Case Section
> United States Department of Justice
> 1331 F. Street NW, Room 625
> Washington, DC   20004
> Tel: (202) 598-2872
> james.nelson@usdoj.gov

28