United States District Court
for the Southern District of Texas
Houston Division

| | | |
|---|---|---|
| **United States of America** | § | |
| | § | |
| v. | § | Criminal No. H-10-459 |
| | § | |
| **Wilmar Rene Duran Gomez** | § | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## Motion to Suppress the Fruits of Illegal Arrest

Defendant Wilmar Rene Duran Gomez respectfully moves this Court, pursuant to the Fourth, Sixth, and Eighth Amendments, to suppress any evidence derived from his arrest, which law enforcement officials effected in excess of their lawful authority.

**I.   Factual and procedural history**

On November 15, 2006, officers with the Fort Bend County Sherriff's Office (FBCSO) discovered an abandoned truck with the dead bodies of two Hispanic males lying on the floor behind the driver's seat. Bates Number 3690 (Search Warrant Affidavit). The bodies had been badly beaten. *Id.* On November 20, 2006, Immigration and Customs Enforcement (ICE) received information from a confidential source alleging that Mr. Duran Gomez, an alien smuggler, had recently beaten two smuggled aliens to death and disposed of their bodies. *Id.* Within two hours, ICE agents and FBCSO detectives began surveilling Mr. Duran Gomez, observing him drive around, and then return to his home, where he spent the night and most of the following day. Bates Numbers 28967-68.

After more than 21 hours of continuous surveillance outside of Mr. Duran Gomez's residence, ICE agents arrested Mr. Duran Gomez as he was leaving his home on November 21, 2006. Bates Numbers 3690-91. An ICE report prepared the next day indicated Mr.

1

Duran Gomez was "taken into custody . . . based on [his] immigration status." Bates Number 4278; *see also* Bates Number 03959 (January 28, 2008 affidavit of ICE agent attesting that Mr. Duran Gomez was arrested "on immigration charges"). As of the time that report was written, ICE agents were still "continuing interviews of [witnesses] to determine whether enough evidence exist[ed] to indict DURAN . . . with the murders" of Abelardo Sagastume and Hector LNU, the two men discovered in the abandoned truck. Bates Numbers 4278-79.

The government did not obtain a warrant for Mr. Duran Gomez's arrest until November 22, 2006. Bates Numbers 290-91. That warrant justified the arrest on the ground that Mr. Duran Gomez was "within the country in violation of the immigration laws," although it did not specify the nature of Mr. Duran Gomez's alleged immigration violation. Bates Number 290. In an entry made into its Seized Assets and Case Tracking System (SEACATS), ICE agents recorded items seized from Mr. Duran Gomez during his arrest. This entry states that Mr. Duran Gomez was arrested "for being in the US unlawfully because of two [crime involving moral turpitude] convictions, one of which is considered an aggravated felony/crime of violence." Bates Number 19052. That paperwork added that Mr. Duran Gomez was "a suspect in a pending homicide investigation by Fort Bend County Sheriff's Office detectives, and [wa]s under investigation for harboring of aliens." *Id.* Another SEACATS entry, reflecting the seizure of recorded jail calls on December 1, 2006, states that Mr. Duran Gomez was arrested "for alien smuggling and potential involvement in 2 homicides." Bates Number 19029.

Incident to his arrest, ICE agents searched Mr. Duran Gomez's person and the vehicle he was entering, and seized keys, two cell phones, a wallet, and several documents.

Agents interviewed Mr. Duran Gomez the next day, at which time he allegedly made a number of incriminating statements, including that he was at the warehouse where some of the beatings occurred and that he helped dispose of the victims' bodies. Bates 029018-21. After the interview, law enforcement transferred Mr. Duran Gomez to a local jail, where they recorded numerous phone calls he made to family members. Mr. Duran Gomez's statements to investigators, his conversations with his family, and evidence allegedly viewed or seized during his arrest formed the basis for warrants authorizing searches of his home and computer.[1]

On December 4, 2006, Mr. Duran Gomez was charged by complaint with obstruction of justice. Crim. No. 06-459 (S.D. Tex.), ECF No. 1. On December 27, 2006, a grand jury returned an indictment charging Mr. Duran Gomez with one count of obstructing justice, under 18 U.S.C. § 1505. No. 06-459, ECF No. 19. The government did not charge Mr. Duran Gomez with the capital charges until July 1, 2010. Crim. No. 10-459, ECF No. 28.

## II. Argument

### A. Legal background

If immigration officials suspect an alien is eligible for removal from the United States, they may issue a notice to appear informing the alien that the government has initiated deportation proceedings against him. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1(a). The attorney general may then issue a warrant authorizing an alien's arrest and detention

---

[1] In the search warrant affidavit for Mr. Duran Gomez's residence, the affiant stated that agents, while executing the arrest, observed "an open spiral notebook laying on a coffee table in the living room in plain view" and that "alien smugglers often keep records of the aliens they have smuggled in such notebooks . . ." Bates Number 3691. The viability of this search warrant, apart from its taint from this unlawful arrest, will be the subject of a separate motion.

"pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Absent such a warrant, immigration officers may arrest an alien only in narrow, statutorily defined circumstances. Relevant here, an immigration officer has the power, without a warrant:

- "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2);

- "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest," *id.* § 1357(a)(4); and

- "to make arrests . . . for any felony cognizable under the laws of the United States, if [1] the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony" and "[2] there is a likelihood of the person escaping before a warrant can be obtained for his arrest," *id.* § 1357(a)(5)(B).

Thus a warrantless arrest is lawful under § 1357(a) only if an immigration officer has "reason to believe" that two things are both true: (1) the arrestee has committed a crime, and (2) he is likely to escape before law enforcement can obtain a warrant. *See Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (referring to "the statutory right to arrest when the officer has reason to believe the alien is improperly present and is likely to escape before a warrant can be obtained."); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016) ("ICE officers may make warrantless arrests for suspected immigration violations only when they have both probable cause for the arrest *and* probable cause that the subject is likely to escape." (emphasis in original)).

"[T]he phrase 'reason to believe'" in § 1357(a) is equivalent to "the constitutional requirement of probable cause." *United States v. Varkonyi*, 645 F.2d 453, 458 (5th Cir. 1981); *see also, e.g.*, *Lopez-Flores v. Ibarra*, 2018 WL 6579180, at *5 (S.D. Tex. Jan. 22, 2018) ("[T]he Fifth Circuit has held that 'reason to believe' in [§ 1357(a)] means constitutionally required probable cause."); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

The burden is on the government to establish that probable cause exists as to both prongs under § 1357(a). *See, e.g.*, *Araujo v. United States*, 301 F. Supp. 2d 1095, 1101-02 (N.D. Cal. 2004) (finding violation of § 1357(a) because "[t]he government has not

attempted to demonstrate, and cannot demonstrate, that [alien] was 'likely to escape before a warrant can be obtained'"); *United States v. Santos-Portillo*, 2019 WL 3047427, at *3 (E.D.N.C. May 31, 2019) ("The government has the burden to show that the escape-likelihood prong is met—that is, that the agents had reason to believe that defendant was likely to escape before a warrant could be obtained.").

### B.     Analysis

The government will be unable to bear its burden of showing that, at the time of Mr. Duran Gomez's arrest, ICE agents had probable cause to believe he (1) had committed a felony or an immigration violation, and (2) was likely to flee before agents could obtain a warrant.  His arrest was therefore unlawful, and the fruits of that arrest must be suppressed.

It is not clear that, at the time of Mr. Duran Gomez's arrest, ICE agents had any basis to suspect he had violated an immigration statute.  An ICE report prepared on November 22, 2006, the day after the arrest, appears to indicate that agents arrested Mr. Duran Gomez *before* learning that his prior convictions supposedly rendered him removable.  *See* Bates Number 4278 ("DURAN was approached and subsequently taken into custody . . . based on [his] immigration status. . . . It was determined that DURAN was [a lawful permanent resident] but was deportable based on his criminal history.").  If this timeline is correct, then ICE agents did not have probable cause, at the time Mr. Duran Gomez was arrested, to believe he was in the United States "in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens."  § 1357(a)(2).  Nor did they have probable cause to believe he had committed a felony "cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens."  *Id.* § 1357(a)(4).  His arrest was therefore unlawful, as information discovered after an arrest cannot furnish probable cause

for effecting that arrest. *See Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) ("Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." (emphasis added)).

ICE agents also lacked probable cause to believe Mr. Duran Gomez had committed a non-immigration-related "felony cognizable under the laws of the United States." § 1357(a)(5)(B). It is clear from the discovery that ICE began investigating Mr. Duran Gomez because it believed he may have been involved in the deaths of Mr. Sagastume and Hector LNU. But according to an ICE report written on November 22, 2006, the day after his arrest, agents still had not "determine[d] whether enough evidence exist[ed] to indict DURAN . . . with the murders." Bates Numbers 4278-79. An indictment requires a finding of probable cause. *See United States v. Fields*, 483 F.3d 313, 353 (5th Cir. 2007). If ICE agents lacked sufficient evidence for an indictment, they also necessarily lacked sufficient information for an arrest under § 1357(a)(5)(B), which requires probable cause as well. *Varkonyi*, 645 F.2d at 458. ICE agents' pretextual immigration arrest of Mr. Duran Gomez was therefore unlawful.

Even if probable cause existed to believe Mr. Duran Gomez had committed a criminal offense, his arrest was still illegal because agents had no reason to believe he was "likely to escape before a warrant c[ould] be obtained for his arrest." § 1357(a)(2); *see also id.* § 1357(a)(4), (5)(B) (permitting warrantless arrest "if there is likelihood of the person escaping before a warrant can be obtained for his arrest"). "The flight-risk determination is not mere verbiage." *United States v. Bautista-Ramos*, 2018 WL 5726236,

at *8 (N.D. Iowa Oct. 15, 2018). Rather, the "likelihood-of-escape limitation is 'seriously applied.'" *Davila v. United States*, 247 F. Supp. 3d 650, 668 (W.D. Pa. 2017) (quoting *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975)).

Here, nothing in the record suggests Mr. Duran Gomez was likely to flee before ICE agents could obtain an arrest warrant. Mr. Duran Gomez does not appear to have been aware that law enforcement was looking for him. "This was not a situation where, for example, the officers were empowered to make a warrantless arrest because an alien attempted to evade custody, or was looking for an opportunity to run, or was speeding cross-country in a car that belonged to someone else." *Pacheco-Alvarez*, 227 F. Supp. 3d at 889. Agents arrested Mr. Duran Gomez on November 21, 2006—more than a week after the murders allegedly occurred. If Mr. Duran Gomez were going to flee to escape capture for the murders, he surely would have done so long before agents took him into custody.

Moreover, "the record does not show that the period between the agents' observation of [Mr. Duran Gomez] and their encounter with him was so short—say, a minute or two—to have made acquisition of a warrant impossible." *United States v. Segura-Gomez*, 2018 WL 6582823, at *8 (E.D.N.C. May 25, 2018). To the contrary, agents began surveilling Mr. Duran Gomez on November 20, and kept him under constant surveillance for more than 20 hours before arresting him. This provided ample time for law enforcement to obtain a warrant. Indeed, even when law enforcement arrested him the next day, he was not in a hurry as he exited his house, and was carrying no luggage with him. Given that obtaining a warrant is "not . . . a daunting task," *id.*, this interval gave agents more than sufficient time to present their case for probable cause to a magistrate.

Because there was no reason to believe Mr. Duran Gomez would take flight before agents could obtain a warrant, his arrest was unlawful under § 1357(a).

This Court should therefore suppress all evidence obtained as a result of Mr. Duran Gomez's arrest. The "general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct are not too attenuated." *United States v. Hernandez-Mandujano*, 721 F.3d 345, 353 (5th Cir. 2013); *see, e.g.*, *United States v. Khan*, 324 F. Supp. 2d 1177, 1187-88 (D. Colo. 2004) (suppressing evidence derived from defendant's arrest because, under § 1357(a), government failed to show he was likely to flee before immigration agents could obtain a warrant). Here, the effects seized from Mr. Duran Gomez's person, statements he made in his post-arrest interrogation, his recorded conversations with family members, the items agents observed in his home while arresting him, and the evidence obtained pursuant to the follow-up warrants are all fruits of his unlawful arrest. Without the unlawful arrest, law enforcement would have been unable to obtain any of this information. The Court should therefore suppress that evidence. To the extent the government asserts that some (or all) of this evidence is admissible because "the causal link between the government's unlawful act and the discovery of evidence" is "sufficiently attenuated from the Fourth Amendment violation," *id.*, this Court should conduct an evidentiary hearing at which the parties can contest the proper scope of suppression in this case.

### III. Conclusion

For the reasons described above, Mr. Duran Gomez respectfully requests the Court suppress all evidence obtained as a result of his arrest. Mr. Duran Gomez requests a hearing on this motion.

A proposed order is attached.

Respectfully submitted,

| | |
|---|---|
| /s/ Wendell A. Odom, Jr<br>WENDELL A. ODOM, JR.<br>Texas State Bar # 15208500<br>Federal Bar # 0947<br>440 Louisiana, Suite 200<br>Houston, TX 77002<br>(713) 223-5575<br>(713) 224-2815 (FAX)<br><br>/s/ Neal Davis, III<br>NEAL DAVIS, III<br>Texas State Bar #24038541<br>Federal Bar # 706329<br>440 Louisiana, Suite 200<br>Houston, TX 77002<br>(713) 223-5575<br>(713) 224-2815 (FAX) | /s/ James Wyda<br>JAMES WYDA (#25298)<br>Federal Public Defender<br>Office of the Federal Public Defender<br>100 South Charles Street<br>Tower II, 9th Floor<br>Baltimore, Maryland 21201<br>(410) 962-3962<br>(410) 962-0872 (FAX)<br>Email: jim_wyda@fd.org<br><br>/s/ Julie L.B. Stelzig<br>JULIE L.B. STELZIG (#27746)<br>Assistant Federal Public Defender<br>6411 Ivy Lane, Suite 710<br>Greenbelt, Maryland 20770<br>(301) 344-0600<br>(301) 344-0019 (FAX)<br>Email: julie_stelzig@fd.org |