UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:10-CR-0459 |
| | § | |
| WILMAR RENE DURAN-GOMEZ | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

## I.    INTRODUCTION

Before the Court is Wilmar Rene Duran-Gomez's ["Duran-Gomez"], motion to dismiss the Second Superseding Indictment filed against him by the United States of America ["the Government"][1].    Also pending is the Government's response opposing the motion [Dkt. No. 458] and Duran-Gomez's reply [Dkt. No. 460].  After receiving oral arguments, examining the motion, response, reply, respective attachments and relevant court files, the Court determines that Duran-Gomez's motion is meritorious and should be granted.  His request for alternative relief is rendered moot.

---

[1] Alternatively, he seeks to have the Department of Justice's ["DOJ"] notice of intent ["NOI"] authorizing the death penalty stricken as a sanction [Dkt. No. 454].

1

## II.  FACTUAL BACKGROUND

### A.  Duran-Gomez's Arrest and Plea

Duran-Gomez first came to the attention of the Immigration and Customs Enforcement Agency ["ICE"] after the bodies of two aliens, Abedlardo Sagastume and Hector LNU, were discovered in a field in Fort Bend County, Texas on November 15, 2006.  ICE commenced an investigation along with local law enforcement agencies, the extent of which is not fully disclosed or necessary to the resolution of this case.  ICE's investigation, nonetheless, was based on immigration violations and soon focused on Duran-Gomez.

On November 21, 2006, six days after the aliens' bodies were discovered, the FBI arrested Duran-Gomez at his home. He was mirandized[2] based on alleged immigration violations and cooperated, at some level.  He gave both, oral and written statements that implicated him in the crime for which he had been arrested.  Concurrently, the FBI executed a search warrant at a warehouse on Ashcroft Street in Houston, Texas, where aliens were allegedly held, and where it was believed the murders of the two aliens occurred.

On or about November 29, ICE agents began listening to recorded calls made by and between Duran-Gomez, his mother, his former girlfriend and his sister.  During the course of the telephone calls, he allegedly requested that his mother, girlfriend and sister they remove certain personal property from his home including cash and a computer

---

[2] The Court assumes that Duran-Gomez was mirandized even though only the plea documents evince that fact. Strikingly, the record shows that he was not taken before a magistrate judge.

monitor and CPU, and place the items in a storage unit. Based on information gathered from the telephone calls, Duran-Gomez, along with his mother, girlfriend and sister were charged with obstruction.

Approximately a month later, Duran-Gomez, his mother, sister and girlfriend were formally indicted for obstructing an ICE investigation. *See* [Cr Case No. 04-06-459, Dkt. No. 1]. In the meantime, the Government continued its immigration investigation against Duran-Gomez while he remained in custody. Subsequently, he entered a plea of guilty, pursuant to a plea agreement on May 25, 2007, to obstruction, where he agreed to cooperate with the Government in its ongoing investigation. When he entered his plea of guilty, he confessed to conduct that further implicated him in the deaths of the two aliens. The language contained in his plea agreement, states in relevant part the following:

> The defendant is pleading guilty because he is guilty of the charges contained in Count One of the Indictment. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:
>
> At about 6:10 a.m. on November 15, 2006, two Hispanic male corpses were found in a stolen pickup truck that had been abandoned in rural Ft. Bend County. When the corpses were received by the medical examiner about two hours after they were discovered, he estimated that the men had been killed 12 - 24 hours earlier. The men had been beaten to death.
>
> The bodies and truck were traced back to a warehouse located at 7315 Ashcroft, Suite 116, in Southwest Houston. The warehouse was leased by Wilmar Rene Duran-Gomez.
> . . .
> Acting upon a state-issued search warrant, an FBI forensic team entered the Ashcroft warehouse on November 21, 2006 and conducted a detailed crime scene analysis. The ensuing investigation determined that the men had in fact died in the warehouse on November 14, 2006, at approximately 11:00 p.m.

> After mirandizing and arresting both [Duran-Gomez and his girlfriend] . . .
> on immigration charges, Duran gave a statement. [Emphasis supplied].

A Pre-Sentence Investigation Report ("PSR") was completed in the obstruction case and was filed on March 3, 2008. Nevertheless, four years nearly passed before Duran-Gomez would be sentenced on January 6, 2011. The PSR included the Government's investigation materials that contributed to the probation officer's report and recommendation to the Court. The PSR calculations for punishment purposes were as follows:

> The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 1505 is found in U.S.S.G. §2J1.2. According to U.S.S.G. § 2J1.2(c)(1), if the offense involved obstructing the investigation or prosecution of a criminal offense, apply U.S.S.G. § 2X3.1 (Accessory After the Fact) in respect to that offense. According to U.S.S.G. § 2X3.1(a)(1), the base offense level is to be 6-levels lower than the offense level for the underlying offense, but not more than level 30, as provided by U.S.S.G. § 2X3.1(a)(3)(A). The underlying offense in this matter involved the smuggling-transporting-harboring of unlawful aliens, resulting in the death of two of those aliens. Therefore, the appropriate guideline is U.S.S.G. §2L1.1(a), which produces a base offense level of 12. According to the "pollo lists", there were approximately 1,700 aliens smuggled. Pursuant to U.S.S.G. §2L1.1(b)(2)(C), for 100 or more aliens smuggled, transported, or harbored, 9-levels are added. As described above, a firearm was discharged at the Ashcroft warehouse. Pursuant to U.S.S.G. §2L1.1(b)(5)(A), if a firearm was discharged, increase by 6-levels. As indicated, the aliens detained at the Ashcroft warehouse were treated in a brutal, inhumane manner. They were tied up and beaten repeatedly, left in their underwear and periodically stripped naked, and not fed properly. According to U.S.S.G. §2L1.1(b)(6), if the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2-levels. According to the Commentary, Note 5, conduct to which this adjustment applies includes, ". . . harboring persons in a crowded, dangerous, or inhumane condition." Therefore, this increase has been applied. Pursuant to U.S.S.G. to U.S.S.G. §2L1.1(b)(8), [sic] if an alien was involuntarily detained through coercion or threat, or in connection with a demand for

> payment, increase by 2-levels. Therefore, these calculations total 41, less the 6-level reduction called for, resulting in a base offense level of 35. The base offense level may not exceed 30, however, based upon U.S.S.G. §2X3.1(a)(3)(A).

*See* Case 4:06-CR-0459, [Dkt. No. 109 at 10-11, June 6, 2008]. Duran-Gomez was sentenced to the maximum term that the statute allowed notwithstanding his cooperation and the fact that the PSR included unindicted conduct. According to the Sentencing Guidelines applicable and/or those applied, Duran-Gomez's base Offense Level score for the offense of obstruction was 12 and a Criminal History Category of one. Assuming he had smuggled 1,700 aliens into the United States, as recorded, the Offense Level increases to 21. This scoring would result in a sentencing range of 37 – 46 months. However, once the investigation materials were considered, the sentencing range increased to 151 to 188 months. At the time of his sentencing, Duran-Gomez had been continuously detained in jail approximately 50 months.

### B. The Original, Superseding and Second Superseding Indictments

The Original Indictment in the immigration case, filed on July 1, 2010, charged Duran-Gomez with intentionally engaging in a conspiracy to transport and harbor illegal aliens within the United States and engaging in conduct that caused the deaths of two aliens. Title 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i). *See* [Dkt. No. 1, Indictment]. The documents and statements obtained during the investigation supported the conclusion that the two murdered aliens, Abedlardo Sagastume and Hector LNU, among others, were being held at a warehouse controlled by Duran-Gomez where they "hatched" a scheme to escape.

The murdered aliens were accused by fellow aliens of setting fire to the warehouse in an attempt to escape. Duran-Gomez learned of the fire and, upon inquiry learned that the same two were "plot[ing] to kill" one of his "lieutenants", Jose Alberto Bolanos-Garza, as part of an escape attempt. Bolanos-Garza was not officially named as a codefendant in the 2010 Indictment. He was later named in the Superseding Indictment filed October 4, 2012, along with Efrain Rodriguez-Mendoza.

It is important to note that other codefendants named in the 2010 Indictment, were not charged with participating in the beatings and deaths of the two aliens. The 2012 Indictment made it clear that, in the Government's view, Balanos-Garza, Rodriguez-Mendoza, and Duran-Gomez were all responsible for the beatings and deaths of two aliens and, therefore, should receive the death penalty.

Shortly after the 2006 Indictment for obstruction, the Government announced publicly that, based on its preliminary investigation, it would be seeking the death penalty against Duran-Gomez and perhaps others. At that time, the State of Texas declined to pursue charges against him. Yet, the requisite formal "notice of intent" ["NOI"] to seek death as to Duran-Gomez was not sought until October 15, 2011, fifteen months after the 2010 Indictment was filed and after the case had been set for trial [Dkt. No. 137][3].

In September of 2012, the Government received authority to seek death against Duran-Gomez and filed its NOI and its Superseding Indictment [Dkt. No. 147]. Although the 2012 Indictment disclose, Rodriguez-Mendoza as a codefendant, he was a fugitive at

---

[3] The Government abandoned its "seek or not" application to the DOJ for Balanos-Garza and proceeded to plea negotiations.

the time. In spite of that fact, the Government announced ready for trial as to Duran-Gomez and the remaining codefendants. Six months later, on the eve of trial, Rodriguez-Mendoza was arrested in South Texas attempting to reenter the United States. At that time, the Government insisted that Duran-Gomez and Rodriguez-Mendoza be tried together because it intended to also seek an NOI against him.

Despite the government's announcement that it intended to seek an NOI against Rodriguez-Mendoza, it did not. Rather it engaged in plea negotiations with him. On August 5, 2015, after yet another passed trial date, the Court formally ordered the Government to "seek or not" an NOI as to Rodriguez-Mendoza. [Dkt. No. 251]. However, the Government sought another extension because the DOJ was considering the terms of the plea agreement that had been struck with Rodriguez-Mendoza [Dkt. No. 253]. In the meantime, Bolanos-Garza, along with the remaining codefendants, entered pleas of guilty to lesser crimes, thereby avoiding a trial.

The DOJ rejected Rodriguez-Mendoza's plea agreement. On January 10, 2017, approximately sixteen months after the Court's order, the Government filed an NOI as to Rodriguez-Mendoza, followed by a 2017 Second Superseding Indictment. Frustrated with unsuccessful trial settings, the Court held a telephone conference and directed the parties to agree on a scheduling order that would allow Rodriguez-Mendoza to "catch up" in his preparation for trial since the Government was still insisting on a single trial.

On September 4, 2017, Rodriguez-Mendoza filed a motion for severance. Duran-Gomez filed a separate motion to sever. After reviewing the motions and replies, the Court granted Rodriguez-Mendoza's motion in light of the anticipated extenuated lag

necessary for trial preparation [Dkt. No. 425]. The Court entered the parties Agreed Scheduling Order as to Duran-Gomez, and his case is currently set for trial in March of 2021 , [*See* Dkt. No. 450]. Duran-Gomez promptly filed a motion to dismiss the 2017 Indictment based on violations of his right to a speedy trial and "due process". [*See* Dkt. No. 454].

## III. CONTENTIONS OF THE PARTIES

### A. Duran-Gomez's Contentions

In five main points of contentions, Duran-Gomez asserts that his speedy trial and "due process" rights under the Speedy Trial Act ("Act"), the Fifth, Sixth and Eighth Amendments[4] to the federal Constitution have been violated. First, he contends that his rights were violated because the Government, after arresting him, delayed indicting him for nearly four-years while he remained in jail.[5] Next, he asserts that the Government delayed seeking an NOI for more than two years after the 2010 Indictment and further delayed the trial an additional five years after the 2012 Indictment. Third, Duran-Gomez, asserts that the Government delayed producing discovery, the vast majority of which was not produced until January of 2017. Fourth, he alleges that the Government delayed obtaining plea agreements with four codefendants until 2016, without explanation, further delaying trial preparation. And finally, he maintains that the funding for his defense was insufficient and inconsistent, thereby preventing him from successfully gathering

---

[4] The Court will not address Duran-Gomez' Eighth Amendment claim as a separate contention because, in the Court's view it is premature.

[5] The records show that during this period of delay, the Government conducted interviews and depositions of material witnesses, placed Duran-Gomez in a line-up and obtained a proffer interview from him.

mitigation evidence.[6]  Therefore, he argues, the Court should dismiss the 2017 Indictment based on violations of the Act and the Sixth Amendment and, alternatively, strike the NOI as a sanction under the "Due Process" clauses of Fifth and Eighth Amendments.

In support of his motion, Duran-Gomez points to the fact that the Government's investigation commenced on or about November 15, 2006, when the FBI entered the case.  On November 21, he was arrested on immigration charges, and was mirandized, but was not indicted.  Instead, on December 27, 2006, he was charged with obstructing ICE's investigation.  He entered a plea of guilty to the obstruction charge, pursuant to a plea agreement and agreed to cooperate in the ongoing immigration investigation. Regrettably, his cooperation, however, has been used by the Government to support the Indictments in the case at bar.

He further surmises that the Government's delay in seeking the 2010 Indictment was part of its trial strategy designed to gain some impermissible trial advantage, hamper his defense preparations and punish him.  *See United States v. Bishop*, 629 F.3d 462, 467 (5th Cir. 2010).  As a result, he was forced to either file motions for continuances or acquiesce in those filed by his codefendants.  Hence, he argues, the Government's lackadaisical approach to this case has spanned some 13 years, resulting in the latest trial date in March of 2021.  Therefore, and because this conduct appears to be part of the Government's strategy, he contends that all delays should be charged to the Government.

---

[6] The Court will not address Duran-Gomez's claim of prejudice based on the Court's failure to fund his request for a mitigation expert in light of the disposition of the case.

In support of his argument that all delays should be laid at the Government's feet, Duran-Gomez points out that the Government completed its investigation in large measure before March of 2008.[7] It announced earlier in 2006 that it was "treat[ing] [the] investigation as a potential capital case" based on the beatings and deaths of two aliens. In spite of its post-indictment claim that it was ready for trial, the Government "artificially divid[ed] [his alleged] conduct into two prosecutions". In this regard, he argues that the 2006 Indictment for obstruction cannot be used as a foil to defeat his speedy trial rights on alleged immigration violations.

In further support of his claim concerning of other unconstitutional tactics, Duran-Gomez argues the Government used its immigration investigation materials to enhance the punishment in the obstruction case, and now uses the obstruction conviction as an enhancement in the Indictment.[8] Hence, he argues, the Government has artfully and strategically *overrun* the constitutional protections afforded him under the Fifth and Sixth Amendments to the federal Constitution and the Act. Because the delay between his initial detention and the currently scheduled trial exceeds 15 years, the "threshold" between "ordinary delay" and "presumptively prejudicial delay" has been long crossed. Consequently, he asserts, the Court must scrutinize the Government's conduct and the

---

[7] The Government was prepared to indict Duran-Gomez for alien smuggling based on the deaths of the two aliens in 2007, but chose to delay the Indictment until he was sentenced in the obstruction case set for February 29, 2008. [*See* [Dkt. No. 499, Exhs. 4 and 5].

[8] The PSR provided to the Court in the 2006 case is published in relevant part in the Analysis and Discussion section of this Memorandum. It reveals how the Government presented its "case" for punishment to the 2006 case. Regarding the use of the 2006 case here, reference to the 2006 case is made in the 2017 Second Superseding Indictment. The relevant provisions provided at paragraph 14 state:

> "After the bodies were discovered, WILMAR RENE DURAN-GOMEZ caused items to be removed from his house, to include: a computer, "pollo lists", approximately $36,000 in U. S. currency, and firearms. The items were removed in an attempt to prevent their discovery and seizure by law enforcement officers."

evidence and determine whether the Government's pre-indictment and/or post-indictment conduct warrants dismissal based on prejudice or prosecutorial mischief.

Duran-Gomez admits that he does not have direct evidence, beyond the record, that the Government set out to violate his rights. Nevertheless, he argues, the delays were unconstitutionally strategic, hence the result is the same. Moreover, the manner that the Government has gone about preparing its case establishes bad faith. Therefore, he argues he has also suffered irreparable prejudice by the Government's unconstitutional posturing, indecisiveness and protracted delay.

Duran-Gomez also asserts evidentiary prejudice because of the absence and unavailability of witnesses that were interviewed by the Government during the 2006 – 2010 period. The identity and location of witnesses, who potentially had exculpatory evidence, are either missing, deported or deceased. And, while the Government argues that it has offered up its witnesses, Duran-Gomez contends that it has failed to make available the names and locations of other potential witnesses. *See* [Dkt. No. 499, Sealed Document, Duran-Gomez Reply].

He also points out that since 2016, discovery has been produced on a "rolling basis", a method that is confirmed by the Government. Specifically, at a 2019 hearing, defense counsel stated that DNA analysis needed for comparisons between the several items of evidence seized and the DNA of codefendants and aliens, had not been turned over. As well, Duran-Gomez's computer and phone, and the data extracted, have not been turned over. Other discovery, such as his immigration file, those of the

Government's alien witnesses, witness contact information and alien witness statements who were interviewed by the Government, have not been produced.

In addition to discovery and evidentiary prejudice, Duran-Gomez asserts that his incarceration in jail has (1) hindered his ability to assist in preparing for his case, (2) impacted his mental health causing much anxiety; and (3) resulted in a diminished memory capacity. Therefore, he argues, the reliability of his memory and, for that matter, the memory of the Government's witnesses are unreliable.

Finally, Duran-Gomez asserts that he has been denied access to mitigation data that would obviate the Government's NOI. As a citizen of El Salvador, he could have relied on the El Salvadorian Government for assistance. Access to certain school and court records would have permitted more effective mitigation arguments. To illustrate his point, Duran-Gomez points out that until 2011, the El Salvadorian Government operated a program for El Salvadorian citizens charged with capital crimes in America – the El Salvador Capital Assistance Project. That program was terminated in 2011, after formal capital charges were announced against him, before an NOI was requested. Moreover, his 2006 request that the El Salvadorian Consulate be contacted was ignored. Because it appears that the Government intentionally ignored his request, his defense has been irreparably harmed and prejudiced.

### B. The Government's Contentions

The Government does not deny that Duran-Gomez was arrested on November 21, 2006, for immigration violations that also involved the deaths of two aliens. In fact, the Government stated as much in the plea agreement that it struck with him in his 2006 obstruction case, and in its proffer to the United States Probation Office in 2007-08. Nor does the Government dispute that it has treated the immigration case as a capital case since 2007. Instead, the Government disputes Duran-Gomez's take on when his speedy trial rights began to run and how the obstruction case should be viewed, for speedy trial purposes, against the backdrop of his arrest on immigration charges.

In this regard, the Government asserts that "[T]he fact that [Duran-Gomez] was charged, convicted and sentenced for crimes committed under a separate indictment has no bearing on his Speedy Trial right . . ." (citing to *United States v. Bigler*, 810 F.2d 1317, 1320-21 (5th Cir. 1987). The Government argues that, because the obstruction charge is a distinct charge, apart from the immigration case, the 2006 Indictment relieved it of any speedy trial concerns as to the immigration case. Moreover, it argues the Act did not begin to run on the immigration case until the 2010 Indictment was filed.

The Government also contends that the 2012 and 2017 Superseding Indictments, "reset" the timeline for speedy trial purposes under the Act and the Sixth Amendment and that it is Duran-Gomez's counsel's fault that the trial has been delayed. It maintains that by counsel conducting their own investigation for mitigation evidence, in an effort to persuade the DOJ not to issue an NOI against their client, Duran-Gomez's counsel unnecessarily delayed the trial.

The Government makes a similar argument concerning Duran-Gomez's contention that the Government delayed trial due to the fugitive and NOI statuses of Rodriguez-Mendoza. Its choice to try Duran-Gomez and Rodriguez-Mendoza in a single trial, is its prerogative, it maintains. It further argues that it is not uncommon for the Government's case to be delayed when the delay is due to plea bargaining or the arrest of other codefendants. Accordingly, such delay should not be counted against it because: (1) it had already announced ready for trial in 2011, prior to Rodriguez-Mendoza's arrest; and, (2) because the case was declared complex [Dkt. No. 43, codefendant, Fuentes' motion].

The Government concedes, however, that "the interval between accusation and trial [crosses] the threshold that separates ordinary delay from presumptively prejudicial delay". Nevertheless, it argues, even that delay is the fault of Duran-Gomez, based on the innumerable motions for continuance that he and his codefendants filed. Importantly, the Government notes, Duran-Gomez has not been prejudiced as is evidenced by his failure to vigorously seek a speedy trial.

In support of its position, the Government highlights the many continuances sought by Duran-Gomez and his codefendant:

a)    July 29, 2010, [Dkt. No. 43] codefendant Fuentes moved to certify case as complex. The defendant did not object.;

b)    November 15, 2010, [Dkt. No. 56] codefendant Fuentes moved to continue the trial date. The defendant did not object.;

c)    March 23, 2011, [Dkt. No. 86] the defendant moved for an extension to file pretrial motions;

14

d)      March 29, 2011, [Dkt. No. 89] codefendant Bolanos-Garza moved to continue trial. The defendant did not object.;

e)      November 7 and 22, 2011, [DEs 106 and 108] the defendant moved to extend deadlines to February 28, 2012;

f)      January 17, 2012, [Dkt. No. 114] motion to continue the trial to May 1, 2012;

g)      February 21, 2012, [Dkt. No. 118], the defendant moved to continue to November 13, 2012;

h)      October 10, 2012, [Dkt. No. 139] the defendant moved to continue to April 23, 2013;

i)      March 18, 2013, [Dkt. No. 184] the defendant moved to continue trial to February 10, 2014;

j)      October 31, 2013, [Dkt. No. 216] the defendant moved to continue case to February 10, 2014;

k)      March 3, 2014, [Dkt. No. 232] Court Order continuing trial as to the defendant set to September 14, 2015;

l)      February 20, 2015, [Dkt. No. 237] the defendant moved to continue trial to January 25, 2016;

m)      January 19, 2016, [Dkt. No. 264] the defendant moved to continue trial to September 26, 2016;

n)      September 7, 2016, [Dkt. No. 285] the defendant moved to continue case to April 3, 2017;

o)      May 30, 2017, [Dkt. No. 340] the defendant moved to extend trial to June 13, 2017; (filed response June 20, 2017);

p)      October 4, 2017, [Dkt. No. 357] the parties filed a Joint Scheduling Order to October 15, 2018.

q)      January 19, 2018, [Dkt. No. 369] the defendant submitted a request for rescheduling October 7, 2019, trial January 13, 2020;

r)      February 4, 2019, [Dkt. No. 420] the defendant moved to continue pretrial filing October 2019; and,

s)      May 8, 2019, [Dkt. No. 439]. The Court conducted a status conference as to codefendant Rodriguez-Mendoza.

*See* [Dkt. No. 458, Government's Response]. Hence, the Government asserts that, based on Duran-Gomez's innumerable motions for continuance, he cannot show "actual prejudice". Finally, the Government argues that Duran-Gomez's request that the Court strike the NOI filed in his case, based on alleged Fifth Amendment, due process violations is unsupported by statute or case law. Therefore, Duran-Gomez's request is beyond the authority of the Court and should be denied.

## V.      STATEMENT OF THE LAW

A defendant may seek dismissal of his case for violations of "due process" and the speedy trial rights under the Fifth and Sixth Amendments to the federal Constitution and Speedy Trial Act. Title 18 U.S.C. § 3161(c)(1)(2). The Sixth Amendment guarantees an accused the right to a speedy and public trial. *See* [U. S. Const. amend VI]. The Act, however, prescribes a framework for insuring a speedy trial after an indictment has been returned. Barring extenuating circumstances, a criminal defendant's trial must commence within 70 days after he is charged or makes an initial appearance, whichever is later. *See* 18 U.S.C. § 3161(c). Hence, a defendant may be entitled to dismissal of an indictment when that timeframe is not met and there are no extenuating circumstances that excuse delay. *See* 18 U.S.C. § 3162(a)(2); *see also Bloate v. United* States, 559 U.S. 196, 198-99, 130 S.Ct. 1345, 1349 (2010).

Where there are both pre-indictment and post-indictment claims of unconstitutional delay, a court must distinguish between the two on the issue of speedy trial delay. *See United States v. Lovasco*, 431 U.S. 783, (1977)(citing to *United States v. Marion*, 404 U.S. 307 (1971). Pre-indictment delay claims have traditionally been considered under the Fifth Amendment, as they relate to the deprivation of "due process" of the law by inordinate delay that was also prejudicial to his defense. But, where there is actual restraint imposed by an arrest and a holding to answer for criminal charges, the Due Process Clause is implicated. *Lovasco*, 431 U.S. at 788. Therefore, a court examining a pre-indictment speedy trial claim must look to determine whether the Government is moving "with the dispatch that is appropriate to assure [an accused] an early and proper disposition of the charges against him." *Marion,* 404 U.S. at 313. Similarly, a pre-indictment claim for an alleged "due process" violation requires a court to look to the Government's conduct, *i.e.,* delay tactics or mischief, and determine whether such delay tactics or mischief was oppressive. *Id., see also United States v. Bishop*, 629 F.3d 462, 466 (5th Cir. 2010), (citing *United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir. 1994)).

Post-indictment claims of unconstitutional delay under the Sixth Amendment and the Act, are reviewed under the "balancing test" cited as the *Barker* test. *See Barker v. Wingo,* 407 U.S. 514 (1972). *Barker* dictates a four-part evaluation of the evidence focusing on: (a) the length of the delay; (b) the reason(s) for the delay; (c) the defendant's diligence in asserting his right to a speedy trial; and, (d) any prejudice to the

defendant resulting from the delay. *Id.* at 530-33; *see also United States v. Frye*, 489 F.3d 201, 209 (5th Cir. 2007).

None of the factors is a "necessary or sufficient condition to the finding of a deprivation of the right to speedy trial". Nevertheless, "they are related factors and must be considered with such other circumstances as may be relevant" *Barker v. Wingo,* 407 U.S. 514, 533 (1972; *see also United States v. Young,* 657 F.3d 408, 414 (6th Cir. 2011, (citing to *Barker*, 407 U.S. at 530).

When considering a speedy trial claim, the length of the delay is a "triggering mechanism." *Young*, 657 F.2d at 414. It is measured from the earlier of the date of arrest and detention and the date of indictment. *Id.*, (citing *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006)). When that delay is excessively protracted, it may be said that the length of delay is "presumptive prejudicial." *United States v. Frye*, 489 F.3d 201, 209 (5th Cir. 2007).

When delay is deemed to be "presumptively prejudicial", the burden of persuasion shifts to the Government to establish that the delay was justified or that the defendant's speedy trial rights were not prejudiced. *Id.* In other words, where the first three *Barker* factors weigh so heavily in favor of the defendant that prejudice is to be presumed . . . the Government [must] show that the presumption is extenuated . . ., or rebut the presumption with evidence. *United States v. Serna-Villarreal,* 352 F.3d 225, 231 (5th Cir. 2003); (citing to *Doggett v. United States*, 505 U.S. 647, 655 (1992)). If the Government fails to carry its burden, the proper remedy is dismissal of the indictment

with prejudice. *Bloate*, 559 U.S. at 199; *United States v. Molina-Solorio*, 577 F.3d 300, 308 (5th Cir. 2009).

## VI.    ANAYLSIS AND DISCUSSION

### A. Restatement of Government's Contentions

Concedes that the first *Barker* factor is satisfied in this case, the Government asserts that the Court must consider the remaining three factors to determine whether the delay "has crossed the threshold that separates ordinary delay from presumptively prejudicial delay". *See Amos v.* Thornton, 646 F.3d 199, 205 (5th Cir. 2011). In this wise, the Government asserts that Duran-Gomez' motion should be denied because he has filed numerous motions for continuance. This conduct, the Government suggests, constitutes a "pleading game" designed to "thwart" prosecution by "increasing the delay and cost" of the prosecution [Dkt. No. 458, Government's Response. pp. 8-9].

Next, the Government argues that Duran-Gomez has waived any claim of a violation of his right to a speedy trial. In this regard, the Government argues that the combination of numerous motions for continuance, coupled with his failure to conscientiously seek a speedy trial, waives the right. The Government points to Duran-Gomez and his attorney's waiver of a detention hearing, essentially "conced[ing] that defendant should be detained pending trial." *See* [Dkt. No. 39]. Finally, the Government asserts that the Court lacks the legal authority to strike the NOI, as a sanction and convert the case into a non-capital offense, based on alleged "due process" violations.

The Government has not offered testimonial or documentary evidence, beyond the plethora of motions for continuance in support of its arguments. Therefore, its arguments

rest on an analysis of the three remaining *Barker* factors-whether Duran-Gomez can show that: (1) a speedy trial violation occurred, (2) he demanded a speedy trial, and (3) the "presumptive prejudicial" delay result in actual prejudice. *See Frye*, 489 F.3d at 209[9].

### B. Pre-Indictment Delay

The Court is of the opinion that the Government's pre-indictment conduct violated Duran-Gomez's Fifth Amendment right to "due process" of law and his Sixth Amendment right to a speedy trial. Duran-Gomez was arrested on November 21, 2006, for alleged immigration violations that involved the deaths of two aliens. Thirty days later, he was indicted for obstructing an ICE investigation. Of note is the fact that Duran-Gomez was not arrested for obstruction.

It is the Court's view that the Government's decision to charge Duran-Gomez with the offense of obstruction, after arresting him on immigration charges, does not relieve it of its duty to address Duran-Gomez's speedy trial rights under the Sixth Amendment. In a somewhat oblique argument, the Government contends that Duran-Gomez's conviction for obstruction "has no bearing on his Speedy Trial rights" in this case. That might be true, nevertheless, the Court disagrees with the Government's conclusion. The obstruction case was, in fact, a separate indictment and required separate attention, just as the immigration case for which he was arrested. Granted, the Act does not apply to pre-indictment circumstances but the Sixth Amendment does.

---

[9] Notably, the Government has not attempted to address Duran-Gomez's right to a speedy trial under the Sixth Amendment in the pre-indictment context. It appears that this omission was not an oversight but based in the Government's view that the 2010 Indictment was the speedy trial triggering mechanism – not his arrest and detention.

Relying on *Biglar*, the Government argues that the "timeline" chosen by Duran-Gomez does not aid him. *United States v. Biglar*, 810 F.2d 1317, 1320-21 (5th Cir. 1987). This argument is without logic or legal authority. The Government appears to argue that the conviction on the obstruction case works to exclude any claim of a speedy trial violation in the immigration case, citing to *United States v. Montoya*, *827* F.2d 143, 147-50 (7th Cir. 1987). Neither *Biglar* nor *Montoya* addressed a pre-indictment/detention issue as is presented here. *Biglar* addressed delay that occurs when the state and federal Governments are competing for the body of same accused based on jurisdiction and separate crimes. *Montoya*, on other hand, concerned delay caused when an accused is engaged in plea negotiations.

The Government does not assert that the trial was delayed due to separate governments competing for Duran-Gomez. Nor does the evidence suggest that the Government was engaged in plea negotiations with Duran-Gomez or others in the immigration case during the pre-indictment period. Instead, the evidence shows that the Government simply "sat on him" while they engaged in an unusually protracted investigation that, for all practical purposes, was completed in early 2008.

Had the Government argued that Duran-Gomez was also being detained for deportation proceedings, that argument would be inconsequential for speedy trial analysis. The argument overlooks the fact that the Government never sought to bring him before the appropriate judicial officer. Nor does the Government explain why it did not provide him with a "due process" hearing in the immigration courts regarding any alleged immigration infraction(s). Assuming further that Duran-Gomez could have been

charged or held for immigration infractions, those charges would not defeat his right to a speedy trial on the immigration charges for which he was arrested and detained. Again, even assuming that Duran-Gomez could have been detained on the obstruction charge, that charge does not permit the Government to delay sentencing for years or swap the crimes and ignore the basis for his arrest and detention. The charge of obstruction arose after his arrest and detention on immigration charges.

A formal indictment, as well as actual restraint by an arrest and holding, *i.e.,* pre-indictment, engages the protections of the Sixth Amendment. *Marion,* 404 U.S. at 320 (1971). Hence, while pre-indictment delay does not engage the Act, it does not escape the scrutiny of the Sixth Amendment. *Id.* Duran-Gomez's arrest and detention on the immigration charge and the failure to bring him before a magistrate judge on that matter, cannot be "swept under the rug" simply because of the Government's decision to file the subsequent obstruction charge. Therefore, the Court holds that Duran-Gomez's right to a speedy trial was invoked when the Government arrested and detained him on immigration charges. *See Lovasco,* 431 U.S. at 788.

Duran-Gomez's motion to dismiss is meritorious and should be granted because the Government deliberately delayed charging him with the capital offense for which he was initially arrested and detained. During the course of the pre-indictment delay, he was denied (1) capital qualified counsel, (2) a meaningful opportunity to investigate the immigration charges as they were being developed against him; (3) the opportunity to

obtain evidence; and, (4) the benefits of serving his sentence in prison rather than the inferior confines of jail.[10]

The same delay and conduct also violated Duran-Gomez's right to "due process" under the Fifth Amendment. The evidence shows that the delay was intentional and undertaken for the sole purpose of gaining some tactical advantage and to punish. *Bloate*, 559 U.S. at 198, 99. Such conduct is impermissible and reveals bad faith on the part of the Government. *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996)(citing to *Marion*, 404 U.S. at 325). Because the delay was intentional and suppressive and lacked a plausible explanation, the Court infers prejudice. This inexplicable conduct denied Duran-Gomez "due process" of law and prejudiced his opportunity for a fair or just trial.[11]

The Court does not reach its conclusion lightly. Rather it rests its determination, in part, on the fact that Duran-Gomez began cooperating with the Government long before he was indicted for obstruction and continued to do so afterward. Moreover, by all accounts, the investigation, although complex and protracted, was for all practicable purposes concluded in 2007-08.

---

[10]The Court points out that the scope of the conduct at issue spans several discrete files involving innumerable codefendants and witnesses, none of which are readily available to Duran-Gomez even today. Moreover, the evidence supports the finding, and the Court finds, that these files have not been provided to the defense. Therefore, the scope and nature of the Government's unimitated conduct remains unquantifiable.

[11] To compound the mischief, the Government would not proceed to sentence Duran-Gomez, on the obstruction charge in a timely manner. Instead, it intentionally delayed sentencing him. The Government has not presented evidence or excuse for this unconventional, high-handed, manner of proceeding.

This fact is established in the Government's investigation proffer, presented to the U. S. Probation Officer ("USPO") in early 2008, if not sooner,[12] as part of its preparation for sentencing in Duran-Gomez's 2006 case. Twenty-four (24) of the 27 paragraphs under the "Relevant Conduct" section concern the Government's investigation. In order to appreciate the nature and scope of the Government's investigation and its unmistakable and intentional conduct, the following excerpts taken directly from the USPO's report:

The Offense Conduct[13]

Information for this section of the report was obtained through review of the investigative files and reports of the United States Attorney's Office, the Bureau of Immigration and Customs Enforcement (ICE), and through direct communication with the case agent.

At approximately 6:10 a.m. on November 15, 2006, two Hispanic male corpses were found in a stolen pickup truck that had been abandoned in rural Fort Bend County, Texas. The corpses were received by the Fort Bend County Medical Examiner approximately two hours after they were discovered, and it was estimated they had been killed approximately 12 to 24 hours earlier. It was also determined the men had been beaten to death. Investigation led the authorities to believe the bodies and truck were associated with a warehouse located at 7315 Ashcroft, Suite 116, in the Southwest area of Houston, Texas. The warehouse on Ashcroft was leased by **Wilmar Rene Duran-Gomez**.

On November 21, 2006, acting on a state-issued search warrant, an FBI forensic team entered the Ashcroft warehouse. A detailed analysis of the crime scene determined that the two Hispanic murder victims had died there on November 14, 2006, at approximately 11:00 p.m. During execution of the search warrant, **Duran-Gomez** was apprehended in the driveway of his home in Houston. He was accompanied at the time by his girlfriend, Guillermina Lucas-Cayetano, whose true name was determined to be Diana Soledad Caldas-Guevara. Both were arrested for immigration violations. Following **Duran-Gomez's** arrest, he provided a statement acknowledging he was at the

[12] The USPO received the Government's proffer in sufficient time to publish its Report on March 3, 2008, about 10 months after Duran-Gomez entered his plea to obstruction.
[13] The Offense Conduct section of Duran-Gomez's 2006 is located in the PSI and was under seal. Because of the serious nature of the matters before the Court, certain portions have been unsealed.

warehouse when the beatings occurred. He claimed, however, that he had only learned of the beatings after the victims were near death, and it was too late to save them when he intervened. **Duran-Gomez** further admitted he and his girlfriend had left the bodies at a remote sight, stuffed behind the front seat of a pickup truck that they had unsuccessfully attempted to torch.

While outside **Duran-Gomez's** house, agents looked through the living room window and saw a notebook that appeared to be a smuggled alien list (pollo list). Based upon that information, agents obtained a search warrant. Due to the Thanksgiving holiday, the warrant was not executed until Friday, November 24, 2006. When the search warrant was served on that date, however, agents learned that unknown persons had removed the pollo lists and a computer central processing unit (discernible by dust patterns on a desk and unattached wires extending from a printer and a power source). It was assumed other evidence had been tampered with as well. Also missing from the residence were three vehicles which agents had previously observed in the area at the time **Duran-Gomez** and Caldas-Guevara were arrested: a 2005 Hummer; a 2007 Chevrolet Tahoe; and an older model Chevrolet Suburban. Two of these vehicles were later spotted by other agents at an apartment complex where **Duran-Gomez's** half-sister resided, Judith Arely Lopez. Correspondingly, a photograph of Judith Lopez was shown to a neighbor of **Duran-Gomez's**, who affirmatively identified her as present at **Duran-Gomez's** residence on Thanksgiving Day, November 23, 2006. After obtaining a search warrant for Judith Lopez's apartment, agents found it abandoned and stripped of all furnishings.

On November 29, 2006, an ICE special agent began listening to transcripts of telephone calls placed by **Duran-Gomez** while he was confined in an ICE detention facility. **Duran- Gomez** placed two calls to his mother, Florencia Lopez, on Thanksgiving Day (November 23, 2006). In the first call, placed at approximately 4:05 p.m., Florencia Lopez was in the presence of Yvette Aragon (**Duran-Gomez's** former girlfriend), Judith Lopez, and Luis LNU (Judith Lopez's boyfriend). During this call, **Duran-Gomez** is heard to tell his mother and the others to get "...paperwork, documents, the list, and the computer out of the house office." In addition, **Duran-Gomez** states they should not open "la caja", the translation of which is a box or safe. In the second call, Florencia Lopez advised **Duran-Gomez** that she and Judith Lopez had obtained the items and she (Florencia Lopez) would "keep all the stuff" for **Duran-Gomez**. It was also subsequently determined Yvette Aragon was in possession of a blue bag. During the aforementioned conversation, **Duran-Gomez** inquired if "it had been counted together." He then instructed Florencia Lopez that she, Judith Lopez, and Yvette Aragon should "...count it

together."

Agents ultimately knocked on the door of Florencia Lopez's apartment and were invited in. Both Florencia Lopez and Judith Lopez, who was persuaded to come to her mother's apartment, gave *Mirandized* statements and led agents to a storage facility where, among other things, agents found boxes of **Duran-Gomez's** business records, computer components, and two firearms.

On November 30, 2006, Judith Lopez was interviewed by ICE special agents. According to Judith Lopez, following **Duran-Gomez's** arrest on November 21, 2006, he contacted his mother's home number on November 22, 2006. A three way conversation was conducted, in which **Duran-Gomez** asked them to remove the computer and all documents from his home office. While talking to his wife, Yvette Aragon, **Duran-Gomez** made reference to a "cuete", or firearm. In response, Florencia Lopez, Yvette Aragon, Judith Lopez and Luis LNU, traveled to **Duran-Gomez's** home, retained the services of a locksmith to open the door, and removed the requested items from the home. On November 25, 2006, Judith Lopez rented a storage facility to keep the items belonging to **Duran-Gomez**.

In ensuing conversations with **Duran-Gomez** between November 25 and 27, 2006, Judith Lopez repeatedly suggested destroying the items at the storage facility and contemplated throwing the guns into a bayou. **Duran-Gomez**, however, told her he did not want these items destroyed. **Duran-Gomez** later informed Yvette Aragon as to the location of his cash. Aragon, in turn, informed Judith Lopez, who subsequently found a blue bank bag containing approximately $35,900.

Continuing the interview on November 30, 2006, Judith Lopez then recounted to agents an event which had occurred on November 15, 2006, when **Duran-Gomez** had contacted her telephonically, then come to her apartment. During their conversation, **Duran-Gomez** instructed her to watch the television news, which was carrying the story of the two corpses which had been discovered in the stolen pickup truck in Richmond, Texas. As they watched the story, **Duran-Gomez** informed Judith Lopez that he and two accomplices had beaten four people at the Ashcroft warehouse, because they had started a fire in an effort to escape. According to Judith Lopez, she had then telephoned their mother to ask her to come over, so that she could explain what **Duran-Gomez** had done. **Duran-Gomez** went on to relate that two of the men at the warehouse had later created a plan to kill one of **Duran-Gomez**'s accomplices. **Duran-Gomez** claimed he had not been there when this information was obtained, and his accomplice who had been threatened had beaten the two

men. Judith Lopez believed those two men may have been the corpses which were found.

On April 15, 2007, ICE agents interviewed Pedro Portillo and Abraham Melendez, to discuss their accounts of illegally entering the United States, and ensuing detention in a Houston, Texas, drop house. Portillo was re-interviewed on January 23, 2008. Melendez was re- interviewed on January 24, 2008.

Both Portillo and Melendez began their journey in El Salvador in October 2006. After passing through Guatemala into Mexico, they boarded a train which took them to the United States border, near Hidalgo, Texas. While on that train, they met four Honduran Nationals: Freddy LNU, Jose LNU, Hector LNU, and Abelardo Sagastume. Later, while walking in the border area, they met a smuggler named El Perro, who offered to deliver Portillo and Melendez into the United States for $1,600 each. On October 31, 2006, Portillo and Melendez joined a group of approximately 30 aliens who were brought across the Rio Grande on a raft, and they disembarked into the United States. The four Hondurans were in that raft with them.

After arriving in the United States, the group walked for approximately 15 minutes through a cornfield, after which 12 of the aliens were put into a pickup truck and driven to a drop house in McAllen. They had remained there for approximately four days, when they were loaded again into a pickup truck, some covered by a tarp in the bed, and driven for approximately one-half hour. When they were let out, they were directed through the brush by guides for approximately 21 hours. Upon emerging, they were picked up again and driven to Houston, and they were taken to the Ashcroft warehouse. After being brought to a room inside the building, the aliens were directed by a guard named "Pelon" to undress to their underwear and place their clothes in a bag. Portillo and Melendez were placed in a detention room, where they slept until the following day, November 6, 2006.

The evening of November 6, 2006, Hector LNU, one of the Honduran Nationals they had previously traveled with, entered their detention room. Hector indicated he had been kept at the warehouse for six days, and that he was hungry and desperate to leave. He related his thoughts of starting a fire as a means of escaping, and asked the others for their assistance. The group discouraged him from acting, as Pelon had children staying in the building, and Hector subsequently agreed not to do anything. Hector explained he was being kept in another room across the building, and returned there. Before leaving, Hector remarked there was another male in his room that had been at

the warehouse for 40 days.

On November 7, 2006, Portillo recalled being awakened at approximately 6:00 a.m. by shouts of "Fire!" At that time, Pelon and another guard named El Chino brought all of the aliens to the garage, where they were loaded into two vans. Two of the Hondurans, Hector and Abelardo, were in the van with Portillo and Melendez. While driving, El Chino was overheard informing Pelon of his intentions to investigate the fire, and it subsequently became clear that he suspected Hector and Freddy LNU. On the date of the fire, only seven aliens remained in the warehouse: Portillo, Melendez, the four Hondurans, and a Guatemalan male named Espinoza-Diaz. After the fire, all of the aliens but Espinoza-Diaz were returned to the same detention room in the warehouse. El Chino and Pelon first took Hector for interrogation, then returned shortly afterward for Freddy.

After Hector and Freddy were taken away, Portillo heard moans and groans coming from the garage. He also indicated that it sounded as if they were being hit with a stick. About five minutes after Freddy was taken to the garage, both Portillo and Melendez heard a gunshot. Pelon returned to the detention room, and advised the others, "This is getting hot. Any of you who knew what was going on better talk or you'll be beaten equally." Pelon then took Melendez to the garage. Hector and Freddy were in the garage, along with El Chino and an individual later identified as **Duran-Gomez**. According to Melendez, El Chino and **Duran- Gomez** were beating Hector and Freddy, who both had marks on their backs, arms, and stomachs. A broken broomstick was lying on the floor next to Freddy. **Duran-Gomez** was observed kicking Hector, and had a firearm in his waistband.

Melendez, Hector, and Freddy were next directed to return to the detention room. El Chino entered and instructed all of the aliens to remove their underwear. **Duran-Gomez** then instructed El Chino to tie everyone up, and two cooks present in the warehouse assisted by tying everyone's hands behind their backs with shoelaces. After their hands were tied, the aliens were placed face down on the floor. **Duran-Gomez** then began beating Hector again, along with admonishments to tell the truth. **Duran-Gomez** next decided to shave the aliens heads and eyebrows, in an uneven, patchy manner. Abelardo, however, elected to be beaten rather than be shaved. In response, **Duran-Gomez** kicked him in the abdomen. During this time frame, all of the aliens were beaten, and Portillo and other aliens were stomped on by **Duran-Gomez**. Neither Portillo or Melendez observed Pelon beat anyone. At approximately 10:00 p.m., Pelon instructed the cooks to untie everyone. At some point between November 7 and 8, 2006, two Hondurans were removed after their fees were

paid.

The following day, November 8, 2006, the beatings resumed at approximately 11:00 a.m. The aliens were still nude, and their hands were again tied behind their backs. Five aliens remained, consisting of Portillo, Melendez, Hector, Abelardo, and Victor Espinoza. Hector eventually confessed to starting the fire. Portillo and Melendez indicated that **Duran- Gomez** used a broomstick to sodomize Hector until he bled from his rectum, then forced Hector to lick fecal matter from the broomstick. El Chino later asked Hector why he had set the fire. Hector responded that he was desperate. According to Melendez, Pelon related to him that Hector's family had paid his entire smuggling fee, but he was being forced to remain at the warehouse as punishment. He would be allowed to leave when his health improved.

Portillo and Melendez recalled that on November 9, 2006, El Chino had become very intoxicated and began beating Hector. He had stomped on his back, and also struck him in the back of the head with a firearm until he bled. According to Portillo and Melendez, while all of the aliens were beaten, Hector was targeted more than the others. During the beatings, the aliens were warned not to look, nor were they allowed to speak, on penalty of further beatings. On November 10, 2006, further beatings were administered by El Chino and **Duran-Gomez**. On November 11, 2006, an incident occurred during which El Chino came into the detention room and sprayed perfume on Hector's back. El Chino then lit the perfume on fire, burning the skin off and leaving raw flesh. On this same date, another group of aliens were delivered to the warehouse, and placed in a separate room.

By this time, Portillo and Melendez recalled that Hector's face was swollen, there were bruises near his right eye and on his back and arms, and he had a blood bruise on the back of his head. Portillo advised he had swelling around his own left cheek and eye, and there were scratches on his right cheek from being dragged along the carpet. In addition to the aforementioned tactics used during the beatings, Portillo advised **Duran-Gomez** was known to stomp on various alien's ankles and hands. He recalled one occasion when Hector was sodomized with a beer bottle by El Chino.

On November 12, 2006, Pelon informed the aliens they would each be allowed a phone call to contact family members. They were told to notify their family that they were being beaten and that if the smuggling fee was not satisfied promptly, they would be killed. While Portillo made his call, he was struck in the head. Pelon ordered one of the aliens to strike the callers while they were each on the telephone. Later that day, **Duran-Gomez** instructed the cooks to

tie the aliens' hands behind their backs while they laid on their stomachs. In response to a comment by Melendez, **Duran-Gomez** stomped on his back approximately eight times. **Duran-Gomez** also fired a gunshot into the floor between the heads of Melendez and Hector. Aside from Espinoza, all of the aliens were beaten that day.

On November 13, 2006, Melendez was brought into the detention room by **Duran-Gomez**, who had become angered that Pelon had moved him to another room. After directing Melendez to strip naked, his hands were bound behind his back and a bag was tied over his head. He was then stood against the wall, and **Duran-Gomez** punched him in the forehead. Melendez fell to the ground, bleeding from his forehead and lip. **Duran-Gomez** stated that he felt calmer, because he had seen blood that day. That same morning, Hector and Abelardo began making plans to escape. Pelon became aware of this plan, and El Chino tied up Hector and Abelardo. They were placed on the floor face down and whipped with an extension cord, and also beaten with a broomstick until it broke. Melendez was brought into the room by **Duran-Gomez**, and he was also beaten and whipped by both El Chino and **Duran-Gomez**. Portillo was whipped and beaten by El Chino, and kicked in the face by **Duran-Gomez**. Approximately 30 minutes after the beatings, Pelon arrived and moved Melendez and Portillo from the detention room.

While Melendez and Portillo were in the other room, Espinoza was overheard by Melendez informing Pelon of new plans by Hector and Abelardo to escape. Espinoza reported they had told him if he did not assist them they would beat him to death with a metal pipe they had found. Afterward, Melendez could hear Abelardo and Hector being beaten. According to Melendez, **Duran-Gomez** arrived at approximately 11:00 p.m., and was informed by Pelon and El Chino of the escape plan. **Duran-Gomez** responded that, "[if they were planning on escaping] those sons of bitches don't want to live." Instructions were then given to place bags over the heads of Hector and Abelardo. Melendez then heard more moans and groans, and the sounds of beatings rendered with a stick. Melendez stated his belief that Abelardo died early on, because he could hear only the suffering of one person. He added that, at the time he and Portillo were removed from the detention room, Abelardo was extremely weakened, and had to be assisted to the bathroom by Espinoza. Melendez recalled the beatings lasted approximately one hour, and the moans and groans weakened until there was silence. He then overheard an unidentified voice indicate Hector had died.

Following the aforementioned beatings, Portillo and Melendez never saw Hector or Abelardo again. On approximately November 19 or 20, 2006, they

were both released and left Houston.

On November 29, 2006, ICE agents interviewed Victor Espinoza-Diaz to discuss his account of illegally entering the United States, and ensuing detention in the Ashcroft warehouse. Espinoza-Diaz was re-interviewed on January 23, 2008. In these interviews, Espinoza-Diaz corroborates the information provided by Melendez and Portillo. He advised that Hector and Abelardo had approached him for assistance with their escape plan. They had asked him to distract Pelon so that they could go to the kitchen for a knife and to the bathroom for a stick, with the intention of killing Pelon in order to escape. Espinoza-Diaz declined, however, to assist them, and informed Pelon of the plan. He did so because Hector and Abelardo had threatened to kill him if he did not help them. When Espinoza-Diaz was moved to another room, he heard **Duran-Gomez** call out for the bags which were placed over the heads of Hector and Abelardo.

According to Espinoza-Diaz, when the police arrived at the warehouse, only he and two other aliens were present. After being taken to an ICE detention facility, he came in contact with **Duran-Gomez** at the institution's clinic. At that time, **Duran-Gomez** asked him if he had selected **Duran-Gomez** from a lineup. When Espinoza-Diaz responded affirmatively, **Duran-Gomez** asked why. Espinoza-Diaz then asked **Duran-Gomez** why he had beaten Espinoza-Diaz and the others, and why he had killed the two men in spite of their pleas for themselves and their children. When a guard appeared, the conversation ended. Espinoza- Diaz informed agents he continued to be in fear of **Duran-Gomez** and his associates, and was concerned about the danger to himself and his family.

On December 7, 2007, Judith Lopez was again interviewed by ICE agents, with her attorney present. During this interview, she revised her earlier statements to agents, made on November 30, 2006. During the second interview, Judith Lopez indicated that when **Duran- Gomez** had come to her apartment, he acknowledged having beaten seven people at the Ashcroft warehouse with a golf club. As a result of those beatings, two of the men had died. She further advised that **Duran-Gomez** had once commented to her, "...it's either me or them..."

Following the aforementioned beatings, Portillo and Melendez never saw Hector or Abelardo again. On approximately November 19 or 20, 2006, they were both released and left Houston.
On November 29, 2006, ICE agents interviewed Victor Espinoza-Diaz to discuss his account of illegally entering the United States, and ensuing

detention in the Ashcroft warehouse. Espinoza-Diaz was re-interviewed on January 23, 2008. In these interviews, Espinoza-Diaz corroborates the information provided by Melendez and Portillo. He advised that Hector and Abelardo had approached him for assistance with their escape plan. They had asked him to distract Pelon so that they could go to the kitchen for a knife and to the bathroom for a stick, with the intention of killing Pelon in order to escape. Espinoza-Diaz declined, however, to assist them, and informed Pelon of the plan. He did so because Hector and Abelardo had threatened to kill him if he did not help them. When Espinoza-Diaz was moved to another room, he heard **Duran-Gomez** call out for the bags which were placed over the heads of Hector and Abelardo.

According to Espinoza-Diaz, when the police arrived at the warehouse, only he and two other aliens were present. After being taken to an ICE detention facility, he came in contact with **Duran-Gomez** at the institution's clinic. At that time, **Duran-Gomez** asked him if he had selected **Duran-Gomez** from a lineup. When Espinoza-Diaz responded affirmatively, **Duran-Gomez** asked why. Espinoza-Diaz then asked **Duran-Gomez** why he had beaten Espinoza-Diaz and the others, and why he had killed the two men in spite of their pleas for themselves and their children. When a guard appeared, the conversation ended. Espinoza- Diaz informed agents he continued to be in fear of **Duran-Gomez** and his associates, and was concerned about the danger to himself and his family.

On December 7, 2007, Judith Lopez was again interviewed by ICE agents, with her attorney present. During this interview, she revised her earlier statements to agents, made on November 30, 2006. During the second interview, Judith Lopez indicated that when **Duran- Gomez** had come to her apartment, he acknowledged having beaten seven people at the Ashcroft warehouse with a golf club. As a result of those beatings, two of the men had died. She further advised that **Duran-Gomez** had once commented to her, "...it's either me or them..."

*See* [Case 4:06-Cr-459, Document 109 at pp. 3-9, June 6, 2008)]. The PSR shows that

the Government could have indicted Duran-Gomez in 2006 or 2007, and could have

proceeded to trial as early as 2008. For reasons known only to the Government, it chose

not to do so. And, while the Government has no duty to indict at any particular time, it

has a legal and ethical obligation to prosecute prudently and efficiently while remaining

cognizant of the liberty rights conferred on an accused. *See Lovasco*, 431 U.S. at 791 [Prosecutors are under no duty to file charges before they are satisfied that evidence is sufficient.] This duty does not extend to the government the right to investigate a citizen while detaining him in jail, essentially, holding him in "limbo" without charges for tactical advantage or to punish.

*C. Post-Indictment Delay*

Duran-Gomez also contends that he has been denied a speedy trial under the Act and Sixth Amendment since the 2010 Indictment. Here, his claims under the Act and the Sixth Amendment merge into a single claim and are subject to a *Barker* analysis. However, the law, logic and facts that dictated the Court's determination in the pre-indictment discussion heretofore, also applies here. Therefore, that determination is incorporated in this section by reference.

The Government contends that the defense team [Duran-Gomez's counsel] "resort[ed] to a 'pleading games' in an attempt to thwart prosecution . . . by increasing the delay and cost; and, on no less than 12 occasions has . . . requested continuance of the trial dates or pleading deadlines." For this argument, the Government relies only on Duran-Gomez's motions for continuance as proof that the delay occasioned, has not prejudice him.

The Court is of the opinion that the Government's reliance on the motions alone does not defeat Duran-Gomez's prejudice claim. The prejudice commenced during the pre-indictment phase and carried forward. Hence, the Court finds that the vast majority, if not all, of the continuances that Duran-Gomez sought were precipitated by the

Government's trial strategy of intentional delay. Both the Government and the Court owe an "affirmative obligation" to a criminal defendant and to the public to bring matters to trial promptly. *United States v. Black*, 918 F.3d 243, 253 (2nd Cir. 2019). Here, the Government failed and, thereby, successfully frustrated the Court in its duty.

The Government admits that since 2010, the length of delay in the trial of this case is "presumptively prejudicial". *See* [Government's Response, Dkt. No. 458 at p.13]. By this admission, it concedes that delay has been excessively protracted. Nevertheless, it does not concede that the burden is on it to prove that the delay was justified and that Duran-Gomez suffered no prejudice. *See* Doggett, 505 U.S. at 656-58; *see also Serna*-Villarreal, 352 F.3d 231.

The Court is of the view that the Government has not satisfied its burden by simply pointing to continuances sought by Duran-Gomez. This argument does not satisfy the *Barker* or *Serna-Villarreal*, requirements. Case law dictates that the Government establish that the "presumption of prejudice" is extenuated, or is otherwise rebutted by evidence. The fact that continuances were sought and granted is simply not determinative. Something more is required of the Government. *See Black*, 918 F.3d at 254. What is required is evidence that shows that the Government's conduct did not artfully and strategically engineer Duran-Gomez into positions where he, of necessity, sought continues. *See* [Dkt. No. 499, Supplemental Memorandum]. The record shows that, in fact, it did. The Government cannot rely on its own mischief as a defense to Duran-Gomez's speedy trial rights while claiming no prejudice.

Indeed, the record shows that the Government did not obtain an NOI concerning Duran-Gomez until September 9, 2012, after the case had been set for trial on numerous occasions. Specifically, the Court had set the cases for trial on seven occasions: December 14, 2010, April 26, 2011, August 23, 2011, November 29, 2011, February 28, 2012, May 1, 2012, and November 13, 2012. The filing of an NOI appreciably changed the trial landscape in ways not previously contemplated. Those continuances were based on the fact that the Government had not provided discovery, even though it claimed an open file. It used those continuances to strike plea agreements with other defendants while withholding trial evidence that Duran-Gomez was due for trial preparation. As a result, the Court concludes that even though the Government announced in 2007 that it was going to seek the death penalty as to Duran-Gomez, and that it was ready for trial in 2013, it was not prepared to try the case. By 2013, the government had provided limited discovery to Duran-Gomez, most, if not all of which was delivered on or about April 20, 2011. This disclosure, however, amounted to less than 14% of its discovery obligation. Subsequent disclosures reveal that substantial documents and reports were in the Government's possession in 2011. While, it claimed to be operating under an "open file policy" and openly stated to the Court "everyone would be on the same page from a discovery perspective" it was not operating with candor or honesty.

This conduct did not go unnoticed by Duran-Gomez as suggested by the Government. At the time, counsel asserted that his client's ability to get a fair trial was being impacted by the Government's tactics. *See* [PH Conf. (10.11.12), pp. 6-12]. However, the Government's did not stop with its lack of candor with regard to discovery.

After the case was again set for trial on April 23, 2013, notice of the arrest of Rodriguez-Mendoza was disclosed. His arrest ushered in a new and protracted period of delay at the behest of the Government. The Government's previous announcement that Duran-Gomez would be the only death penalty qualified defendant going to trial prompted the Court to set the case for trial. Nevertheless, the government changed its mind, insisting on one capital trial that would include Rodriguez-Mendoza. Learning of this fact, the Court encourage a severance of Rodriguez-Mendoza and all non-capital defendants from Duran-Gomez's trial. The Government rejected this opportunity and announced that it would be seeking an NOI as to Rodriguez-Mendoza in order that it could have a single trial. *See* [PH Conf. (5.28.13) pp. 7-13].

Although, the Government was insisting on a single trial, it did not seriously move forward to obtain an NOI as to Rodriguez-Mendoza. Instead it sought a four-week delay to decide how it did handle Rodriguez-Mendoza even though the government had made it clear that it was going to seek the death penalty against him. That four week delay lasted almost four years to February 10, 2017. In the meantime, the Government engaged in plea bargaining with Rodriguez-Mendoza and sought to resolve whether his intellectual IQ was too low be tried under the Death Penalty Act.[14] Dutifully, the Court continued to set the case for trial based on representations by the Government as to when it would be ready for trial.

---

[14] On August 5, 2015, after the Court ordered the Government to "seek or not" an NOI as to Rodriguez-Mendoza, it informed the Court that it would do so by September 15, 2015. It did not, and again sought an extension.

The government's dilemma is laid bare at the Court's July 29, 2015, conference. The Government announced that it was ". . . in somewhat of a limbo . . ." It had not obtained an NOI as to Rodriguez-Mendoza and was not ready to try the case. With little warning, the prosecution team was replaced on December 17, 2015. The new team promptly announced ready for trial. However, it had no NOI as to Rodriguez-Mendoza and continued to insist on a single trial. All the time, Duran-Gomez's counsel continued to complain about the ineffectiveness of the "open file" policy. According to counsel, critical evidence had not been disclosed.

This long delay by the Government has been prejudicial and cannot be articulated with specificity and precision. Nevertheless, the Court is of the opinion that Duran-Gomez cannot nor should he be required to do so since events between 2010 and 2017 were under the Government's control. Hence, the Court is left to conclude that, at the outset, the delay was intentional, designed to gain some tactical advantage, and not in the interest of justice. *Marion*, 404 U.S. at 325 (1971). The record of Court proceeding since 2006, speaks loudly and clearly that Duran-Gomez's speedy trial rights have been violated and that he has been irreparable prejudiced. The Government's prosecutorial policy has had a discriminatory impact. *See United States v. Armstrong,* 517 U.S. 456, 465 (1996).

The Government also asserts that Duran-Gomez failed to consciously seek a speedy trial. Therefore, he cannot now claim prejudice. In the Court's view, presuming waiver of a fundamental right based on "inaction is inconsistent with [the Supreme Court's] pronouncements on waiver of Constitutional rights." *Barker*, 407 U.S. at 525.

In fact, the delays in this case up to January 30, 2017, must be attributed to the Government because it was then that the vast majority of discovery was finally delivered to Duran-Gomez. Even then, the Government acknowledged that other discovery would be forthcoming.

The effect of the Government's conduct has been to punish Duran-Gomez[15]. His arrest, pretrial detention and unnecessary criminal prosecution for obstruction, speaks loudly concerning the Government's motivations. *See Bigler*, 810 F.3d at 1323 (5th Cir. 1987). It has offered no explanation why it took four years to indict Duran-Gomez or the additional seven years to provide him with discovery that has been in the Government's hands since 2006-07.

The provision of the Act and the Sixth Amendment do not abide such conduct. The Court is of the opinion that the delay in this case is so excessive that it has presumptively "compromise[d] the reliability of a trial in a way that [Duran-Gomez] [cannot] prove, or for that matter, identify." *Doggett*, 505 U.S. at 655. This conclusion is necessary, in part, because the Government has not handled this case in a systematic and

---

[15] Although Duran-Gomez has not raised the issue of double jeopardy, the Court *sua sponte* raises the issue pursuant to *Illinois v. Vitale*, 447 U.S. 410 (1980). There, the Supreme Court addressed the guarantees afforded an accused under the Fifth Amendment to the federal Constitution. Directing our attention to *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), the Supreme Court stated that "[t]he constitutional prohibition of double jeopardy . . . protects against multiple punishments for the same offense." *Id.* at 415.

While the offense conduct in the case at bar is not the "same offense" conduct described in the obstruction case, the Government precipitously injected its immigration investigation materials into it. The result of this wanton conduct was to enhance Duran-Gomez's punishment far above that of the ordinary obstruction case. The effect was to punish him for unadjudicated conduct – conduct that is yet to be tried to a jury. The "Due Process" clause protects criminal defendants against conduct that punishes unadjudicated conduct, in particular, where the conduct alleged is the subject of an ongoing prosecution.

conventional manner, along the lines of "fair play and decency". By all accounts, the Government's delay has been and continues to be oppressive and unjustified. *See Dickey v. Florida*, 398 U.S. 30, 51-52 (1970).

The Court has thoroughly considered the Government's evidence and argument against dismissal of the Indictment and, accordingly, finds that the evidence and argument are lacking and disagreeable with regard to the Act, the Sixth Amendment and Fifth Amendment "due process" principles. Hence, the integrity, efficiency and centrality of the rule of law and good conscience dictates dismissal. In view of the analysis and discussion concerning both pre-indictment and post-indictment delay, the Court finds actual prejudice and HOLDS that the 2017 Superseding Indictment be, and it is hereby, DISMISSED with Prejudice. *Barker*, 407 U.S. at 522.

It is so ORDERED.

SIGNED on this 12th day of March, 2020.

_____
Kenneth M. Hoyt
United States District Judge