United States District Court
for the Southern District of Texas
Houston Division

| | | |
|---|---|---|
| **United States of America** | § | |
| | § | |
| v. | § | Criminal No. H-10-459 |
| | § | |
| **Wilmar Rene Duran Gomez** | § | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### Motion for Return of Ex Parte Materials and for Taint Hearing

On March 18, 2020, the government appealed this Court's dismissal of the second superseding indictment on Sixth Amendment speedy trial grounds. In the course of that appeal, the clerk's office disclosed to the government certain materials Mr. Duran Gomez had previously filed with this Court ex parte. Mr. Duran Gomez now moves this Court for an order (1) directing the government to return those materials to the clerk, and (2) scheduling a "taint hearing" at which the government will be required to (a) address whether any ex parte materials were disclosed to its trial counsel and, if so, (b) prove it did not use those ex parte materials to obtain any additional evidence against Mr. Duran Gomez, or otherwise use those materials in its case against Mr. Duran Gomez.

**I.     Factual and procedural history**

Mr. Duran Gomez was first charged with capital crimes in July 2010, based on conduct that occurred in November 2006. ECF No. 1. A second superseding indictment, returned in January 2017, charged Mr. Duran Gomez with one count of conspiracy to transport and harbor aliens, under 8 U.S.C. § 1324(a)(1)(A)(v)(I); two counts of harboring an unlawful alien resulting in death, under 8 U.S.C. §§ 1324(a)(1)(A)(iii), (B)(i), (A)(v)(II), (B)(iv); two counts of kidnapping resulting in death, under 18 U.S.C. §§ 1201(a)(1), 2; and

1

two counts of hostage-taking resulting in death, under 18 U.S.C. §§ 1203, 2. ECF No. 314 at 1-12.

On August 26, 2019, Mr. Duran Gomez filed a motion to dismiss the second superseding indictment based on a violation of his Sixth Amendment right to a speedy trial. ECF No. 454. On January 29, 2020, while the motion was pending, Mr. Duran Gomez moved the Court to partially unseal certain sealed materials on the docket in this case. ECF No. 519. With respect to Mr. Duran Gomez's ex parte filings or transcripts reflecting his ex parte communications with the Court, the motion "specifically request[ed] that such documents and transcripts be provided solely to counsel for Mr. Duran Gomez and do not lose their ex parte designation." ECF No. 519 at 3. The government did not oppose that request. ECF No. 519 at 4. On February 19, 2020, the Court granted Mr. Duran Gomez's motion, instructing that "all ex parte submissions and transcripts relating to Wilmar Rene Duran Gomez shall be furnished **only** to counsel for Duran Gomez and shall retain their ex parte status." ECF No. 528 at 1 (emphasis in original).

On March 12, 2020, the Court dismissed the second superseding indictment with prejudice and entered final judgment. ECF Nos. 534, 535. The government filed a timely notice of appeal. ECF No. 546.

The sealed materials covered by this Court's February 19, 2020 order were added to the record on appeal (ROA) on May 6, 2020. On May 27, 2020, the parties jointly asked the Fifth Circuit for permission "to view those portions of the sealed ROA to which defense counsel and government counsel had access in the district court." Dkt. #431008. The parties' motion made clear that they "[we]re not requesting that they be given access to any ex parte filings or proceedings that are part of the ROA." *Id.* Rather, they were requesting

only that "the Court permit counsel for both parties to view those portions of the sealed ROA to which they had access in district court." *Id.* On June 12, 2020, the Fifth Circuit entered an order containing the following language:

> Unless the court granted access to one or more specific documents ONLY, it is ordered, counsel for Wilmar Rene Duran-Gomez, United States of America may obtain all ex parte documents *filed on behalf of* Wilmar Rene Duran Gomez, United States of America, and all other non ex parte documents in the record.

Dkt. #450586 (emphasis in original).

In its opening appellate brief, filed on June 25, 2020, the government referenced and relied upon several ex parte materials Mr. Duran Gomez had filed in this Court. Disclosure of these ex parte materials to the government seemed contrary to both (1) this Court's February 19, 2020 order, which provided that they "be furnished **only** to counsel for Duran Gomez and shall retain their ex parte status," and (2) the parties' May 27, 2020 joint request to the Fifth Circuit, which indicated they were not seeking access to ex parte materials. Mr. Duran Gomez's counsel therefore emailed the government's appellate counsel on July 21, 2020, to inquire about the extent of the government's access to Duran Gomez's ex parte materials. *See* Exhibit 1 at 11-12. Appellate counsel's response made clear that the Fifth Circuit had granted the government access to all ex parte materials relating to Duran Gomez from this Court. *See id.* at 11.

Among other things, those ex parte materials included:

- Proposed budgets and funding requests that Mr. Duran Gomez filed in December 2010, February 2013, March 2013, May 2013, March 2015, and November 2017. These documents laid out, in some detail: avenues of investigation the defense team intended to pursue; the types—and, in some instances, specific names—of experts whom defense counsel hoped to retain; the identities of witnesses the defense team planned to interview, for use during both the guilt and penalty phases; forensic tests defense counsel wanted to conduct; and theories of mitigation that defense counsel expected to

3

develop, including the categories of evidence on which those theories would rely.  ROA.1312-56, 1416-48, 1450-97, 1528-1621, 1666-1785, 1793-95.

- This Court's orders granting in part and denying in part Mr. Duran Gomez's proposed budgets.  ROA.1363, 1514, 1797.

- Memoranda this Court wrote to the Fifth Circuit explaining why it believed certain funding was or was not justified.  ROA.1364-68, 1511-13, 1626-31, 1645-46, 1665, 1787-89.

- Orders and memoranda from the chief judge of the Fifth Circuit approving funds for Mr. Duran Gomez's defense, including specific amounts that could be spent on particular categories of experts and specialists.  ROA.1375-76, 1526-27, 1664, 1790-92.

- Other correspondence between defense counsel and the Court regarding Mr. Duran Gomez's need for funding and how he intended to spend that funding.  This correspondence included, among other things, a May 2013 "Emergency" motion for money to conduct mitigation investigation.  ROA.1498-1509, 1652-53, 1820-25, 1833.

- Minutes and transcripts of status conferences at which the Court and defense counsel discussed Mr. Duran Gomez's need for funding to investigate particular matters and hire specific types of experts.  ROA.1406, 1449, 1622, 1786, 2067-94.

- Status reports in which Mr. Duran Gomez's counsel described what investigation and mitigation work they had already conducted, and what work remained to complete.  ROA.1522-24, 1623-25, 1654-56.

- Requests for appointment of additional counsel, filed in December 2010 and October 2018, as well as the Court's orders ruling on those requests.  ROA.1357-61, 1369, 1798-1803, 1806-07.

- A motion asking this Court to fund a consultant who could convince Mr. Duran Gomez to plead guilty in return for a non-death sentence.  The motion recounted and alluded to conversations between Mr. Duran Gomez and his attorneys regarding his prospects at trial and the benefits of accepting a plea, among other things.  ROA.1632-42.

- Motions seeking the issuance of subpoenas (which the Court granted) for records and materials that Mr. Duran Gomez intended to use in preparing his defense for both the guilt and penalty phases.  ROA.1838-81.

- Motions asking the Court to order the U.S. Marshals Service to move Mr. Duran Gomez to different facilities, which touched on matters of trial and sentencing strategy.  ROA.1370-72, 1374, 1808-18.

Because these materials discuss certain privileged matters relating to defense strategy, Mr. Duran Gomez's counsel emailed government appellate counsel on July 28, 2020, to ask whether he had shared the ex parte materials with government trial counsel. *See* Exhibit 1 at 7-9. Mr. Duran Gomez's counsel also asked government appellate counsel to take certain steps to "wall off" the ex parte materials from government trial counsel, so as to avoid prejudice to Mr. Duran Gomez's right to a fair trial. *See id.* at 8-9. On August 3, 2020, government appellate counsel informed the defense that the government would not agree to abide by Mr. Duran Gomez's request. *See id.* at 4. The government claimed Mr. Duran Gomez had put the ex parte materials "at issue" by litigating his motion to dismiss. *See id.* Therefore, the government maintained, Mr. Duran Gomez had waived any privilege with respect to those materials. *See id.* Mr. Duran Gomez's counsel told government appellate counsel in a follow-up email that they did not agree with the government's characterization of what materials Mr. Duran Gomez put in issue by filing his motion to dismiss. *See id.* at 2-3.

On August 7, 2020, Mr. Duran Gomez filed a "Notice" informing the Court of the parties' dispute and advising the Court that if the Fifth Circuit reversed the dismissal order, Mr. Duran Gomez "m[ight] at that time seek appropriate relief from the Court." ECF No. 581 at 4. In a response filed August 26, 2020, the government asserted that, in the event of a remand, it would "not use (and has not used) any ex parte materials made available on appeal for trial preparation." ECF No. 585 at 1. It also reiterated its refusal to" wall off" the government's trial team from the ex parte materials at issue. ECF No. 585 at 5. The Court held a status conference to discuss the matter on August 27, 2020. *See* ECF No. 586. During that call, the government declined to answer the Court's questions about whether trial

5

counsel had access to the ex parte materials, other than to state that members of the trial team were involved in preparing the appellate briefs and preparing for oral argument.

On December 23, 2020, the Fifth Circuit reversed the dismissal order and remanded the case to this Court. ECF No. 603 at 1. The mandate issued on January 14, 2021. ECF No. 603 at 1.

## II. Argument

Many of the ex parte materials disclosed to the government contain communications protected by the attorney-client and work-product privileges. Other communications, even if not strictly falling within the ambit of the privilege, concern sensitive and confidential matters of defense strategy that the government is not entitled to learn of before trial. Because disclosure of these matters was inadvertent, and directly contrary to the pleadings and stated intentions of both parties, Mr. Duran Gomez requests that the Court direct the government to return the ex parte materials to the clerk. In addition, the government should be required to (1) reveal the extent to which trial counsel has had access to the ex parte materials, and (2) demonstrate that it has not used those materials to obtain other evidence against Mr. Duran Gomez.

### A. The government should return the ex parte materials to the clerk.

The bulk of the materials described above consist of requests made, and orders entered, pursuant to the Criminal Justice Act (CJA). That statute authorizes district courts to appoint private attorneys to represent any federal felony defendant who is "financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a)(1)(A). When "investigative, expert, or other services [are] necessary for adequate representation" of the defendant, those attorneys "may request [such services] in an ex parte application" to the district court. *Id.* § 3006A(e)(1). If the court determines, "after appropriate inquiry in an

6

ex parte proceeding, that the services are necessary and that the [defendant] is financially unable to obtain them," it "shall authorize counsel to obtain the services." *Id.* This provision reflects Congress' view "that investigative assistance is sometimes a necessity for an adequate defense." *Mason v. Arizona*, 504 F.2d 1345, 1351 n.6 (9th Cir. 1974). It is "designed to accord federal prisoners full constitutional rights under the Due Process Clause and the Sixth Amendment." *Id.* at 1352.

As the CJA's plain text indicates, a defendant may submit his funding requests ex parte, and the district court must consider those requests ex parte. *See United States v. Theriault*, 440 F.2d 713, 715 (5th Cir. 1971). "The manifest purpose of requiring that the inquiry be ex parte is to insure that the defendant will not have to make a premature disclosure of his case." *United States v. Sutton*, 464 F.2d 552, 553 (5th Cir. 1972) (per curiam). Permitting defendants to proceed ex parte prevents disclosure of "the strengths and weaknesses of a defendant's case and his or her trial strategy, including possible defenses, witnesses, and evidence to be used at trial." *United States v. Gonzales*, 150 F.3d 1246, 1259 (10th Cir. 1998). Like grand jury proceedings, "CJA proceedings [would] be frustrated if conducted openly": "The CJA process is the defendant's means of preparing a defense, and keeping that process closed will prevent the government from being 'tipped off' as to the direction in which the defendant's trial strategy is heading." *Id.* The CJA, "which requires that a defendant reveal a high degree of detail about his or her reasons for requesting assistance other than counsel in preparing for trial, recognizes that confidentiality of that detail is vital to the proper functioning of the CJA process." *Id.*; *see also United States v. Edwards*, 488 F.2d 1154, 1162 (5th Cir. 1974) ("Dissemination of information critical to the defense permits the government to enjoy unauthorized discovery

which is forbidden under our concept of criminal procedure and the statute."); *United States v. Abreu*, 202 F.3d 386, 390 (1st Cir. 2000) (citing CJA's "legislative history, which states that an ex parte proceeding is provided for in subsection (e) so as to 'prevent the possibility that an open hearing may cause a defendant to reveal his defense'").

More than just sound policy, the CJA's provision for ex parte motions has a constitutional dimension. Allowing the government access to a defendant's funding requests is likely to "reveal information protected by the attorney-client privilege and by the attorney work-product doctrine." *Gonzales*, 150 F.3d at 1266. If such access were permitted, attorneys might be "reluctant to provide the court with information necessary to obtain services for the defense as discussed above," and defendants might be similarly "reluctant to reveal information that could help the attorney in the defense of the case, or in analyzing the strength of the case for trial." *Id.* In addition, government knowledge of a defendant's CJA budgeting requests could "implicate [a defendant's] Fifth Amendment rights as to the instant crime," putting "the government in a position to investigate and bring new charges against defendants who inculpate themselves in uncharged criminal conduct in order to obtain an adequate defense." *Id.*

The result would be that defendants who cannot afford counsel, unlike those who can, would be forced to compromise their constitutional rights. As the First Circuit has explained:

> There is another principle at stake: fair treatment of indigents. Defendants who are able to fund their own defenses need not reveal to the government the grounds for seeking a psychiatrist who might potentially testify at sentencing. To require indigent defendants to do so would penalize them for their poverty.

*Abreu*, 202 F.3d at 391; *see also United States v. Wells*, 879 F.3d 900, 913 (9th Cir. 2018) ("The Government's exclusion from the administration of the CJA is a significant

contributing factor to the fairness of our system and the CJA's role in redressing the imbalance of power between an indigent defendant and the Government. A contrary position might well result in a system wherein the outcome of criminal trials would be determined by the poverty of the accused rather than the integrity of the fact-finding process.").

In short, the CJA's ex parte process operates, like a privilege, to protect defendants' right to put on a full defense, to communicate candidly with counsel, and to avoid self-incrimination. The Court should therefore treat disclosure of ex parte material the same way it would treat disclosure of privileged material.

The holder of a privilege generally waives that privilege if he voluntarily discloses privileged information to a third party. *See, e.g.*, *United States v. Murra*, 879 F.3d 669, 681-82 (5th Cir. 2018); *United States v. Seale*, 600 F.3d 473, 492-93 (5th Cir. 2010). But a waiver does not necessarily occur if disclosure of privileged information is "inadvertent." *Alldread v. City of Grenada*, 988 F.2d 1425, 1433 (5th Cir. 1993). Although "inadvertent disclosure *may* result in a waiver of the privilege," courts do not apply "a per se rule of waiver." *Id.* at 1434 (emphasis in original). Instead, they "consider the circumstances surrounding a disclosure on a case-by-case basis" to determine the existence or non-existence of waiver. *Id.* This analysis looks to on a non-exhaustive list of five factors: "(1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Id.* at 1433.

Here, Mr. Duran Gomez took all reasonable steps to prevent disclosure to the government. He submitted his CJA requests to the Court ex parte; his January 29, 2020

motion for unsealing "specifically request[ed]" that the relevant documents and transcripts "be provided solely to counsel for Mr. Duran Gomez and do not lose their ex parte designation," ECF No. 519 at 3; and his May 27, 2020 motion in the Fifth Circuit made clear he was "not requesting that [the parties] be given access to any ex parte filings or proceedings that are part of the ROA." Dkt. #431008. It is unclear what else Mr. Duran Gomez could reasonably be expected to do to preserve the materials' ex parte status.

Mr. Duran Gomez also moved to "remedy the error" quickly. *Alldread*, 988 F.2d at 1433. Defense counsel first learned of a potential disclosure on June 25, 2020, when the government filed its opening appellate brief. It took some time after that to confirm that the government's reference to certain materials in that brief derived solely from ex parte materials, and not been elsewhere disclosed in the record. Twenty-six days after the filing of the government's 140-page brief, counsel for Mr. Duran Gomez emailed government counsel to inquire about the extent of the disclosure. There is no reason to believe that contacting the government sooner—e.g., on June 26th—would have mitigated the prejudice Mr. Duran Gomez may suffer as a result of the disclosure. At that point, the government had already made use of the materials in its appellate brief, and any potential retrial was many months, if not years, in the future.

The third *Alldread* factor, the scope of the discovery, is "not applicable in this case," as Mr. Duran Gomez "was not the party who produced the documents" to the government and therefore "did not have the opportunity to review the documents for privilege before they were produced." *Corona v. Chevron Corp.*, 2008 WL 11483069, at *4 (S.D. Tex. June 18, 2008). The fourth factor, the extent of the disclosure, is also irrelevant here. That factor asks how big or small a party's disclosure of privileged materials was "relative to the total

document production." *Id.* Because it was the clerk, not Mr. Duran Gomez, who disclosed ex parte documents to the government, factor four does not bear on this case.

Finally, "the overriding issue of fairness" weighs heavily against a finding of waiver. *Alldread*, 988 F.2d at 1433. Mr. Duran Gomez's budget requests and status reports, his subpoena requests, his motions for appointment of additional counsel, this Court's and the Fifth Circuit's orders, and the transcripts of status conferences all reveal highly sensitive information about Mr. Duran Gomez's strategy for both the guilt and sentencing phases of trial. The confidentiality of that information is crucial in putting on an aggressive defense. *See Gonzales*, 150 F.3d at 1258-59. Through no fault of his own, Mr. Duran Gomez now suffers from a handicap—disclosure of his strategy and theory of the case—that the government does not. And ensuring a level playing field—important in any case—is particularly critical given the stakes in this case. "In capital proceedings generally, [the Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). In light of the "irremediable" consequences of allowing the government to know Mr. Duran Gomez's guilt-phase and sentencing strategy in advance of trial, the Court should decline to find a waiver here.

Because disclosure of Mr. Duran Gomez's ex parte materials was inadvertent, the government must return those materials to the clerk. *See Alldread*, 988 F.2d at 1433-34 (affirming district court's determination that "considerations of fairness counseled in favor of ordering the materials returned").

11

**B.     The Court should hold a "taint hearing" at which the government must show it has not profited from access to Mr. Duran Gomez's ex parte materials.**

In addition to ordering the ex parte materials returned, the Court should require the government to demonstrate that it has not used those materials to build its case against Mr. Duran Gomez.

In *Kastigar v. United States*, 406 U.S. 441, 448-49 (1972), the Supreme Court upheld, against a Fifth Amendment self-incrimination challenge, a federal statute authorizing district courts to compel witnesses to testify over claims of privilege, provided that "'no testimony or other information compelled [by the court] (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case'" (quoting 18 U.S.C. § 6002). The Court held "that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Id.* at 453.

Although "the Fifth Amendment allow[s] the government to prosecute using evidence from legitimate independent sources," *Kastigar* imposes on the government an "affirmative duty" to show that such evidence is not the fruit of compelled testimony. *Id.* at 460-61. That is, "[w]hen a defendant claims that the government wrongfully used immunized testimony, the government has the burden of proving by a preponderance of the evidence that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *United States v. Cantu*, 185 F.3d 298, 302 (5th Cir. 1999). "In a taint hearing (commonly referred to as a '*Kastigar* hearing'), the government must demonstrate that it used nothing from the defendant's immunized testimony, either directly as evidence, or indirectly as an investigatory lead." *United States*

12

*v. Jimenez*, 256 F.3d 330, 348 (5th Cir. 2001).  At such a hearing, the government must "give the defendant a chance to cross-examine relevant witnesses, to ensure the lack of tainted evidence."  *Cantu*, 185 F.3d at 304.

As explained above, the CJA's provision for ex parte budget requests serves a similar purpose as the self-incrimination privilege and other privileges.  The government's use of ex parte materials to obtain additional evidence against Mr. Duran Gomez would therefore undermine the CJA's protections in the same way that using immunized statements to develop further evidence undermines the privilege against self-incrimination.  If the government acquires evidence through its improper access to ex parte materials, that evidence is tainted and is inadmissible at trial, just like evidence acquired via statements made during immunized testimony.

To ensure the government has not exploited the inadvertently disclosed ex parte materials, the Court should conduct a "taint hearing" at which the government will be required to demonstrate "it used nothing from [those materials], either directly as evidence, or indirectly as an investigatory lead."  *Jimenez*, 256 F.3d at 348.  Without such a hearing, the Court runs the risk of admitting evidence derived from governmental invasion of Mr. Duran Gomez's confidential, constitutionally protected trial preparations.

### III. Conclusion

For the reasons described above, Mr. Duran Gomez requests that the Court order the government to (1) return to the clerk all ex parte materials to which it gained access during the appeal of the Court's dismissal order, (2) disclose the extent of government trial counsel's access to those ex parte materials, and (3) conduct a "taint hearing" at which the government will be required to prove it did not use the ex parte materials to acquire additional evidence against Mr. Duran Gomez.

13

Undersigned counsel have conferred with counsel for the government, who have advised that they oppose this motion.

A proposed order is attached.

Respectfully submitted,

| | |
|---|---|
| /s/ Wendell A. Odom, Jr<br>WENDELL A. ODOM, JR.<br>Texas State Bar # 15208500<br>Federal Bar # 0947<br>440 Louisiana, Suite 200<br>Houston, TX 77002<br>(713) 223-5575<br>(713) 224-2815 (FAX)<br><br>*/s/ Neal Davis, III*<br>NEAL DAVIS, III<br>Texas State Bar #24038541<br>Federal Bar # 706329<br>440 Louisiana, Suite 200<br>Houston, TX 77002<br>(713) 223-5575<br>(713) 224-2815 (FAX) | */s/ James Wyda*<br>JAMES WYDA (#25298)<br>Federal Public Defender<br>Office of the Federal Public Defender<br>100 South Charles Street<br>Tower II, 9th Floor<br>Baltimore, Maryland 21201<br>(410) 962-3962<br>(410) 962-0872 (FAX)<br>Email: jim_wyda@fd.org<br><br>*/s/ Julie L.B. Stelzig*<br>JULIE L.B. STELZIG (#27746)<br>Assistant Federal Public Defender<br>6411 Ivy Lane, Suite 710<br>Greenbelt, Maryland 20770<br>(301) 344-0600<br>(301) 344-0019 (FAX)<br>Email: julie_stelzig@fd.org |