Case 4:10-cr-00459 Document 719 Filed on 10/29/21 in TXSD Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
January 10, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:10-CR-459-1 |
| | § | |
| WILMAR RENE DURAN GOMEZ | § | |
| | § | |
| Defendant | § | |

## MEMORANDUM OPINION AND ORDER

**I.  INTRODUCTION**

Before the Court is the defendant's, Wilmar Rene Duran Gomez, motion to strike the government's "death notice" in this case [DE 625], the government's response to the motion [DE 651], and the defendant's reply [DE 671]. The Court previously entered an Order addressing the defendant's motion [DE 662], but failed to await receipt of the defendant's response. In deference to the parties' agreement concerning motions, responses and replies, the Court withdraws its previous Order and enters this Order in its stead.

**II.  FACTUAL BACKGROUND**

Taking the facts in the light most favorable to the government, the facts show that prior to November 2006, the defendant, Efrain Rodriguez-Mendoza and Jose Alberto Bolanos Garza were engaged in the business of harboring illegal

aliens, conduct that violated Title 8 United States Code § 1324(a)(1)(A) *et. seq*. On or about November 6, 2005, an alien by the name of Abelardo Sagustume arrived at the warehouse that the defendants, Rodriguez and Bolanos, kept illegals while they awaited payments due for smuggling, housing and maintaining the aliens. Already at the location were Hector LNU and other illegal aliens.

Hector, who had already expressed an interest in escaping from the location, was soon joined by Sagustume and several other aliens in a plot to escape. The plan included attacking Bolanos, and if necessary, killing him. On November 7, the aliens set fire in a bathroom of the location as part of their plan to escape. However, the plan did not materialize as Hector and Sagustume and their participators expected. The aliens were all quickly removed from the location and held until the defendant, Rodriguez and Balonas were certain that the local police did not respond or investigate the matter.

The defendant, Rodriguez and Balonas [now referred to as defendants] began an investigation concerning the fire. The investigation focused on Hector, Sagustume and several other aliens. Each of the aliens was brought in and questioned and later, were subjected to kicking and beating on their arms, legs, chests and backs. They were denied food and water not permitted to use the restroom facilities.

Over the next several days, the defendants engaged in joint and serial beatings of the aliens, eventually focusing on Hector and Sagustume. Over the same period, the defendants directed Hector and Sagustume to call their families and demand that the families pay the smuggling fees. During the calls, the aliens were beaten or struck so that the families would appreciate the urgency for getting the fees paid.

During the period between November 7 and November 14, the defendant, in addition to the beatings, conducted other immoral and ungodly acts against Hector and Sagustume in particular.

Eventually, Hector confessed that he set the fire in an effort to escape. Prior to his confession, however, an unnamed alien informed Rodriguez that Hector and Sagustume were plotting to kill him and/or the defendant. On or before November 14, the defendants exacted additional beatings against Hector and Sagustume. After these beatings, the defendant and Rodriguez left the room. At some point in time, Rodriguez returned to the room where Hector and Sagustume were kept. After this last visit by Rodriguez, he exited the room and announced to the defendant and Balonas that Hector appeared not to be breathing. Even later, Rodriguez announced that he believed that Sagustume was also dead.

The defendants wrapped the bodies of the aliens and drove them to a field where they set fire to the vehicle and the aliens. After the events, Rodriguez and Balonas fled the locations where they had been living.

## III. CONTENTIONS OF THE PARTIES

### A. The Defendant's Contentions

In his motion to strike the death notice in this case, the defendant asserts that, pursuant to 18 U.S.C. § 3591(a)(2), the Federal Death Penalty Act ["FDPA"] the government must establish that the defendant's "own, personal actions constituted the 'but-for' cause of the victims' death." The defendant contends that for the government to simply assert that the victims were the subject of various beatings inflicted by the defendant, without that Duran actually struck the fatal blow(s), violates the strictures of the FDPA and Supreme Court precedent, pointing particularly to *Tison v. Arizona*, 481 U.S. 137 (1987) and *Emmund v. Florida*, 458 U.S. 782 (1982).

The defendant asserts that both *Tison* and *Emmund* teach that culpability rest on "individualized consideration [of the assailants] as a constitutional requirement [when] imposing the death sentence." *Emmund*, 458 U.S. at 78 (quoting *Lockett v. Ohio*, 438 U.S. 576, 605 (1978)). Therefore, because the autopsy report does not specify a particular injury as the cause of death of the victims, and because the

government cannot establish that the fatal blow was struck by the defendant, the death notice must be struck.

### B. The Government's Contentions

The government contends that the defendant's arguments for striking the death notice cannot be "squared" with controlling precedent from both the Supreme Court and the Fifth Circuit Court of Appeals. According to the government, the error committed by the defendant in his arguments rest in the defendant's use of a non-death penalty case to interpret § 3591(a)(2). *United States v. Barrage*, 571 U.S. 204, 208, 212-13 (2014). The government argues that the case does not impose a "heightened causation" standard in capital cases. Accordingly, the government argues that there is no requirement that the defendant be the actual killer, *i.e.,* striking the fatal blow – only that his [personal liability], his role in the death of the aliens be tied to a culpable mental state before or during the commission of the offense. Hence, the government points to § 3591(a)(2) as controlling as to what constitutes the requisite mental state.

### III. ANALYSIS AND DISCUSSION

### A. The Government's Perspective on the Law

The controlling precedent, in the government view, that is dispositive of the defendant's motion is set out in a number of cases, most recently, *United States v. Fackrell*, 2021 U.S. App. LEXUS 7175 (5th Cir. March 11, 2021). There, *Fackrell*

made an argument similar to that made by the defendant here and the Circuit Court held that a person may be convicted of capital murder where the evidence establishes that the accused "aided and abetted" the murderer. Hence, the government argues, proving that Fackrell had the requisite mental state to be convicted may be established by showing that he aided and abetted the murder of the victim.

### B. The Defendant's Perspective on the Law

The defendant's counter argument is that the eligibility factors set out in the FDPA, while permitting proof of the accused's mental state to be established vicariously, also contains a "causation" element that also must be proved. In this regard, the defendant argues that the *mens rae* element does not trumped the "but-for" personal causation element in the statute. Following through on this argument, the defendant points out that even if the evidence establishes that the defendant had the requisite *mens rae* to commit murder, but fails to establish that the defendant personally inflicted serious bodily injury that resulted in the death of the victim, the *Tison* and *Emmund* teachings dictate against imposing a death sentence.

## IV. THE RELEVANT COUNTS AND STATUTE

In Courts Two, Three, Four, Five, Six and Seven, the government charges that the defendant, Rodriguez and Bolanos took as hostages two aliens, Hector and Sagustume, kidnapped, harbored, and inflicted serious bodily injuries that resulted in the two victims' death. In seeking to apply the death penalty, the government relies on Title 18 U.S.C. § 3591(a)(2)(B)(C) and (D). Those sections provide that:

(A) "a defendant who has been found guilty of any other offense for which a sentence of death is provided is liable if he:

(B) intentionally inflicted serious bodily injury <u>that resulted in the death</u> of the victim;

(C) intentionally participated in an act, <u>contemplating that the life</u> of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, <u>and</u> the victim died as a <u>direct result</u> of the act; or [Emphasis supplied]

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a <u>direct result</u> of the act. [Emphasis supplied]

A lengthy discussion was undertaken by the Supreme Court in *Burrage v. United States*, 571 U.S. 204, 1345 S. Ct. 81 (2014), concerning the phrase "results from" and/or, as in this case, "resulted in" as to whether the phrase "imposes a

requirement of actual causality, *i.e.,* proof that [death] would not have occurred in the absence of – that is -- "but for" – the defendant's conduct. *Id*. at 204 [citations omitted]. The Supreme Court reasoned that where the government seeks to impose a penalty enhancement based on causation, the enhancement cannot be applied unless the defendant would not have died "but for" the bodily injured inflicted by that defendant. *Id*. Stated differently, in the absence of evidence that the beatings inflicted, personally by the accused defendant were an independently sufficient cause of the victims' death or serious bodily injury, the penalty enhancement cannot be applied. *Id*. It follows that, upon conviction for murder, a defendant cannot be assessed the penalty enhancement of death unless the defendant's part in the conduct is both, the actual cause and the legal cause [proximate cause] of the victims' deaths. *Id*. at 210. In other words, the conduct of the accused may be the actual cause of a victim's death, yet not be the legal or proximate cause of death. In these instances, the science and the law travel separate and distinct paths.

In the case at bar, § 3591(a)(2)(B)(C) and (D), require that the government's proof establish that the defendant: (a) intentionally inflicted serious bodily injury that was a direct result of the victims death, a death that would not have occurred, "but for", the defendant's personal act(s); or (b) intentionally participated in an act, contemplating that the life of the victims would be taken and that the participation was the legal case of the victims' death; or (c) intentionally engag[ed] in an act of

violence, knowing that the act created a grave risk of death to the victims . . . and the victim died as a "direct result" of the act(s).

The government points out that on days two, three and five, the defendant and co-defendants Rodriguez and Bolanos beat the two victims and three other aliens concerning the setting of the fire at the warehouse and to provoke the victims' families to pay the smuggling fees. On day six, after beating the five aliens, the defendant allegedly instructed Rodriguez-Mendoza to pour a flammable liquid on one of the victims and light it. However, there is no evidence that the act was carried out. While there were burn marks evident on the victims at the time the autopsy was performed those burns are not distinguished for the burns that were exacted after the deaths of the victims.

The defendant's argument is well taken. The government's evidence fails to bring the defendant within the zone of conduct that permits a penalty enhancement. The defendant, for purposes of his motion, accepts the facts as set out by the government concern the defendant's individual conduct. However, there is no dispute that the victims' deaths cannot, as a matter of law, be traced to any particular fatal act or injury that the defendant inflicted or directed. Adding to the uncertainty about the legal cause of the victims' death is the statement of the government's key cooperating[1] witness who devotedly placed himself apart from

---

[1] *See Bolanos-Garza's* plea agreement provided to the government in Cause No. Docket entry 279, at page 9.

the defendant and Rodriguez during the beatings. Moreover, he placed Rodriguez alone, in the room with the victims prior to the victims' death. His statements are incredulous, at least. To believe Bolanos, he never participated.

The government also argues that the conduct of Rodriguez and Bolanos may be attributed to the defendant under the aiding abetting statute. That argument fails to enable that the defendant sought or participated in the legal cause the victims' deaths. Both *Tison* and *Emmund* instruct against the application of vicarious liability in the context of a homicide that involves multiple actors, particularly when the government seeks to use it to impose a death penalty.

The Fifth Circuit, too, has spoken to the constitutional requirements for proving the eligibility factors in a death-eligible case. In *United States v. Williams*, 610 F.3d 271, 288 (5th Cir. 2010), the Circuit Court noted that both the mental state and the particular role of the assailant against whom the government seeks to impose the death penalty, must be established separately.

In the case at bar, the evidence and pleadings establish that neither the individual acts of the defendant, nor the beatings that he personally inflicted on the victims was the "direct cause" or "but for" cause of the victims' deaths. *Barrage*, 571 U.S. at 208. In other words, when the conduct of a defendant is not an independently sufficient cause of the victims' death, a defendant cannot be liable for penalty enhancement under § 841(b)(1)(c), *Burrage*, 571 U.S. at 210-214.

There is likewise insufficient evidence, as a matter of law, to support the conclusion that the defendant contemplated that death would be the result of the beatings he and the codefendants inflicted on the victims. The victims were of no value to the defendants were they to die. All the evidence points to acts of punishment for the victims' attempt to escape, threat against the life of Bolanos and for recovery of the smuggling fees.

Therefore, the Court concludes that the defendant's motion to strike the death notice, as it relates the defendant, Wilmar Rene Duran Gomez, should be and it is Hereby Granted.

It is so Ordered.

SIGNED on this 29th day of December 29, 2021.

_____
Kenneth M. Hoyt
United States District Judge