1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS

2                     HOUSTON DIVISION

3   ***********************************************************

4   UNITED STATES OF AMERICA     4:10-CR-00459-1

5
   VS.                       HOUSTON, TEXAS

6

7   WILMAR RENE DURAN-GOMEZ      MARCH 23, 2022

8
   ***********************************************************

9
         TRANSCRIPT OF MOTION TO SUPPRESS PROCEEDINGS

10     HEARD BEFORE THE HONORABLE KENNETH M. HOYT
             UNITED STATES DISTRICT JUDGE

11
   ***********************************************************

12
   APPEARANCES:

13
   FOR THE GOVERNMENT:         MS. JILL JENKINS STOTTS

14                       MS. LISA MARIE COLLINS
                       U.S. Attorney's Office

15                       1000 Louisiana Street
                       Suite 2300

16                       Houston, Texas 77002

17                       MR. BARRY KENT DISNEY
                       U.S. Department of Justice

18                       Capital Case Section
                       1331 F St NW

19                       Washington, DC 20004-1107

20
   FOR THE DEFENDANT:          MR. NEAL DAVIS, III

21                       MR. WENDELL A. ODOM, JR.
                       Law Offices of Wendell Odom &

22                         Neal Davis, III
                       440 Louisiana Street

23                       Suite 200
                       Houston, Texas 77002

24
       Proceedings recorded by mechanical stenography,

25   transcript produced via computer.

1                              MR. JAMES WYDA
                              Federal Public Defender
2                              District of Maryland
                              100 S. Charles Street
3                              Tower II 9th Floor
                              Baltimore, Maryland 21201

4

5                              MS. JULIE L.B. STELZIG
                              Assistant Federal
6                              Public Defender
                              District of Maryland
7                              6411 Ivy Lane
                              Suite 710
8                              Greenbelt, Maryland 20770

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **EXAMINATION INDEX**

                                                 **PAGE NO.**

2

3  **Ross Neal**

4       Direct Examination by Ms. Collins.............  14
      Cross-Examination by Mr. Davis................  36

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**P R O C E E D I N G S**

THE COURT:  Good morning.  Please be seated.

All right.  Let me call the case and then there are a couple of housekeeping matters that we need to address and then I think we'll be ready to get started.

This is Cause Number 2010-459, the United States of America versus Wilmar Rene Duran-Gomez.

Present here in the courtroom for the government are?

MS. COLLINS:  Lisa Collins for the United States joined by Jill Stotts and Barry Disney.

THE COURT:  All right.  And who will be handling the witnesses this morning?

MS. COLLINS:  I will, Your Honor.

THE COURT:  All right.  Thank you.

Let's see.  And will there be a need, at least at this point in your thinking, for anyone else to participate in the discussion?

MS. COLLINS:  From the United States, no, Your Honor.

THE COURT:  All right.  And I say that because I believe that all of the questioning and proceedings need to happen from the podium and I think the podium -- let me see. I'm in a different courtroom so, let's see, where is the podium?

MS. COLLINS:  Right there.

1    THE COURT:  That's the podium.  Very good.

2         So that's all I needed.  Thank you, Ms. Collins.

3         And representing the defendant, Mr. Duran-Gomez?

4    MR. DAVIS:  Good morning Your Honor.  Neal Davis, III,

09:13AM  5  joined with Wendell Odom and Julie Stelzig.

6         And we also have Madeleine Stuzin, S-T-U-Z-I-N,

7    who is an intern; and this is the first time she's been in a

8    courtroom to see a proceeding, Judge.

9    THE COURT:  Did you say Madeleine?

09:13AM 10  MR. DAVIS:  We call her "Maddie."

11   THE COURT:  Is it M-A-D-L-Y-N?

12   MS. STUZIN:  M-A-D-E-L-E-I-N-E.

13   THE COURT:  All right.  Very good.  All right.  Thank

14   you.

09:13AM 15  MR. DAVIS:  And Jim Wyda will be at FDC if FDC does

16   call in.

17   THE COURT:  I think that we are attempting to -- with

18   the storm this morning, we may be having some difficulty

19   getting that in, but I believe I heard from Mr. Wyda just at

09:14AM 20  that point, perhaps speaking through the -- at least speaking

21   through the system letting us know that he is present.

22        Is that you, Mr. Wyda; or was that the

23   interpreter?

24        (No response.)

09:14AM 25  THE COURT:  All right.  Are you able to hear me?  I'm

1 speaking now to the interpreter.  I can see the interpreter on

2 the line.  Are you able to hear me?

3 INTERPRETER DEL VILLAR:  Yes, Your Honor.  I can hear

4 you, but we will need to establish the telephone call with, I

09:14AM 5 guess, Mr. Wyda or whoever has the phone there with the

6 defendant so that we can begin the simultaneous interpretation.

7 THE COURT:  You're not able --

8 INTERPRETER DEL VILLAR:  It may take a few minutes.

9 THE COURT:  You're not able to connect with him at this

09:14AM 10 point?

11 INTERPRETER DEL VILLAR:  I don't see him on the video.

12 But, I mean, I just need the phone number to call.

13 THE COURT:  I have no idea what the phone number is.

14 INTERPRETER DEL VILLAR:  I can't hear him on the video.

09:15AM 15 If I could get that phone number.

16 THE COURTROOM MANAGER:  Mr. Wyda does not have his

17 phone on his person because of the --

18 INTERPRETER DEL VILLAR:  I have a phone number that he

19 can call if that's necessary.

09:15AM 20 THE COURT:  Well, he doesn't have a phone, but they

21 should have a phone at that location.

22 So what is that phone number, Cynthia?  Do you

23 know?

24 THE COURTROOM MANAGER:  No, Your Honor.

09:15AM 25 THE COURT:  All right.  So he should get that --

1    MS. STELZIG:  I apologize.  Do we need a number for

2  Mr. Wyda or for the facility?

3    THE COURT:  I'm sorry.  Who is speaking?

4    MS. STELZIG:  I am so sorry, Your Honor.  Julie Stelzig

09:15AM  5  from the Public Defender's Office.

6    THE COURT:  Go ahead.  I'm sorry.  I just wanted to

7  make sure the court reporter --

8    MS. STELZIG:  Of course.  I apologize.  I do have a

9  number for the facility and a number for Mr. Wyda.

09:15AM 10    THE COURT:  Well, then you need to call the facility

11  probably because they probably took Mr. Wyda's phone when he

12  went in.

13    MS. STELZIG:  I do expect that's what's happened.

14  Your Honor, I did try to reach Mr. Durrett, the attorney for

09:16AM 15  FDC, and I was not able to reach him, but I sent him an e-mail

16  and haven't heard back so I'm not sure.  They may be having

17  trouble connecting.

18    INTERPRETER DEL VILLAR:  Okay.  There they are.

19    THE COURT:  I believe we have visual on the room and an

09:16AM 20  officer in the room.  That looks like a man in a suit, probably

21  not one of the prisoners there or detainees.  That's probably

22  Mr. Wyda.

23    So let's see if we got that in place.  Okay.

24    (Off-the-record discussion.)

09:20AM 25    THE COURT:  Well, I think you just need to be aware

1    that these mikes are hot and if he wants to talk to his client,

2    he needs to either move away from them or speak into his ear

3    rather than -- and I'm not sure if Mr. Wyda speaks Spanish or

4    not, but I'm sure Mr. Duran-Gomez speaks enough English to at

09:20AM   5    least understand his attorney.

6            INTERPRETER DEL VILLAR:  And then if we could just make

7    sure to keep the noise down from the FDC.  I think we're ready

8    to begin.

9            THE COURT:  Exactly.  And the same would apply here,

09:20AM  10    gentlemen and ladies, if you please do not rattle papers on

11    your desk nor at the microphone so that we might be able to

12    hear or at least get the transmission through.

13            I believe the storm has passed, but it doesn't

14    mean that we are out of the zone of challenge in the

09:21AM  15    stratosphere or wherever this thing blew through so I

16    appreciate that very much.

17            Mr. Wyda, can you hear me, sir?

18            MR. WYDA:  Yes, Your Honor.

19            THE COURT:  Thank you very much.  And you hear the

09:21AM  20    interpreters, correct?

21            MR. WYDA:  Yes, Your Honor.

22            THE COURT:  Very good.  This is the best of all worlds

23    with an attorney on the location it seems to me.

24            Now, having said that, let me say to counsel

09:21AM  25    this is not going to take all day to do.  I'm going to give

each of you one hour to present the evidence as it relates to

each witness.  If it's going to take more than that, then

you're trying the case and I really don't have the time to do

that today and I will not be here tomorrow.  So anything that

09:21AM  you might think you need to do regarding two witnesses, I

believe -- is that right, Ms. Collins?

MS. COLLINS:  That's correct.

THE COURT:  Beyond the two witnesses, if there's

anything else you think you need to do, you will need to do it

09:21AM  on Thursday and we can fix a time for that.

I will not take closing arguments from you.  I

will not take opening arguments from you.  I'm as familiar with

this case as I can be over these years.

And of course the most important thing are the

09:22AM  writings that you have provided to me.  You've done a good job

of presenting the issues and defining the areas and the

question remains what are the facts and so the facts will

dictate it seems to me and you've stated those in my judgment

fairly accurately or at least openly and completely in your

09:22AM  papers.

Another item I need to point out to counsel,

particularly for the defense, and that is that when a motion is

filed and the government responds, in my judgment if I

determine that a reply is unnecessary, I will not wait two

09:22AM  weeks for a reply.  I will respond to that motion.

1          A time frame must be pushed together.  We cannot

2     spend week on week on week and these things get lost in my

3     paperwork when I have 80 or 90 defendants in one case that I

4     need to deal with on sentencings and I have three to five

09:23AM 5     international criminal cases that might be going on trial and I

6     have other major litigations going on and certainly we are at a

7     crunch time to some extent in our courts when we are trying now

8     to get back on speed and lawyers are doing as well in their

9     offices so there's too much paper to read for me to wait on

09:23AM 10    replies.

11          If I'm ruling in your favor, you certainly should

12    not be complaining about not having had an opportunity to file

13    a reply.  If I'm going to rule against you, I hope to do it

14    sufficiently so that if, for example, I do not wait on the

09:23AM 15    reply, you will at least have sufficient basis to say

16    "reconsider" and we can move in that direction.

17          All right.  As I understand it, we have two

18    witnesses that will be called.  Is there any other witness or

19    witnesses that are going to be testifying from the government's

09:24AM 20    perspective beyond what you've already revealed?

21          MS. COLLINS:  No, Your Honor.

22          THE COURT:  And I gather the defense will not be

23    presenting witnesses, correct?

24          MR. DAVIS:  That's correct, Your Honor.

09:24AM 25          THE COURT:  All right.  And so here is the order of

proceeding.  I hope you brought your lunch.  I have a 2:00

proceeding this afternoon that requires the full court

proceeding together and so you might have a 30-minute lunch.  I

hope that if you don't have it, you will send someone to get

09:24AM  it.  You will have a short period of time if we are pushed to

get this done.  I don't know whether we will or not.

Who are the witnesses in this case?

MS. COLLINS:  Ross Neal and Ray Lamb, Your Honor.

THE COURT:  Are they both in the courtroom?

09:24AM  MS. COLLINS:  They're sitting right outside,

Your Honor.

THE COURT:  Would you have them come in, please?

MR. DAVIS:  Your Honor, if I may, just briefly just for

the record, just really two things.

09:24AM  One, I just wanted the Court to know -- and I'm

sure the Court is aware --- but we wanted to make sure it was

on the record that we did have a waiver of the defendant's

right for the presence -- for his presence in the motions

hearing.

09:25AM  We discussed with Mr. Duran-Gomez that there's a

possibility that the video may go out.  He understands that.

We wanted to proceed with this as quickly as possible and

continue to proceed even if the video went out.

And then Number 2, Your Honor, what the defense

09:25AM  is planning on doing is I will be handling both witnesses,

1  Agent Neal and Agent Lamb.  However, would the Court

2  entertain -- we had some argument after the motions hearing.

3      THE COURT:  I'm good.  I think I'm where you are; and

4  I'm where you are, Ms. Collins.  I think if I need argument, we

09:25AM  5  can do it on Thursday, but I'll make that determination after I

6  hear the evidence.  There is some areas in the evidence where

7  some questions might need to be asked, but those will be my

8  questions.

9      MR. DAVIS:  Sure.  And if that were to happen, Judge,

09:26AM  10  Ms. Stelzig would be more than happy to help the Court in any

11  way the Court sees fit.

12      THE COURT:  Sure thing.  I would like to do this in one

13  setting because of the circumstances where Mr. Duran-Gomez is

14  locked in now.  I would like to get this done with his presence

09:26AM  15  and if there's some argument to be made on paper or in-person,

16  on paper doesn't create a problem, but in-person does create

17  another problem.

18      All right.  Gentlemen, if you would please step

19  forward, come to the railing there, if you would, and raise

09:26AM  20  your right hand.

21      Mr. Ray Lamb?

22      MR. LAMB:  Yes, Your Honor.

23      THE COURT:  What about Mr. Ross Neal?

24      MR. NEAL:  Yes, sir.

09:26AM  25      THE COURT:  Okay.  Gentlemen, I'm going to swear you

in.  You are witnesses who have been called to give testimony

in this case.  So would you raise your right hand at this time

and take an oath?

(The oath was administered.)

09:27AM   THE COURT:  Thank you very much.

Who is your first witness, Ms. Collins?

MS. COLLINS:  Ross Neal, Your Honor.

THE COURT:  All right.

Yes, sir?

09:27AM   MR. DAVIS:  May we invoke the rule, Your Honor?

THE COURT:  The rule has been invoked, Mr. Lamb.  That

means that you will sit outside the hearing of the testimony in

the case.  You will not talk to Mr. Neal about his testimony;

and, of course, if there is someone who can talk to Mr. Neal,

09:27AM   it would be the attorneys by either side who might have some

concerns or questions.

And, of course, the lawyers are admonished not to

advise Mr. Lamb of any testimony that's been given here in the

courtroom.

09:27AM   So if you would step out, please, sir.  Thank you

very much.  I suspect that if you haven't had coffee, you've

probably got enough time to get some.

MR. LAMB:  Thank you.

THE COURT:  Sir, come forward.  And I think the podium

09:27AM   is the place where you can be seen and heard.  I believe the

1    witness stand is over on my left.  Please take the witness

2    stand and we will be getting started.

3              Adjust the microphone there.  The seat slides

4    forward.  Yes.  Good deal.  Just bend it.  It will bend down.

09:28AM  5    All right.  You've got it.  Test it there.

6              How are you doing?

7         THE WITNESS:  I'm doing well.  Thank you, Your Honor.

8         THE COURT:  Great.  We're good.

9              Ms. Collins.

10         MS. COLLINS:  Yes, Your Honor.

11                        **ROSS NEAL,**

12    having been previously duly sworn, testified as follows, to

13    wit:

14                   **DIRECT EXAMINATION**

09:28AM  15   **BY MS. COLLINS:**

16    Q.    Could you please state your name for the record.

17    A.    Yes.  My name is Ross Neal, R-O-S-S N-E-A-L.

18    Q.    What do you do for a living?

19    A.    I'm a criminal investigator, special agent.

09:28AM  20   Q.    With what agency?

21    A.    I work for the U.S. Department of Homeland Security,

22    Immigration and Customs Enforcement; and at the current time,

23    I'm assigned at the Office of Professional Responsibility.

24    Q.    All right.  How many years have you been with the

09:29AM  25   Department of Homeland Security?

A.    With the Department of Homeland Security or its legacy

agencies, for 25 years since 1996.

Q.    All right.  During the period of your time, 25 years,

would it be fair to say that you've had numerous encounters

09:29AM  with undocumented persons?

A.    Yes.  That's correct.  Numerous.

Q.    Ballpark figure.  Hundreds, thousands?

A.    Thousands.

Q.    All right.  I want to turn back to November of 2006.

09:29AM  Where were you assigned at that time?

A.    At that time I was assigned to Homeland Security

Investigations in Houston, Texas.

Q.    All right.  And have you been in Houston your entire time

with the department?

09:29AM  A.    I have not.  I started in 1996 in Southern California

between San Diego and Los Angeles.

      I moved to West Texas about 90 miles east of El Paso.  I

moved to South Texas near Brownsville.  That was all with the

Border Patrol.

09:30AM       And then in 2002, I became an investigator in Houston

where I worked until 2011.  I transferred to Beaumont, Texas,

as an investigator.

      And then in 2021, now I'm with my current assignment with

the Office of Professional Responsibility in Houston again.

09:30AM  Q.    All right.  Kind of walk us through in November of 2006,

1   kind of your day-to-day responsibilities or activities with

2   your assignment.

3   A.    So in 2006, I was a field agent in Houston.  At the time I

4   was assigned to the immigration and document and benefit fraud

09:30AM   5   investigations unit.  So on the daily, I would investigate

6   crimes that involved benefit or document fraud, visa fraud,

7   identity theft, that kind of thing.

8   Q.    All right.  As a part of your assignments at that time,

9   was it common for you to make use of confidential informants?

09:31AM   10   A.    Yes, it was.

11   Q.    All right.  And during that period of time --

12         INTERPRETER DEL VILLAR:  The interpreter speaks.

13              I'm sorry, Your Honor.  I'm getting an awful lot

14   of noise from the FDC, and it's making it very difficult to

09:31AM   15   understand.

16         THE COURT:  Would you tell whoever it is to stop it.

17         INTERPRETER DEL VILLAR:  If we could please keep the

18   noise down, there's some clicking or some shuffling or

19   something that's making it very difficult to hear.

09:31AM   20         THE COURT:  Mr. Wyda, make sure there's nothing going

21   on in that room with any of the pencils and papers and things

22   of that sort.

23              I appreciate it.  Thank you.

24         MR. WYDA:  Thank you, Your Honor.  Will do.

09:31AM   25         THE COURT:  Thank you, sir.

1          MS. COLLINS:  May I proceed, Your Honor?

2          THE COURT:  You may.

3   **BY MS. COLLINS:**

4   Q.    All right.  On November 20th of 2006, did you receive a

5   call from a confidential informant?

6   A.    I did.

7   Q.    Where were you at that time?

8   A.    I was out to dinner with my family in Kingwood, Texas.

9   Q.    All right.  Was it common for you to get calls kind of at

10  all hours of the day and night from confidential informants?

11  A.    Yes, all times of day or night.

12  Q.    All right.  With regards to this specific confidential

13  informant, was this someone that you had used prior to

14  November 20th of 2006?

15  A.    Yes, it was.

16  Q.    And can you give us kind of a time frame of how long you

17  had been working with this particular CI?

18  A.    It's been many years, but I believe since 2005.

19  Q.    All right.  So give or take a year.  Would that be fair?

20  A.    Probably a year or year and a half.  Somewhere in there.

21  Q.    All right.  Throughout the time that you had made use of

22  this CI, had you received information that you had been able to

23  corroborate from him or her?

24  A.    Yes, I had conducted a successful investigation with the

25  confidential informant.  I believe there were two or three

1    indictments and convictions.

2    Q.    All right.  Because of that, did you believe that his or

3    her information had been proven credible in your experience?

4    A.    Yes.

09:33AM   5    Q.    All right.  Based on that, when you received a call from

6    him or her on the evening of November 20, 2006, did you take

7    that call?

8    A.    Yes, I took the call at the table in the restaurant.

9    Q.    Now, based on the fact that you were there with family at

09:33AM   10    dinner, was this a long call or a fairly short call?

11    A.    It was a short call.

12    Q.    Can you give us an idea of the basics of what the CI told

13    you at that time?

14    A.    Yes.  The source answered -- I answered the call and the

09:33AM   15    source said, "Did you see on the news where there were two

16    Hispanic people that had been beaten and killed and found in a

17    stolen vehicle?"

18    Q.    Okay.  Let me stop you there.  Had you seen that?

19    A.    Yes, I had seen that.

09:34AM   20    Q.    And when you had seen that report on the news, had it

21    caught your attention?

22    A.    Yes, it caught my attention.  I thought -- right from the

23    get-go, I thought, well, this is likely involved in alien

24    smuggling or narcotic smuggling.

09:34AM   25    Q.    What was your basis for that?

A.    Stolen vehicle, people beaten to death and concealed in

the vehicle, it was just the first thing that jumped out at me.

Q.    All right.  And did you tell him or her that, that you had

seen that?

09:34AM  A.    Yes.  I said, "I did see that."

Q.    What was their response?

A.    The source said, "I know who did it."

Q.    All right.  At that point, did you have any further

conversation on the phone?

09:35AM  A.    No, not that I remember.  I terminated the call pretty

quickly after that.

Q.    All right.  What was the reason for that?

A.    I was in a public restaurant with my family.  I didn't

want to -- I didn't want to continue that conversation there.

09:35AM  Q.    All right.  After you made it out of the restaurant and

were able to drop your family off, did you reinitiate

conversation with that source?

A.    Eventually I did, but I think before I did that, I reached

out to a colleague to see if one of my coworkers could meet.

09:35AM  Q.    All right.  Based on your training, would it be fair to

say that you would normally meet a source with someone else

present, in other words, not by yourself?

A.    Correct.  We're prohibited from meeting sources alone.

Q.    All right.  And was your colleague able to meet you?

09:35AM  A.    Yes.

Q.    And what was his name again?

A.    Ray Lamb.

Q.    All right.  What did the two of you do together?

A.    We initially met and we discussed the call and we kind of came up with a game plan.  Our initial plan was that we were going to make contact with the source and try to meet the source in person.

Q.    All right.  And were you able to do that?

A.    Yes, we were.

Q.    Can you give us a ballpark on about how long it was between the initial call and when you were able to actually meet the source?

A.    It was a long time ago.  I'm going to say it was in the neighborhood of two hours.

Q.    All right.  And how did you meet the source?  Rather, where did you meet the source?

A.    We met the source in person.  I believe it was at the source's residence, but asked the source to come out and get in the vehicle with us.

Q.    All right.  And is that where you were able to get a bit more information from him or her about what they knew?

A.    Yes.  That's correct.  We talked at length after that.

Q.    And what was the source able to tell you about these homicides?

A.    The source identified the person that they believed to be

1    responsible.  They said it was Wilmar Duran.  They said that he

2    smuggled aliens, that he had a business where they used vans

3    that they would move -- they would move illegal aliens from

4    Houston throughout the country and also that Mr. Duran had a

09:37AM  5    warehouse where he would keep these people prior to them being

6    moved.

7        So they would come from the southwest border area, they

8    would go into the warehouse.  Once their fees and family

9    members were contacted, they would either be released or they

09:37AM  10   would be put on a van and sent somewhere else in the country.

11   Q.   All right.  Let me pause you there.

12       In your experience over the last 25 years, was the

13   smuggling of illegal or undocumented persons a trade that you

14   were familiar with?

09:38AM  15   A.   Yes, very, since the inception of my career.

16   Q.   In the information that the source was giving you, did

17   this all make sense from your experience with how people would

18   be smuggled?

19   A.   Yes, perfect sense.  It was very common for Houston at the

20   time.

21   Q.   All right.

22       INTERPRETER DEL VILLAR:  The interpreter speaks.  I'm

23   sorry to interrupt, Your Honor.

24       I'm also having a little bit of trouble hearing

09:38AM  25   the witness.  If I could get the witness to approach the

1    microphone or just speak up a little.

2              THE COURT:  We got it.

3              INTERPRETER DEL VILLAR:  Thank you, Your Honor.

4    BY MS. COLLINS:

09:38AM  5    Q.    Originally the conversation had been about homicides.  Was

6    the source able to give you more information about the

7    homicides specifically?

8    A.    Yes, we asked for more information about the homicides.

9    The source said that they believed that the individuals -- that

09:39AM 10    there were several Honduran individuals that had caused trouble

11    in the warehouse and that they had been beaten, that a couple

12    of them had died and were found in the stolen truck and there

13    were a couple that had survived.  The source believed that

14    there was some sort of tool like a golf club that was used to

09:39AM 15    beat the aliens.

16    Q.    And did the source have any -- well, let me ask you this.

17    Based on what the source was telling you at this time, did you

18    have reason to believe that there were people still being held?

19    A.    Yes.  We had reason to believe that there were people

09:39AM 20    still being held.  I mean that's the MO for how these

21    organizations operate.

22    Q.    And based on the information that the source was giving

23    you, did you have reason to believe that some of those people

24    being held may have serious injuries?

09:39AM 25    A.    Absolutely.

Q.    All right.  Did you ask the source about the specific
details of how the persons who did not survive, the homicide
victims, had been transported to where they were found?

A.    Yes.  We asked for that information and we were provided

09:40AM  with the information that the source had a girlfriend or -- I'm
not sure if it was a girlfriend or a wife, but romantic
relationship with a person from Peru and that the person from
Peru had actually driven the stolen vehicle with Mr. Duran
following in a vehicle that belonged to him, a Tahoe, a nearly

09:40AM  new Chevrolet Tahoe and that they took the bodies to the place
where they were going to dump them.  They took gasoline and
tried to light the bodies in the vehicle on fire to destroy the
evidence.

Q.    All right.  Was there any information the source was able

09:41AM  to give about Wilmar Duran's state of mind or kind of how he
was responding to the situation?

A.    Yes.  So the source said that Mr. Duran was very nervous,
that he was considering leaving town, trying to abscond, said
that he was having dreams or visions where he could see the

09:41AM  people that were beaten and could see foam coming out of their
mouth so he was very disturbed.

Q.    At that point were you concerned about what Wilmar Duran
might do at that point?

A.    Yes, I was very concerned both for the safety of the other

09:41AM  smuggled aliens that were likely in the warehouse as well as --

1    I assumed it was just a matter of a very short time before

2    Mr. Duran absconded and it would be very difficult to locate

3    him.

4    Q.   In your experience dealing with individuals who smuggle

09:42AM  5    humans into the country, can you tell us what you know about

6    their ability to -- well, their ability to get in and out of

7    the country?

8    A.   Yes.  So by nature, alien smugglers move people all over

9    the world surreptitiously.  They have contacts throughout the

09:42AM  10   United States.  They'll have contacts at not only our southwest

11   border, but the borders of Mexico and Guatemala and throughout

12   Central and South America.  So they are the experts of moving

13   people secretly, yes.

14   Q.   All right.  In your experience dealing with these types of

09:43AM  15   individuals, once they are out of sight, is it very difficult

16   to locate them again?

17   A.   It is very difficult to locate them again.  Their networks

18   are -- they don't operate like ours.  They operate on cash.

19   They operate word of mouth.  It's just much more difficult to

09:43AM  20   track someone like that than it is just your everyday Joe.

21   Q.   All right.  Once the source had provided you with this

22   information, did you and Agent Lamb take any steps to try to

23   confirm that what the source had told you was true?

24   A.   Yes.  So the source provided a general area where they

09:43AM  25   believed the warehouse was.  We went to that area and we

1   started surveillance just on our own to see if we could pick

2   anything up, but there were lots of -- it was storage buildings

3   and places without a lot of markings on them so we didn't make

4   a lot of headway there.

09:44AM  5       We were able to identify Mr. Duran's home on Cortina Drive

6   and at some point we reached out to the Fort Bend County

7   Sheriff's Office and we actually went to the sheriff's office

8   where we spoke with investigators, we saw the truck, and we

9   exchanged information and ideas.

09:44AM  10  Q.   Okay.  Let me ask you a couple of follow-up questions

11  there.

12       At the time that the source gave you the name of

13  Wilmar Duran, did you have that person identified at that time?

14  A.   Yes, we had Mr. Duran identified pretty quickly.  He had

09:44AM  15  immigration history as well as criminal history that we were

16  able to find pretty easily.

17  Q.   And what was his status in the country?

18  A.   Mr. Duran was a lawfully admitted permanent resident so he

19  was a national of El Salvador but with that lawfully admitted

09:45AM  20  permanent resident status, you can -- it's essentially an

21  immigrant visa so you can come and go as you like in the

22  United States.

23  Q.   All right, sir.  Are there times when a lawful permanent

24  resident can be deported from the country or have their ability

09:45AM  25  to be here rescinded?

1    A.    Yes.   The most common -- the most common cause for

2    something like that are criminal convictions.

3    Q.    All right.  And in this case, once you had him identified,

4    did you run his criminal history?

09:45AM  5    A.    Yes, we did; and Mr. Duran had several criminal

6    convictions.

7    Q.    All right.

8         MS. COLLINS:  Your Honor, may I approach with

9    Government's Exhibit A?

09:45AM 10         THE COURT:  Yes.  Are you looking at your Exhibit A?

11         MS. COLLINS:  Yes, Your Honor.

12         THE COURT:  All right.  You don't have a copy of it?

13         MR. DAVIS:  We do, Your Honor.

14         THE COURT:  All right.  I just don't want you to have

09:46AM 15    to go back and forth.  I want you to give him the exhibits you

16    need him to look at so that we don't have to go back and forth

17    away from this camera.

18         MS. COLLINS:  Absolutely.

19    BY MS. COLLINS:

09:46AM 20    Q.    All right.  Agent Neal, looking at Government's Exhibit A,

21    can you tell us what that is?

22    A.    Yes.  It's a criminal history printout.

23    Q.    All right.  And is this the criminal history printout for

24    Wilmar Duran from back in 2006?

09:46AM 25    A.    Yes, it is.

Q.   And is the date and time that that was printed in
Government's Exhibit A?

A.   Yes, the date and time is on it.

Q.   All right.  And is that November 21, 2006, at 10:46 A.M.?

A.   Yes, it is.  It looks like the first one off of the
11/21/06 has been cut off on the printout, but these were the
old dot matrix printers.  It's common for, you know, a row to
be knocked off of it.

Q.   Understood.  And on the very last page of
Government's Exhibit A, is the full date of
November 21st, 2006, printed out a little bit more cleanly?

A.   Yes, it is.

Q.   All right.  That date and time, was that the time period
where you were doing follow-up after your conversation with the
source?

A.   Yes.  Literally from the time I got off the phone, we
worked maybe 40 hours straight.

Q.   All right.  Now, you mentioned that you had him identified
and that you had an address on Cortina Drive; is that right?

A.   That's correct.

Q.   Were you able to lay eyes on Wilmar Duran?

A.   I don't remember the first time we actually saw Mr. Duran
in person.

Q.   All right.  Fair enough.

     Because of that, do you remember if it was before or after

1    you met with the Fort Bend Police Department?

2    A.    I don't remember exactly.

3    Q.    All right.  Well, let's talk about your interactions with

4    Fort Bend.  What was the purpose of going there and talking to

09:48AM  5    the investigators?

6    A.    We were just trying to further the investigation to try

7    to -- our initial goal was to try to find the warehouse, try to

8    find the stash house and see if there were people that were in

9    jeopardy, that were injured, that sort of thing.

09:48AM  10   Q.    All right.  In the process of talking to the

11   investigators, were you able to or did they share information

12   that they had collected as a part of their investigation?

13   A.    Yes, they did.

14   Q.    In other words, did they tell you about what was collected

09:48AM  15   at the scene?

16   A.    Yes, they did.

17   Q.    As part of that, were you able to confirm that information

18   the source had given you was, in fact, correct?

19   A.    Yes, I did.  Meeting with Fort Bend didn't contradict

09:49AM  20   anything that we had thus far.

21   Q.    And in this particular case, the specifics like that the

22   truck had been set on fire or attempted to, did that turn out

23   to be true?

24   A.    Yes, it did.

09:49AM  25   Q.    All right.  Based on that, did you once again believe you

1   had credible information from the source?

2   A.   Yes, I believed I had credible information from the

3   source.

4   Q.   All right.  Now, after speaking to Fort Bend, at some

09:49AM   5   point were you able to locate Wilmar Duran?

6   A.   Yes, we were able to locate Mr. Duran.

7   Q.   Once you located him, what were you hoping to accomplish

8   by surveillance on him?

9   A.   We were hoping that he would lead us back to the warehouse

09:49AM   10   so we could identify the warehouse.

11   Q.   All right.  During this period of time -- well, do you

12   recall at what point this printout, this criminal history was

13   shared with you and Agent Lamb?

14   A.   I don't remember exactly.  It would have been normal for

09:50AM   15   me to have the information before this printout was done

16   because we had laptops, we had 24-hour law enforcement support

17   center that we can call at any time and we can give them

18   whatever information we have and they can -- they would have

19   already been able to provide criminal histories, immigration

09:50AM   20   histories, even commercial database information to us.

21   Q.   All right, sir.  So from your experience back in 2006, you

22   would believe that you would have had this information fairly

23   quickly?

24   A.   Yes.  I would have had the criminal history and the

09:51AM   25   immigration history very quickly.

1    Q.   All right.  And based on what you saw in the criminal

2    history, did you have reason to believe that Wilmar Duran was

3    deportable?

4    A.   Yes.

09:51AM   5    Q.   Why?

6    A.   He had multiple criminal convictions, one of which was an

7    aggravated felony and another was a crime involving moral

8    turpitude.  It was a theft charge.

9    Q.   All right.  Each of those convictions on their own, would

09:51AM  10    they have made Wilmar Duran deportable?

11    A.   I don't remember specifically and it changes from time to

12    time, but at the time I believe you would have had to have both

13    convictions and you would have had to have -- you would have

14    had to have the judgment and conviction records from the court.

09:51AM  15    Q.   All right.  Based on both of these convictions and your

16    information at the time, did you believe that you could detain

17    and arrest for immigration purposes Wilmar Duran?

18    A.   Yes, I believed that I could arrest and detain Mr. Duran.

19    Q.   Now, let me ask you this.  Did you immediately detain

09:52AM  20    Wilmar Duran when you first saw him?

21    A.   No, I did not.

22    Q.   Why not?

23    A.   I was afraid if we took Mr. Duran into custody right away,

24    we may never be able to locate the warehouse.  If there are

09:52AM  25    people that are locked in, it's a good chance they could just

1    be left there so we were hoping that we could get the warehouse

2    identified before we took Mr. Duran into custody.

3    Q.    All right.  Because of that, did you-all have continuous

4    surveillance on Mr. Duran hoping he would in fact lead you to

09:53AM  5    the warehouse?

6    A.    If I remember correctly, once we located Mr. Duran, yes,

7    we tried to keep continuous surveillance on Mr. Duran.

8    Q.    All right.  As all of this is kind of unfolding, would it

9    be fair to say that there were a lot of moving pieces at that

09:53AM  10    time?

11    A.    There were lots of moving pieces.

12    Q.    Were there quite a few different agencies and different

13    departments within those agencies all trying to work to solve

14    these cases?

09:53AM  15    A.    Yes.  Not only Homeland Security Investigations, but

16    Fort Bend County Sheriff's Office, Houston Police Department

17    became involved.  I believe the FBI was involved to some

18    extent.

19    Q.    All right.  Fair to say communication was not perfect at

09:53AM  20    that time?

21    A.    Correct.  And everybody was going -- was taking the best

22    leads that their agency had to try to -- all try to come up

23    with the same end.

24    Q.    All right.  Would it be fair to say that everyone was

09:54AM  25    trying to at least keep each other informed of what they were

1    doing?

2    A.    Yes.

3    Q.    And specifically were you working fairly closely with the

4    Fort Bend sheriff's department to aid each other's

09:54AM   5    investigations?

6    A.    Yes, we were working fairly closely.

7    Q.    All right.  Did there come a point in time where you

8    learned that a warrant was being sworn out for the warehouse?

9    A.    Yes.

09:54AM   10   Q.    All right.  And at the time do you recall whether or not

11   you were aware of where the warehouse had been located?

12   A.    I don't remember the timeline exactly.  I know before it

13   was served, I do remember going out and the warehouse was

14   identified through Houston Police Department efforts, I

09:54AM   15   believe, and I remember setting up surveillance on the

16   warehouse itself.

17   Q.    All right.

18             INTERPRETER DEL VILLAR:  The interpreter speaks.

19             May the interpreter just have a moment to change?

09:55AM   20        THE COURT:  Yes.

21             (Off-the-record discussion.)

22        THE COURT:  All right.  Proceed.

23        MS. COLLINS:  Yes, Your Honor.

24   BY MS. COLLINS:

09:55AM   25   Q.    At the point where you knew a warrant was being sworn out

1    for the warehouse, were you concerned with Wilmar Duran's

2    whereabouts?

3    A.    Yes, very concerned.

4    Q.    Based on what the source had told you concerning his

09:55AM 5    nightmares and other concerns, were you afraid that

6    Wilmar Duran would run?

7    A.    Yes, I was virtually certain if he learned that there was

8    a warrant being conducted at the warehouse that he would

9    definitely run.

09:55AM 10   Q.    Based on that, did you make the decision to detain him

11   before that occurred?

12   A.    Yes.  The decision was made to detain him before that

13   occurred.

14   Q.    All right.  And who was present when he was taken into

09:55AM 15   custody?

16   A.    I was present, but I was in my vehicle.  Agent Lamb was

17   present.  There were some members of the Hostage Rescue Team

18   for HSI that were present and I don't remember if there was

19   state and local involvement or not.

09:56AM 20   Q.    All right.  Let's talk about the HRT team that was there.

21   A.    Okay.

22   Q.    Was it common for them to be present at the time of an

23   arrest?

24   A.    Yes, definitely if it related to human smuggling.

09:56AM 25   Q.    All right.  And why was that?

1   A.   That was their investigative discipline was human

2   smuggling and hostage rescue.

3   Q.   All right.  Do you recall who actually placed hands on

4   Wilmar Duran and took him into custody?

09:56AM   5   A.   I do not.

6   Q.   All right.  At the time that he was taken into custody --

7   well, let me ask you this.  Who gave the order or who made the

8   decision, if you recall, to take him in when you did?

9   A.   I honestly don't remember who gave that -- who gave the

09:57AM   10   order.  I think it was understood that that was what we were

11   going to do.

12   Q.   All right.  Fair enough.  And where were you when he was

13   taken into custody?

14   A.   I believe I was on the street or in the driveway of the

09:57AM   15   residence.

16   Q.   All right.  And were you actually at Wilmar Duran's

17   residence at that time?

18   A.   Yes.

19   Q.   Okay.  At the time that he was taken into custody, did you

09:57AM   20   believe that he was a deportable individual?

21   A.   Yes, I did.

22   Q.   Did you believe that you had the authority to take him in

23   under immigration statutes and laws?

24   A.   Yes, I did.

09:57AM   25   Q.   Along with that, at the time that he was taken into

1    custody, did you believe that you had probable cause to believe

2    that he had committed other felonies at that time?

3    A.   Yes, I believed I had --

4         THE COURT:  Excuse me.  When you say, "other felonies,"

09:58AM  5    what are you referring to?

6         MS. COLLINS:  Absolutely, Your Honor.

7    **BY MS. COLLINS:**

8    Q.   Specifically based on the source --

9         THE COURT:  Let me say it this way.  Are you referring

09:58AM  10   to something other than the documents that he had looked at?

11        MS. COLLINS:  The criminal history, Your Honor?

12        THE COURT:  Yes.

13        MS. COLLINS:  Yes, Your Honor.

14        THE COURT:  All right.  Let's proceed.

09:58AM  15        MS. COLLINS:  Yes, Your Honor.

16   **BY MS. COLLINS:**

17   Q.   Specifically did you believe you had probable cause that

18   Wilmar Duran had been involved in both human smuggling and the

19   homicides or murders of two individuals?

09:58AM  20   A.   Yes, I believed I had probable cause to believe that.

21   Q.   And at that time were you concerned that he was going to

22   flee?

23   A.   Yes, I was very concerned.

24        MS. COLLINS:  Pass the witness, Your Honor.

09:58AM  25        THE COURT:  All right.

CROSS-EXAMINATION

**BY MR. DAVIS:**

Q.   Good morning, Agent Neal.

A.   Good morning.

Q.   My name is Neal Davis.

THE COURT:  Make sure you speak at the microphone, not away from it.

MR. DAVIS:  Yes, Your Honor.

THE COURT:  The interpreters need to be able to hear you.

MR. DAVIS:  Yes, Your Honor.

**BY MR. DAVIS:**

Q.   I have a few questions to ask you and maybe a few documents to show you to try to clear up some of your testimony.

This happened a long time ago, correct?

A.   Yes, sir, it happened a long time ago.

Q.   November of 2006, correct?

A.   Correct.

Q.   You said you initially received a phone call of November 20 of 2006 when you were at dinner with your family, correct?

A.   Yes, sir.

Q.   And about what time was that?  Do you recall?

A.   No, sir, I don't recall.  No, sir, I don't recall.

1  Q.   That's fine.  It was nighttime though; is that correct?

2  A.   Yes, sir, it was after work.

3  Q.   So probably it could have been 7:00, 8:00.  We don't know,

4  right?

10:00AM  5  A.   Correct.

6  Q.   But it was in the evening?

7  A.   It was in the evening.

8  Q.   All right.

9  A.   I remember the restaurant.

10:00AM  10  Q.   You do?

11  A.   Yes, sir.

12  Q.   What restaurant?

13  A.   Rico's.

14  Q.   Okay.  That phone call was a very short phone call though,

10:00AM  15  correct?

16  A.   Yes, sir, it was a short phone call.

17  Q.   Okay.  Then you took your family home and called

18  Agent Lamb?

19  A.   Correct.  Yes, sir.

10:00AM  20  Q.   Okay.  And the basics of the initial phone call you got in

21  the restaurant were that the CI -- your CI said, "Did you see

22  the news?  There were two Hispanic males that were killed and

23  left in a stolen pickup truck somewhere in Fort Bend County,"

24  correct?

10:00AM  25  A.   Yes.

1    Q.    And you were familiar with that?

2    A.    Yes, I was familiar with that.  I remembered it.

3    Q.    It drew your attention because it seemed like this could

4    be something that you would deal with personally at your job,

10:00AM  5    correct?

6    A.    Correct.

7    Q.    Okay.  So you got with Agent Lamb.  How long was it

8    approximately between the time you got home with your family

9    and called Agent Lamb?

10:01AM  10   A.    I called Agent Lamb -- it would have been short, probably

11   within 30 minutes.

12   Q.    So after you guys ate dinner -- between the time of the

13   first call from the CI to the time you called Agent Lamb was

14   about 30 minutes?

10:01AM  15   A.    That's to the best of my recollection, yes, sir.

16   Q.    Okay.  And then you and Agent Lamb decided to meet up and

17   try to formulate a game plan, correct?

18   A.    Correct.

19   Q.    Where did you guys meet?

10:01AM  20   A.    I don't remember.  I think it was probably 126 Northpoint,

21   which was one of our offices.  It would have been my office at

22   the time.

23   Q.    Okay.

24   A.    And his too, I think.

10:01AM  25   Q.    So it was at an office.

1    Did you take any initial notes concerning the initial

2    phone call that you had with the CI?

3    A.   I don't remember taking any notes, and I haven't been able

4    to find any notes.

10:02AM  5    Q.   Okay.  You don't remember taking any notes, and you

6    couldn't find any notes?

7    A.   Correct.

8    Q.   When was the last time you looked for notes concerning

9    this case?

10:02AM  10    A.   It's been years.

11    Q.   Okay.  You don't recall when, what year?  I know this is

12    an old case, but do you recall the last time you looked for

13    your notes?

14    A.   Not exactly, no.

10:02AM  15    Q.   Okay.  Who asked you to look for your notes?

16    A.   One of the other agents that's assigned to the case.  I

17    don't know if it's Agent Perez.  Probably Agent Perez.

18    Q.   And I may ask you some more about your notes.

19    A.   Sure.

10:02AM  20    Q.   But you and Ray Lamb met at your office and decided to do

21    a game plan because one person can't meet with a CI.  It has to

22    be two people, correct?

23    A.   Correct.

24    Q.   Okay.  And you guys were going to meet the CI at her

10:03AM  25    residence, right?

1    A.   Correct.  At the source's residence.

2    Q.   Okay.  So when you met with the CI, you had her come into

3    the car and you and Agent Lamb talked to her, correct?

4    A.   We talked to the source, correct.

10:03AM 5    Q.   And when you talked to her, did you take notes?

6    A.   I don't remember.

7    Q.   Okay.  And if you don't, that's fine.  You don't remember

8    if you took notes.  Did Agent Lamb take notes?

9    A.   I don't remember.

10:03AM 10   Q.   Okay.  Because later on you will file an ROI, a report of

11   the incident, later on, correct?

12   A.   Correct.

13   Q.   And you want that report to be as accurate as possible,

14   correct?

10:03AM 15   A.   Correct.

16   Q.   And you did, as a matter of fact, take or create an ROI;

17   is that correct?

18   A.   I'm not certain if I created an ROI or Agent Lamb did, but

19   there was an ROI created.

10:04AM 20   Q.   All right.  Now, let's talk a little bit about this CI.

21   You said you had used the CI for about a year or a year and a

22   half; is that correct?

23   A.   That's correct to the best of my recollection.

24   Q.   Okay.  And she had helped you with two or three

10:04AM 25   indictments; is that correct?

A.    Yes.  The source helped me with two or three indictments
and one investigation, but there were several indictments.
Q.    And the whole reason this person is a CI is because she
had gotten into trouble and wants to help in other
investigations and perhaps help in other investigations because
she may have information concerning colleagues that are also
criminals; isn't that correct?
A.    So, I don't remember the -- I don't remember the specifics
on what the source's initial motivation was.  I remember how I
discovered the source, but that's all.  As far as prior
criminal history, I suspect there was some, but I honestly
don't know what it was.
Q.    Well, you said that she had given you information
concerning successful investigations in the past.  Had she
given you any information that was not successful?
A.    No.  All the information that I had received from the
source had been credible information.
Q.    All right.  So the CI got into the vehicle and she gave
you some more information that you talked about on direct, but
isn't it true this information that she was giving you wasn't
information that she personally got?  Isn't that true?
A.    A lot of the information that the source gave us was
information through other people.  That's correct.
Q.    And that information, the actual source of the information
was from Judith Lopez, who is the defendant's sister, isn't

1  that correct?

2  A.   To the best of my recollection there was direct

3  information from Duran.  There was information from the sister

4  of Mr. Duran as well as the mother of Mr. Duran.

10:06AM 5  Q.   Okay.  But your CI had no direct information, had not

6  talked to Mr. Duran-Gomez, had just talked to two other people

7  who may have had information concerning this and relayed that

8  to you; isn't that right?

9  A.   I couldn't say that with 100 percent certainty.  To the

10:07AM 10  best of my recollection, I believe that the source had some

11  direct information from Mr. Duran, but the majority of the

12  information came from other sources.

13         MR. DAVIS:  May I approach the witness, Your Honor?

14         THE COURT:  Is this going to be a document?

10:07AM 15         MR. DAVIS:  It is.  It is Exhibit 23.

16         THE COURT:  From your book?  Give him a book if he

17  needs it so you don't go back and forth.

18         MR. DAVIS:  I understand, Judge.  I'm trying to make it

19  easy because I'm not going to use all these exhibits.

10:07AM 20         THE COURT:  So am I.  So give him that and go on and

21  see later on if you need to give him the book.

22         MR. DAVIS:  Okay.  Thank you, Judge.

23         THE COURT:  I don't want to spend time walking back and

24  forth.

10:07AM 25         MR. DAVIS:  I understand, Your Honor.

**BY MR. DAVIS:**

Q.   I would like to show you what's been marked as Defendant's

Exhibit 23.  Could you go ahead and take a quick look at that

if you can.

10:08AM       THE COURT:  You can't do it there.

MR. DAVIS:  I wanted to put it together for him if

that's okay.

THE WITNESS:  Your Honor, do you want --

THE COURT:  He's going to ask you a question.  Did you

10:08AM   look at it?  Number 23?

THE WITNESS:  Do you want me to read the report in its

entirety --

THE COURT:  No.  He asked you did you look at it.  Have

you seen it?  Just answer "yes" or "no."  You've looked at it.

10:08AM       THE WITNESS:  Yes, sir, I see it.

**BY MR. DAVIS:**

Q.   That's an ROI that was written after your meeting with the

CI.  In fact, this ROI was written on December 5th of '06, a

couple of weeks later, isn't that correct -- or a week later,

10:08AM   maybe a week and a half?

A.   Yes, sir.  It shows the report date as December 5, 2006.

Q.   Now, isn't it true that in that ROI all of the information

that was given to you was -- by the CI was information that was

relayed to you from Judith and perhaps her mother, isn't that

10:09AM   correct, according to that ROI?

1        THE COURT:  Do you have a particular point you want him

2   to look at?

3        MR. DAVIS:  Well, Judge, I think the point I'm trying

4   to make is --

10:09AM  5        THE COURT:  No.  Is there a point in the document that

6   says that?

7        MR. DAVIS:  No, it's not.  It's the document in its

8   entirety.

9        THE COURT:  Okay.

10:09AM  10        MR. DAVIS:  Can you repeat the question, sir?

11   **BY MR. DAVIS:**

12   Q.   Right.  That report just says that you received

13   information from your CI that the CI had learned from other

14   people that Mr. Duran-Gomez could possibly be involved in this

10:09AM  15   murder?

16   A.   That is what the report says, yes, sir.

17   Q.   Okay.  All right.  So what you have then is the CI who is

18   telling you information about a rumor or something that she had

19   heard, correct?

10:10AM  20   A.   I don't know that I could categorize it as a rumor.

21   Q.   At that point it's a rumor because you needed to do some

22   further investigation, don't you?

23   A.   Yes, correct.

24        MR. DAVIS:  If you want to, just go ahead and put that

10:10AM  25   in.

1    May I approach again?  I'm just going to put it

2 together.  I shouldn't have done that.  Okay.

3 **BY MR. DAVIS:**

4 Q. Okay.  So at that point you have information that needs to

10:10AM 5 be corroborated; but even though you have a CI who is giving

6 you credible information, you're receiving information from a

7 source, another source that you don't know is credible or not

8 credible, isn't that correct?  That source being Judith Lopez?

9 A. Yes, I didn't have a relationship -- a working

10:11AM 10 relationship with Judith.

11 Q. But at that point after talking to the CI, you knew

12 Judith Lopez was somebody who was an interested party in this,

13 correct?  A witness perhaps?

14 A. Correct.

10:11AM 15 Q. Did you run any criminal history on Judith Lopez?

16 A. I don't remember.

17 Q. Did you know that she had been charged in several other

18 crimes, especially crimes that we consider moral turpitude or

19 would go toward her truthfulness?

10:11AM 20 A. I don't remember.

21 Q. That she had been charged and convicted of tampering with

22 government records?

23 A. No, I don't recall that.

24 Q. Okay.  Or the two thefts that she may have.

10:11AM 25   But that would be important to know, wouldn't you agree?

1  A.    It would be important to know if you were using that

2  person as a witness.

3  Q.    Well, she is a witness in this case.  It would be

4  important to know because that goes toward her credibility for

10:12AM  5  being truthful.  You need to check out your witnesses in your

6  investigation, correct?

7  A.    Correct.  But at this stage I'm following leads in my

8  investigation so...

9  Q.    All right.  And your lead right now is that Judith gave

10:12AM  10  your CI information concerning Wilmar Duran-Gomez, correct?

11  A.    That's a small part of it.

12  Q.    At what time do you recall meeting this CI?  Was it still

13  late in the night of 11/20 or early in the morning of 11/21?

14  A.    Is the question when did I initially meet with the CI?

10:12AM  15  Q.    Meet face-to-face with Agent Lamb, this conversation you

16  had in the car?

17  A.    It would have started approximately two hours after I left

18  dinner.

19  Q.    So it was still --

10:13AM  20  A.    So it was at night.  I mean, it was, I would guess, around

21  9:00 P.M., maybe.  I remember it was dark.

22  Q.    All right.  After that, what did you and Agent Lamb do?

23  A.    We attempted to identify the warehouse.  We attempted to

24  identify Mr. Duran's residence and any vehicles that might be

10:13AM  25  associated with Mr. Duran.

Q.   Did you try to run a criminal history or a check to try to find out maybe different addresses?  You said you could look up his immigration history and his commercial data.  Did you run it immediately after that?

10:13AM

A.   I don't remember specifically.  I suspect that I did run his immigration and criminal history relatively quickly.

Q.   Okay.  So you and Agent Lamb, you said in direct that one of the things that you learned was the general area where the warehouse was located, correct?

10:14AM

A.   Correct.

Q.   That was around Bissonnet and Hillcroft; is that correct?

A.   I would have to review the notes.  It was Southwest Houston.  That could be.

Q.   Okay.  Did you contact Fort Bend County Sheriff's Office

10:14AM

immediately and let them know that you had a lead in this case?

A.   I contacted them during the night at some point.  I'm not sure exactly how long I waited.  I just don't remember.

Q.   Okay.  Did you, after meeting with the CI in the car, go back to the office and try to formulate a game plan?

10:15AM

A.   No, I don't remember going back to the office.

Q.   Okay.  Where did you guys go after you met with the CI? I'm just trying to get that clear.

A.   We were out in the field.  We were between the general area of the warehouse and the residence and that's when we

10:15AM

decided to reach out to Fort Bend County and we ended up

1     driving to Fort Bend County that night.

2     Q.    Did you find a location where this warehouse was?

3     A.    We didn't find the specific location.

4     Q.    In fact, after running -- I won't get to that just yet.

10:15AM  5         So you-all were just kind of going around Bissonnet and

6     Hillcroft looking -- did you have the CI with you?

7     A.    I think the source was with us during -- when we initially

8     started and then we took the source back and then we went back

9     out by ourselves.

10:15AM 10    Q.    I may have asked this question.  Did you take any notes

11    concerning this?

12    A.    I don't remember taking notes, and I haven't been able to

13    find any notes.  So it's possible, but I don't have them.

14    Q.    Okay.  So you had the name Wilmar Rene Duran-Gomez?

10:16AM 15    A.    Correct.

16    Q.    Okay.  You're not sure if you ran his criminal history

17    just yet when you were out in the field?

18    A.    I don't remember the exact time that I ran his criminal

19    history.

10:16AM 20    Q.    You didn't run any other history concerning immigration or

21    try to find something where -- run him and try to find his

22    address.  You didn't do any of that?

23    A.    Yes, we were definitely doing that.  We were trying to

24    further the investigation any way we could.  So we were

10:16AM 25    searching for that sort of information.

1          And at some point we got closer on the warehouse as well.

2     There was another warehouse that was associated with a business

3     that Mr. Duran had.

4     Q.    Sure.  And we'll get to that in just a second.

10:17AM 5          So you guys are trying to use the database to try to find

6     out where he is and everything; but to be clear, the murders

7     initially happened almost a week before, correct?

8     A.    That's correct.  I think it was about a week before.

9     Q.    So it's been quite a few days and Mr. Duran-Gomez is still

10:17AM 10    in the city from your source's information, correct?

11    A.    Yes, we believed he was still in the city.

12    Q.    He hasn't fled?

13    A.    Correct.

14    Q.    Okay.  At some point in time, you did find the general

10:17AM 15    area where a warehouse that was associated with Mr. Duran-Gomez

16    was located, correct?

17    A.    Correct.

18    Q.    Now, that's from running, like, a data or an Accurint,

19    correct?

10:18AM 20    A.    Yes.  It's been so long ago, I don't remember exactly how

21    we came up with it or who put their finger on it initially, but

22    I remember getting the information relayed to us in the field.

23    Q.    Okay.  Do you know who relayed that information to you in

24    the field?

10:18AM 25    A.    I do not.

1    Q.    Okay.  And that location to that warehouse was not the

2    warehouse that was searched; isn't that correct?

3    A.    That is correct.

4    Q.    Okay.  It was another completely different warehouse,

10:18AM  5    correct?

6    A.    Yes, it had a different street address on the same street

7    in the same block, I believe.

8    Q.    Okay.  In fact, there was never a connection made from the

9    warehouse that was searched to Mr. Duran-Gomez other than later

10:18AM  10   on being shown the warehouse by somebody else, correct?  There

11   was no paper -- there was nothing in your searches to show that

12   the warehouse that was searched was associated with

13   Mr. Duran-Gomez; isn't that correct?

14   A.    Okay.  So I think I need to clarify something.  So I was

10:19AM  15   not the affiant for the search warrant.

16   Q.    Let me stop you there because I'm not asking you that

17   question.

18   A.    Okay.

19   Q.    What I'm asking is that in your investigation, you never

10:19AM  20   learned that the warehouse that was searched had any

21   association with Mr. Duran-Gomez through a lease or anything,

22   correct?

23   A.    Well --

24   Q.    I'm asking this question poorly.  Let me start all over.

10:19AM  25        You got an address on Ashcroft Drive -- 7935 Ashcroft

1    Drive, correct?

2    A.    I don't remember the specific address.

3    Q.    But that's not the address of the warehouse that was

4    searched, right?

10:19AM  5    A.    I don't think so.

6    Q.    Okay.  You got that information by running

7    Wilmar Duran-Gomez on a database and that address popped up,

8    correct?

9    A.    I believe that's accurate, correct.

10:20AM  10    Q.    The warehouse that was searched never popped up on any

11    search of Mr. Duran-Gomez, correct?

12    A.    That came from --

13    Q.    That came from somebody else?

14    A.    That came from somebody else.  I don't remember ever --

10:20AM  15    that specific -- I don't remember us ever getting that specific

16    address through any sort of commercial database or criminal

17    history or anything that we were trying to run out in the

18    field.

19    Q.    Okay.  But you're looking in that general area for the

10:20AM  20    warehouse?

21    A.    Correct.

22    Q.    Okay.  But you did find a home address for Mr. Duran-Gomez

23    in your searches, correct?

24    A.    Correct.  I don't remember if it was from the source or if

10:20AM  25    we found it through the commercial database; but yes, we found

1    his address.

2    Q.    And that was on Cortina Drive?

3    A.    Correct.

4    Q.    C-O-R-T-I-N-A Drive, correct?

10:21AM  5    A.    Correct.

6    Q.    Did you go to that address?

7    A.    Yes.

8    Q.    Okay.  Did you see Mr. Duran-Gomez there?

9    A.    I don't remember seeing Mr. Duran-Gomez until he was taken

10:21AM 10   into custody there.

11   Q.    Did you have officers from one of these agencies conduct

12   surveillance at that address?

13   A.    Yes.

14   Q.    And when?  When did that surveillance start?

10:21AM 15   A.    The surveillance started as soon as we had people

16   available.  We were trying to be between the residence and the

17   warehouse.

18   Q.    You had a lot of agencies.  You're looking for the

19   warehouse, but you also have an address where Mr. Duran-Gomez

10:21AM 20   is.  You're afraid he's going to flee.  You had plenty of

21   people to have around conducting surveillance.  Do you recall

22   when surveillance started on the house?  Was it on 11/20 or was

23   it on 11/21?

24   A.    I don't remember when specifically the surveillance

10:22AM 25   started at the Cortina address and also to clarify, I wasn't in

1    charge of the surveillance.  I'm essentially assigned to a

2    different investigative group and I get a colleague -- they're

3    only two of us.  It's not like we have our group and our

4    surveillance that we can call on.  So what I was trying to

10:22AM  5    explain, there were lots of moving pieces.

6    Q.   Well, let me stop you because I understand what you're

7    saying.  You're not in charge of this investigation.  You're

8    not directing people.  I'm just asking you questions if you

9    knew when surveillance started on Cortina.

10:22AM  10    A.   I don't remember exactly, no, sir.

11    Q.   All right.  At some point in time -- well, you said -- you

12    did lay eyes on the defendant.  When was the first time you saw

13    the defendant?

14    A.   I remember seeing him specifically when he was arrested,

10:23AM  15    but I also seem to remember that we had seen his vehicle in the

16    area of the warehouse, but I can't remember.  I don't -- I

17    didn't positively identify him in the vehicle.

18    Q.   All right.  But that was the day before on 11/20 that

19    somebody spotted him in the vehicle or that you may have seen

10:23AM  20    him in the vehicle, correct?

21    A.   It could have been 11/20.  It could have been in the

22    morning hours of 11/21.  It all runs together.

23    Q.   Do you remember where that vehicle went to?

24    A.   It went to Cortina Drive.

10:23AM  25    Q.   Okay.  So he went home?

1    A.    Correct.

2    Q.    And he stayed home?

3    A.    To the best of my recollection, yes.

4    Q.    Okay.  Now, you said on direct examination that you spoke

10:24AM  5    to the investigators at some point with Fort Bend Sheriff's

6    Office and they told you certain aspects of the crime scene and

7    the crime scene being where the truck was found and that seemed

8    to corroborate your story that was given to you by your CI?

9    A.    That's correct.

10:24AM  10   Q.    But still at this point you hadn't tried to do any

11   investigation on the actual source of the information,

12   Judith Lopez or Judith's mom?

13   A.    No, I hadn't.

14   Q.    Okay.  You ran his criminal history and you discovered

10:24AM  15   that he had two -- at least two what you considered to be --

16   well, one aggravated felony and a crime involving moral

17   turpitude.  You ran this criminal history?

18   A.    Not the printout.  I did not run that.  It was run by

19   another agent in the office.

10:25AM  20   Q.    Another agent in the office.  But did you have this

21   information before 11/21 at 10:00 in the morning?

22   A.    I don't remember specifically, but I suspect that I did

23   have that information almost immediately.

24   Q.    Okay.  Now, this information you said involves possible

10:25AM  25   convictions of a crime of moral turpitude.  And do you have

1    Government's Exhibit A in front of you?

2    A.    Yes, I do.

3    Q.    And that crime of moral turpitude is what?

4    A.    Theft.

10:25AM  5    Q.    Now, you've been -- you've said that the laws change about

6    what can be considered a crime of moral turpitude or an

7    aggravated felony.  They've changed quite a bit over the years,

8    haven't they?

9    A.    They do change and also whether that particular conviction

10:26AM  10   is sufficient.

11              INTERPRETER DEL VILLAR:  The interpreter speaks.  I'm

12   sorry I have to interrupt the proceedings.

13              Sarita, please mute your phone.  I can still hear

14   you on the phone.  Thank you.

10:26AM  15             I'm sorry, Your Honor.  I'm ready to continue.

16              THE COURT:  No problem.

17              MR. DAVIS:  May I approach, Your Honor?  I think I left

18   some notes.

19              THE COURT:  Sure.

20   BY MR. DAVIS:

21   Q.    Okay.  The crime of moral turpitude you're talking about

22   is the theft, correct?

23   A.    Correct.

24   Q.    And then the aggravated felony is the aggravated assault

10:26AM  25   deadly weapon, correct?

A.    Correct.  And actually the aggravated assault, it may have
also fallen under the CIMT as well.  I don't remember
specifically.

MR. DAVIS:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(Brief pause in the proceedings.)

**BY MR. DAVIS:**

Q.    All right.  Agent, that notebook has Tabs 1 through 8, I
think.  If you look at the tap right before Tab Number 4 is
Defendant's Exhibit 37.  If you go to Tab 4 and then work
backwards, it's quite a few pages; and you'll see Defendant's
Exhibit 37.

And that page starts with "Request for Certified Copies"
at the top.

THE WITNESS:  Mr. Davis, you say I'm looking for
Exhibit Number 37?

MR. DAVIS:  Yes.

THE COURT:  I tell you what.  Can you find it for him?

THE WITNESS:  I found 36.  There's 37.

MR. DAVIS:  And --

THE COURT:  Let's don't talk.  I mean, just point it
out to him and then ask the question.

**BY MR. DAVIS:**

Q.    If you go to three pages, four pages from Exhibit 37, you
will see the order for deferred adjudication that's written on

1    the top.  If you look at the bottom, you will see

2    "COURTDOCS-0204."  It's a handwritten order.

3         Do you have that?

4    A.    Yes, sir.  I'm looking at Order Deferring Adjudication of

10:30AM  5    Guilt.

6    Q.    That's it.  And are you familiar with these orders?

7    A.    (No response.)

8    Q.    Well, if you look on this order, if you go down about in

9    the middle of the page, you will see it's handwritten

10:30AM  10   "Aggravated Assault," correct?

11   A.    Correct.

12   Q.    And if you go down just a little bit, the next line, it

13   says, "Seven years DAG."

14        That means seven years deferred adjudication.  Do you see

10:30AM  15   that?

16   A.    Yes, I do.

17   Q.    And then you will see a bunch of circles about in the

18   middle of the page, but there's three lines each with circles.

19   On the third line, it says:  "Affirmative Findings."

10:31AM  20        And do you see "Affirmative Findings"?  It's next to a

21   bunch of circles and as a matter of fact, there's a circle with

22   an X through it and it's that same line that says:

23   "Affirmative Findings"?

24   A.    Yes, I see the circle with the X, "Affirmative Findings."

10:31AM  25   Q.    Okay.  And that first circle that is circled "NA" is for

1    deadly weapon.  It says:  "Deadly Weapon."  Is there

2    affirmative finding?  It says "NA."

3    A.    Yes, there is.

4    Q.    So this isn't an aggravated assault deadly weapon, is it?

10:31AM  5    There's no affirmative finding of a deadly weapon.  It's just

6    an aggravated assault?

7    A.    The affirmative finding deadly weapon says "NA."

8    Q.    Okay.

9    A.    Violence, yes.

10:32AM  10    Q.    Okay.  And an assault isn't an aggravated felony

11    especially if there's imprisonment of less than a year.  In

12    fact, he wasn't imprisoned.  He was given probation, correct?

13    A.    I think there were two parts to the question and could you

14    go back to the first part, please.

10:32AM  15    Q.    Sure.  The first part is he didn't receive any jail time

16    at all, did he?

17    A.    No.  It looks like in the order he did not receive jail

18    time for that.

19    Q.    He just did probation?

10:32AM  20    A.    Correct.

21    Q.    So it's not an aggravated felony?

22    A.    I couldn't tell you if it was an aggravated felony right

23    off the top of my head.

24    Q.    All right.  Then the other crime of moral turpitude is the

10:32AM  25    theft, right?

A.    Correct.

Q.    So you're basing the probable cause, at least for your immigration arrest, for aggravated felony and a theft.  And a theft in 2006 wasn't considered a crime of moral turpitude; isn't that correct?

A.    I'm sorry.  One more time.

Q.    Well, the BIA -- oh, I can't remember what the "BIA" stands for.

THE COURT:  Let's do it this way.  He can't argue with it.  If the sentencing guidelines and the law says it's not, it really doesn't matter what he says.

MR. DAVIS:  That's true, Your Honor.  And for the record, the BIA didn't rule until 2016 that a theft was a crime of moral turpitude.

THE COURT:  And it was after 2016, did you say, that it was considered a crime of moral turpitude?

MR. DAVIS:  That's correct.

THE COURT:  We can argue about that.  If the government wants to take that up, fine.  But at the time if the findings or the rule was that a crime of theft was not one involving moral turpitude, then that's the law.  Let's proceed.

MR. DAVIS:  Thank you, Judge.

**BY MR. DAVIS:**

Q.    All right.  At that time in direct you said you had reason to believe that he was deportable, correct?

A.    Correct.

Q.    And you're basing that on the aggravated felony and the crime of moral turpitude, correct?

A.    I was basing it on the two convictions.

Q.    That you found from your criminal history?

A.    The two convictions that we found from the criminal history, correct.

Q.    And nothing more, at least at that point, correct, just the criminal history?

A.    Correct, off the criminal history.

Q.    But you do have access to his immigration history or any commercial databases too, correct?

A.    That's correct.

Q.    And you didn't go further in your investigation at least at that point to try to run an immigration history on him, had you?

A.    I'm almost certain that I had Mr. Duran's immigration history.

Q.    Did you have that in your notes or anything?

A.    I don't remember specifically where it was, but it would have been something that I would have gotten very quickly.

Q.    Now, you said at that point you think you had reason to believe that you could detain him or arrest him for an immigration violation, correct?

A.    Correct.

1   Q.   But the second prong to that is he must be a flight risk,

2   too; isn't that true?

3   A.   I'm sorry.  Would you repeat that, please?

4   Q.   Yes.  The second prong to that, you just can't arrest him

10:35AM  5   because you believe that he has an immigration arrest.  It's a

6   civil proceeding, right?  He must have an immigration issue

7   plus be a flight risk, isn't that true?

8        MS. COLLINS:  Your Honor, we have to object to calling

9   for the ultimate conclusion.

10:35AM  10  BY MR. DAVIS:

11  Q.   Let me ask you this.  You believed he was going to flee?

12  A.   Yes, I believed Mr. Duran was going to flee.

13  Q.   It's been a week since the murders and he hasn't fled,

14  correct?

10:36AM  15  A.   Correct.

16  Q.   Okay.  You've conducted surveillance on him and he hasn't

17  fled, correct?

18  A.   Correct.

19  Q.   As a matter of fact at any point in time during almost the

10:36AM  20  20 hours of surveillance you conducted on Mr. Duran-Gomez, it

21  didn't look like he was going to flee, did it?

22  A.   That's correct.  He hadn't fled yet.

23  Q.   The first time you may have laid eyes on him was when

24  Mr. Duran-Gomez was being followed to an apartment complex

10:36AM  25  somewhere on the South Sam Houston Tollway, correct?

1    A.    Yes.  That's possible.

2    Q.    And he went from there back home, correct?

3    A.    Correct.

4    Q.    And he stayed at home almost the entire night, correct?

10:36AM  5    A.    Correct.

6    Q.    Right?

7    A.    Yes.

8    Q.    And as a matter of fact when he was arrested -- and you

9    were there during the arrest, correct?

10:36AM  10   A.    Yes.

11   Q.    When he was arrested, when he left, when he was leaving

12   his house, he was leaving his house with his girlfriend, right?

13   A.    Correct.

14   Q.    And he wasn't carrying any luggage, was he?

10:37AM  15   A.    Not that I remember.

16   Q.    And this has been a week later that you -- and he still

17   hasn't gone anywhere.  He stayed right there in Houston at his

18   home, right?

19   A.    Correct.

10:37AM  20   Q.    So that's not an indication of him wanting to flee, right?

21   I mean he's staying where he's staying.

22        THE COURT:  I think this is argumentative.  That's my

23   call.  That's my call.

24        MR. DAVIS:  I'll move on, Your Honor.

10:37AM  25        THE COURT:  Thank you.

**BY MR. DAVIS:**

Q.   Let's talk a little bit about the surveillance.  At one
point in time he was even surveilled by air, right?

A.   I don't remember specifically, but it's possible.

Q.   Okay.  All right.  You worked on this for, you said,
40 hours straight, right?

A.   Approximately.

Q.   And I was trying to get a timeline as to what's going on
and I think what had happened is that after you met with the CI
and you got with Agent Lamb, you guys went out -- I'm sorry.
That's backwards.

     You got with Agent Lamb, you met with the CI, you went to
Southwest Houston looking for the warehouse.  Sometime at that
point you helped with surveillance, right?

A.   Correct.

Q.   And when you did help with surveillance, did you also help
surveil Cortina Drive?

A.   I think I did at some point.  It's just hard to remember
that far back.

Q.   Okay.  Did you go around where all these warehouses were
in the general area that you knew of?

A.   Yes.

Q.   Now, at some point in time, the warehouse that was
searched, that location was given by somebody else, but you
weren't part of that investigation; is that correct?

1    A.    That's correct.

2    Q.    Okay.  Now, you said in direct testimony that you didn't

3    want to take the defendant into custody who you had been

4    surveilling for quite a while because you wanted to get where

10:39AM   5    the warehouse was; is that correct?

6    A.    That's correct.

7    Q.    And that's because -- well, why?  I mean you could have

8    taken him into custody and find out where the warehouse is,

9    couldn't you have?

10:40AM   10    A.    If I took Mr. Duran into custody before I knew where the

11    warehouse was, then I'm basing all of my hopes that Mr. Duran

12    will tell me where the warehouse is.  It could have a hundred

13    people in it that are locked up with no food or water or

14    anything.

10:40AM   15    Q.    I understand.  I understand.  But isn't it also true that

16    you're just suspecting right now that he's involved in human

17    smuggling.  You don't have any direct proof that he's involved

18    in any human smuggling, isn't that correct?  It's all based on

19    a rumor from a third party that you haven't even looked at yet?

10:40AM   20          MS. COLLINS:  Objection.  Argumentative, Your Honor.

21          THE COURT:  The form of the question is a problem.

22    Let's don't make speeches.  I'm the Court and I'm hearing --

23          MR. DAVIS:  I understand, Judge.  I'm trying to make my

24    point and also ask the question.

10:40AM   25          THE COURT:  You can argue your point to me.

```
 1          MR. DAVIS:  Okay.  Thanks, Judge.
 2  BY MR. DAVIS:
 3  Q.   Okay.  The only probable cause you have for human
 4  smuggling at this point is from your CI, right?
 5  A.   That's correct.  I'm following leads that I had initially
 6  received from a CI.
 7  Q.   Right.  And the only probable cause that you have for a
 8  murder is from your CI; isn't that correct?
 9  A.   That's where it started, correct.
10  Q.   Right.  Okay.  There's nothing that connects
11  Mr. Duran-Gomez to human smuggling at any point until -- let me
12  strike that because that's not a question I want to ask.  Let
13  me move on.
14          Did you personally go to the warehouse that was searched?
15  A.   Yes, I was at the warehouse that was searched.
16  Q.   And when did you do that?
17  A.   I was surveilling the warehouse before the entry was made.
18  I remained outside after entry was made and while the scene was
19  being processed by the FBI.
20  Q.   Was that after Mr. Duran-Gomez's arrest?
21  A.   Yes, it was.
22  Q.   What time was Mr. Duran-Gomez arrested?  Do you recall?
23  It was 6:20 P.M.; isn't that true?
24  A.   That seems accurate.  I remember it being in the evening.
25  Q.   Okay.  He wasn't taken to a magistrate judge immediately,
```

10:41AM (line 5)
10:41AM (line 10)
10:42AM (line 15)
10:42AM (line 20)
10:43AM (line 25)

1    was he?

2    A.    No, he was taken into immigration proceedings.

3    Q.    Okay.  Did he see an immigration judge?

4    A.    I'm sure he did at some point, but that's not part of the

5    initial immigration proceedings.

6    Q.    But you didn't have him see an immigration judge or

7    anything, did you?

8    A.    I would never have any detainee see an immigration judge.

9    That's not part of what I do.

10   Q.    Did you interview -- and you interviewed Mr. Duran-Gomez

11   the next day, did you not?

12   A.    No.

13   Q.    You didn't?

14   A.    Not that I remember.

15        MR. DAVIS:  May I have just a moment, Your Honor?

16        THE COURT:  Yes, please.

17            (Brief pause in the proceedings.)

18        MR. DAVIS:  I just have a couple of more questions for

19   you.

20   BY MR. DAVIS:

21   Q.    Your confidential informant that you had used, you had

22   known her for about a year and a half, right?

23   A.    Yes, to the best of my recollection.

24   Q.    And it's true that she was also undocumented; isn't that

25   true?

A.    Yes, I believe so.

Q.    And that she was going to be deported because of a
criminal charge and that's why she came to try to work with
you; isn't that true?

10:45AM  A.    That could be true.

Q.    And she only gets to stay because she's worked out a deal
where as long as she provides you information, she gets to stay
in the country; isn't that true?

A.    So while we use confidential informants --

10:45AM  Q.    Well, my question is as long as she helps you, she gets to
stay in the country, right?

A.    As long as I'm using the confidential informant, I have to
provide a parole into the country and an employment
authorization document to the informant.

10:46AM  Q.    So she has a pretty good motive to come to you, correct?
She has a pretty good motive to try to keep working with you
and give you information, correct?

A.    I assume that's her motive, yes.

Q.    Absolutely.  And it's up to you to make sure that
10:46AM  information is good information, correct?

A.    Correct.

Q.    Now, at some point in time, you did look at
Mr. Duran-Gomez's immigration history; isn't that correct?

A.    That's correct.

10:46AM  Q.    Now, his two convictions were from 1993 and the aggravated

1    assault or the assault case was from 2003, isn't that correct?

2    You can look at that exhibit.

3    Actually the date of the order is 2002 on 37 -- on

4    Defense Exhibit 37, right?

10:47AM  5    A.    I have the date of offense for the aggravated assault was

6    11/26/01.  That's what it says on the order.

7    Q.    And the order is January 10th of 2002 and that was four

8    years before -- that's just to the left -- to the left of

9    11/26/01.  That conviction was from early 2000s, isn't that

10:47AM  10   correct?

11   A.    That's correct.

12   Q.    2002, four years before this happened, correct?

13   A.    Correct.

14   Q.    Okay.  And if you looked at his immigration history, you

10:47AM  15   would have found that he hadn't been deported, he kept his LPR

16   status, correct?

17   A.    Correct.  He hadn't been deported in 2001.

18   Q.    Didn't you find that strange?

19   A.    No, not strange at all.

10:47AM  20   Q.    Did it make you want to -- something like that would want

21   to make you look further into his immigration history though,

22   right?  It's a four-year conviction and he still hasn't been in

23   any proceedings.  Something --

24   A.    Yes, but a criminal conviction is not necessarily going

10:48AM  25   to -- that won't necessarily trigger an immigration proceeding.

1    Q.    That's right.

2    A.    They are two entirely different systems.

3    Q.    That's right.  Exactly.

4          Now, the warrant for his arrest as an alien didn't happen

10:48AM  5    until the next day, November 22nd; is that correct?

6    A.    That's correct.

7    Q.    How long does it take to get a warrant for an arrest of an

8    alien?

9    A.    The warrant for arrest is generated when you're processing

10:48AM  10   the detainee.

11   Q.    It's not something that you can get before you arrest him?

12   A.    It's not normally obtained before.

13   Q.    Okay.  How about just an arrest warrant for a charge like

14   murder?

10:49AM  15   A.    What's the question?

16   Q.    The question is it doesn't take long to generate an arrest

17   warrant for murder, does it?

18   A.    Not necessarily.  I mean --

19   Q.    You would need to have probable cause --

10:49AM  20   A.    -- a day.

21   Q.    -- and present a probable cause affidavit to a judge who

22   then can sign that warrant, correct?

23   A.    Correct.

24   Q.    Right.  You did that for a search warrant before his

10:49AM  25   arrest, but you did not try to attempt to get an arrest warrant

1   for Mr. Duran-Gomez because you didn't have enough probable

2   cause for murder at that point, did you?

3   A.    I believe that I haven't had enough probable cause.

4   Q.    But you didn't present it to a judge and try to get an

10:49AM   5   arrest warrant, did you?

6   A.    That's correct.  I did not.  And I also didn't get the

7   search warrant either.

8   Q.    Right.  I understand that.

9   A.    Okay.

10:49AM   10   Q.    But a search warrant was gotten, right?

11   A.    Correct.

12        MR. DAVIS:  May I have just a moment, Your Honor?

13        INTERPRETER DEL VILLAR:  While we wait, the interpreter

14   speaks.

10:50AM   15        If I could just make sure that Mr. Neal is

16   speaking into the microphone.  He's straying a little bit, and

17   it's making it a little hard to hear with some of the noise in

18   the background.

19        THE COURT:  I agree.  Thank you.

10:50AM   20        MR. DAVIS:  Judge, I pass the witness.

21        THE COURT:  I have a couple of matters before you leave

22   just in case.

23        MR. DAVIS:  Yes.

24        THE COURT:  There seems to be an indication that there

10:50AM   25   was a warehouse that was searched that was not the warehouse

that the parties were intending or thinking they were
searching.  Am I correct on that?

        THE WITNESS:  There was another warehouse on Ashcroft
that was related to Mr. Duran that we discovered through, if I
remember correctly, it was like a commercial database, but that
was not the warehouse that the search warrant was --

        THE COURT:  Issued for.

        THE WITNESS:  -- issued for because we had --
additional information came out where a witness came out and
said, "This is the specific address."

        THE COURT:  But that's the warehouse that you had some
surveillance on, I gather is what you're saying, before someone
gave you a different address.

        THE WITNESS:  Yes, sir.  We spent an extensive amount
of time just in the general area hoping that we would see
something coming or going where we could identify it ourselves.

        THE COURT:  Now, the reason I ask that is because one
of the documents that the government has proffered for exhibit,
it's called Exhibit B, and it's a search warrant issued by a
Harris County judge.  Was that the search warrant as far as you
know that was issued for the warehouse that did get searched on
November 21st?

        THE WITNESS:  I would have to look at it, Your Honor.
I don't remember if it was in Harris County or Fort Bend
County.

1          THE COURT:  All right.  Let me just -- I'm sorry.

2          THE WITNESS:  No, sir.  You're fine.

3              (Reviewing document.)  Yes, sir.  That's correct.

4     This is the search warrant, and it was in Harris County.

10:52AM  5          THE COURT:  Thank you.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  And this is the warehouse that -- this is

8     the other warehouse, the one that was later determined as

9     opposed to the one that was simply associated with the

10:52AM 10    defendant, right?

11         THE WITNESS:  Yes, sir, that's correct.

12         THE COURT:  Okay.  I got it.  Thank you.

13             All right.  Ms. Collins, any redirect?

14         MS. COLLINS:  No, Your Honor.

10:52AM 15         THE COURT:  You may step down, sir.

16             I tell you what.  Let's take about a ten-minute

17    break.  I'm sure the interpreters might appreciate that, and

18    we'll take about a ten-minute break.  It's about ten until

19    11:00.  Let's make that to 11:05 and then we'll pick up with

10:52AM 20    the next witness, okay?

21         MS. COLLINS:  Your Honor, just for your knowledge --

22         THE COURT:  Make sure you're speaking into the --

23         MS. COLLINS:  Absolutely.

24         THE COURT:  Thank you.

10:52AM 25         MS. COLLINS:  We rest at this point.  We will not be

1  calling the second witness.

2      THE COURT:  Yes.  And I understand that, but you

3  understand the risk and that is that Mr. Neal can call him?

4      MS. COLLINS:  Absolutely, Your Honor.

10:53AM  5      THE COURT:  You don't care about that.

6      MS. COLLINS:  I do not.

7      THE COURT:  Let's do this.  Let's go ahead -- and you

8  step down, sir.  Thank you very much.

9          Mr. Neal, let me know whether or not you want to

10:53AM  10  call that witness so I'll know whether or not there will be any

11  more testimonial evidence in this case.

12      MR. DAVIS:  I will, Your Honor.  Can I discuss it with

13  counsel?

14      THE COURT:  Yes, you have 15 minutes.

15      INTERPRETER DEL VILLAR:  The interpreter cannot hear

16  Mr. Neal.

17      THE COURT:  I'm sorry.  Mr. Neal, you're not -- thank

18  you.

19      MR. DAVIS:  I'm sorry.

10:53AM  20          Yes, Judge.  May I be able to discuss it with

21  co-counsel?

22      THE COURT:  You may and you will have 15 minutes and

23  we'll take a break at this point.  Thank you very much.

24          Don't speak into the microphones after I leave,

10:53AM  25  please.

1          THE COURTROOM MANAGER:  All rise.

2                    (Court is in recess.)

3          THE COURTROOM MANAGER:  All rise.

4          THE COURT:  All right.  Please be seated.

11:09AM  5          Let's see if we've got the interpreter and all

6     back in place and online already.  Yes.

7          MR. WYDA:  We're here, Your Honor.

8          THE COURT:  Very good.

9          INTERPRETER DEL VILLAR:  The interpreter is

11:09AM 10     interpreting, Your Honor.

11          THE COURT:  Yes.  Thank you.

12               Mr. Neal.

13          MR. DAVIS:  Yes, Your Honor.  So we are not going to

14     call Agent Lamb.

11:09AM 15          THE COURT:  Okay.

16          MR. DAVIS:  And we wanted to clear up with the Court

17     exhibits that -- we gave you a lot of exhibits, Judge; and we

18     wanted to narrow it down for the Court to --

19          THE COURT:  I'm going to ask that.  I'm going to do

11:09AM 20     that with the government as well as you if we're ready now to

21     go into what the Court should consider.

22               So I don't know if -- you did not give me an

23     exhibit list.

24          MR. DAVIS:  I thought I included it right at the very

11:10AM 25     beginning, Judge.

1          THE COURT:  Let me just take a quick look then and

2     maybe I overlooked it.  Oh, yes, there is something in here.  I

3     guess that is the exhibit list.  I apologize.

4          MR. DAVIS:  No.  That's okay, Judge.  I wish I had put

5     it together a little better.

6          THE COURT:  Okay.  Tell me what you're offering.  I

7     believe you show Exhibits 1 through 54.

8          MR. DAVIS:  That's correct, Your Honor.

9          THE COURT:  All right.  So which of these are you

10     offering?

11          MR. DAVIS:  Exhibits 13.

12          THE COURT:  Hold on just one second.  Let me keep up

13     with you.

14          MR. DAVIS:  14.

15          THE COURT:  All right.  Hold on just one second.  I

16     think I marked the wrong line there.  Okay.

17          MR. DAVIS:  Judge, you may want to go back to that

18     first page because Exhibit 12 as well.  Sorry.

19          THE COURT:  All right.  Okay.

20          MR. DAVIS:  Exhibit 13, 14, Exhibit 15.

21          THE COURT:  Yes.

22          MR. DAVIS:  16.

23          THE COURT:  Got it.

24          MR. DAVIS:  Exhibit 20.

25          THE COURT:  Okay.

1        MR. DAVIS:  22.

2        THE COURT:  All right.

3        MR. DAVIS:  29.

4        THE COURT:  Okay.

11:11AM  5        MR. DAVIS:  30.

6        THE COURT:  Yes.

7        MR. DAVIS:  36.

8        THE COURT:  Just one second.  Let me turn the Page.

9            36 you say?

11:11AM  10       MR. DAVIS:  Yes, Your Honor.

11       THE COURT:  All right.

12       MR. DAVIS:  37.

13       THE COURT:  All right.

14       MR. DAVIS:  38.

11:11AM  15       THE COURT:  Uh-huh.

16       MR. DAVIS:  39.

17       THE COURT:  Yes.

18       MR. DAVIS:  41, 43.

19       THE COURT:  All right.

11:11AM  20       MR. DAVIS:  I hate to do this to you, Judge.  I have to

21  backtrack to also Exhibit 23.

22       THE COURT:  Okay.

23       MR. DAVIS:  And that's it, Your Honor.

24       THE COURT:  23.  And you stopped at -- the last call

11:11AM  25  was Exhibit 43?

1          MR. DAVIS:  43.  Yes, Your Honor.

2          THE COURT:  All right.  Let me ask Ms. Collins or the

3     one who may be responding whether or not there are objections

4     to these exhibits as you heard them.

11:12AM  5          MS. COLLINS:  No, Your Honor.

6          THE COURT:  Okay.  All right.  Then they're admitted

7     for purposes of this proceeding.

8                As well we have the Government's Exhibits A, B

9     and C.  Are you offering those three, Ms. Collins?

11:12AM  10          MS. COLLINS:  Yes, Your Honor.

11          THE COURT:  All right.  Any objections as it relates to

12     any of those, Mr. Neal?  You need to speak into the microphone.

13          MR. DAVIS:  No, Your Honor.

14          THE COURT:  Okay.  So they're admitted for these

11:12AM  15     proceedings.

16                All right.  Let me see what else do I have here

17     if anything?

18                All right.  Did the government have any other

19     evidence that it wants to offer or intends to offer in this

11:12AM  20     matter?

21          MS. COLLINS:  No, Your Honor.

22          MR. DAVIS:  No, Your Honor.

23          THE COURT:  And the defense closes as well?

24          MR. DAVIS:  Yes, Your Honor.

11:13AM  25          MS. STELZIG:  Your Honor, this is Ms. Stelzig.

1            We had intended to present argument today, but

2    perhaps because of the Court's schedule, it might be more

3    useful to the Court if we offered supplemental briefing because

4    we do think it would be helpful to incorporate some of the

11:13AM   5    testimony that we heard today into our argument and we would be

6    happy to provide that to the Court within two weeks of this

7    proceeding if that time frame is amenable to the Court.

8            THE COURT:  Well, it depends on when this could be

9    ready if you're relying upon the testimony in terms of

11:13AM  10    supplementing.  We certainly don't need any supplementation as

11    it relates to the motion and the response and the reply; but if

12    there is something that you need to bring to the Court's

13    attention, my comment next was going to be that I'll give you

14    five pages to tell me what it is in the record that supplements

11:14AM  15    or supports your motion, not as opposed to simply rewriting the

16    motion itself.

17            And of course I don't know that two weeks is not

18    too long.  I've got trials and things stacking up.  I have to

19    do things when my hands are on them; otherwise, I'll have a lot

11:14AM  20    of promises made and not fulfilled.

21            So what I'm going to ask, if I can ask the court

22    reporter, is whether or not this transcript can be ready in

23    rough fashion or rough form at any time soon?

24            THE COURT REPORTER:  Yes.

11:14AM  25            THE COURT:  Of course you're going to say "yes," but

1    when is soon?  I remember there was a book I used to read

2    called *Sooner*.

3              THE COURT REPORTER:  I can give it to you rough today.

4              THE COURT:  If the government insists on that or if

11:15AM  5    defense insists on that, then they may end up dealing with this

6    matter without the benefit of it.  But if they are willing to

7    receive for purposes of supplementation a rough draft and that

8    record would reflect that, then I'm looking at receiving

9    responses by next week end.  That would be Friday.

11:15AM  10             THE COURTROOM MANAGER:  April 1st.

11             THE COURT:  April Fools' Day, is that what that is?

12             THE COURTROOM MANAGER:  Yes, Your Honor.

13             THE COURT:  I would be looking at receiving that by

14   April 1st and I think probably for the benefit of the record

11:15AM  15   since that is a Friday, we could probably say that following

16   Monday, which would be April what?

17             THE COURTROOM MANAGER:  Four.

18             THE COURT:  April 4.  I would receive your documents

19   and supplementation on April 4.  All right?

11:16AM  20             MS. STELZIG:  Thank you, Your Honor.

21             THE COURT:  Okay.  April 4th, receive supplementations.

22             Is there anything else that I need to hear

23   regarding this proceeding?

24             MS. COLLINS:  No, Your Honor.

11:16AM  25             THE COURT:  Okay.

1    MS. STELZIG:  Your Honor, not with respect to this

2    proceeding.  I believe that we had originally had a status

3    conference that was scheduled for the 24th that was then later

4    consolidated into this proceeding to deal with other matters.

11:16AM  5    So we do have a few other matters, but not with respect to the

6    motion.

7    THE COURT:  So the other matters that you are referring

8    to, are those matters that have been presented to me by

9    motion --

11:16AM  10    MS. STELZIG:  Yes, Your Honor.

11    THE COURT:  -- by the defense at this point; or are

12    they matters that are not before the Court directly?

13    MS. STELZIG:  Your Honor, most of them are matters that

14    are before the Court at least partially and one was, I believe

11:16AM  15    we had said in the status conference to discuss the status of

16    the defense's de-authorization submission.

17    THE COURT:  And that was to be done by both the

18    government and the defense?

19    MS. STELZIG:  Your Honor, we had requested that there

11:17AM  20    be a hearing so that we could provide a date that the

21    government could provide an update to the Court and to the

22    defense about the status of that.

23    THE COURT:  Okay.

24    MS. STELZIG:  So we would just ask for --

11:17AM  25    THE COURT:  Well, let's see what they have to say about

1    it then.

2         MS. STELZIG:  Thank you.

3         THE COURT:  We're talking about the question -- I think

4    this is a request.

5         For the benefit of the record, why don't you,

6    Ms. Stelzig, kind of give us a 50-word or less kind of basket

7    to put this in.  What is this about for the record?

8         MS. STELZIG:  Thank you, Your Honor.

9         I'm sorry.  You mean with respect to the

10   de-authorization request?

11        THE COURT:  Yes.  Uh-huh.

12        MS. STELZIG:  Thank you, Your Honor.

13        So just for some context, Mr. Duran-Gomez, we

14   submitted a draft of our de-authorization request.  That's a

15   de-authorization to have the death penalty removed from the

16   case.

17        We submitted a draft in November for the

18   government's review, which was then amended on December 14th

19   and asked that it be submitted at that time to the Department

20   of Justice.  We understand that there's an internal process

21   that has to take place first in the U.S. Attorney's Office.

22        We then sent an updated version on January 18th

23   that incorporated this Court's ruling regarding the motion to

24   strike the death notice and we asked at that time that our

25   de-authorization request be submitted promptly.

1              So we were just hoping for an update from the

2    government on what the status of that de-authorization request

3    was because obviously it informs the next steps in the

4    proceeding.

11:18AM  5              THE COURT:  All right.  Who will speak to that,

6    Ms. Collins?

7              MS. COLLINS:  I can, Your Honor.

8              THE COURT:  Go ahead.

9              MS. COLLINS:  To put it simply, it is under review by

11:18AM 10    our U.S. Attorney.

11              THE COURT:  All right.  And when you say, "by the

12    U.S. Attorney," are you talking about the local U.S. Attorney?

13              MS. COLLINS:  Yes.  Here in the Southern District.

14              THE COURT:  All right.  So that begins the process, I

11:18AM 15    gather, as far as the Department of Justice is concerned.  Some

16    review is done by the U.S. Attorney local and that

17    recommendation or whatever position might be taken is forwarded

18    to Washington -- I'll say Washington -- the Department of

19    Justice and that process then is reviewed or that

11:19AM 20    recommendation or lack of recommendation is reviewed.

21              MS. COLLINS:  Yes, Your Honor.

22              THE COURT:  All right.  What are we talking about in

23    terms of a -- I don't know that you have any history or

24    experience with this, but what are we talking about in terms of

11:19AM 25    a time frame for this generally for this process?  Do you know?

1          MS. COLLINS:  Your Honor, I don't know that there is a

2     general time frame for the process, although as you stated, I

3     haven't done this fairly often.  However, I don't know that

4     there's a date or a time that I could give at this point.

11:19AM 5          THE COURT:  All right.  Now, we've had a changing of

6     the guard and the acting U.S. Attorney, is that the person who

7     would be responsible for getting this done?

8          MS. COLLINS:  Yes, Your Honor.  And I think enough time

9     has passed that she's now considered the U.S. Attorney for the

11:20AM 10    Southern District.  But, yes, she would start the process and

11    is able to make a decision, whatever that decision is.

12         THE COURT:  Well, has she been nominated and gone

13    before Congress?

14         MS. COLLINS:  No, Your Honor.  As I understand it, it's

11:20AM 15    a time frame situation.  So after a period of time, she

16    becomes, I guess by default, the U.S. Attorney until --

17         THE COURT:  I know that we have -- judges have a

18    process in place that we step into the breach and try to make

19    sure that that office has representative leadership and I think

11:20AM 20    that's where we're talking about, that period of time has

21    passed.

22         MS. COLLINS:  Yes, Your Honor.

23         THE COURT:  And no one has said no and Washington has

24    not said no so that's where we are.

11:20AM 25         MS. COLLINS:  Yes, Your Honor.

1    THE COURT:  Okay.  All right.  You have it.

2         The motions that were filed and prepared and the

3    responses filed, the Court will in all likelihood be issuing

4    those orders on those today or by Thursday at the latest.  I

5    believe there are three or four different motions and I don't

6    feel that I need to go through them.

7         But let me ask whether or not there's anything

8    that's gotten old on me that I missed and just forgot to pick

9    it up.

10        Do you know, Ms. Stelzig?

11        MS. STELZIG:  Thank you, Your Honor.  There are two

12   motions that are fully briefed and are ready for the Court to

13   rule.

14        That is our ECF 689, motion for disclosure of

15   jailhouse informants.

16        THE COURT:  ECF, what's that number?

17        MS. STELZIG:  689, Your Honor.

18        THE COURT:  689.  Okay.

19        MS. STELZIG:  And also ECF No. 676, the motion to

20   exclude inconsistent positions.  And the Court had indicated

21   that we should hold off on a reply for that so that is also

22   considered as fully briefed.

23        Your Honor, we filed seven discovery motions.

24   The government has filed responses to three of them.  We would

25   like an opportunity to reply to those, Your Honor, because in

1    at least two of them the government has conceded that discovery

2    that has been requested is no longer available so we would like

3    to provide an opportunity in our reply to seek particular

4    remedies.

11:22AM  5    THE COURT:  Well, let's consider that a separate motion

6    as opposed to whether or not I should be entering an order on

7    it.

8    MS. STELZIG:  Very well, Your Honor.

9    And then the other four, Your Honor, which are

11:22AM  10   ECF 738, 740, 741 and 744, I have not seen a response from the

11   government so I don't know if one is forthcoming.

12   THE COURT:  These are discovery motions as well?

13   MS. STELZIG:  Yes.  Those are all motions to compel

14   discovery.

11:22AM  15   THE COURT:  Okay.  Motion to compel discovery or

16   whatever.  Okay.

17   I'm not sure what those -- how those are titled,

18   Ms. Collins, but are you able to take a look and briefly tell

19   us what your time frame is for those?  What are those three, I

11:23AM  20   believe?

21   MS. COLLINS:  Yes, Your Honor.  If you will give me

22   just one moment.

23   THE COURT:  Take your time.

24   INTERPRETER DEL VILLAR:  The interpreter speaks.

11:23AM  25   In the meantime, I have dropped off of the call.

1  I don't know if, Sarita, if you can hear me if you would like

2  to take a moment --

3       THE COURT:  I can hear you, but can you hear me?

4       INTERPRETER DEL VILLAR:  I can hear you, Your Honor;

11:23AM 5  but I dropped off of the telephone call with the other

6  interpreter where we are team interpreting.  If I can, I would

7  like to take a moment to have her call me back and add me back

8  on --

9       THE COURT:  All right.  Do that, please.

11:23AM 10      INTERPRETER GOMEZ-MOLA:  I have heard that.  This is

11  Sarita intervening, and I will try to do that.  Thank you.

12      INTERPRETER DEL VILLAR:  Thank you, Sarita.  I

13  appreciate it.

14      THE COURT:  While they're doing that, let me do a

11:23AM 15  housekeeping matter for my benefit and for the benefit of the

16  record.

17           Would the defendant, Mr. Duran-Gomez, raise his

18  right hand and wave that he is in the proceedings if, in fact,

19  he is; and I do see that.

11:24AM 20           And you are, in fact, Rene Duran-Gomez, sir?

21      (No response.)

22      THE COURT:  I'm sorry.

23      THE DEFENDANT:  Yes.

24      THE COURT:  All right.  Very good.  Thank you.

11:24AM 25           Do you have any complaints or concerns about any

1    of the proceedings that you were unable to hear or see in this

2    process?

3            THE DEFENDANT:  No.

4            THE COURT:  All right.  Yes.

11:24AM  5       MR. WYDA:  Thank you, Your Honor.

6            THE COURT:  Yes, ma'am.

7            MS. COLLINS:  Yes, Your Honor.  For the four mentioned

8    by defense counsel where we did not respond in writing, that

9    was due to the fact we believe we've complied and there's

11:25AM 10   simply nothing else to be able to turn over; however, we can

11   put that in writing by the end of the week if the Court would

12   like.

13           THE COURT:  All right.  Let me just tell you how I have

14   to operate in these proceedings, particularly in criminal

11:25AM 15   proceedings; and I don't know that I operate differently in

16   civil proceedings.

17           Even when opposing counsel says, "We have given

18   you everything that we got our hands on or we can think of or

19   that we know about," I'm going to enter an order directing you

11:25AM 20   to do that.

21           Why?  Because I can't have you to come up or

22   someone come up a year or two later and say, "Oh, if you had

23   told me, Judge, I would have supplemented my findings.  So the

24   duty is a continuing obligation on the part of the party who is

11:25AM 25   to produce to produce and that means promptly produce, not at

1   the time of trial or at some point after the matters have

2   gotten cold in everyone's minds.

3           So if you see an order that goes out, it probably

4   will say, for example, I granted the defendant's request for

11:26AM  5   discovery.  If you've already complied, then it's of no

6   consequence.

7           However, there's a tagline that says that if you

8   are of the opinion that anything that's been requested is

9   classified or is privileged in some way, you have a duty to put

11:26AM 10   that in the Court's hands.

11           I don't think I want to dance around with, well,

12   we would have filed a motion to -- for the Court to take this

13   under advisement or review it *in camera*, but we thought that it

14   was not needed.  Anything that touches this case that is part

11:26AM 15   of the evidence, if it is relevant or not in the minds of the

16   responding attorney, it should either be given to the Court

17   *in camera* so the Court can determine relevancy or not.  That's

18   basically the way I see these motions because I have no way --

19           INTERPRETER DEL VILLAR:  Your Honor --

11:27AM 20           THE COURT:  -- I have no way of determining with the

21   volume of documents whether or not something is complete or

22   not.

23           I'm sorry.  I think I heard from the interpreter.

24           INTERPRETER DEL VILLAR:  Yes, Your Honor.  I'm sorry.

11:27AM 25   I'm so sorry to interrupt, but it's just that we have not had

1    the chance yet to add me to the call so Sarita needs to do

2    that.  If we may just have a moment of silence for just a few

3    moments.

4             THE COURT:  Will do.  We'll hang on.

11:27AM  5             INTERPRETER GOMEZ-MOLA:  Your Honor, I can communicate

6    to Ramon through the Court that I am trying, doing my best

7    interpreting and also trying to do this and I just cannot find

8    a way of merging the call after I have --

9             INTERPRETER DEL VILLAR:  Okay.  Let's do this.  Can we

11:27AM  10   have the defendant maybe hang up and maybe call me and I'll do

11   the transition?

12            THE COURT:  I think we're done with the proceeding

13   essentially and I don't know that we need to start this process

14   up again.  What are we losing when we don't have that phone

11:28AM  15   connection?

16            INTERPRETER DEL VILLAR:  We've been in team

17   interpreting mode and so we need to switch now and that's the

18   thing.  I mean, if Your Honor is going to only continue maybe

19   another two or three minutes, then that won't be necessary; but

11:28AM  20   if we're going to continue much longer --

21            THE COURT:  I think that's where we are at this point.

22   I think that's where we are at this point.  Let me just make

23   sure.

24                 Ms. Collins.

11:28AM  25            MS. COLLINS:  To respond, Your Honor, I believe we've

1   done just that.  In those motions where we believe something is

2   privileged or classified, we have responded in those

3   situations.

4                THE COURT:  Very good.  Thank you.

11:28AM  5                Anything else from the defense?

6                MS. STELZIG:  Just very briefly, Your Honor.

7                With respect to the government's response -- and

8   I appreciate that this case has been going on a long time.

9   These are not the original prosecutors, and I think everyone on

11:28AM 10   the government's side has been trying hard.  Unfortunately

11   we're still missing a lot of substantial discovery; and I just

12   want to make sure that in the government's response, they're

13   addressing our particular concerns.

14                For example, like in ECF 740, we document

11:29AM 15   extensively in that motion and its exhibits the number of phone

16   records that we know the government subpoenaed for individuals

17   and we don't have the records.

18                So maybe the government explains, well, the phone

19   companies didn't have them or we had them but we can't find

11:29AM 20   them, but we feel like we need to have that explanation on the

21   record so we can stop trying to chase down these records and

22   get a final answer one way or the other.

23                THE COURT:  Correct.

24                MS. STELZIG:  So I just want to make sure that's --

11:29AM 25                THE COURT:  And my response is if the government has

1   not filed a response or if the government's response is one way

2   or the other, then I will enter an order directing them to do

3   what has to be done to satisfy the motion, whether it's by

4   producing the evidence or making a disclaimer of some sort that

11:29AM  5   it's unavailable.

6          The government can certainly do that without me

7   having an order; but even if the government does respond, "We

8   don't know where the records are.  We can't find them," I'm

9   still going to enter that same order because they may be found

11:29AM 10  six months from now.  We just don't know and it's a continuing

11  obligation.

12         That's to avoid having to redo these motions and

13  arguments over and over again.

14      MS. STELZIG:  Thank you, Your Honor.

11:30AM 15      THE COURT:  All right.  All right.  That's Ms. Stelzig.

16       Anything else from you, Mr. Neal?

17      MR. DAVIS:  No, Your Honor.

18      THE COURT:  Mr. Odom, you've been very quiet.  Are you

19  present?

11:30AM 20      MR. ODOM:  Yes, sir, I am.  I'm here and observing,

21  Judge.

22      THE COURT:  Thank you.  Thank you very much.

23       And, Mr. Disney, you're present as well, are you

24  not?

11:30AM 25      MR. DISNEY:  I am, Your Honor.  Thank you.

1    THE COURT:  All right.  I don't believe we heard

2    anything from Ms. Stotts yet, have we?

3    MS. STOTTS:  No, Judge; but I'm here and present.

4    THE COURT:  I'm making sure the record is clear on all

11:30AM   5    of this so that even the parties who are not present are able

6    to understand the makeup of the courtroom this morning.

7    I'm done here.  Thank you very much.  I expect to

8    see your papers on or before April 4 and I'm going to pass back

9    to the defense everything that was not admitted in evidence.  I

11:31AM   10   don't want these other documents.  They'll end up getting

11   destroyed because we have no place to keep them.  So Cynthia

12   will make that available to you.

13   I believe the government's exhibits are

14   straightforward three exhibits, and we're done with that.

11:31AM   15   All right.  Thank you very much.

16   THE LAW CLERK:  All rise.

17   (The proceedings were adjourned.)

18   * * * *

19   REPORTER'S CERTIFICATE

20   I, Lanie M. Smith, CSR, RMR, CRR, Official
     Court Reporter, United States District Court, Southern District
21   of Texas, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
22   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

23

24   ____/s/ Lanie M. Smith_____
     Official Court Reporter

25