Case 4:10-cr-00459   Document 775   Filed on 07/27/22 in TXSD   Page 1 of 10

United States District Court
Southern District of Texas
**ENTERED**
July 27, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:10-CR-00459-001 |
| | § | |
| WILMAR RENE DURAN-GOMEZ | § | |

### ORDER ON MOTION TO SUPPRESS

**I.     INTRODUCTION**

Before the Court is the defendant's, Wilmar Renee Duran Gomez, motion to suppress the fruits of an illegal arrest [DE 504], the government's response to the defendant's motion [DE 531], and the defendant's reply [DE 622], the testimony of one witness, and the exhibits proffered by the government and the defense. The Court admitted the proffered exhibits of the parties, obtained a transcription of the witness' testimony and has received the supplemental written arguments from counsel..[1] Having reviewed the exhibits and written documents and testimony of the witness, the Court is of the opinion that the defendant's motion to suppress should be granted.

**II.     SUMMARY FACTUAL BACKGROUND**

On November 15, 2006, officers for the Fort Bend County Sheriff's Office discovered an abandoned truck and the bodies of two Hispanic males in an open field. The bodies appeared to have been beaten, were doused with gasoline, and left to burn. Five days later, ICE Agent Ross Neal of Immigration and Customs Enforcement ["ICE"], received information from a confidential informant ["CI"] that identified the defendant as possibly involved in the death and disposal of the bodies.

---

[1] The defense filed a multi-paged post-hearing memorandum; the government, in its words, "stands on the testimony . . . and [its] previous filings . . ."

Based on the information provided by the CI and her "source", [2] surveillance on the defendant was started that night, November 20, and continued through November 21 when, approximately 20 hours later, at 6:20 p.m. the defendant was arrested as he and his girlfriend were leaving his home. An ICE arrest warrant was prepared the days following his arrest. At the point of the arrest, ICE seized the defendant's vehicle keys, two cell phones, a wallet and several documents on his person or found in his vehicle. The defendant was not taken before a magistrate concerning the immigration matter or concerning any alleged law violation but, instead, was taken to an ICE office at 126 Northpoint in Houston, Texas where he was questioned concerning the deaths of the aliens. [3] At some point, the defendant was placed in a local jail where his phone calls were recorded.

On December 4, 2006, thirteen (13) days after his arrest, the defendant was criminally charged with Obstruction of Justice by the Department of Justice, and a grand jury returned an indictment on that charge on December 27, 2006. The defendant was not indicted on a murder charge concerning the aliens until July 1, 2010, after serving a sentence of five (5) years on the Obstruction charge. No civil immigration violations were ever processed.

---

[2] It is not clear when or where or if SA Neal ever met with the "source" that he testified provided information to his CI. Nevertheless, he treated the information from the CI and the source as "a small part of . . ." of the overall investigation. *See* [TR., p 46, l. 11].

[3] The records and testimony show that the defendant was not arrested for the murder of the aliens. It is unclear whether or when the defendant was Mirandized or told why he had been arrested. It is clear however, that a written warning concerning immigration charges was not executed until the afternoon of November 22, 2006 *See* [Def. Exh. 36].

### III.  CONTENTIONS OF THE PARTIES

#### A.  *Contentions of the Defendant*

The defendant asserts that ICE failed to obtain a warrant for his arrest until November 22, after he was arrested on alleged immigration violations even though they questioned him about the two murdered aliens.[4] He also asserts that the evidence seized during a search of his person, vehicle and/or place of residence as well as any recorded phone calls while he was detained must be suppressed as violative of Title 8 U.S.C. § 1226(a) and the Fourth Amendment to the federal Constitution.

Additionally, the defendant asserts that: (a) ICE arrested him before learning whether his prior convictions would support deportation, the asserted basis for his arrest; (b) there was no probable cause to arrest him at the time of his arrest because he was not violating any law or in violation of any ICE regulation concerning ". . . the admission, exclusion, expulsion or removal of aliens; (c) ICE had no credible basis to believe that he had committed a felony "cognizable under the law of the United States regulating the admission, exclusion, expulsion, or removal of aliens"; (d) "ICE agents lacked probable cause to believe that the defendant had committed an immigration-related "felony cognizable under the laws of the United States;" and (e) even if probable cause existed to believe that the defendant had committed a criminal or immigration offense, there is no evidence that he was likely to flee before a warrant could be obtained for his arrest.

---

[4] The warrant states that the defendant is an alien who entered the United States on November 12, 1992, remains in the United States in violation of the immigration laws and was, therefore, liable to be taken into custody as authorized by Section 236 of the immigration and Naturalization Act.

B.      *Contentions of the Government*

The government asserts that the "warrantless arrest of the defendant was lawful because ICE agents had both, knowledge that the defendant was in the United States in violation of the law and probable cause to believe that he was likely to flee before a warrant could be obtained. In addition, the government argues that the defendant's Fourth Amendment rights were not violated because ICE Agents had probable cause to believe that the defendant had committed a felony – the murder of two aliens. Therefore, the Court should not grant the defendant's motion to suppress even if the statutory immigration basis for his arrest was unwarranted.

## IV.    SUMMARY OF TESTIMONY AND EXHIBITS RECEIVED

On November 20, 2006, around seven or eight o'clock p.m., while having dinner with his family, ICE Agent Neal received a phone call from a CI inquiring whether he was aware that two Hispanic males had been killed and left to burn in a stolen pickup truck in Fort Bend County, Texas. The CI claimed to have information from a source concerning who committed the crimes and that her source implicated the defendant, Duran-Gomez. After acknowledging that he had seen the same news accounts, Agent Neal informed the CI that he would meet with her later.

Agent Neal finished his dinner and reached out to Agent Ray Lamb. They met at their offices at the 126 Northpoint location. At that time, Agents Neal and Lamb discussed and developed a plan for going forward with an investigation based on the phone call from the CI. Initially, they would simply meet with the CI to obtain any additional details. Agent Neal did not remember whether he or SA Lamb took notes. He also admitted that notes, would have been critical to the preparation of a Report of Incident ("ROI"), however, at the time, he did not have notes, did not remember taking notes and his best guess is that Agent Lamb prepared the ROI.

The CI had been used by Agent Neal on one previous occasion. On that occasion, according to Agent Neal, she provided credible information that resulted in several convictions from a single criminal charge. Concerning the murder of the aliens, the CI stated that she had no direct or personal information that the defendant was involved and that her source had a criminal history. Agent Neal testified that he did not know the CI's source and that he did not meet with the source at any time prior to the defendant's arrest. He stated: "I believe that the source had some direct information [about] Mr. Duran, but the majority of the information [about the defendant] came from other sources." He did not testify that the other sources were reliable or how he substantiated any information received. When challenged concerning his reliance on second hand information, SA Neal admitted: "I couldn't say that – the CI had direct information -- with 100 percent certainty."

During the interview, the Agents drove the CI to a warehouse area where she believed the murders had occurred. However, the CI could not identify a particular address or location. After the CI was returned to her residence, Agents Neal and Lamb continued their investigation in the warehouse area, attempting to identify a location, or "spot" the defendant driving in the area. Next, they contacted the Fort Bend County Sheriff's office, traveled to the location where the vehicle was being kept, visited the location where the bodies were recovered and continued their investigation.

Ongoing attempts were being made by ICE to locate and identify the defendant warehouse and his residential address. The defendant's immigration history revealed several addresses, but did not reveal a warehouse address leased by the defendant. The residential addresses, however, permitted the Agents to focus their attention on the defendant's known residence. Testimony reveals that he returned to his residence at some point late on November 20, or during the early

morning hours on November 21, and did not leave until 6:30 p.m., when he was arrested. After the defendant was arrested, a search warrant was issued for a warehouse location based on an affidavit prepared by a Fort Bend County Sheriff's Officer that was signed by Judge Jan Krocker, 184th District Court, Harris County, Texas on November 21, 2006, at 8:50 p.m., after the defendant was arrested and had been questioned.

SA Neal testified that he did not personally "run" the criminal or immigration history on the defendant. That was done by agents back at the office. The criminal history that was relayed to Agent Neal revealed that the defendant had been charged with "Aggravated Assault, with a deadly weapon" in 2001. However, it also revealed that the deadly weapon portion of the charge was dismissed and that the defendant was placed on deferred adjudication. Agent SA Neal also learned that the defendant had been convicted of a theft charge. He was uncertain whether the theft charge against the defendant was classified as a crime involving moral turpitude at the time the defendant was arrested, however. The offense dates back to the mid-1990s. Nevertheless, Agent Neal insisted that based on this criminal history they had probable cause to arrest the defendant for immigration violations without a warrant.

He later admitted that because an immigration proceeding is a civil, as opposed to a criminal proceeding, a warrantless arrest requires proof that the defendant was about to flee. When asked whether the surveillance on the defendant, leading up to his arrest, persuaded him that the defendant was about to flee, Agent Neal responded that it did not. Moreover, he admitted that the defendant may not have been deported even after a hearing. It is noteworthy that at the time of his arrest, the defendant still maintained his Lawful Permanent Resident ["LPR"] status. When questioned about any other basis for a warrantless arrest on November 21, Agent Neal admitted

that he did not have sufficient probable cause to arrest the defendant for smuggling aliens or the murder of the two aliens.

## V. DISCUSSION AND ANALYSIS

### A. *Probable Cause Did Not Exist for Warrantless Arrest Based on Immigration Violation(s)*

The defendant asserts, relying on Title 8 U.S.C. § 1357(a) *et. seq.,* that neither ICE Agents Neal and Lamb, nor others involved in the ICE investigation had a statutory basis to arrest the defendant on November 21, 2006. The Court agrees.

Title 8 U.S.C. §§ 1357(a)(2) provides that an immigration officer may arrest an alien when:

> . . . "any alien is entering or attempting to enter the United States in violation of the law . . . [or when the officer] believes that the alien . . . is in the United States in violation of any law or regulation and is likely to escape before a warrant can be obtained . . . As well, an immigration officer may arrest an alien for felonies committed, [when he/she has] reasonable grounds to ". . . believe that the [alien]. has committed or is guilty of committing a felony and is likely to escape before a warrant can be obtained for [the alien's] arrest." *See* [§§ 1357(a)(4) and (a)(5)(B)].

It is unclear when Agents Neal and Lamb received the defendant's immigration and criminal histories, however, it is safe to conclude that they were in possession of both when they began surveilling the defendant in the early morning hours on November 21. At the time, the defendant was not attempting to enter or remain in the United States illegally. Therefore, he was not violating immigration laws or regulations by either "entering, [or] attempting to enter the United States," or otherwise violating a regulation that regulates the "admission, exclusion, expulsion or removal of aliens" from the United States. *See* [8 U.S.C. § 1357(a)(2).

The defendant had not been excluded or expelled by a court at the time of his arrest. In fact, he was not illegally present in the United States at the time of his arrest as no adjudication of his LPR status had occurred. Therefore, there was no basis for Agents Neal and Lamb to reasonably believe that the defendant was in violation of § 1357(a) or (a)(2). *See Deville v. Marcantez*, 567

F.3d 156, 164 (5th Cir. 2009). And, there is every reason to believe that the defendant's immigration status was inconsequential at the time. Agent Neal testified that they were focused on the information provided by his CI concerning the murder of two aliens. The defendant's immigration history, in particular, provided no basis for probable cause to arrest the defendant. Moreover, his criminal history was admittedly suspect and did not establish probable cause for a warrantless arrest for an immigration violation. The tenor of Agent Neal's testimony leads the Court to conclude that defendant immigration status was of little or no concern to them at the time. This conclusion is supported by the fact that the defendant was surveilled for over 20 hours, was never brought before a magistrate concerning his immigration status and, at the point of arrest, was not warned by the Agents that he was subject to deportation.

The government asserts, nevertheless, that Agents Neal and Lamb had a reasonable believe that: (a) the defendant was in violation of the law based on prior convictions; and (b) he would likely flee before a warrant could be obtained. The second of these arguments fails because Agent Neal testified to the contrary. When questioned concerning whether the defendant appeared as though he was about to flee, Agent Neal admitted that the defendant did not give him that impression. He testified that the defendant was arrested because a search warrant for a warehouse was being obtained and ICE Agents feared that if the defendant learned that it was about to be issued or executed, he might flee. Hence, the documentary evidence supports the Court's finding that probable cause to arrest was because and there was no fear that he might flee.

A warrantless arrest is reasonable only where the historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). There were no historical facts that would lead a reasonable officer to

believe that he had probable cause to arrest the defendant. It is clear to the Court that probable cause did not exists for a warrantless arrest and Agent Neal admitted as much.

The Court concludes that the evidence fails to establish that; (a) ICE Agents had direct evidence of an immigration law violation upon which an affidavit for a search warrant could be requested; (b) the Agents had insufficient time to obtain a warrant for an arrest of the defendant; (c) the defendant acted in a manner that led the Agents to conclude that the defendant was about to flee or escape; and, (d) the defendant was illegally in the United States after having been deported or excluded from the United States.

      B.      *Probable Cause to Arrest on Other Law Violation(s)*

The evidence also fails to establish probable cause for an arrest for the murder of two aliens or for alien smuggling. It was after his arrest and questioning, the search of his home, search of the warehouse, the recording of the defendant's phone calls, and the interviews of several aliens that an unrelated Obstruction charge arose. The ROI prepared by SA Lamb two weeks after the defendant was arrested, establishes that the murder investigation was commenced based on second hand, uncorroborated statements. And, while the CI revealed the source of her information, neither Agent Neal nor Agent Lamb felt compelled to corroborate the information or otherwise determine the credibility of the CI's source before arresting the defendant. Agent Neal admitted that they did not have "enough" probable cause to arrest the defendant on a law violation -- *i.e.,* murder or alien smuggling -- at the time of his arrest. *See* [Transcript, p. 70, L. 3].

Therefore, the Court concludes that the defendant's motion to suppress should be granted. Because the evidence fails to establish the parameters of the violations, the specific suppressable materials are not apparent. The Court DIRECTS the parties to separately provide to the Court the

scope of materials that is to be suppressed or submit an agreed statement concerning the same within 20 days.

It is so Ordered.

SIGNED on July 27, 2022, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge